UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

-----------------------------------------------------------------------x

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION; | : | |
| AMERICAN BOOKSELLERS FOUNDATION FOR | : | **AMENDED COMPLAINT** |
| FREE EXPRESSION; ANDROGYNY BOOKS, INC. | : | **FOR DECLARATORY** |
| d/b/a A DIFFERENT LIGHT BOOKSTORES; | : | **& INJUNCTIVE RELIEF** |
| ADDAZI, INC. d/b/a CONDOMANIA; | : | |
| HEATHER CORINNA; ELECTRONIC FRONTIER | : | Civil Action No. 98-CV- |
| 5591 | | |
| FOUNDATION; ELECTRONIC PRIVACY | : | |
| INFORMATION CENTER; FREE SPEECH MEDIA; | : | |
| NERVE.COM, INC.; AARON PECKHAM d/b/a URBAN | : | |
| DICTIONARY; PHILADELPHIA GAY NEWS; | : | |
| PLANETOUT, INC.; POWELL'S BOOKSTORES; | : | |
| PUBLIC COMMUNICATORS, INC.; SALON | : | |
| MEDIA GROUP, INC; DAN SAVAGE; and SEXUAL | : | |
| HEALTH NETWORK; | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN ASHCROFT, in his official capacity as | : | |
| ATTORNEY GENERAL OF THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

-----------------------------------------------------------------------x

**PRELIMINARY STATEMENT**

1.  Plaintiffs challenge the constitutionality of the Child Online Protection Act (COPA),

a broad federal censorship law that imposes severe criminal and civil penalties on the

availability, display, and dissemination of constitutionally protected, non-obscene materials on

the Internet by making it a crime to "knowingly . . . by means of the World Wide Web, make[]

any communication for commercial purposes that is available to any minor and that includes any

material that is harmful to minors . . . ." 47 U.S.C. § 231(a)(1) (hereinafter 47 U.S.C. § 231 is

referred to as "COPA").  Under COPA, *any* speech that some community might consider to be "harmful to minors" is potentially criminal if displayed for free on the World Wide Web (the "Web") and accessible by minors.  The effect of COPA is to restrict *adults* from communicating and receiving expression that is clearly protected by the Constitution.  COPA is unconstitutional under the First and Fifth Amendments to the United States Constitution, both on its face and as applied to plaintiffs.  In February 1999, this court granted a preliminary injunction against COPA.  In June 2004, the United States Supreme Court affirmed that ruling.  Plaintiffs now seek a permanent injunction against enforcement of COPA.

2.  Plaintiffs represent a broad range of individuals and entities who are speakers, content providers, and users of the Web.  Plaintiffs include online magazines, booksellers, art vendors, gay and lesbian content providers, and individual authors and columnists.  COPA directly violates the First Amendment rights of plaintiffs, their members, and tens of millions of other speakers to communicate protected expression on the Web.  COPA targets both written and visual expression that is sexually explicit, including sexually frank magazine articles, advice about sexual pleasure, Web-based discussion boards and chat rooms about sexual topics, and visual art and videos.  In addition to violating the rights of Web content providers, COPA violates the rights of millions of Web users to view this constitutionally protected speech, including the right to do so anonymously.

3.  COPA restricts speech on the Web.  The Internet in general, and the Web in particular, represents the most participatory marketplace of mass speech yet developed -- it is in many ways a far more speech-enhancing medium than radio or television, print, the mails, or even the village green.  With a few simple tools and at a very low cost, the Web enables average

2

citizens and small businesses, as well as large corporations, to publish online newspapers, distribute electronic pamphlets, participate in local or worldwide conversations, and communicate with a broader audience than ever before possible.  The vast majority of information on the Web is available for free, even when it is created and provided by commercial entities or individuals hoping to make a profit.  Thus, the Web also provides millions of users with access to a vast range of free information and resources.  Web users are far from passive listeners -- rather, they are empowered with the tools to seek out exactly the information they need and to respond with their own information if desired.

4.  COPA does not restrict the *sale* of speech on the Web.  In fact, COPA provides an explicit defense for providers who charge for their speech by credit or debit card.  Rather, COPA explicitly and purposefully restricts a wide range of protected expression that is provided *for free* on the Web by organizations, entities, and individuals who happen to be communicating on the Web "for commercial purposes."

5.  Because of the way the Web works, COPA's prohibition on certain communications with minors prevents adults from accessing those same communications.  There are no reasonable means for speakers to ascertain the age of persons who access their free Web communications, or to restrict or prevent access by minors to their content.  COPA's affirmative defenses impose tremendous burdens on both Web speakers and users, and thus do not save the statute.  COPA would reduce most of the adult population on the Web to reading and communicating only material that is suitable for young children.  In addition, because COPA makes no allowance for the varying levels of maturity of minors of different ages, COPA

prohibits speech that is valuable and constitutionally protected for older minors, but that may not be appropriate for younger children.

6.   Since enactment of COPA, two reports commissioned by Congress propose a variety of options for protecting minors *without* imposing criminal sanctions on adult speech.  These options include the use of filtering programs, the promotion of Internet education and high-quality Internet content for children, and the vigorous enforcement of existing laws.  In contrast to the many other options now available, COPA offers only marginal support for the government's interest while imposing a censorship regime on the Web that is far more draconian than in any other medium.

## JURISDICTION AND VENUE

7.   This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the federal Constitution and 28 U.S.C. §§ 1331 and 1361.

8.   The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

9.   The Court has the authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

10.  Venue is proper in this district under 28 U.S.C. § 1391(e).

## THE STATUTORY LANGUAGE AT ISSUE

11.  COPA, codified at 47 U.S.C. § 231, imposes criminal and civil penalties for "knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, mak[ing] any communication for commercial

4

purposes that is available to any minor and that includes any material that is harmful to minors . . . ." 47 U.S.C. § 231(a)(1).

12.   Persons who violate Section 231(a) "shall be fined not more than $50,000, imprisoned not more than 6 months, or both." 47 U.S.C. § 231(a)(1).  Section 231(a)(2) states that "[i]n addition to the penalties under paragraph (1), whoever intentionally violates such paragraph shall be subject to a fine of not more than $50,000 for each violation.  For purposes of this paragraph, each day of violation shall constitute a separate violation." 47 U.S.C. § 231(a)(2).

13.   Section 231(a)(3) states that "whoever violates paragraph (1) shall be subject to a civil penalty of not more than $50,000 for each violation.  For purposes of this paragraph, each day of violation shall constitute a separate violation." 47 U.S.C. § 231(a)(3).

14.   COPA defines material that is "harmful to minors" as "any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that -- (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." 47 U.S.C. § 231(e)(6).

15.   COPA defines "minor" as "any person under 17 years of age." 47 U.S.C. § 231(e)(7).

16.  COPA defines the phrase "by means of the World Wide Web" to mean "by placement of material in a computer server-based file archive so that it is publicly accessible, over the Internet, using hypertext transfer protocol or any successor protocol." 47 U.S.C. § 231(e)(1).

17.  COPA defines "commercial purposes" as being "engaged in the business of making such communications." 47 U.S.C. § 231(e)(2)(A).

18.  COPA defines "engaged in the business" as meaning "that the person who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income).  A person may be considered to be engaged in the business of making, by means of the World Wide Web, communications for commercial purposes that include material that is harmful to minors, only if the person knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web." 47 U.S.C. § 231(e)(2)(B).

19.  Section 231(b) of COPA attempts to exempt certain persons from liability.  It states: "For purposes of subsection (a), a person shall not be considered to make any communication for commercial purposes to the extent that such person is -- (1) a telecommunications carrier engaged in the provision of a telecommunications service; (2) a person engaged in the business of providing an Internet access service; (3) a person engaged in the business of providing an

6

Internet information location tool; or (4) similarly engaged in the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication made by another person, without selection or alteration of the content of the communication, except that such person's deletion of a particular communication or material made by another person in a manner consistent with subsection (c) or section 230 shall not constitute such selection or alteration of the content of the communication."

20.  Section 231(c) of COPA provides an affirmative defense if the defendant "in good faith, has restricted access by minors to material that is harmful to minors - (A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology."  47 U.S.C. § 231(c)(1).

21.  Section 231(d) of COPA forbids the disclosure of "any information collected for the purposes of restricting access to such communications" to minors without prior consent.  47 U.S.C. § 231(d)(1)(A).

22.  COPA does not define the distinction between what constitutes a "knowing" violation under § 231(a)(1) and an "intentional" violation under § 231(a)(2).

23.  COPA makes no distinction between material that may be "harmful" to very young minors and material that may be "harmful" to older minors.

24.  COPA does not define the relevant "community" for purposes of determining what is "harmful to minors" in the global medium of the Web.

25.  COPA does not define what comprises a work "considered as a whole" in the context of the Web, which is a seamless, interconnected set of texts, sound and graphics provided by different content providers and located on different computers around the world.

## PROCEDURAL HISTORY

1.  COPA was signed into law on October 21, 1998.  The following day, plaintiffs filed suit in this Court, alleging that COPA violated the First and Fifth Amendments to the United States Constitution.  Plaintiffs sought a preliminary injunction to prevent COPA's enforcement.

2.  On February 1, 1999, following an evidentiary hearing, this Court preliminarily enjoined enforcement of COPA.  This Court's decision was supported by detailed findings of fact based on six days of testimony, numerous affidavits, and extensive documentary evidence submitted by both sides.  On the basis on that record, this Court held that plaintiffs were likely to succeed on their claim that COPA violates the First Amendment, because COPA "imposes a burden on speech that is protected for adults," and because the government could not prove that COPA is the "least restrictive means available to achieve the goal of restricting the access of minors to [harmful to minors] material."  *American Civil Liberties Union v. Reno*, 31 F.Supp.2d 473 (1999).

