**EXHIBIT 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMERICAN CIVIL LIBERTIES UNION, )
*et al.*, )
)
       Plaintiffs. )
)
v. ) Civil Action No.
) 98-CV-5591
ALBERTO R. GONZALES, in his official )
capacity as Attorney General of )
the United States. )
)
       Defendant. )
)

## DECLARATION OF J. CHRISTOPHER RACICH

1. I am employed as the Managing Director and Counsel for First Advantage CoreFacts ("CoreFacts"). CoreFacts is a technology and computer forensics consulting firm that assists clients with fact-finding in litigation, regulatory reviews, and business decisions.

2. As the Managing Director for CoreFacts, I conduct and supervise electronic retrieval projects, advise attorneys on issues involving electronic evidence collection, and investigate spoliation and evidence destruction issues. I am also responsible for the equipping, designing, and configuring of forensic computer hardware to optimize the leading forensic software.

3. Prior to working with CoreFacts, I was the Director of Computer Forensics, Southeast Region for Kroll Associates, the world's largest investigation firm.

4. In addition to my positions with Kroll Associates and CoreFacts, I frequently lecture on the topic of computer forensics and electronic discovery and have been qualified and testified as an expert witness in these fields. These cases have involved, among other things, identifying how data is transferred via the Internet, gathering data from backup tapes during discovery, and analyzing the transfer of data in intellectual property disputes.

5. I was retained by the law firm of Latham & Watkins LLP and asked to review documents relating to the case of *American Civil Liberties Union, et al. v. Alberto R. Gonzales*. In particular, I was asked to review Defendant's Motion to Compel and the Declaration of Paul Mewett in Support of Defendant's Motion to Compel.

6. I have had discussions with a technical professional at Salon Media Group regarding the Salon website. Through those discussions, I have developed an understanding of the structure of the Salon website. In addition, I have browsed each Plaintiff's website since being retained in this matter.

7. I disagree with Mr. Mewett's assertion that it would be an easy endeavor to create navigable versions of the various websites requested in Defendant's Motion to Compel.

8. Dynamic websites can draw upon many sources for the content the ultimate website user sees and typically do not draw on information from only one discrete location. These types of websites can draw on complicated environments that use information from numerous sources to generate content for the viewer. These environments can include large and complex relational databases and proprietary application servers that generate content.

9. The Salon website exemplifies a modern and complex website. Salon's data is stored in an Oracle database, which sends content to application servers, which in turn generate web pages which are sent to web hosting servers. It is possible to copy the data stored in the Oracle database to a portable medium such as a DVD, CD ROM or tape. However, a copy of the data stored in the Oracle database is not sufficient to create a navigable copy of the Salon website.

10. In order to create a navigable website copy from the data contained in Salon's Oracle database, one would have to replicate the entire web hosting environment in order to generate web pages as they appear on the actual website. Replicating the entire web hosting environment would include using an identical Oracle server with the same database as Salon, using an identical application server that would draw on the database to generate content and having identical web servers to distribute the content. Any differences in the environment would likely cause significant problems with the creation of a website copy that allows navigation through the entire website as it existed at the time of copying. Creating a navigable copy of Salon's website would take at least several weeks of full time labor by a technical professional. To the extent that creating a navigable copy of other Plaintiffs' websites would require replicating their respective web hosting environments, I would expect that creating navigable copies of those websites would take similar time and effort.

11. Mr. Mewett states in paragraph 9 of his Declaration: "[I]t should be possible for a single physical machine to run each of the twenty-five plaintiffs' websites, using the software applicable to each website." By "machine," I understand Mr. Mewett to mean computer or server. Given the exacting nature of computer programming and the sophistication of many of the Plaintiffs' websites, it is not reasonable to believe that all 25 websites could be placed on one computer or server, which would then work correctly.

12. Moreover, to use the content of the databases and scripts that assist in creating the dynamic web pages, one would also have to obtain licensed copies of the various software packages that are necessary to create and run the websites. This may be impossible if the software is proprietary or modified to function uniquely, as is often the case in website programming.

13. Mr. Mewett's statement in paragraph 7 of his Declaration that backups "are easily stored, transported, and transferred" misses the point. A backup is not the same as a usable, navigable version of a website. As explained above, simply making backup copies as described in Mr. Mewett's Declaration will not create a useable navigable version of the Plaintiff's website.

14. The cost of recreating a navigable website for any one of the websites at issue, much less all of the websites at issue, would be considerable. Given that there is no standardization of data between the Plaintiffs' websites, the expertise required would be significant. The time, hardware and software expenses for creating navigable versions of the websites are impossible at this point to calculate, but would be extremely high.

15. While it may be possible to copy the data located on the various websites, converting this data into a navigable and useable form of the type requested by Defendant would be an extremely difficult and costly task.

16. In contrast, any person with access to a web page can print any particular web page off of their web browser (such as Microsoft Internet Explorer). In addition, there are several commercially available software products and applications that can be used to capture, save and print images of individual web pages on the Internet. Examples of these products include Adobe Acrobat, Print to File, and SnagIt. Using any of these or similar products, Defendant can easily and inexpensively copy, save and print any web page on any Plaintiff's website.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*[Signature]*
12/01/05

3