3.  On the initial appeal of this Court's decision, the Third Circuit upheld the issuance of the preliminary injunction on the ground that COPA's definition of "harmful to minors" relied on reference to "contemporary community standards," which created an impermissible burden on Web publishers who were unable to restrict access to their Web sites based on the geographic locale of the site visitor.  *American Civil Liberties Union v. Reno*, 217 F.3d 162 (2000).  The

Court of Appeals affirmed on this single ground, and did not reach the other grounds relied upon by this Court.

4.   The Supreme Court vacated and remanded the decision by the Court of Appeals. Rejecting the Third Circuit's approach, the Court narrowly held "that COPA's reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 585 (2002) (emphasis in original).  The Court did not lift the injunction preventing the government from enforcing COPA absent further action, and it remanded the case for further proceedings on issues including "whether COPA suffers from substantial overbreadth for other reasons, whether the statute is unconstitutionally vague, or whether the district court correctly concluded that the statute likely will not survive strict scrutiny analysis…." *Id*. at 585-86.

5.   On remand, the Third Circuit reaffirmed its conclusion that COPA was unconstitutional.  In its primary holding, the court ruled that COPA failed strict scrutiny because it would deprive adults of material that they are constitutionally entitled to receive.  The court rejected the government's plea to re-write the statute to narrow its application, and found that COPA's affirmative defenses did nothing to ameliorate the statute's burden on speech protected for adults.  The court further held that other alternatives, including Internet filtering programs, were a substantially less restrictive means of preventing a minor's access to harmful materials. *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (2003).

6.   The Supreme Court affirmed, holding that plaintiffs were likely to prevail on their claim that COPA violated the First Amendment by burdening adults' access to protected speech.

9

*Ashcroft v. American Civil Liberties Union,* 124 S. Ct. 2783 (2004).  The Court held that the government had not met its burden of proving that COPA's criminal penalties were the least restrictive means of protecting minors fro sexually explicit material on the Web.  The Court observed that filtering technology, which imposes selective restrictions on speech at the receiving end, appeared to be a less restrictive alternative than COPA, which imposes universal restrictions at the source.  The Court also noted that filtering technology appeared to be a more effective means of achieving COPA's stated goals, because filters would block harmful material that originated abroad and could be applied to other online communications, such as email.

7.  Since this Court's initial decision, two separate reports commissioned by Congress have independently concurred with its factual findings.  Specifically, when Congress passed COPA, it also set up the Commission for Online Child Protection to study methods of reducing access by minors to sexually explicit material.  The COPA Commission issued its final report in October 2002.  Also in 2002, the National Research Council (the "NRC") published a 350-page report that studied ways to address material on the Internet that is inappropriate for children. The COPA Report and the NRC Report both independently identified a number of alternatives for protecting children, and both concluded that applying criminal laws to protected speech on the Internet poses significant First Amendment problems, while failing to protect children effectively.

8.  The COPA Report found that requiring age verification systems would not be effective at blocking access to non-Web-based communications.  It noted that age verification and credit cards impose an adverse impact on First Amendment values because requiring identification has a chilling effect on access.  The NRC Report found that widespread use of age

10

verification technology compromises the privacy of adult viewing.  This loss of privacy creates a chilling effect on the freedom of adults who wish to access lawful though controversial material.

9.   Both reports emphasized that there are numerous alternative means of restricting minors' access to certain materials.  The reports called for the government to vigorously enforce obscenity and child pornography laws.  It suggested the government could also promote media literacy and Internet safety education, support development of and access to high-quality Internet material that is educational and attractive to children in an age-appropriate manner, and support self-regulatory efforts by private parties.

10.  Both reports also applauded the use of voluntary methods and technologies to protect children, and noted that filtering programs can be highly effective in reducing the exposure of minors to inappropriate content.

### THE PARTIES

1.   Plaintiff AMERICAN CIVIL LIBERTIES UNION ("ACLU") is a nationwide, nonpartisan organization of over 400,000 members dedicated to defending the principles of liberty and equality embodied in the Bill of Rights.  The ACLU is incorporated in the District of Columbia and has its principal place of business in New York, New York.

2.   Plaintiff AMERICAN BOOKSELLERS FOUNDATION FOR FREE EXPRESSION ("ABFFE") was organized as a not-for-profit organization by the American Booksellers Association in 1990 to inform and educate booksellers, other members of the book industry, and the public about the dangers of censorship and to promote and protect the free expression of ideas.  ABFFE is incorporated in Delaware, and has its principal place of business in New York, New York.

3.   Plaintiff ANDROGYNY BOOKS, INC. d/b/a A DIFFERENT LIGHT

BOOKSTORES operates bookstores and maintains a Web site through which users can purchase

magazines, books, music, and DVDs by, about, and for gay and lesbian individuals.  Androgyny

Books, Inc. is incorporated in California and has its principal places of business in San

Francisco, California and West Hollywood, California.

4.   Plaintiff ADDAZI, INC. d/b/a CONDOMANIA is the nation's first condom store and

is a leading online seller of condoms and distributor of safer-sex related materials.  Addazi, Inc.

d/b/a Condomania is incorporated in Massachusetts and has its principal place of business in Los

Angeles, California.

5.   Plaintiff HEATHER CORINNA is a writer, artist, sex-educator, and activist whose

primary commercial presence on the Web consists of three Web sites that she owns and operates:

 Scarlet Letters, Scarleteen, and Femmerotic.  Heather Corinna lives in Minneapolis, Minnesota

and operates each Web site using a server located in Seattle, Washington.

6.   Plaintiff ELECTRONIC FRONTIER FOUNDATION ("EFF") is a nationwide,

nonprofit organization of approximately 2,000 paying individual members that is committed to

defending civil liberties in the world of computer communications.  EFF is incorporated in

California and has its principal place of business in San Francisco, California.

7.   Plaintiff ELECTRONIC PRIVACY INFORMATION CENTER ("EPIC") is a non-

profit research organization that collects and distributes information concerning civil liberties

and privacy issues arising in the new communications media.  EPIC is incorporated as a not-for-

profit corporation in the District of Columbia, and has its principal places of business is in the

District of Columbia.

12

8.   Plaintiff FREE SPEECH MEDIA, LLC ("Free Speech Media") is a Colorado limited liability for-profit corporation with its primary place of business in Colorado.  Free Speech Media, in partnership with Public Communicators, Inc., a not-for-profit organization, operates freespeech.org, a Web site that promotes independent audio and video content on the Web.

9.   Plaintiff NERVE.COM, INC. is an online magazine devoted to sexual literature, art, and politics.  Nerve is a for-profit corporation that is incorporated in Delaware and has its principal place of business in New York City.

10.   Plaintiff AARON PECKHAM, d/b/a/ URBAN DICTIONARY, operates an online dictionary of contemporary slang with more than 400,000 definitions for slang words and phrases.  Aaron Peckham, a 23-year-old college student, owns and maintains the site as a sole proprietorship in Sacramento, California. The Web site, urbandictionary.com, is operated from servers located in Houston, Texas.

11.   Plaintiff PHILADELPHIA GAY NEWS has been the leading print newspaper for the gay and lesbian community of Philadelphia since 1976.  Philadelphia Gay News is now also published on the Web.  Philadelphia Gay News is a for-profit corporation that is incorporated in Pennsylvania and that has its principal place of business in Philadelphia, Pennsylvania.

12.   Plaintiff PLANETOUT, INC. is a leading global online media company offering content of interest to the lesbian, gay, bi-sexual, and transgender community.  PlanetOut, Inc. is incorporated in Delaware and has its principal place of business in San Francisco, California.  PlanetOut's shares are publicly traded on the NASDAQ Stock Exchange under ticker symbol LGBT, which stands for Lesbian, Gay, Bisexual, and Transgender.

13.   Plaintiff POWELL'S BOOKSTORES is a reader-centered company that operates seven bookstores in Portland, Oregon, and maintains a Web site through which users can purchase new, used, rare, and out-of-print books.  Powell's Bookstores is incorporated in Oregon and has its principal place of business in Portland, Oregon.

14.   Plaintiff PUBLIC COMMUNICATORS, INC. ("Public Communicators") is a not-for-profit tax-exempt organization under IRC § 501(c)(3) that is incorporated in California and has its principal place of business in Colorado.  Public Communicators, in partnership with Free Speech Media, operates freespeech.org, a Web site that promotes independent audio and video content on the Web.

15.   Plaintiff SALON MEDIA GROUP, INC. ("Salon") is a leading online magazine featuring articles on current events, the arts, politics, the media, and relationships.  Salon is a for-profit corporation that is incorporated in California and has its principal place of business in San Francisco, California.

16.   Plaintiff DAN SAVAGE is the author of the most widely syndicated sex column in the United States, "Savage Love."  He is also Editor-in-Chief and part-owner of The Stranger, an alternative news weekly based in Seattle Washington, and the sole proprietor of "Spreading Santorum," a satirical Web site.  Dan Savage resides in Seattle, Washington.

17.   Plaintiff SEXUAL HEALTH NETWORK, INC. ("Sexual Health Network") is incorporated in the State of Connecticut with its principal place of business in Connecticut. Sexual Health Network owns and operates sexualhealth.com, which is dedicated to providing easy access to sexuality information, education, support and other sexuality resources.

14

18.  Defendant ATTORNEY GENERAL JOHN ASHCROFT heads the United States Department of Justice, which is the agency of the United States government responsible for enforcement of federal criminal laws, including the statute at issue in this case.

## FACTS

### The Internet

1.  The Internet is a decentralized, global medium of communications that links people, institutions, corporations and governments around the world.  It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers.   While estimates are difficult due to its constant and rapid growth, the Internet is currently believed to connect more than 180 countries and over 800 million users.

2.  Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the Internet.  Rather, the range of digital information available to Internet users is individually created, maintained, controlled and located on millions of separate individual computers around the world.

3.  The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it.  Unlike television, cable, radio, newspapers, magazines or books, the Internet provides the average citizen or small business with an affordable means for communicating with, accessing and posting content to a worldwide audience.

### The World Wide Web

15

4.   The World Wide Web (the "Web") is the most popular way to provide and retrieve information on the Internet.  Anyone with access to the Internet and proper software can post content on the Web, which may contain many different types of digital information -- text, images, sound, and video.  The Web is comprised of millions of separate but interconnected "Web sites," which in turn may have hundreds of separate "Web pages," that display content provided by particular persons or organizations.  Any Internet user anywhere in the world with the proper software can create her own Web page, view Web pages posted by others, and then read text, look at images and video, and listen to sounds posted at these sites.

5.   To gain access to the information available on the Web, a person uses a Web "browser" – software like Internet Explorer – to display, print and download documents that use hypertext transfer protocol ("http"), the standard Web formatting language.  Each document on the Web has an address that allows users to find and retrieve it.  Most Web documents also contain "links."  These are short sections of text or images that refer and link to another document.  Through the use of these links from one computer to another, and from one document to another, the Web for the first time unifies the diverse and voluminous information made available by millions of users on the Internet into a single body of knowledge that can be easily searched and accessed.

6.   A number of search engines and directories -- such as Google and Yahoo -- are available free of charge to help users navigate the Web.  Once a user has accessed the search service, she simply types a word or string of words as a search request and the search service provides a list of sites that match the search string.

**How Individuals Access the Web**

7.   Individuals have several easy means of gaining access to the Web.  Internet service providers ("ISPs") offer their subscribers dial-up or high speed access to computers or networks linked directly to the Internet.  Most ISPs charge a modest monthly fee, but some provide free or very low-cost access.  National "commercial online services," such as America Online, also provide subscribers with additional services, including access to extensive content within their own proprietary networks.  In addition, many educational institutions, libraries, businesses, and individual communities maintain a computer network linked directly to the Web, and provide account numbers and passwords enabling users to gain access to the network.

8.   Most users of the Internet are provided with a username, password and e-mail address that allow them to log on to the Internet and to communicate with other users.  Many usernames are pseudonyms or pen names that provide users with a distinct online identity and help to preserve their anonymity and privacy.  The username and e-mail address are the only express indicators of the user's identity; that is, persons communicating with the user will know the user only by her username and e-mail address (unless the user reveals other information about herself through her communications).

**Other Means of Exchanging Information Through The Web**

9.   The Web also allows individuals to communicate through a wide range of interactive fora, including discussion groups and chat rooms, using hypertext transfer protocol.  Many Web sites use software applications, sometimes called "middleware," to provide users of their sites with access to discussion groups and chat rooms.

10.  Discussion groups, or "message boards," allow users of computer networks to post messages onto a public computerized bulletin board and to read and respond to messages posted

by others in the discussion group.  Discussion groups have been organized to cover virtually every topic imaginable.  Chat rooms allow users to engage in simultaneous conversations with another user or group of users by typing messages and reading the messages typed by others participating in the "chat."

11.  Online discussion groups and chat rooms create an entirely new global public forum where individuals can associate and communicate with others who have common interests, and engage in discussion or debate on every imaginable topic.

12.  It is also possible to set up an account for electronic mail, commonly referred to as "e-mail," using the Web.  Several commercial Web sites such as Yahoo and Hotmail provide free e-mail accounts to individuals.  These accounts allow individuals to use the Web to create, send, and receive e-mails with other individuals.  Such accounts allow individuals who do not possess their own computer or Internet access account to establish a permanent e-mail address and to correspond with other individuals by using the Web at public libraries and other public Internet access sites.

13.  As can be seen from the various ways that individuals can exchange information and communicate via this technology, the Web is "interactive" in ways that distinguish it from traditional media.  For instance, users are not passive receivers of information as with traditional broadcast media; rather, users can easily respond to the material they receive or view online.  In addition, "interactivity" means that Web users must actively seek out with specificity the information they wish to retrieve and the kinds of communications in which they wish to engage. For example, to gain access to material on the Web, a user must know and type the address of a relevant site or find the site by typing a relevant search string into a search engine.

18

**The Range of Content Available on the Web**

14.  Content on the Web is provided by the millions of Web users worldwide, and the content ranges from art, to humor, to literature, to medical information, to music, to news, to sexually oriented material.  For example, on the Web, one can view the full text of the Bible, read The New York Times, or peruse an article on the supermarket industry.  One can browse through paintings from art galleries around the world, view in detail images of the ceiling of the Sistine Chapel, or watch a video about immigration.  The overwhelming majority of information on the Web is provided for free to users.

15.  At any one time, the Web serves as the global communication medium for literally tens of thousands of political debates and social dialogues among world-class newspapers as well as small town citizens.  Although the vast majority of the information on the Web is not sexually oriented, there is a broad range and quantity of material available on the Web that might be considered "harmful to minors" in some communities.

16.  The Web provides tremendous opportunities for individual entrepreneurs, start-up companies, and home-based businesses, as well as businesses that also exist in the offline world.  There are an enormous range of individuals and companies communicating on the Web for commercial purposes, from booksellers and online magazines to party suppliers and pizza parlors.  It is not possible to know the exact number of sites, but the percentage of sites that are run by profit-making enterprises has increased dramatically over time.  The number of such sites is now in the tens of millions.

**The Impact of COPA on the Web**

19

1.   Because of the nature of the Web, COPA suppresses an enormous amount of speech that is constitutionally protected for adults and older minors.

2.   COPA purports to restrict only content provided on the Web "for commercial purposes," but in fact it explicitly restricts a wide range of protected expression that is provided *for free* on the Internet by individuals and organizations.  47 U.S.C. § 231(a)(1).  COPA does not address the commercial *sale* of content; in fact, providers who sell their content are explicitly *exempt* from COPA when the buyer pays by credit or debit card.  47 U.S.C. § 231(c).  Rather, COPA targets all other communications made publicly accessible on the Web "for commercial purposes," defined very broadly as being "engaged in the business of making such communications."  47 U.S.C. § 231(e)(2)(A).  COPA's definition of a person "engaged in the business" explicitly provides that "it is not necessary that the person make a profit" nor that the making of the communications be the person's "principal business."  47 U.S.C. § 231(e)(2)(B). Just like many traditional print newspapers, bookstores, and magazine publishers, many Web publishers make a profit (or attempt to make a profit) through advertising.  In addition, content providers such as online booksellers, music stores, and art vendors allow potential customers to browse their content for free -- similar to browsing in a non-virtual book store or art gallery. Finally, some online content providers make a profit by charging their content contributors, although users may access the content for free.  Thus, COPA impacts a wide range of providers of free content, from fine art to popular magazines to news and issue-oriented expression.

3.   COPA applies to all communications on the Web that are "available to any minor." Because all free content on the Web is "available to" both adults and minors, COPA on its face applies to communications between adults.  Given the technology of the Web, there are no

20

reasonable means for speakers who provide information for free to ascertain the age of persons who access their speech, or to restrict or prevent access only by minors. From the perspective of these speakers, the information that they make available on the public spaces of the Web must either be made available to all users of the Web, including users who may be minors, or not made available at all.

4.   COPA's affirmative defenses do nothing to alleviate the severe burden of the law on protected speech. The defenses impose tremendous burdens on both Web content providers and Web users that substantially suppress protected speech.

5.   There is no entity that will issue a digital certificate to verify age on the Web, so the digital certificate defense is unavailable to Web content providers.

6.   Because of the nature of the Web, COPA would require that users of any interactive forum provide a credit card or adult access code before entering the discussion – *even if the discussion contains a wide range of speech that is not harmful to minors*. This would have the effect of restricting speech that is not even covered by the statute.

7.   Credit card and adult access code systems require users to provide personally identifying information before accessing restricted content.

8.   Credit card and adult access code systems require either users or Web content providers to pay for content that would otherwise be available for free.

9.   Because the vast majority of content on the Web is available for free, most Web users will not provide credit cards or adult access codes to obtain access to Web content. Requiring users to provide a credit card or adult access code before they can browse a Web page to determine what it offers will deter most users from ever accessing those pages.

21

10.  Web users are even less likely to provide a credit card or adult access code in order to gain access to sensitive, personal, controversial or stigmatized content on the Web.

11.  COPA's credit card defense would foreclose adults without credit cards entirely from accessing protected speech.

12.  The implementation of credit card or adult access code systems to comply with COPA would prevent or deter a substantial number of adult Web users from accessing protected speech.

13.  COPA would force Web content providers to choose between risking severe criminal penalties, self-censoring any material that might be "harmful to minors" from their site, or setting up credit card or adult access code systems that would drastically reduce their audiences.

14.  Many Web content providers would not set up credit card or adult access code systems because they know that few if any of their users would use them.

15.  Like many offline newspapers, Web content providers depend on attracting a high level of traffic to their sites to attract and retain advertisers and investors.

16.  Most Web content providers want to reach the widest possible audience for their speech, and do not want to require adults to provide credit cards or adult access codes before accessing their speech.

17.  Many content providers could not afford the substantial start-up and per-transaction costs associated with setting up and maintaining credit card and adult access code systems.

18.  Implementing COPA's credit card defense would force Web content providers to charge for speech that they want to distribute for free.  Financial institutions will not verify credit cards in the absence of a financial transaction.

19.  Implementing COPA's adult access code defense would force Web content providers to eliminate anonymous access to their speech.

20.  Implementing COPA's credit card or adult access codes defenses would fundamentally alter the nature of communication on the Web, which is characterized by spontaneous, instantaneous, seamless and unrestricted access to information.

**The Ineffectiveness of COPA and the Effectiveness of Alternative Means**

21.  A significant portion of the content provided on the Web, including sexually explicit material, originates abroad.  All of the content on the Web is available to all Web users worldwide and may be accessed as easily as content that originates locally.  Because it is not possible to prevent content posted abroad from being available to Web users in the United States, COPA will not accomplish its purported purpose of keeping sexually explicit content from minors in the United States.

22.  Conversely, there are many alternative means that are more effective at assisting parents in limiting a minor's access to certain material if desired.

23.  Commercial online services like America Online provide features to prevent children from accessing chat rooms and to block access to Web sites and newsgroups based on keywords, subject matter, or specific newsgroups.  These services also offer screening software that blocks messages containing certain words, and tracking and monitoring software to determine which resources a particular online user (*e.g.*, a child) has accessed.  Many also offer children-only discussion groups that are closely monitored by adults.

24. Parents and other online users can also use stand-alone filtering programs, also known as user-based blocking programs, to restrict access to sexually explicit content.  These

programs allow users to block access to sexually explicit web pages, to prevent children from giving personal information to strangers by e-mail or in chat rooms, and to keep a log of all online activity that occurs on the home computer.

25. Filtering programs are not perfect, both because they fail to screen all inappropriate material and because they block valuable Web sites. However, a voluntary decision by concerned parents to use these programs for their children constitutes a far less restrictive alternative than COPA's imposition of criminal penalties for protected speech among adults.

26. Congress itself has recognized the usefulness of filtering programs. In another provision enacted along with COPA, and not challenged here, Congress required Internet service providers to "notify [all new customers] that parental control protections (such as computer hardware, software or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors." 47 U.S.C. § 230(d). Congress also passed legislation that mandates the use of filtering programs in public schools and libraries who receive funds under two popular federal programs. Children's Internet Protection Act, 20 U.S.C. § 9134 (f); 47 U.S.C. § 254 (h)(6).

**The Impact of COPA on Plaintiffs**

1. Because all communications on the Web are available throughout the United States as well as the world, all plaintiffs engage "in interstate or foreign commerce." 47 U.S.C. § 231(a)(1).

2. Plaintiffs fear prosecution under COPA for communicating, sending, displaying, or distributing material that might be deemed "harmful to minors" by some community in the United States. Plaintiffs and/or their members all provide for free on the Web "for commercial

24

purposes" material that they believe to be valuable for adults, but that they fear could be construed as "harmful to minors" in some communities.

3.   Because COPA excludes from its coverage only speech that has "serious literary, artistic, political, or scientific value for minors," plaintiffs legitimately fear prosecution for material that communities believe has no value for *minors* even though it has value for *adults*.

4.   Plaintiffs also fear civil penalties under COPA for their online communications.  A federal prosecutor anywhere in the country could seek civil penalties of up to $50,000 for each day of violation simply by filing a civil complaint against one of the plaintiffs and proving merely by a preponderance of the evidence that the plaintiff had communicated material that the local community believes is "harmful to minors."

5.   Plaintiffs also fear liability for material created by others that is available on their Web sites and Web-based online discussion groups and chat rooms.  COPA contains an exemption for providers "engaged in the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication made by another person, without selection or alteration of the content of the communication."  47 U.S.C. § 231(b)(4).  Elsewhere, however, COPA states that it applies to a person who "knowingly solicits . . . material to be posted on the World Wide Web."  47 U.S.C. § 231(e)(2)(B).  Plaintiffs fear that Section 231(b) will not exempt them from prosecution or civil penalties because they will be found to have "solicited" or "selected" the communications for publication on their sites.

6.   Plaintiffs do not understand what COPA prohibits, and are thus unable to determine with certainty what speech is prohibited by COPA and what speech is not.  For example, they do not know the relevant "community" for determining what is "harmful to minors" on the global

25

Internet.  They do not know whether their speech will be prohibited if it is found to be "harmful" to very young minors even if it has value to older minors.  They do not know what comprises a work "considered as a whole" in the context of speech on the Web, which is a seamless, interconnected set of texts, sound, and graphics provided by different content providers and located on different computers around the world.

7.    Plaintiffs are each faced with three equally untenable alternatives for complying with COPA:  (i) risk criminal prosecution and substantial civil penalties; (ii) self-censor all material that could be considered "harmful to minors" from their sites, thus denying adults and older minors access to constitutionally protected material; or (iii) set up credit card or adult access code systems which would prevent or deter most adults and older minors from accessing their constitutionally protected material.  All three of these options violate the First Amendment rights of plaintiffs and their users.

**American Civil Liberties Union**

8.    The American Civil Liberties Union (the "ACLU") sues on behalf of its members, who fear prosecution or other enforcement under the statute for displaying material that is "harmful to minors." The ACLU also fears that if the statute goes into effect, content providers will be forced to restrict communications that they consider potentially "harmful to minors," thereby depriving the ACLU's members of the ability to communicate and access constitutionally protected speech

9.    Many ACLU members use the Web to communicate on a wide variety of subjects for commercial purposes.  Some members provide free content on the Web which they fear will make them subject to criminal and civil liability under COPA.  The ACLU also has a broad

spectrum of members who use the Web to access material.  Many ACLU members are minors, including both high school and college students, who will be directly affected by this Act.

10.  *Lawrence Ferlinghetti:*  Lawrence Ferlinghetti is a member of the ACLU.  Mr. Ferlinghetti is San Francisco's poet laureate and has authored two novels and more than a half-dozen collections of poetry, including *A Coney Island of the Mind*.  Mr. Ferlinghetti is the co-founder and co-owner of both City Lights Bookstore, founded in 1953, and City Lights Publishing, a book publisher founded in 1955, which are located in San Francisco, California.

11.  In 1956, Mr. Ferlinghetti's City Lights Publishing published Allen Ginsberg's poem "Howl," and Mr. Ferlinghetti sold the poem at his City Lights Bookstore.  As a result, Mr. Ferlinghetti was arrested and tried for publishing and selling obscene material.  After a lengthy trial, at which Mr. Ferlinghetti was represented by the ACLU, he was acquitted of these charges.

12.  City Lights Books currently has a Web site that promotes books available from the bookstore and publisher.  The Web site also contains lists of literary events and a brief history of City Lights Bookstore and Publishing.  The City Lights Web site also has a section with a brief history of the "Howl" obscenity trial and photographs from the trial. Also, Mr. Ferlinghetti's work is available on a variety of poetry sites on the Web.

13.  In Mr. Ferlinghetti's experience, there are people who would find his work and the work he publishes "harmful to minors."  If COPA takes effect, Mr. Ferlinghetti has not yet decided whether he would risk prosecution, self-censor, or restrict content on his Web site.

14.  *Patricia Nell Warren*:  Patricia Nell Warren is a member of the ACLU.  Ms. Warren is a former Reader's Digest editor and the author of eight novels, four books of poetry, and numerous articles, poems, and essays.  According to recent surveys of independent book sales,

27

Ms. Warren's novels are the most popular novels among classic gay literature.  Ms. Warren's

novel *The Front Runner* was on The New York Times best-seller list and continues to be one of

the best-selling gay novels of all time; it has sold an estimated 10 million copies worldwide and

has been translated into 10 languages.  Ms. Warren is also a popular columnist.  Her provocative

column  "Left Field" on the politics of AIDS and public health appears monthly in *A & U*

*Magazine*.  Ms. Warren has won prestigious awards for her nonfiction writing.

15.  Ms. Warren is also the co-founder and co-owner of Wildcat International.  Wildcat

International is an independent media company specializing in writing, publishing, filmmaking,

special events, and media consulting.  Wildcat Press is the publishing arm of Wildcat

International.  Ms. Warren promotes Wildcat Press's books on the Internet at the Wildcat Press

Web site.  Some of the material in Wildcat Press's publications is sexually explicit.  The Web

site includes reviews of and excerpts from Ms. Warren's books and articles and commentaries

written by Ms. Warren.

16.  Much of the content on Wildcat Press's Web site deals with gay and lesbian issues.

Ms. Warren has faced repeated attempts to ban her books at libraries and through book

distributors and bookstores.  For example, at an American Booksellers Association (ABA)

exposition, Christian booksellers unsuccessfully pressured the ABA to remove a Wildcat Press

banner promoting its gay titles from the book-expo lobby.  Some of the excerpts and articles

found on the Wildcat Press Web site, such as "Looking for Mr. Goodbar . . . Gay Style," frankly

discuss gay and lesbian sex.  An excerpt from Ms. Warren's book *Billy's Boy* is available on the

Wildcat Press Web site.  The excerpt features a young man with a gay father confronting his own

homoerotic feelings, and contains sexually explicit details such as the description of a

28

"foursome" erotically dancing and a description of two men passionately kissing.  Ms. Warren

fears that this material may be considered "harmful to minors" in some communities.

17.  Because Ms. Warren believes that adults and minors should have the right to access

speech provided on the Wildcat Web site, if COPA were to take effect she would risk

prosecution rather than self-censor or restrict content on her Web site.  Ms. Warren fears that the

expense of defending against even an unfounded prosecution or civil suit brought under COPA

would force the Wildcat Press out of business.

## American Booksellers Foundation for Free Expression

1.  Plaintiff American Booksellers Foundation for Free Expression ("ABFFE") has

hundreds of bookseller members from coast to coast, many of whom sell materials that contain

nudity or descriptions of the nude human body, and which deal frankly with the subject of

human sexuality.  ABFFE's members are not "adult bookstores."  Some member bookstores have

their own Web pages that discuss the content of books sold in stores. For instance, the Sisterhood

Bookstore, in Los Angeles, California has an extensive Web site which lists many of the books it

sells, often with pictures of the books, covers and descriptions of their content.  Because many of

the books sold by Sisterhood Bookstore are about feminism, lesbianism and sex, its owners fear

that some communities would find its Web site "harmful to minors" under COPA.

2.  Most member bookstores use the Web to obtain information and excerpts of books

from publishers.  For example, member booksellers may review popular titles such as *Primary

Colors* by Anonymous and *Sabbath's Theatre* by Philip Roth, which include passages describing

nudity and sexual conduct.

29

3.   ABFFE members' right to learn about, acquire, and distribute materials containing nudity and sexual conduct, and their patrons' right to purchase such materials, would be seriously infringed by COPA if it is not enjoined because ABFFE members and the publishers with which they transact business would be forced to risk prosecution, self-censor or restrict protected speech on the Web.

**Androgyny Books, Inc. d/b/a A Different Light Bookstores**

4.   Plaintiff Androgyny Books, Inc. d/b/a A Different Light Bookstores aims to serve the gay, lesbian, bi-sexual, and transgender community and has functioned at different times as bookstore, social hall, sanctuary, and life-line.  A Different Light Bookstores ("A Different Light") has operated retail bookstores since 1979 and today has stores in San Francisco and West Hollywood, California.  A Different Light also maintains a Web site through which users can purchase magazines, books (fiction and nonfiction), music, DVDs, and sex toys of interest to gay and lesbian individuals.  The Web site receives approximately 100,000 users per month.

5.   Users of A Different Light's Web site have access to a broad range of information relevant to the gay, lesbian, bi-sexual, and transgender community.  Users can search through different pages located on the Web site for books and other products of interest.  Books found on the Web site are frequently written by gay and lesbian authors.  Users can choose from approximately 18,000 book titles in different categories, including fiction, erotica, spirituality, health, travel, couples/family, and humor.

6.   A Different Light does not require users to identify themselves before accessing information and services available on its Web site.  A Different Light provides all content on its Web site free of charge to all users.  A Different Light has placed a warning message in front of

books and videos depicting full frontal nudity and graphic sexual contact that notifies users that they are about to enter a part of the Web site containing sexually explicit materials.  Users are only required to provide a credit card if they purchase a book or other product.

7.   A Different Light fears prosecution under COPA because its Web site contains material that may be considered "harmful to minors" in some communities.  Some books described on the Web site are sexually graphic.  For example, the description of the book, "Going Down:  The Instinct Guide to Oral Sex," explicitly discusses how to perform a blow job.  In addition, covers of DVDs such as "Bang the Butt from the Back," and "Transgender Bender" depict sexual acts, including oral sex and anal penetration.

8.   A Different Light believes its presence and materials provide a necessary reference for gays, lesbians, bi-sexual, and transgender persons of all ages who are discovering their sexuality. A Different Light believes that its audience would be greatly reduced if it were required to place all potentially "harmful to minors" materials behind a credit card or adult access code screen.  If COPA were to take effect, A Different Light has not decided whether it would risk prosecution, self-censor or restrict the content on its Web site.

**Addazi, Inc. d/b/a Condomania**

9.   Condomania, the nation's first condom store, was established in June 1991 in New York City.  In 1996, Condomania launched condomania.com, the Internet extension of Condomania's retail store featuring an online catalog, the latest safer sex information, and regularly updated newsletters and editorials.  Condomania.com is the leading online seller of condoms, and also distributes a broad range of safer-sex related materials for free.  Condomania

focuses on assisting customers of every age, sex, culture, and sexual orientation in learning about and purchasing condoms and safer sex products.

10.  Condomania.com dramatically increases the availability of safer sex products not typically found in many parts of the country and the world.  It also offers a wealth of information to people who might not otherwise have access to the facts about safer sex and the products available.  Condomania.com has approximately 7,000 unique users each day.

11.  Condomania's Web site contains a full color online catalog featuring over 750 of the most popular items related to safer sex and romance.  Over 200 different condoms are featured, categorized by style or brand so consumers can find the condoms that are best suited for them. Each condom has been photographed fully inflated so the viewer can see its actual shape, size, texture and color.  In addition, the dimensions for each condom are displayed alongside a picture and dimensions of an "average" condom, so that each condom can be statistically and visually compared.  The Condom Wizard, an interactive condom search guide, guides users through a series of individualized questions and provides product recommendations custom tailored to each visitor's needs and preferences.  The Condomania site also includes a fifteen-page Condomania Safer Sex Manual that uses frank language to educate and help people negotiate the many issues of safer sex.

12.  All of the information on the Condomania Web site is available for free to Web users, and users are not required to identify themselves before accessing the content on the site. Users are only asked to provide a credit card if they are purchasing a product.

13.  Both adults and older minors use condomania.com to access information about contraception and sexual pleasure.  For example, when the hotline for the Centers for Disease

32

Control is unable to answer certain types of questions, individuals are referred to Condomania's

Web site and information line.   These individuals sometimes include teenagers inquiring about

proper condom usage when contemplating first-time intercourse.

14.   Condomania believes that the information it provides may prevent sexually

transmitted disease and unwanted pregnancy among older minors and adults.  Although

Condomania believes that the information it provides is valuable to adults and older minors and

can save lives, Condomania fears that some communities may consider certain of its materials

"harmful to minors."

15.   Condomania believes that individuals often access the Web site anonymously to

learn about safer sex and condom usage, subjects that can cause trepidation, embarrassment, fear,

and anxiety in many people.  If users were required to provide a credit card or adult access code

to obtain the information on Condomania's Web site, Condomania believes that most adults and

older minors would simply forego access and would thus be denied important information about

sexuality and safer sex.  If COPA were to take effect, Condomania would risk prosecution rather

than self-censor or restrict content on its Web site.

**Heather Corinna**

1.   Plaintiff Heather Corinna maintains several Web sites, each of which deals with

issues of sex and sexuality with an explicit focus on challenging and combating the sexual

oppression of traditionally marginalized groups.  The three most visited sites --  Scarlet Letters,

Scarleteen, and Femmerotica -- combined are viewed by more than 15,000 users daily and by

millions of users each year.  Heather Corinna fears prosecution under COPA because each of her

three sites contains material that might be considered harmful to minors in some communities.

33

2.   Scarlet Letters, www.scarletletters.com, was created by Heather Corinna in February of 1998 as the Web's first artistic and educational site with a focus on women's sexuality and an all-female staff.  Scarlet Letters remains one of the few sexual publications of its size, scope, and circulation independently owned and operated by women.  Scarlet Letters publishes fiction, nonfiction, poetry, essays, commentary, visual art, and other material aimed at educating and entertaining its users.  The site sponsors an "Artist in Residence" program designed to provide artists and writers with a chance to create new erotic work and present it to the site's users. Scarlet Letters also sponsors interactive discussion forums in which readers, writers, artists, and staff explore issues pertaining to human sexuality.  Scarlet Letters contains numerous photographs of nude men and women in sexual poses with one another, and erotic stories that include graphic sexual scenes.

3.   Scarleteen, www.scarleteen.com, was created by Heather Corinna in 1998 and is owned by Heather Corinna and Scarlet Letters.  Scarleteen is the Internet's largest independent, unaffiliated, free resource for young adult sex education, information, and discussion, serving nearly two million teens, young adults, parents, and educators each year.  The site also includes message boards where users can read or post messages on a variety of topics involving sexuality. Users of Scarleteen can access information, including articles, discussion groups, and links to other resources, on a broad range of topics relating to sex and sexuality.  For example, Scarleteen features a special report on date rape drugs, a "users guide" on orgasm and sexual response that includes frank and explicit discussion of sexual stimulation and masturbation, extensive information about sexually transmitted diseases, and a section devoted to helping teenagers who are struggling with non-heterosexual feelings and relationships.  Heather Corinna intends to use

34

the Web site to promote and sell her forthcoming book, which will provide essentially the same teen-oriented content that Scarleteen provides in a longer, more comprehensive format.

4.   In 1999, Heather Corinna founded Femmerotic, www.femmerotic.com.  Femmerotic is Heather Corinna's personal Web site for showcasing her photographic and textual work and for providing an "open and intimate look at her life as an artist and activist."  Several thousand people log onto the site to access its free content, and approximately 80 people are paid members with access to additional material.  Samples of erotic and non-erotic writing, as well as samples from Heather Corinna's bodies of photographic work, much of which depicts nude women, are available for free to non-subscribing users of Femmerotica.

5.   Heather Corinna believes that requiring all users to identify themselves, or to provide a credit card or adult access code, before they could access content on her Web sites is contrary to her philosophy that sex and sexuality should be discussed more openly, without shame or stigma.  Heather Corinna believes that women in particular will be deterred by age verification barriers that prevent them from viewing sexual material anonymously and for free.  In addition, one of Heather Corinna's Web sites, www.scarleteen.com, is specifically designed for and targeted to an audience of minors, and thus restricting minors from accessing it would completely defeat the purpose of the site.  If COPA were to take effect, Heather Corinna would risk prosecution rather than self-censor or restrict content on her Web sites.

**Electronic Frontier Foundation**

6.   Plaintiff Electronic Frontier Foundation ("EFF") is a nationwide, nonprofit organization of approximately 2,000 paying individual members that is committed to defending civil liberties in the world of computer communications, to developing a sound legal framework

35

for that world, and to educating the government, journalists, and the general public about the legal and social issues raised by this new medium.

7.   EFF sues on behalf of its members, who fear prosecution or other enforcement under the statute for displaying material that is "harmful to minors."  EFF also fears that if the statute goes into effect, content providers will be forced to restrict communications that they consider potentially "harmful to minors," thereby depriving EFF's members of the ability to communicate and access constitutionally protected speech.

8.   *Bill Boushka*:  Mr. Boushka, a member of EFF, maintains a site on the Web called "High Productivity Publishing" ("HPPUB").  HPPUB provides the public with commentary and analysis of current events, with a particular emphasis on individual liberty and associated responsibilities and obligations.  On his site, Mr. Boushka has published a copy of a book he has written entitled *Do Ask, Do Tell:  A Gay Conservative Lashes Back*, an exposé about gays in the military.  This politically-charged text contains subject-matter and language that might be deemed "harmful to minors" and is available for reading, download, and purchase to anyone interested in the topic.

9.   *Open Enterprises Cooperative*:  Open Enterprises, a member of EFF, is a worker-owned cooperative which maintains a site on the Web called "Good Vibrations."  Good Vibrations has an online store where individuals can purchase sex toys, and erotic and sexual self-help books and videos.  The Good Vibrations site includes an antique vibrator museum and up-to-date sex information and news.  The Good Vibrations site serves as a resource for quality products and information, models honest communication about sexuality, and promotes the philosophy that sex is fun and natural.  All of the information on the site is provided for free.

36

The site is a resource not only for Open Enterprises' customers but for sex therapists, educators and advice columnists nationwide.

10.  These EFF members, and other EFF members not specifically mentioned, fear prosecution for displaying material that may be considered "harmful to minors."  None of the EFF members can prevent their communications from reaching minors without also preventing adults from accessing their speech.

**Electronic Privacy Information Center**

11.  Plaintiff Electronic Privacy Information Center ("EPIC") is a nonprofit educational organization established in 1994 to examine civil liberties and privacy issues arising on the Internet.  In furtherance of its mission, EPIC conducts research, pursues litigation and testifies before Congress and other public bodies.  EPIC also publishes reports and an electronic newsletter (the "EPIC Alert") and maintains a comprehensive Web site dealing with online civil liberties and privacy issues that logs more than 500,000 visits each month.

12.  Since its inception, EPIC has devoted a substantial amount of time and resources to issues affecting free expression on the Internet.  For example, EPIC examines the effects of Internet rating systems and blocking and filtering programs designed to restrict minors' access to "inappropriate" content.  EPIC staff frequently speak at conferences and lecture at universities and law schools on these issues.

13.  In December 1997, EPIC published the report, "Faulty Filters: How Content Filters Block Access to Kid-Friendly Information on the Internet."  In 2001, it published an updated version of the report, "Filters and Freedom 2.0: Free Speech Perspectives on Internet Content Controls."  In research for these reports, EPIC staff visited scores of Web sites that had been

blocked by a "filtered" search engine in order to ascertain the nature of the content available at those sites. EPIC staff reviewed the content available at filtered and blocked Web sites on a continuing basis to assess the effect of filtering and blocking systems on Internet expression. EPIC staff also reviewed the content available at Web sites containing sexually-explicit material in order to assess the procedures, if any, employed at such sites to restrict minors' access. In the course of these activities, EPIC staff accessed material that might be deemed "harmful to minors" in some communities.

14.  EPIC fears that many content providers, in an attempt to comply with COPA, may remove from their Web sites material similar to that which EPIC staff heretofore have been able to access. EPIC also fears that many content providers, in an attempt to comply with COPA, may attempt to impose credit card are adult access code requirements as a condition of accessing material similar to that which EPIC staff heretofore have been able to access without providing such information.

15.  Because it believes that the ability to access information anonymously is protected under the First Amendment, EPIC does not intend to instruct its staff to use a credit card or adult access code at any Web site in order to access material that might be deemed "harmful to minors" in some communities. EPIC thus fears that COPA will limit the ability of its staff to continue the research activities described above and inhibit its ability to pursue its educational mission.

**Free Speech Media, LLC and Public Communicators, Inc.**

16.  Free Speech Media, LLC ("Free Speech Media") and Public Communicators, Inc. ("Public Communicators") together operate freespeech.org, a Web site designed to encourage the

democratic expression of progressive ideals through promoting, curating and hosting independent creators of audio and video content on the Web. Free Speech Media provides the Web site services, including hardware, personnel and Internet connectivity. The majority of the content on the Web site is provided by Public Communicators. Free Speech Media controls the content of the "home page" and provides some content on the Web site.

17.   Freespeech.org promotes video and audio content on the Web that is often too candid or esoteric to be displayed through mainstream media. Free Speech Media and Public Communicators believe that broadcasting such messages using the audio or video technology available on the Web, and freespeech.org in particular, is superior to dissemination through print media because such technology allows a user to gain a greater understanding of a particular idea by allowing her to view and hear the speaker. In addition, in some cases freespeech.org provides the only forum in which organizations may broadcast speech that is prohibited in their countries through other media.

18.   Over 500 video and audio files are licensed and currently available to be viewed by users to freespeech.org. Freespeech.org has an average of 8,423 users per day. Video and audio files cover a wide range of topics, including human rights, homelessness, labor issues, racism, prison conditions, sexuality, AIDS, feminism and environmentalism. All of the information on freespeech.org is available to users for free. Users of the content on freespeech.org are not required to identify themselves to access the available information.

19.   Users to freespeech.org can also participate in online discussions on a variety of topics in the Online Community, a gathering place for sharing information, organizing activities, and collaborating on projects. Using tools such as event calendars, blog capacity, mailing lists,

and unmonitored online social fora, Free Speech Media and Public Communicators endeavor to provide a comprehensive and dynamic space in which to engage social activists, artists, teachers, and various community organizers.

20.  Free Speech Media and Public Communicators fear that they are vulnerable to prosecution under COPA for speech available through freespeech.org that may be considered "harmful to minors" in some communities.   For example, many audio and video messages available on freespeech.org contain frank discussions of sexual issues, descriptions of sexual acts and strong language.  For instance, an audio clip of a speech by Larry Kramer about AIDS is rife with adult language.  Video messages such as AIDS Community Television's "Oral Sex and HIV Transmission, Parts 1 & 2" contain candid and explicit discussions about safer sex.  In addition, videos posted on freespeech.org such as "Chero Collage:  What is Eroplay," by Frank Moore contain nudity and sexual imagery.

21.  Free Speech Media and Public Communicators believe that requiring users to provide a credit card or adult access code would prevent freespeech.org from reaching a large portion of its audience.  Anonymity is extremely important to the users of freespeech.org, especially when accessing controversial or stigmatized content.  For example, users from countries such as Saudi Arabia, where homosexuality is a crime, would be unwilling to provide any identifying information before accessing a film from freespeech.org about lesbian sexuality.

22.  If COPA were to take effect, Free Speech Media and Public Communicators would be opposed to censorship but have not yet decided whether they would risk prosecution, self-censor, or restrict content on their Web site using a credit card or adult access code system.

**Nerve.com, Inc.**

23.  Plaintiff Nerve.com, Inc. ("Nerve") is an online magazine dedicated to a frank exploration of sex and sexuality.  Nerve publishes content in a variety of formats, including but not limited to prose and poetry, photography, interviews, and reviews.  Nerve intends to be graphic, forthright, topical, and artistic in its presentation of information about sex and sexuality. Nerve believes that sex as a topic has a distinctly political dimension, and much of the material on its site contains explicit and indirect political analysis.  Nerve has won multiple awards for both its prose and photography.

24.  Nerve is visited by approximately one million users per month.  Of these users, approximately 25,000, or 2.5 percent, are paid "premium" members who have unlimited access to site's archived materials and special content.  Approximately half of the "premium" members are women.  Nerve has published two books that contain essentially the same content as the site; both books have been prominently displayed at major bookstores.

25.  Nerve's Web site contains a substantial amount of material that it fears could be considered "harmful to minors" in some communities.  Much of the content on Nerve's Web site directly addresses sex and sexuality in graphic terms, and contains forthright discussions of sexual issues and detailed descriptions of sexual acts.  For example, the piece of fiction "The Courting of Anatomy" by novelist Helen Walsh includes a description of the narrator masturbating after viewing her first images of two women having sex.  The essay "Mystery Tour:  Four strangers screw their way around London – without leaving a chat room," by Luke Sutherland, includes graphic sexual language depicting oral sex, "finger fucking," and group sex. Nerve's Web site also includes many photographs of nude and semi-nude persons taken by

41

professional photographers such as Nan Goldin, Bettina Rheims, and Sylvia Plachy, and by the site's own users.

26.  Nerve believes that the government should not be able to force adults and older minors to provide credit cards or adult access codes before they may access the material on Nerve's Web site.  Nerve also believes that the Web is often the only means for individuals, women in particular, to explore intelligent and nuanced representations of sex and sexuality.  If COPA were to take effect, Nerve has not yet decided whether it would self-censor, risk prosecution, or restrict all of its content using a credit card or adult access code system.

**Aaron Peckham, d/b/a Urban Dictionary**

1.  Plaintiff Aaron Peckham, d/b/a Urban Dictionary, operates an online slang dictionary whose terms and definitions are solely user-generated and user-rated.  Urbandictionary.com ranks among the 5,000 most visited sites on the Web and serves between 60,000 and 80,000 daily users. Users can read definitions written by other users or contribute their own words and definitions. Users can also vote for their favorite or least favorite definitions by clicking the "thumbs up" or "thumbs down" icons.  Definitions with the most "thumbs up" votes are listed before definitions with "thumbs down" votes.

2.  Urbandictionary.com is comprised mostly of text, although users can also submit images and sounds to accompany definitions.  Aaron Peckham, Urban Dictionary's owner and operator, is currently editing a book containing the best text definitions. The book is scheduled for release in Fall 2005 and will be available for sale at the site and in bookstores.

3.  Aaron Peckham fears prosecution under COPA because Urban Dictionary contains material that may be considered "harmful to minors" in some communities.  Dozens of the

words, phrases, and definitions found on urbandictionary.com humorously, graphically, or symbolically describe human anatomy and sexual acts. For example, urbandictionary.com lists 107 synonyms for vagina under "bearded clam," including "dripping delta," "meat wallet," and "stench trench." urbandictionary.com lists 186 definitions of the word "fuck," 43 definitions of "booty," and 116 definitions of "cock." The lead definition of the slang term "teabagging" reads as follows: "To have a man insert his scrotum into another person's mouth in the fashion of a teabag into a mug in an up/down (in/out) motion." The first of 19 definitions of the slang term "pearl necklace" reads: "the glorious culmination of tit-fucking, in which you blow your nuts all over a girl's tits, shoulders, and neck, and, with any luck, chin. one of the highest expressions of love and affection bestowable upon a woman by a man."

4.   All of the content on Urban Dictionary is provided for free to users and users are not required to identify themselves or to verify their ages. Letters to the site from students, parents, lawyers, educators, reporters, media translators, and lexicographers attest to the site's cultural significance. The Urban Dictionary Web site encourage users, including minors, to understand, participate, and take ownership of the English language and its constantly evolving definitions. Slang is inherently spontaneous, irreverent, and emotional. In order to be realistic and timely, the definitions in Urban Dictionary must be presented in an unedited and spontaneous fashion. Aaron Peckham believes that requiring a credit card or adult access code before providing access to Urban Dictionary would drastically reduce or even eliminate its audience. Such a decrease in the audience size could force Urban Dictionary to discontinue operation. Because the content of the Web site is user-generated, Aaron Peckham has little ability to ensure that users comply with a "harmful to minors" standard. He is a full-time college student who possesses neither the

financial resources nor the time to develop and implement introduce a pre-approval process that would satisfy compliance with COPA's "harmful to minors" standard.  If COPA were to take effect, Aaron Peckham has not decided whether he would risk prosecution, self-censor, restrict content on the site, or simply shut down Urban Dictionary.

**Philadelphia Gay News**

5.   Plaintiff Philadelphia Gay News publishes both online ("PGN Online") and in printed newspaper form ("PGN Print").  PGN Print is the largest and oldest gay newspaper in Philadelphia.  PGN Print has been published since 1976 and has a weekly circulation of 17,500 copies.  PGN Online has been published since September 1996 and has more than 400,000 hits per month.

6.   PGN Online and PGN Print share much of the same content, including national and local news stories written by PGN correspondents, arts and events sections, regular columns, a calendar of events, and editorials on a variety of social and political topics.  In addition, PGN Online contains online personal and classified advertisements.

7.   PGN Online fears prosecution under COPA because its Web site contains material that could be considered "harmful to minors" in some communities merely because the Web site is devoted to issues relevant to the gay and lesbian community.  Discrimination and violence against members of this community are still commonplace, and many people, including lawmakers, are openly hostile to "alternative" or "gay lifestyles."  For instance, PGN Online has reason to believe that some communities would consider access to personal advertisements inappropriate for minors when involving persons of the same gender.  PGN Online also contains descriptions of social and sports clubs that cater to the gay and lesbian community and that some

communities may believe to be "harmful to minors" because they "entice" young people into exploring gay life.

8.   PGN Online also fears prosecution under COPA because its Web site contains sexually explicit materials that might be considered "harmful to minors."  For instance, PGN Online's classifieds section contains sexually explicit descriptions.  Recent examples include advertisements of a man seeking "oral submissives w/ hungry holes" and a "handsome man who loves ass, 44, with a big fat Italian tool" seeking someone who "enjoys having his sweet butt slowly licked and who will blow my tool real good."  In addition, PGN Online depicts suggestive images of men engaging in sexual acts with other men.

9.   PGN Online believes that its audience would be drastically reduced if it were required to place all potentially "harmful to minors" materials behind a credit card or adult access code screen.  Many lesbians and gay men have a not unjustified fear of identifying their sexuality to others, as lesbians and gay men have, historically and in today's world, been the subjects of harassment, threats and misunderstanding.   If COPA were to take effect, PGN Online would risk prosecution rather than self-censor or restrict the content on its Web site.

**PlanetOut Corporation**

10.  Plaintiff PlanetOut Inc. ("PlanetOut") is a leading global online media company offering consumer services, news, and entertainment to the gay, lesbian, bi-sexual and transgender community.  PlanetOut aims to provide an online community for gay, lesbian, bi-sexual and transgendered persons of all ages, including teenagers, many of whom may be

45

undergoing intense feelings of isolation.  Facing the risk of being "outed" in their communities,

such individuals need a safe environment to engage in normal teen and adult behaviors.

PlanetOut seeks to provide a source of information and personal contact to persons who would

otherwise have no other means to learn about the gay, lesbian, bi-sexual and transgender

community.

11.  Based in San Francisco, PlanetOut reaches a global audience through a number

of Web sites, including "Gay.com" and "PlanetOut.com."  PlanetOut provides a variety of

information of interest to the gay, lesbian, bi-sexual and transgender community, such as

national and international news, including stories written by its own correspondents, and

information regarding health, entertainment, travel, dating, shopping, and career advice.  Other

services provided are chat rooms and personal advertisements.

12.  According to Nielsen//NetRatings, Gay.com ranked first among all measured Web

sites in terms of average time spent online per person at home in September and October

2004.  Among all Web sites measured, Gay.com ranked seventeenth based on the number of

overall visits per person during September 2004.  PlanetOut offers Fortune 500 advertisers

access to its network of gay, lesbian, bi-sexual, and transgender persons.

13.  The vast majority of content on PlanetOut's Web sites is available for free to all

users, who do not need to identify themselves in order to access the content.  PlanetOut provides

users with the option of becoming PlanetOut members, free of charge, to access additional

services and content, including personal ads and weekly newsletters.  PlanetOut currently has a

growing base of more than 3.3 million active members.  Although PlanetOut members are asked

to provide their name, e-mail address, and date of birth, PlanetOut has no way to verify the accuracy of the information provided by its members.

14.   PlanetOut fears prosecution under COPA because its Web sites contain materials that could be considered "harmful to minors" in some communities merely because the Web site is devoted to issues relevant to the gay, lesbian, bi-sexual and transgender community.   PlanetOut also fears prosecution because its Web sites contain some sexually explicit material which some people may consider "harmful to minors."   Gay.com offers online columns where users can read about sexuality, gay sensuality and issues related to love-making between people of the same sex.   For instance, in the online column "Ask Dr. K:  Safer sex questions answered," infectious disease specialist Dr. Jeffrey Klausner offers advice in articles such as "The truth about barebacking," "How safe are rimming and fingering?," and "He has bumps on his penis." PlanetOut.com offers sexual discourse as well.   One example is the "Dr. Berzon Archive," where licensed psychotherapist Betty Berzon offers sexual health and gay sexuality advice on subjects ranging from partners who refuse to be openly gay to relationships involving large age differences.

15.   PlanetOut aims to reduce the isolation of gay, lesbian, bi-sexual and transgender individuals who fear oppression by providing an online forum through which individuals can communicate openly and without fear.   PlanetOut maintains a wide variety of online message boards covering topics such as arts and entertainment, family, religion, news, fitness, and health, as well as specific message boards for men, women, teens, bisexuals, transgendered individuals, individuals with HIV/AIDS, leather aficionados, and others.   PlanetOut fears prosecution under COPA because some of these message boards, which may be viewed free of charge by any

47

Internet user, contain frank discussions about sexuality and explicit content.  For example, recent postings include discussions of sex techniques for gay men, first time lesbian experiences, sexual fantasies, and descriptions of specific sexual encounters.

16.  PlanetOut believes that its audience would be drastically reduced if users were required to provide a credit card or adult access code in order to access content on its Web sites. Many members of the gay, lesbian, bi-sexual and transgender community are extremely reluctant to identify themselves.  If COPA were to take effect, PlanetOut has not yet decided whether it would risk prosecution, self-censor or restrict content on its Web sites.

**Powell's Bookstores**

1.  Plaintiff Powell's Bookstores operates a popular Web site which allows users to browse and purchase new, used, rare, and out-of-print books.  In addition to its online business, Powell's operates seven stores, all located in Portland.  Users of the Web site can choose from titles contained in the combined inventory of all stores.  The Web site is visited by six to seven million unique users per month.

2.  Called the "world's largest independent new and used bookstore" by the Wall Street Journal, the Powell's Web site allows users access to more than one million titles.  To access the inventory, users may search an extensive database by title, author, subject, or key word. Powell's Web site does not require users to identify themselves in order to access information and services available on its Web site.  Users access the Web site free of charge and only provide a credit card if they decide to purchase a book.

3.  Powell's fears prosecution under COPA because its Web site contains material that may be considered "harmful to minors."  For example, Powell's includes sexually explicit book

48

reviews and synopses.  A review of the "Joy of Gay Sex Fully Revised 3rd Edition," contains an explicit discussion of anal penetration.  A review of "The Many Joys of Sex Toys: The Ultimate How-To Handbook for Couples and Singles," contains explicit discussions of masturbation and sexual techniques.

4.   Powell's believes that its users would not provide a credit card or adult access code simply to browse materials on the site that are potentially "harmful to minors."  Powell's believes it has a social responsibility to the community and to its industry to fight censorship, promote literary awareness and encourage authors and their works.  If COPA were to take effect, Powell's would risk prosecution rather than self-censor or restrict the content on its Web site.

**Salon Media Group, Inc.**

5.   Plaintiff Salon Media Group, Inc. ("Salon") is a well-known, popular online magazine.  Salon includes cutting-edge news articles; commentaries on and reviews of music, art, television, and film; and regular columns on politics, relationships, the media, business, and other areas of interest.  Salon's Web site also includes "Table Talk," an interactive feature in which users participate in hundreds of different online discussions on such issues as books, sports, work life, romance, and digital culture.  Salon's Web site features the current issue of the magazine and also includes back issues.  Salon receives approximately 30-35 million page views per month and has 3.2 million unique users.

6.   The Salon Web site contains material that it fears could be considered "harmful to minors" in some communities.  For example, in the article "You Pussy!" writer Margot Magowan describes her views on the rhetorical implications of the word "pussy" and her belief that it is a word in need of reclamation.  In "Aroused: My First Porn Movie," Susie Bright

discusses the first time she viewed a pornographic film and the erotic response it elicited in her. The description includes vivid imagery of both the sexual acts that took place in the film and of Susie Bright's own act of masturbation.  In "Rectal Romance," Rebecca Traister interviews writer Toni Bentler about her recent memoir "The Surrender," about the author's discovery and exploration of anal sex.  The interview includes a frank discussion of anal sex including graphic descriptions of the act.

7.   Users may access Salon in one of two ways:  they may obtain free access on a day-by-day basis by viewing advertisements, or they may purchase a "premium membership" granting unlimited advertisement-free access.  The vast majority of Salon users choose free access, and are not required to provide any identification to access the content on the site.

8.   If COPA were to take effect, Salon has not yet decided whether it would risk prosecution, self-censor, or restrict content on its Web site.

**Dan Savage**

9.   Plaintiff Dan Savage is the most widely syndicated sex advice columnist and most widely read gay columnist in the United States.  His column, "Savage Love," appears in the print and free online editions of Seattle's alternative news weekly The Stranger, of which he is Editor in Chief and part-owner, the print and free online editions of the humor magazine "The Onion," and the print and free online editions of many of America's leading alternative weeklies, including the Village Voice and the Philadelphia Weekly.  The column consists of letters from readers accompanied by Dan Savage's responses.  The letters and responses routinely include graphic descriptions of sexual acts.  Savage Love has been published weekly since 1991.

10.  Dan Savage views his column as a conversation about human sexuality and an antidote to the ignorance about sex that is prevalent in a society that promotes abstinence-only education.  Frank discussions about unconventional sexual practices are often interwoven with political and educational material addressing such topics as gay rights and HIV and AIDS prevention.  Dan Savage receives mail from a diverse readership that includes gay, straight, and transgendered adults, as well as many older minors.

11.  The Spreading Santorum Web site grew out of a series of Savage Love columns that followed public anti-gay comments by U.S. Senator Rick Santorum of Pennsylvania, who equated consensual gay sex with incest, bigamy, and "man on dog" sex.  A Savage Love reader proposed that Senator Santorum's comments be memorialized by the naming of a sex act for him, and Dan Savage used his column as a forum for reader suggestions.  By a wide margin, Savage Love readers voted to define the newly coined word "Santorum" as "that frothy mixture of lube and fecal matter that is sometimes the byproduct of anal sex."  Soon thereafter, Dan Savage created the Spreading Santorum Web site as a vehicle for promoting and tracking the use of the word "Santorum."

12.  Dan Savage fears prosecution under COPA because both Savage Love and Spreading Santorum routinely include material that might be considered harmful to minors in some communities.  For example, Savage Love columns explore such topics as "pegging," a reader-created term for women using strap-on dildos to engage in anal sex with straight men, and "watersports," a term describing sexual activity that involves urine.

13. If COPA were to take effect, Dan Savage fears that many of the publications in which his column is syndicated would self-censor and remove his column from their sites,

thereby greatly reducing the reach of his expression.  With respect to the material on the Web sites he controls directly, Dan Savage has not yet decided whether he would risk criminal prosecution, self-censor or restrict content on his sites.

**Sexual Health Network**

14.  Plaintiff Sexual Health Network, Inc. ("Sexual Health Network") was founded in May 1996 by its current President, Dr. Mitchell Tepper, who has a doctorate in Human Sexuality Education from the University of Pennsylvania and a Master's degree in Public Health from the Yale University School of Medicine.  Sexual Health Network is dedicated to providing easy access to sexuality information, education, support and other sexuality resources for everyone, including those with disability, chronic illness or other health-related problems.  In August 2004 Sexual Health Network received a grant from the National Institutes of Health to develop sexual health therapeutic learning programs on-line, *i.e.* a computerized mechanism for delivering personalized information that helps users clarify the nature of their sexual concerns, suggest differential diagnoses, and offers education on treatment options.

15.  Sexual Health Network fears prosecution under COPA because sexualhealth.com, the Web site owned and operated by Sexual Health Network, contains material that may be considered "harmful to minors" in some communities.  All of the information on sexualhealth.com is available to all users (including juveniles) for free, and the Web site has approximately 75,000 unique users each month.  Web users can access a free sexual health video library and information on men's sexual health, women's sexual health, love and relationships, sexuality education, disability and chronic conditions and sexually transmitted infections, as well as links to other sexual health resources.  Users can also send questions to sexualhealth.com

experts, who will post the question and answer on the Web site.  Volunteer content contributors to sexualhealth.com include a number of the world's leading experts on sexuality and disability, chronic illness, and women's and men's general sexual health.

16.  Sexual Health Network fears prosecution under COPA because speech communicated through sexualhealth.com necessarily contains explicit descriptions of sexual acts and practices.  Sexualhealth.com includes specific advice on how to achieve sexual pleasure, as well as numerous articles and advice relating to sexuality generally.  For example, the Web site includes advice for a parent who encountered a 15 year-old child engaged in sexual contact with the family dog; advice on how to locate masturbation videos for a developmentally disabled adult; and an article providing information to help women reach orgasm.  In addition, an article entitled "Sexual Pleasure: But What About Me?" by Dr. Tepper discusses how people with spinal cord injuries can achieve sexual pleasure.  Another article, entitled "The Joys That Vibrators Can Bring To Your Sex Life," contains an explicit discussion of how to use vibrators to enhance sexual pleasure.

17.  Sexual Health Network believes that its audience would be drastically reduced if it were required to place all material that is potentially "harmful to minors" behind a credit card or adult access code screen.  Anonymity is extremely important to its online users; many use the Web site because they are afraid to ask their doctors questions about sexuality.  Mandatory screening would prevent Sexual Health Network from communicating accurate and free information regarding sexuality to those most in need.  If COPA were to go into effect, Sexual Health Network would not self-censor but has not yet decided whether it would risk prosecution or restrict content on its Web site using a credit card or adult access code system.

53

## CAUSES OF ACTION

### First Cause of Action:
### Violation of Adults' Rights Under the First and Fifth Amendments
### of the United States Constitution

18.  Plaintiffs repeat and reallege paragraphs 1-186.

19.  COPA violates the First and Fifth Amendments of the United States Constitution on

its face and as applied because it restricts a vast quantity of speech which is constitutionally

protected speech for adults.

20.  COPA violates the First and Fifth Amendments because it is not the least restrictive

means of accomplishing any compelling governmental purpose.

21.  COPA violates the First and Fifth Amendments because it is substantially overbroad.

### Second Cause of Action:
### Violation of Older Minors' Rights Under the First and Fifth Amendments
### of the United States Constitution

22.  Plaintiffs repeat and reallege paragraphs 1-186.

23.  COPA violates the First and Fifth Amendments of the United States Constitution

because it interferes with the rights of minors to access and view material that is not harmful to

them by prohibiting the dissemination of any material with sexual content that is "harmful to

minors" of any age, despite the fact that the material will not be "harmful" to all minors.

### Third Cause of Action:
### Violation of the Right to Communicate and Access Information Anonymously
### Under the First and Fifth Amendments of the United States Constitution

24.  Plaintiffs repeat and reallege paragraphs 1-186.

25.  COPA violates the First and Fifth Amendment right to communicate and access information anonymously.

### Fourth Cause of Action:
### Vagueness in Violation of the First and Fifth Amendments
### of the United States Constitution

26.  Plaintiffs repeat and reallege paragraphs 1-186.

27.  COPA is unconstitutionally vague, in violation of the First and Fifth Amendments.


### PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court:

A.      Declare that 47 U.S.C. § 231 violates the First and Fifth Amendments of the United States Constitution;

B.      Permanently enjoin defendants from enforcing the above-noted provision;

C.      Award plaintiffs costs and fees pursuant to 28 U.S.C. § 2412; and

D.      Grant plaintiffs such other and further relief as the Court deems just and proper.


Dated: December 8, 2004

                              Respectfully submitted,


                              _____
                              Ann Beeson
                              Christopher A. Hansen
                              Benjamin E. Wizner
                              American Civil Liberties Union Foundation
                              125 Broad Street
                              New York, New York 10004

(212) 549-2500

Stefan Presser
Attorney ID No. 43067
7803 St. Martins Lane
Philadelphia, PA 19118
(215) 247-2176

Jonathan H. Feinberg
Kairys, Rudovsky, Epstein & Messing, LLP
924 Cherry Street
Suite 500
Philadelphia, PA  19107
(215) 925-4400

David L. Sobel
Electronic Privacy Information Center
1718 Connecticut Avenue NW
Suite 200
Washington, D.C. 20009
(202) 483-1140

Lee Tien
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333

Christopher R. Harris
Michele M. Pyle
Latham & Watkins
885 Third Avenue
Suite 1000
New York, New York  10022
(212) 906-1200

ATTORNEYS FOR PLAINTIFFS