# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JANET RENO, in her official capacity as Attorney General of the United States. | : | NO.  98-5591 |

FILED   FEB 0 1 1999

I

## M E M O R A N D U M

**Reed, J.**                                                    **February 1, 1999**

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." Although there is no complete consensus on the issue, most courts and commentators theorize that the importance of protecting freedom of speech is to foster the marketplace of ideas. If speech, even unconventional speech that some find lacking in substance or offensive, is allowed to compete unrestricted in the marketplace of ideas, truth will be discovered. Indeed, the First Amendment was designed to prevent the majority, through acts of Congress, from silencing those who would express unpopular or unconventional views.

Despite the protection provided by the First Amendment, unconventional speakers are often limited in their ability to promote such speech in the marketplace by the costs or logistics of reaching the masses, hence, the adage that freedom of the press is limited to those who own one. In the medium of cyberspace, however, anyone can build a soap box out of web pages and speak her mind in the virtual village green to an audience larger and more diverse than any the Framers could have imagined. In many respects, unconventional messages compete equally with the

speech of mainstream speakers in the marketplace of ideas that is the Internet, certainly more than in most other media.

But with freedom come consequences. Many of the same characteristics which make cyberspace ideal for First Amendment expression -- ease of participation and diversity of content and speakers -- make it a potentially harmful media for children. A child with minimal knowledge of a computer, the ability to operate a browser, and the skill to type a few simple words may be able to access sexual images and content over the World Wide Web. For example, typing the word "dollhouse" or "toys" into a typical Web search engine will produce a page of links, some of which connect to what would be considered by many to be pornographic Web sites. These Web sites offer "teasers," free sexually explicit images and animated graphic image files designed to entice a user to pay a fee to browse the whole site.

Intending to address the problem of children's access to these teasers, Congress passed the Child Online Protection Act ("COPA"), which was to go into effect on November 29, 1998. On October 22, 1998, the plaintiffs, including, among others, Web site operators and content providers, filed this lawsuit challenging the constitutionality of COPA under the First and Fifth Amendments and seeking injunctive relief from its enforcement. Two diametric interests -- the constitutional right of freedom of speech and the interest of Congress, and indeed society, in protecting children from harmful materials -- are in tension in this lawsuit.

This is not the first attempt of Congress to regulate content on the Internet. Congress passed the Communications Decency Act of 1996 ("CDA") which purported to regulate the access of minors to "indecent" and "patently offensive" speech on the Internet. The CDA was struck down by the Supreme Court in <u>ACLU v Reno</u>, 117 S. Ct. 2329 (1997) ("<u>Reno I</u>") as

2

violative of the First Amendment.  COPA represents congressional efforts to remedy the constitutional defects in the CDA.

Plaintiffs attack COPA on several grounds: (1) that it is invalid on its face and as applied to them under the First Amendment for burdening speech that is constitutionally protected for adults, (2) that it is invalid on its face for violating the First Amendment rights of minors, and (3) that it is unconstitutionally vague under the First and Fifth Amendments.  The parties presented evidence and argument on the motion of plaintiffs for a temporary restraining order on November 19, 1998.  This Court entered a temporary restraining order on November 20, 1998, enjoining the enforcement of COPA until December 4, 1998.  (Document Nos. 29 and 30).  The defendant agreed to extend the duration of the TRO through February 1, 1999.  (Document No. 34).  The parties conducted accelerated discovery thereafter.  While the parties and the Court considered consolidating the preliminary injunction hearing with a trial on the merits, the Court, upon due consideration of the arguments of the parties, ultimately decided that it would proceed only on the motion for preliminary injunction. (Document No. 39). There necessarily remains a period for completion of discovery and · · ····· ·· ̄     · ·   · ε merits.

The defendant filed a motion to dismiss the entire action pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing in addition to her arguments in response to the motion for preliminary injunction.  (Document No. 50).  The plaintiffs filed a response to the motion to dismiss (Document No. 69), to which the defendant filed a reply.  (Document No. 81).

On the motion of plaintiffs for preliminary injunction, the Court heard five days of testimony and one day of argument on January 20, 1999 through January 27, 1999.  In addition, the parties submitted briefs, expert reports, declarations from many of the named plaintiffs,

3

designated portions of deposition transcripts, and documentary evidence for the Court's review.

Based on this evidence and for the reasons that follow, the motion to dismiss will be denied and

the motion for a preliminary injunction will be granted.

## I. The Child Online Protection Act

In what will be codified as 47 U.S.C. § 231, COPA provides that:

> (1) PROHIBITED CONDUCT.-Whoever knowingly and with knowledge of the
> character of the material, in interstate or foreign commerce by means of the World
> Wide Web, makes any communication for commercial purposes that is available to
> any minor and that includes any material that is harmful to minors shall be fined not
> more than $50,000, imprisoned not more than 6 months, or both.
> (2) INTENTIONAL VIOLATIONS.-In addition to the penalties under paragraph
> (1), whoever intentionally violates such paragraph shall be subject to a fine of not
> more than $50,000 for each violation. For purposes of this paragraph, each day of
> violation shall constitute a separate violation.
> (3) CIVIL PENALTY.-In addition to the penalties under paragraphs (1) and (2),
> whoever violates paragraph (1) shall be subject to a civil penalty of not more than
> $50,000 for each violation. For purposes of this paragraph, each day of violation
> shall constitute a separate violation.

COPA specifically provides that a person shall be considered to make a communication for

commercial purposes "only if such person is engaged in the business of making such

communication." 47 U.S.C. §231(e)(2)(A). A person will be deemed to be "engaged in the

business" if the

> person who makes a communication, or offers to make a communication, by
> means of the World Wide Web, that includes any material that is harmful to
> minors, devotes time, attention, or labor to such activities, as a regular course of
> such person's trade or business, with the objective of earning a profit as a result of
> such activities (although it is not necessary that the person make a profit or that
> the making or offering to make such communications be the person's sole or
> principal business or source of income). A person may be considered to be
> engaged in the business of making, by means of the World Wide Web,

4

communications for commercial purposes that include material that is harmful to minors, only if the person knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web.

47 U.S.C. § 231(e)(2)(B).

Congress defined material that is harmful to minors as:

any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that-
(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

Id. at § 231(e)(6). Under COPA, a minor is any person under 17 years of age. Id. at § 231(e)(7).

COPA provides communicators on the Web for commercial purposes affirmative defenses to prosecution under the statute. Section 231 (c) provides that:

(c) AFFIRMATIVE DEFENSE.-
(1) DEFENSE.-It is an affirmative defense to prosecution under this section that the defendant, in good faith, has restricted access by minors to material that is harmful to minors-
(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number;
(B) by accepting a digital certificate that verifies age; or
(C) by any other reasonable measures that are feasible under available technology.

The disclosure of information collected in implementing the affirmative defenses is restricted in § 231(d):

(d) PRIVACY PROTECTION REQUIREMENTS.-
(1) DISCLOSURE OF INFORMATION LIMITED.-A person making a

5

communication described in subsection (a)–

(A) shall not disclose any information collected for the purposes of restricting access to such communications to individuals 17 years of age or older without the prior written or electronic consent of–

 (i) the individual concerned, if the individual is an adult; or

 (ii) the individual's parent or guardian, if the individual is under 17 years of age; and

(B) shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the person making such communication and the recipient of such communication.

(2) EXCEPTIONS.–A person making a communication described in subsection (a) may disclose such information if the disclosure is–

(A) necessary to make the communication or conduct a legitimate business activity related to making the communication; or

(B) made pursuant to a court order authorizing such disclosure.


## II. Arguments of the Parties

The arguments of the parties are plentiful and will be only summarized here for purposes of the motion for a preliminary injunction.  Plaintiffs argue that COPA is unconstitutional on its face and as applied to them because the regulation of speech that is "harmful to minors" burdens or threatens a large amount of speech that is protected as to adults.[1]  According to the plaintiffs, the fact that COPA is vague, overbroad, and a direct ban on speech that provides only affirmative defenses to prosecution contributes to the burden COPA places on speech.  The plaintiffs argue that the affirmative defenses provided in COPA do not alleviate the burden on speech because their implementation imposes an economic and technological burden on speakers which results in loss of anonymity to users and consequently loss of users to its Web sites.  The plaintiffs contend that the defendant cannot justify the burden on speech by showing that COPA is narrowly tailored

---

[1]  The plaintiffs are not challenging the provision of COPA that pertains to speech that is obscene. Thus, the enforcement of that provision of COPA is unaffected by this Memorandum and Order.  Obscenity and child pornography have been the subject of other separate criminal statutes for many years.  These laws are as well not implicated in this proceeding.

to a compelling government interest or the least restrictive means to accomplish its ends.

Alternatively, plaintiffs frame their facial attack to the statute as an overbreadth challenge, arguing

that speech will be chilled on the Web because the statute covers more speech than it was

intended to cover, even if it can be constitutionally applied to a narrow class of speakers.  The

plaintiffs also challenge COPA as being unconstitutionally vague under the First and Fifth

Amendments and facially unconstitutional as to speech protected for minors.

Defendant argues that COPA passes constitutional muster because it is narrowly tailored

to the government's compelling interest in protecting minors from harmful materials.  The

defendant argues that the statute does not inhibit the ability of adults to access such speech or the

ability of commercial purveyors of materials that are harmful to minors to make such speech

available to adults.  The defendant points to the presence of affirmative defenses in the statute as a

technologically and economically feasible method for speakers on the Web to restrict the access of

minors to harmful materials.   As to the plaintiffs' argument that COPA is overbroad, the

defendant argues that the definition of "harmful to minors" material does not apply to any of the

material on the plaintiffs' Web sites, and that the statute only targets commercial pornographers,

those who distribute harmful to minors material "as a regular course" of their business.  The

defendant contends that plaintiffs cannot succeed on their motion for a preliminary injunction

because they cannot show a likelihood of success on their claims and that their claim of

irreparable harm is merely speculative.

Some of the defendant's substantive arguments are conceptually intertwined with her

arguments in support of the pending motion to dismiss the complaint on the basis that the

plaintiffs lack standing to attack the statute.  The motion to dismiss will serve as a starting point

for the Court's analysis.

## III. Resolution of Defendant's Motion to Dismiss

Among other things, the "irreducible constitutional minimum" of standing requires that the plaintiffs allege that they have suffered or imminently will suffer an injury. It is well established that a credible threat of present or future criminal prosecution will confer standing. See, e.g., Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 392-93 (1988) (noting that the Court was "unconcerned by the pre-enforcement nature of th[e] suit" and holding that the injury-in-fact requirement was met, in part, because "plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them"); Steffel v. Thompson, 415 U.S. 452, 459 (1974) ("It is not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statue that he claims deters the ex..r:i:.: of his constitutional rights."), Doe v. Bolton, 410 U.S. 179, 188-89 (1973). The rationale underlying this rule is that a credible threat of present or future prosecution is itself an injury that is sufficient to confer standing, even if there is no history of past enforcement. See Bolton, 410 U.S. at 188. In part, this rationale is based on a recognition that a speaker who fears prosecution may engage in self-censorship, which is itself an injury.

"The standard—encapsulated in the phrase 'credible threat of prosecution'–is quite forgiving " New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 14 (1st Cir 1996) ("NHRLPAC"); see also Babitt v United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) After analyzing both Supreme Court precedent and federal appellate court decisions, the NHRLPAC Court concluded that "the preceding cases make clear that when dealing with pre-

enforcement challenges to recently enacted (or, at least non-moribund) statutes that facially

restrict expressive activity by the class to which the plaintiff belongs, the court will assume a

credible threat of prosecution in the absence of compelling contrary evidence." 99 F.3d at 15; see

also Babitt, 442 U.S. at 301-02; Doe, 410 U.S. at 188; American Booksellers, 484 U.S. at 392-

93; Chamber of Commerce v. REC, 69 F.3d 600, 603-04 (D.C. Cir. 1995) (even though no

present danger of enforcement existed, a credible threat of prosecution existed because nothing

would "prevent the Commission from enforcing its rule at any time with, perhaps, another change

of mind of one of the Commissioners"); Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)

(holding that when a state statute "chills the exercise of First Amendment rights, standing exists

even though the official charged with enforcement responsibilities has not taken any enforcement

action against the plaintiffs and does not presently intend to take any such action").

      The gravamen of the motion of defendant is that plaintiffs' fear of prosecution is wholly

speculative and, therefore, not a credible threat sufficient to confer standing. The defendant

argues that the plaintiffs lack standing because the material on their Web site is not "harmful to

minors," and the plaintiffs are not "engaged in the business" of distributing harmful to minors

materials under the statute. The defendant contends that the Court should narrowly construe

COPA to apply to those engaged in the business of commercial pornography, which does not

include any of the plaintiffs.

      There is nothing in the text of the COPA, however, that limits its applicability to so-called

commercial pornographers only; indeed, the text of COPA imposes liability on a speaker who

knowingly makes any communication for commercial purposes "that includes any material that is

harmful to minors," and defines a speaker that is engaged in the business as one who makes a

communication "that includes any material that is harmful to minors . . . as a regular course of

such person's trade or business (although it is not necessary that the person make a profit or that

the making or offering to make such communications be the person's sole or principal business or

source of income." (emphasis added).  Because COPA applies to communications which include,

but are not necessarily wholly comprised of material that is harmful to minors, it logically follows

that it would apply to any Web site that contains only some harmful to minors material.

Based on the allegations of the complaint and the evidence and testimony presented to the

Court, it appears that all of the individual plaintiffs except Electronic Privacy Information Center

have some content on their Web sites or post some content on other sites that is sexual in nature.[2]

All of the organizational plaintiffs have members who have some content on their Web sites or

who post some content on other sites that is sexual in nature.[3]  The plaintiffs contend that such

sexual material could be considered "harmful to minors" by some communities.

The plaintiffs offer an interpretation of the statute which is not unreasonable, and if their

---

[2]         Plaintiff Electronic Privacy Information Center ("EPIC") is a nonprofit education organization
which studies civil liberties and privacy issues on the Internet.  Thus, EPIC claims that it will suffer imminent
injury as a user of the Web because it fears that it will have to incur costs or its staff will lose anonymity  in
accessing content on the Web and that content providers, to comply with COPA, will remove materials from their
Web sites that it has been able to access and study in the past.  (Complaint ¶¶ 137-141).  The First Amendment
protects the right to "receive information and ideas."  Virginia State Board of Pharmacy v. Virginia Citizens
Consumer Council, Inc., 425 U.S. 748, 757 (1976) (internal quote omitted); see also Pacific Gas and Electric
Company v  Public Utilities Commission of California, 475 U.S. 1, 7 (1986) (noting that the First Amendment
protects the public's interest in receiving information); Kreimer v. Bureau of Police for the Town of Morristown,
958 F.2d 1242, 1254-55 (3d Cir. 1992) (same).

[3]         Furthermore, the four organizations who are bringing suit on behalf of their members--the
American Civil Liberties Union, the American Booksellers Foundation for Free Expression, the Electronic Frontier
Foundation and the Internet Content Coalition-- have averred facts sufficient to support their standing to facially
challenge the statute.  See, e.g., Hunt v  Washington Apple Adver  Comm'n, 432 U.S. 333, 343 (1977).  In each
case, members of their respective organizations would have standing in their own right, the interest each
organization seeks serves to protect is germane to its purpose and neither the claim asserted nor the relief requested
requires the participation of individual members in the lawsuit.  See id.

interpretation of COPA's definition of "harmful to minors" and its application to their content is correct, they could potentially face prosecution for that content on their Web sites.  Vermont Right to Life Comm. Inc. v. Sorrell, 19 F. Supp.2d 204, 210 (D. Vt. 1998) (plaintiffs had standing to challenge campaign finance statute, even though State argued that the plaintiffs were and had been complying with disclosure requirements and that internal group mailings or an isolated distribution of flyers at a county fair are "a far cry from the mass media activities contemplated by the legislature" because the statute on its face could be applied to the activities of the plaintiffs).  Moreover, in the First Amendment context, courts recognize a that litigants "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." American Booksellers, 484 U S  at 393 (internal quotation and citation omitted).  This Court concludes that the plaintiffs have articulated a credible threat of prosecution or shown that they will imminently suffer an injury sufficient to establish their standing to bring this lawsuit.  Accordingly, the motion to dismiss will be denied.


## IV. Standard for a Preliminary Injunction

To obtain a preliminary injunction, the plaintiffs must prove: (1) a likelihood of success on the merits, (2) irreparable harm; (3) that less harm will result to the defendant if the preliminary injunction issues than to the plaintiffs if the preliminary injunction does not issue; and (4) that the public interest, if any, weighs in favor of plaintiffs.  See Pappan Enterprises, Inc. v. Hardees's Food Systems, Inc , 143 F.3d 800, 803 (3d Cir. 1998)).

11

## V. <u>Findings of Fact</u>

Based on all the evidence admitted at the preliminary injunction hearing, the Court makes the following findings of fact.[4]

The parties submitted a Joint Stipulation of Uncontested Facts at the preliminary injunction hearing. (Joint Exhibit 3). Findings of fact numbered 1 through 20 and other findings as indicated are taken from the Joint Stipulation to provide background.

### A. <u>The Internet and the World Wide Web</u>

1.  The Internet is a giant network that interconnects innumerable smaller groups of linked computer networks: a network of networks. (Joint Exhibit 3 ¶1).

2.  The nature of the Internet is such that it is very difficult, if not impossible, to determine its size at a given moment. However, it is indisputable that the Internet has experienced extraordinary growth in the past few years. In 1981, fewer than 300 computers were linked to the Internet, and by 1989, the number stood at fewer than 90,000 computers. By 1993, however, over 1,000,000 computers were linked. The number of host computers has more than tripled from approximately 9.4 million hosts in January 1996 to more than 36.7 million hosts in July 1998. Approximately 70.2 million people of all ages use the Internet in the United States alone. (Joint Exhibit 3 ¶ 3).

---

[4]     The final adjudication of this case will not occur until after a trial on the merits, and thus, the parties may present further evidence at that trial. The findings of fact entered today, unless the result of a stipulation of the parties or based upon substantially identical testimony by witnesses for both sides, are characterized by the Court unconventionally as "testimony" or "evidence presented" so that the Court can explain the evidentiary basis for this Court's legal conclusion that the plaintiffs have met their burden under Federal Rule of Civil Procedure 65 to establish their right to the injunction they seek. Thus, these provisional findings will govern the case until conclusive findings of fact on the merits of the case are entered after the trial.

3.    Some of the computers and computer networks that make up the Internet are owned by

governmental and public institutions; some are owned by non-profit organizations; and

some are privately owned.  The resulting whole is a decentralized, global medium of

communications -- or "cyberspace" -- that links individuals, institutions, corporations, and

governments around the world.  The Internet is an international system.  This

communications medium allows any of the literally tens of millions of people with access

to the Internet to exchange information.  These communications can occur almost

instantaneously, and can be directed either to specific individuals, to a broader group of

individuals interested in a particular subject, or to the world as a whole.  (Joint Exhibit 3 ¶

4).

4.    The content on the Internet is as diverse as human thought.  The Internet provides an easy

and inexpensive way for a speaker to reach a large audience, potentially of millions.  The

start-up and operating costs entailed by communication on the Internet often are

significantly lower than those associated with use of other forms of mass communication,

such as television, radio, newspapers, and magazines.  Creation of a Web site can range in

cost from a thousand to tens of thousands of dollars, with monthly operating costs

depending on one's goals and the Web site's traffic.  Commercial online services such as

America Online allow subscribers to create a limited number of Web pages as a part of

their subscription to AOL services.  Any Internet user can communicate by posting a

message to one of the thousands of available newsgroups and bulletin boards or by

creating one of their own or by engaging in an on-line "chat", and thereby potentially reach

an audience worldwide that shares an interest in a particular topic. (Joint Exhibit 3 ¶ 12).

13

5.      Individuals can access the Internet through commercial and non-commercial "Internet

service providers" of ISPs that typically offer modem access to a computer or computer

network linked to the Internet.  Many such providers are commercial entities offering

Internet access for a  monthly or hourly fee.  Some Internet service providers, however,

are non-profit organizations that offer free or very low cost access to the Internet. (Joint

Exhibit 3 ¶ 18).

6.      Another common way that individuals can access the Internet is through one of the major

national commercial "online services" such as America Online or the Microsoft Network.

These online services offer nationwide computer networks (so that subscribers can dial-in

to a local telephone number), and the services provide extensive and well organized

content within their own proprietary computer networks.  In addition to allowing access

to the extensive content available within each online service, the services also allow

subscribers to link to the much larger resources of the Internet.  Full access to the online

service (including access to the Internet) can be obtained for modest monthly or hourly

fees.  The major commercial online services have millions of individual subscribers across

the United States.  (Joint Exhibit 3 ¶ 19).

7.      In addition to ISPs, individuals may be able to access the Internet through schools,

employers, libraries, and community networks.  (Joint Exhibit 3 ¶¶ 14-17).

8.      Once one has access to the Internet, there are a wide variety of different methods of

communication and information exchange over the network, utilizing a number of different

Internet "protocols."  These many methods of communication and information retrieval

are constantly evolving and are therefore difficult to categorize concisely.  The most

14

common methods of communications on the Internet (as well as within the major online

services) can be roughly grouped into six categories:

(1)    one-to-one messaging (such as "e-mail"),
(2)    one-to-many messaging (such as "listserv" or "mail exploders"),
(3)    distributed message databases (such as "USENET newsgroups"),
(4)    real time communication (such as "Internet Relay Chat"),
(5)    real time remote computer utilization (such as "telnet"), and
(6)    remote information retrieval (such as "ftp," "gopher," and the "World Wide Web").

Most of these methods of communication can be used to transmit text, data,

computer programs, sound, visual images (i.e., pictures), and moving video

images.    (Joint Exhibit 3 ¶ 22).

9.    When persons communicate solely via e-mail, they utilize a protocol known as SMTP (for

simple mail transfer protocol).  Similarly, persons may chat using the Internet Relay Chat

protocol, or may post messages on "Usenet" news groups using a protocol referred to as

NNTP.  The communications listed above in categories (1) through (5) do not involve

communicating by means of "HTTP" or hypertext transfer protocol, which is the protocol

effected by COPA.  (Joint Exhibit 3 ¶ 23).

10    Web-based chat rooms, e-mail, and newsgroups utilizing HTTP or hyper-text transfer

protocol are interactive forms of communication, providing the user with the opportunity

both to speak and to listen.    (Joint Exhibit 3 ¶ 24).

11.    The primary method of remote information retrieval today is the World Wide Web.  (Joint

Exhibit 3 ¶ 25).

12    The World Wide Web, or the "Web," uses a "hypertext" formatting language called

hypertext markup language (HTML), and programs that "browse" the Web can display

15

HTML documents containing text, images, sound, animation and moving video stored in many other formats. Any HTML document can include links to other types of information or resources, so that while viewing an HTML document that, for example, describes resources available on the Internet, an individual can "click" using a computer mouse on the description of the resource and be immediately connected to the resource itself. Such "hyperlinks" allow information to be accessed and organized in very flexible ways, and allow individuals to locate and efficiently view related information even if the information is stored on numerous computers all around the world. (Joint Exhibit 3 ¶ 26).

13.    The World Wide Web was created to serve as the platform for a global, online store of knowledge, containing information from a diversity of sources and accessible to Internet users around the world. Although information on the Web is contained in individual computers, the fact that each of these computers is connected to the Internet through World Wide Web protocols allows all of the information to become part of a single body of knowledge. (Joint Exhibit 3 ¶ 27).

14.    Many organizations now have "home pages" on the Web. These are documents that provide a set of links designed to represent the organization, and through links from the home page, guide the user directly or indirectly to information about or relevant to that organization. (Joint Exhibit 3 ¶ 30).

15.    Links may also take the user from the original Web site to another Web site on another computer connected to the Internet. The ability to link from one computer to another, from one document to another across the Internet regardless of its status or physical location, is what makes the Web unique. (Joint Exhibit 3 ¶ 31).

16

16.   The World Wide Web exists fundamentally as a platform through which people and organizations can communicate through shared information. When information is made available, it is said to be "published" on the Web. Publishing on the Web simply requires that the "publisher" has a computer connected to the Internet and that the computer is running Web server software. The computer can be as simple as a small personal computer costing less than $1500 dollars or as complex as a multi-million dollar mainframe computer. Many Web publishers choose instead to lease disk storage space from someone else who has the necessary computer facilities, eliminating the need for actually owning any equipment oneself. (Joint Exhibit 3 ¶ 32).

17.   A variety of systems have developed that allow users of the Web to search for particular information among all of the public sites that are part of the Web. Services such as Yahoo, Excite!, Altavista, Webcrawler, Infoseek, and Lycos are all services known as "search engines" or directories that allow users to search for Web sites that contain certain categories of information, or to search for key words.

18.   No single organization controls any membership in the Web, nor is there any single centralized point from which individual Web sites or services can be blocked from the Web  From a user's perspective, it may appear to be a single, integrated system, but in reality it has no centralized control point.  (Joint Exhibit 3 ¶ 37).

19.   Once a provider posts its content on the Internet and chooses to make it available to all, it generally cannot prevent that content from entering any geographic community. Unlike the newspaper, broadcast station, or cable system, Internet technology gives a speaker a potential worldwide audience. Because the Internet is a network of networks, any network

17

connected to the Internet has the capacity to send and receive information to any other network. (Joint Exhibit 3 ¶ 41).

20. Sexually explicit material exists on the Internet. Such material includes text, pictures, audio and video images, extends from the modestly titillating to the hardest core. Some Web sites display for free what appear to be still or moving images of a sexually explicit nature. Sexually explicit materials exist on Web pages and on Web-based and non-Web based interactive fora. It exists on sites based in the United States and sites based outside the United States. (Joint Exhibit 3 ¶ 43).

21. There was no evidence in the record regarding the number of Web sites which are posted within the United States. However, based on a statistic from July of 1998 on the percentage of Internet hosts that originate in the United States, Dr. Donna Hoffman estimated that 60% of all content originates in the United States and 40% originates outside the United States. (Hoffman Testimony).

### B. The Speech Provided by the Plaintiffs

22. The plaintiffs represent a broad range of individuals, entities, and organizations suing on behalf of their members, who are speakers, content providers, and ordinary users on the Web. Some of the plaintiffs post, read, and respond to content including, *inter alia*, resources on obstetrics, gynecology, and sexual health; visual art and poetry; resources designed for gays and lesbians; information about books and stock photographic images offered for sale; and online magazines. (Plaintiffs' Declarations; Testimony of Talbot, Laurila, Barr, Rielly, and Tepper).

18

23.     Internet users of all ages access content provided by the plaintiffs over the Web. At least
some of the plaintiffs provide interactive fora such as Web-based electronic mail (email),
Web-based chat, and Web-based discussion groups. Content providers and Web site
operators who offer interactive fora, including some of the plaintiffs, usually select the
topic or topics that will be interactively "discussed" by users through reading and posting
content. (Plaintiffs' Declarations; Talbot Testimony; Rielly Testimony).

24.     The vast majority of information on the plaintiffs' Web sites, as on the Web in general, is
provided to users for free. (Plaintiffs' Declarations; Hoffman Testimony).

25.     The plaintiffs are a diverse group of speakers, which was illustrated by the live testimony
and declarations that were submitted to the Court.[5] Christopher Barr, the vice president
and editor-in-chief of CNET, testified that CNET's Web site provides news on a variety of
topics which is available to users for free. CNET is supported by advertising that is
displayed on its Web page. Barr testified that while he did not think that any material on
CNET was harmful to minors, CNET feared prosecution under COPA for materials of a
sexual nature on its Web site, particularly links provided in articles on the site to other
sites on the Web and materials that may be downloaded for free by a user from the site.
Barr testified that articles on the site in the past have linked to Playboy's Web site, and

---

[5]     The Court considered live testimony and declarations of the plaintiffs which was submitted at
both the preliminary injunction hearing and the temporary restraining order hearing. Declarations were submitted
by Dr. Jeffrey Scott Levy of OBGYN.net; Nikki Douglas of RiotGrrl; Charles Tarver of BlackStripe; Nadine
Strossen, member of the ACLU; Mark Segal of Philadelphia Gay News; Jon E. Noring of the Electronic Frontier
Foundation (EFF); Marc Rotenberg of the Electronic Privacy Information Center; John William Boushka of EFF;
David Bunnell, member of the ACLU; Lawrence Ferlinghetti of City Lights Bookstore and member of the ACLU;
Richard P. Groman of West Stock; Miriam Sontz of Powell's Bookstore; Christopher Finan of the American
Booksellers for Free Expression; Adam K. Glickman of Addazi, Inc. d/b/a Condomania; Ernest Johnson of ArtNet
Worldwide Corporation, Roberta Speyer of OBGYN.net, Barry Steinhardt of EFF; and Patricia Nell Warren, a
member of the ACLU.

that a Kama Sutra screen saver, which includes forty drawings of people engaged in sexual contact, can be downloaded onto a user's computer.  Barr testified that while CNET had not yet developed a policy regarding what the site would do to comply with COPA or where it would place screening devices, if at all, he stated that CNET would probably opt to self-censor the content of the site. (Barr Testimony).

26.     Mitchell Steven Tepper, a member of the ACLU, is owner and operator of the Sexual Health Network, a Web site that he runs out of his home in Connecticut.  The mission of his Web site is to provide easy access to information about sexuality geared toward individuals with disabilities.  In addition to content which Tepper provides on the site, he also offers interactive components, including a bulletin board, where users may post comments, and a chat room.  While any user can access the content on his site for free, Tepper is trying to make a profit from .... .... ... ....... .. ... ......., .... as yet has been unsuccessful.  Tepper testified that Sexual Health Network fears prosecution under COPA based on the content of this site, which is almost exclusively sexual in nature and which contains, for example, information on sexual surrogacy as a form of sexual therapy and advice on how a large man and a small women should position themselves comfortably for intercourse.  Tepper expressed concern that because of the sexual nature of his Web site, implementing one of the affirmative defenses in COPA on his Web site would have the effect of driving viewers away from his site because the users would not want to disclose personal information that reveals their identity in connection with his site.  Tepper also testified that he believed that utilizing a third party age verification service would reduce the amount of traffic on his site because of the stigma and costs to the user associated with

20

such services. (Tepper Testimony).

27.    Thomas P. Rielly is the founder and chairman of PlanetOut, a Web site directed to
developing an online community for gay, lesbian, bisexual, and transgendered people.
PlanetOut's primary revenue comes from advertising on the site.  Rielly testified that the
Internet is a valuable resource for "closeted" people who do not voluntarily disclose their
sexual orientation due to fear of the reactions of others because it allows closeted people
access to this information while preserving their anonymity.  PlanetOut provides a member
form for users who would like to register in order to receive free benefits, but it does not
require membership to access its site.  Rielly estimated that less than 10% of the users to
his site have registered, and PlanetOut does not verify the registration information
provided by the user.  The site includes a bulletin board, on which users may post and read
messages, and chat rooms.  The chat rooms are open 24 hours a day, during which they
are monitored by a person for some of the time.  Rielly testified that it would be
impracticable to monitor all the chat on the site, and that there is no way to edit the
content of chat before it is posted.  (Rielly Testimony).  PlanetOut contains some content
of a sexual nature, including chat profiles of users, at least one of which included a
photograph of a male with exposed genitals, and Internet radio shows with "Dr. Ruthless"
on topics such as anal sex and masturbation.  (Plaintiffs' Exs. 75, 76).  Other areas of
PlanetOut's site are not sexual in nature.  Rielly testified that he predicted that traffic to
his site would drop off if he were to require credit card or other age verification on
PlanetOut; to support this prediction, ne noted that the traffic to a competitor's site which
had placed its entire content behind a credit card wall and charged users $10 per month

only grew to 10,000 total users. While PlanetOut currently cannot process credit cards on its site, it plans to develop its ability to conduct direct commercial transactions over the Web in the future. (Rielly Testimony).

### C. Commercial Activity on the Web

28.   E-commerce, or commercial transactions which are conducted online, is rapidly increasing. (Defendant's Ex. 188). Hoffman testified that there are 3.5 million Web sites globally on the Web, and approximately one third of those sites are commercial, that is Web sites that intend to make a profit. By the year 2003, it is estimated that the total revenues from the Web, including revenues from ISPs, business to business commerce, and business to consumer commerce, will reach $ 1.4 to $ 3 trillion. (Hoffman Testimony). There is no doubt that growth on the Web is explosive.

29.   There are many reasons that may explain such expansive growth. For example, the Web is attractive to businesses because there are low barriers to entry as compared to other forms of commerce and the Web offers a global market or audience of all ages. The Web is attractive to consumers of all ages because a wide array of products and services are offered in an environment which attempts to provide those consumers with "full information." (Hoffman Testimony).

30.   Despite the explosive growth and popularity on the Web, not all companies who operate Web sites are making money online. (Hoffman Testimony).

31.   Hoffman testified that there are five general business models operating on the Web: (1) the Internet presence model, which involves no direct sales or advertising but is used by a

22

business to raise customer awareness of the name and products of the Web site operator,
(2) the advertiser supported or sponsored model, in which nothing is for sale, content is
provided for free, and advertising on the site is the source of all revenue, (3) the fee based
or subscription model in which users are charged a fee before accessing content, (4) the
efficiency or effective gains model, by which a company uses the Web to decrease
operating costs, and (5) the online storefront, in which a consumer buys a product or
service directly over the Web. (Hoffman Testimony).

32. Dr. Hoffman testified that the most popular business model is the advertiser supported or
sponsored model, which is illustrated by the variety of online magazines which operate on
the Web. The fee based or subscription model is the least popular on the Web, although
there are some successful examples of this model, such as the <u>Wall Street Journal</u> Web
site. It is possible for a Web site to adopt a business model that is a hybrid of these five
models. (Hoffman Testimony).

33. As online storefront models and general commercialization on the Web proliferates, the
use of credit cards online and the requirement that users complete fill-out forms or register
with a site will increase. (Hoffman Testimony).

34 The plaintiffs employ a variety of different business models. Some of the plaintiffs receive
income from the operation of their sites by selling advertising on their Web sites. Some of
the plaintiffs charge other Internet speakers, such as fine artists, fine art galleries, or audio
or video content creators, to post relevant content on their Web sites. Some of the
plaintiffs sell goods over their Web sites, ranging from millions of books, to condoms and
other sexual health devices, to books that they authored themselves. Some of the plaintiffs

23

generate revenue by combining these business models. (Plaintiffs' Declarations; Testimony of Barr, Rielly, Tepper, Talbot, Laurila).

35.   Dr. Hoffman testified that investors evaluate an e-business by the number of customers they believe the Web site is able to attract and retain over time, or "traffic." She believes that traffic is the most critical factor for determining success or potential for success on a Web site. The best way to stimulate user traffic on a Web site is to offer some content for free to users. Thus, virtually all Web sites offer at least some free content. (Hoffman Testimony).

36.   Dr. Hoffman testified that another factor affecting traffic to a Web site is "flow." Interactivity increases a users interest level on the Web, which in turn results in return visits to the Web by users. "Flow" describes an online experience in which the user is completely engaged and focused while browsing or surfing the Web, has a sense of control over the experience, and has a proper mix of skills and challenges. Because return users equal more traffic to Web sites, facilitating a user's flow experience is related to a Web site's commercial success. There are many factors that could disrupt a user's flow, including registration screens, broken links on a site, or poor site design. (Hoffman Testimony and Expert Report).

37.   Dr. Hoffman observed in her testimony that in general, users of the Web are reluctant to provide personal information to Web sites unless they are at the end of an online shopping experience and prepared to make a purchase. (Hoffman Testimony). Some Web sites that have required registration or a payment of a fee before granting access to a user to the site have not been successful, such as HotWired and Idea Market. Other Web sites that

24

require a credit card to make a purchase have been successful in obtaining such information from users, such as Amazon.com. (Hoffman Testimony). Through studies that she has conducted and her observations of consumer behavior online, Hoffman concluded that consumers on the Web do not like the invasion of privacy from entering personal information, that their willingness to reveal personal information to a Web site is connected to the degree of trust the user has of the Web site, and that usually users will only reveal credit card information at the time they want to purchase a product or service. (Hoffman Testimony).

### D. Burden of Implementing the Affirmative Defenses Provided in COPA

38.    COPA provides three affirmative defenses that speakers may utilize to avoid prosecution for communicating harmful to minors materials: (1) requiring the use of a credit card, debit account, adult access code, or adult personal identification number, (2) accepting a digital certificate that verifies age, or (3) any other reasonable measures that are feasible under available technology. The parties' expert witnesses agree that at this time, while it is technologically possible, there is no certificate authority that will issue a digital certificate that verifies a user's age. (Farmer Testimony; Olsen Testimony). The plaintiffs presented testimony that there are no other reasonable alternatives that are technologically feasible at this time to verify age online. (Farmer Testimony). The defendant did not present evidence to the contrary.

39.    It appears that the parties agree that the technology required to implement credit card authorization and adult access codes on a Web site is currently available and used on the

Web. (Olsen Testimony; Farmer Testimony).

40.   Depending on (1) the amount of content on a Web site, (2) the amount of that content that

could be considered "harmful to minors," (3) the degree to which a Web site currently is

organized into files and directories, (4) the degree to which "harmful to minors" content

currently is segregated into a particular file or directory on the Web site, and (5) the level

of expertise of the Web site operator, the technological requirements for implementing the

affirmative defenses of credit card verification or accepting adult access codes or PINs

ranges in the testimony of the parties from trivial (Olsen Testimony) to substantial (Farmer

Testimony).  The specific technological requirements of and costs associated with both

affirmative defenses are detailed below.

## 1. Technological Requirements and Out-of-Pocket Costs of Implementing Credit Cards

41.   To obtain credit card verification from users before granting access to harmful to minors

materials, a Web site would need to construct a credit card screen in front of such

materials.  (Farmer Testimony).  It is not disputed that a credit card or age verification

screen can be placed at any point on a Web site: on the last page, or in front of an area of

the site, or on select pages throughout the site, or at the beginning of the site on the home

page.  (Farmer Testimony; Tepper Testimony).

42.   The parties agree that to implement the verification of credit card numbers, a Web site

would need to undertake several steps, including (1) setting up a merchant account, (2)

retaining the services of an authorized Internet-based credit card clearinghouse, (3)

inserting common gateway interface, or CGI, scripts into the Web site to process the user information, (4) possibly rearranging the content on the Web site, (5) storing credit cards numbers or passwords in a database, and (6) obtaining a secure server to transmit the credit card numbers.  (Olsen Testimony; Farmer Testimony).

43.     The evidence shows that the cost of credit card verification services range from a start-up cost of approximately $300, plus per transaction fees, for a service that does not automatically verify or authorize the credit card numbers on the site to thousands of dollars in start-up costs, plus per transaction fees, to set up online credit card verification. (Tepper Testimony; Farmer Testimony).

44.     Alternatively, a Web site could retain the services of a third party to provide online management of the verification of credit cards, but the Web site would incur costs for such services.  (Olsen Testimony).

45.     The parties agree that if a Web site is using an ISP that does not support credit card verification or CGI scripts, a Web site may need to transfer the content to another ISP or its own server.  (Farmer Testimony; Olsen Testimony).  The plaintiffs proffer that a secure server which supports credit card verification may cost a few thousand dollars.  (Farmer Testimony).

46      There is no dispute that there are two types of credit card transactions that occur over the Internet: (1) an "authorize only" transaction (which determines whether the credit card number is valid and can be used to make a purchase), and (2) a "funds capture" transaction (which charges a particular amount to the user's credit card for a product or service).  A fee is charged to the content provider every time a credit card number is

27

authorized; such transaction fees would be approximately $.15 to $.25 per transaction. (Farmer Testimony; Olsen Testimony). Such authorization is not indicated on the credit card holder's monthly statement.   (Olsen Testimony; Farmer Testimony).  However, it is not clear from the conflicting testimony presented at the preliminary injunction hearing whether credit card verification services or clearinghouses will authorize or verify a credit card number in the absence of a subsequent funds capture transaction.  (Farmer Testimony; Olsen Testimony ).

47.     The parties' experts agree that to avoid incurring the costs of authenticating a credit card number every time a user wants to access harmful to minors content behind the screen, a Web site operator could maintain a database of credit card numbers provided by previous users to the site, enabling the credit card number of a repeat user to be verified through the database.  Thus, a Web site would only incur the cost of authorization one time per year for each new user to the screened content.  (Farmer Testimony; Olsen Testimony).  A content provider could also provide users with a password once their credit card has been authorized and store the valid passwords in a database; to return to a screened portion of the site, a return user would enter her password.  A Web site could store encrypted credit card numbers or passwords on the site to reduce security risks associated with storing such information online. (Farmer Testimony; Olsen Testimony).   Creating and maintaining such a database would impose some technological burdens and economic costs on a content provider, but a simple database could be constructed without much expense. (Farmer Testimony, Olsen Testimony).

48      The plaintiffs presented testimony that a minor may legitimately possess a valid credit or

28

debit card.  (Farmer Testimony).  Of course, a minor may obtain the permission of her

parents to use a parent's credit card as well.  The defendant presented no evidence to the

contrary.


## 2. Technological Requirements and Costs Associated with Adult Access Codes or PINs

49.  The knowledgeable witnesses for the parties agree that there are approximately twenty-

five services on the Web which will provide adult access codes or personal identification

numbers.  Adult access codes and adult personal identification numbers (PINs) are

passwords that allow a user to access either an entire site or a restricted area of a Web site

that accepts that particular access code or PIN.  (Alsarraf Testimony, Farmer Testimony).

50.  Laith Alsarraf, the president and CEO of Cybernet Ventures, testified on behalf of the

defendant at the preliminary injunction hearing regarding the adult verification service,

Adult Check, provided by his company.  Once an Adult Check screen is inserted at some

point into a Web s          ⁻ ⁻the Web site is blocked to everyone unless they

possess a valid Adult Check PIN.  A Web site operator can sign up for free with Adult

Check to accept Adult Check PINs, and a Web site operator can earn commissions of up

to 50% to 60% of the fees generated by users who sign up with Adult Check to view

screened content on the site.   Adult Check provides the Web site operator with a script,

free of charge, which can be placed at any point on the Web site where the content

provider wishes to block access to minors.  (Alsarraf Testimony).

51  The parties do not dispute that a user who comes across an Adult Check screen on a Web

29

site may click on the link to the Adult Check site and immediately apply for an Adult Check PIN online. (Alsarraf Testimony). Technically, almost all Web sites can link to such a third party, and the link may be placed anywhere on the Web site. (Farmer Testimony).

52. A user may obtain an Adult Check PIN for $16.95 per year. Adult Check accepts payment by credit card online, or a user may elect to fax or mail an application and a check and a copy of a passport or driver's license to Adult Check. (Alsarraf Testimony).

53. According to Alsarraf, approximately three million users possess a valid Adult Check PIN. The number of Web sites currently using Adult Check is approximately 46,000. Adult Check provides a list of links to other sites utilizing Adult Check PINs on its Web site. The vast majority of these links are to adult entertainment sites. (Alsarraf Testimony).

54. Alsarraf explained that Adult Check utilizes mechanisms whereby it attempts to track fraudulent use of the Adult Check PINs. If Adult Check determines that a PIN is being used fraudulently, that PIN is immediately invalidated. In addition, Adult Check offers free tools to Web sites to prevent a user from bookmarking a page containing harmful to minors material on a Web site and later returning to that page without first passing through the Adult Check screen. A Web site would have to implement such tools to prevent a user from attempting such an end-run around the screen. (Alsarraf Testimony). The Court infers that similar tools should be technically available to other Web sites which have implemented screening by other methods, such as credit cards.

### 3. Reorganizing a Web Site to Segregate Harmful to Minors Materials

55    It appears clear to all the parties that to place potentially harmful to minors materials

30

behind credit card or adult verification screens, some reorganization of the Web site would be required. (Farmer Testimony; Olsen Testimony). To do this, a content provider could reorganize the files in the Web site's directory, which is a place on the site which can hold such files, to disallow files containing material that is harmful to minors from being served to a user unless she enters a credit card number or adult access code or PIN. (Farmer Testimony, Olsen Testimony). A Web site can organize its directories and the files within the directories in any way it chooses. (Olsen Testimony; Farmer Testimony).

56.    It appears uncontradicted that a content provider can segregate potentially harmful to minors images from other non-harmful to minors images and text on a single web page by organizing the potentially harmful to minors images into a separate directory such that a user could only call up those images on the page once she had entered her adult PIN, adult access code, or credit card number. The other images and text on the page would appear for all users. (Alsarraf Testimony). Text is more difficult to segregate than images, and thus if a written article contains only portions that are potentially harmful to minors, those portions canno. be hidden behind age verification screens without hiding the whole article or segregating those portions to another page, without the use of Java scripts or other technology that would allow the text to be pieced back together once a user entered a credit card, access code, or PIN. (Farmer Testimony; Olsen Testimony).

57    The party's experts appear to agree that the length of time required for, and economic costs incurred by, a content provider to review the content currently on a Web site for potentially harmful to minors materials and reorganize or segregate such content depends (1) on the amount of content on a Web site, (2) whether the Web site operator or content

31

provider can utilize a search mechanism to review its content, (3) whether a Web site is already organized into files and directories according to content, and (4) the familiarity a Web site operator has with the content of the files and directories. (Farmer Testimony; Olsen Testimony). The effort required to segregate new content on an ongoing basis over time once a Web site has been organized to implement the affirmative defenses in COPA may be a relatively easier and less expensive task for a Web site operator. (Olsen Testimony).

58.   Some of the plaintiffs have contracts with advertisers, ISPs, or bounty partners which prohibit the Web site's ability to place advertisements near particular content on the Web site or post particular content that contains nudity or that is of a sexually explicit nature. (Defendant's Exs. 25 (under seal) and 105; Tepper Testimony). Such contracts indicate that market forces may necessitate Web site operators and content providers who rely on advertising revenue to segregate content of a sexual nature regardless of COPA.

59.   Once again the experts agreed that the only way to comply with COPA regarding potentially harmful to minors materials in chat rooms and bulletin boards is to require that a credit card screen or adult verification be placed before granting access to all users (adults and minors) to such fora, or to implement a full-time monitor on the site to read all content before it is posted. Because of the dynamic nature of the content of such interactive fora, there is no method by which the creators of those fora could block access by minors to harmful to minors materials and still allow unblocked access to the remaining content for adults and minors, even if most of the content in the fora was not harmful to minors. (Farmer Testimony; Olsen Testimony).

32

### 4. Security Issues

60. COPA requires that content providers or Web site operators take the necessary precautions to prevent unauthorized access to the information they receive from users during the age verification process.  Implementing security measures to safeguard the information provided by users, such as the use of encryption methods, SSLs, and secure servers, will impose some additional technological burdens and economic costs on Web site operators.

### 5. Effect of Complying with COPA on Traffic

61. Hoffman testified that she concluded in light of consumer behavior on the Web that COPA would have a negative effect on users because it will reduce anonymity to obtain the speech and reduce the flow experience of the user, resulting in a loss of traffic to Web sites.   She testified that it was her prediction that content providers would have to adopt one or more methods to comply with COPA by (1) eliminating content on the site that was, or potentially could be considered, harmful to minors, or (2) erect a age verification system on their Web site in front of harmful to minors materials, or (3) alter the questionable content to comply with COPA.  Hoffman opined that whatever method of compliance a speaker elected, users may visit other sites which offered such material without a screen, which would result in loss of traffic to a site. (Hoffman Testimony). Olsen, one of the experts who testified for the defendant, conceded in his testimony that the number of users deterred from a site by registration requirements imposed by COPA

33

could be in the thousands.  (Olsen Testimony).

62.  Hoffman testified that she concluded that the out of pocket costs associated with
complying with COPA did not constitute the real economic burden on content providers,
but rather it was the economic harm that would result from loss of traffic to the site that
constituted the burden.   Even though a Web site operator could pass the cost of
compliance with COPA on to the consumer, Hoffman testified that in general users would
refuse to pay to access content on the site.

63.  Brian L. Blonder, an accountant with expertise in evaluating business plans and economic
conduct, testified that in his opinion, COPA would not impose an unreasonable economic
burden from either out-of-pocket costs or loss of viewers on the seven Web sites of the
plaintiffs which he investigated, including ArtNet, CNET, Salon Magazine, A Different
Light Bookstore, Sexual Health Network, Planet Out, and Free Speech Media.  (Blonder
Testimony and Supplemental Expert Report).

64.  It is reasonable to infer that the number of users deterred from a screened Web site or a
screened portion of a Web site and the economic impact that such loss of viewers may
have on a Web site depends in part on the number of users that visit the site, the strength
of the motivation of the user to access the screened material, and the economic resources
and revenues available to the Web site from other sources and content.  The plaintiffs have
shown that they are likely to convince the Court that implementing the affirmative
defenses in COPA will cause most Web sites to lose some adult users to the portions of
the sites that are behind screens.

34

### E.  Blocking or Filtering Software

65.    The plaintiffs contend that a lesser restrictive means to achieve the goal of Congress of

restricting the access of minors to materials that are harmful to them is the use of

"blocking" or "filtering" technology.

66.    It appears that the parties do not dispute that blocking or filtering software may be used to

block Web sites and other content on the Internet that is inappropriate for minors.  Such

technology may be downloaded and installed on a user's home computer at a price of

approximately $40.00.  Alternatively, it may operate on the user's ISP.  Blocking

technology can be used to block access by minors to whole sites or pages within a site.

(Olsen Testimony).  Blocking and filtering software will block minors from accessing

harmful to minors materials posted on foreign Web sites, non-profit Web sites, and

newsgroups, chat, and other materials that utilize a protocol other than HTTP.  (Olsen

Testimony).

67.    It appears undisputed that blocking and filtering technology is not perfect in that it is

possible that some Web sites that may be deemed inappropriate for minors may not be

blocked while some Web sites that are not inappropriate for minors may be blocked.  In

addition, a minor's access to the Web is not restricted if she accesses the Web from an

unblocked computer or through another ISP.  It is possible that a computer-savvy minor

with some patience would be able to defeat the blocking device. (Magid Testimony).  No

evidence was presented to the Court as to the percentage of time that blocking and

filtering technology is over- or underinclusive.

68    Several Web sites associated with plaintiffs or declarants in this litigation, including Web

35

sites of Condomania, Electronic Frontier Foundation, RiotGrrl, Sexual Health Network, A Different Light, PlanetOut, and Philadelphia Gay News, are currently blocked by SurfWatch and Cyberpatrol, which are two blocking or filtering programs. (Joint Stipulation Exhibit 3 ¶¶ 45-51).

## VI. Analysis of the Motion for Preliminary Injunction and Conclusions of Law

### A. Substantial Likelihood of Success on the Merits

For the purposes of the motion for preliminary injunction, the Court will focus its analysis on the claim of plaintiffs that COPA is unconstitutional on its face for violating the First Amendment rights of adults. The first task of the Court is to determine the level of scrutiny to apply to COPA; then the Court must apply that level of scrutiny to the statute to determine whether plaintiffs are likely to succeed on their claim that it does not pass constitutional muster.

#### 1. Standard of Scrutiny

COPA is a content-based regulation of speech which is protected at least as to adults. Although there are lower standards of scrutiny where the regulation of general broadcast media or "commercial" speech, that is, speech that proposes a commercial transaction, are involved, neither is appropriate here. In Reno I, the Supreme Court found that the case law provided "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium," rejecting the argument that the lowered level of scrutiny applied to the broadcasting medium should be applied to the Internet. See ACLU v Reno, 117 S.Ct 2329, 2344 (1996). The defendant asserted in her brief that the statute may be subject to the lower level of scrutiny which has been applied to the regulation of "commercial speech;" however, the defendant did not press that

36

position for the purposes of the temporary restraining order, nor did she argue this position at the preliminary injunction hearing. Further, it is clear that the case law setting forth the standard of scrutiny for the regulation of commercial speech is inapplicable to the statute before the Court.

Nonobscene sexual expression is protected by the First Amendment. See Sable Communications of California, Inc. v. FCC, 492 U.S. 115, 126 (1989). As a content-based regulation of such expression, COPA is presumptively invalid and is subject to strict scrutiny by this Court. See R.A.V. v. City of St. Paul, 505 U.S. 377, 381 (1992); Sable, 492 U.S. at 126. "As a matter of constitutional tradition, in the absence of evidence to the contrary, we presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." ACLU v. Reno, 117 S.Ct. 2329, 2351 (1997). Thus, the content of such protected speech may be regulated in order to promote a compelling governmental interest "if it chooses the least restrictive means to further the articulated interest." Sable, 492 U.S. at 126 ("It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends."). Attempts of Congress to serve compelling interests must be narrowly tailored to serve those interests without unnecessarily interfering with First Amendment freedoms. Id. Thus, the burden imposed on speech must be outweighed by the benefits gained by the challenged statute. See Elrod v. Burns, 427 U.S. 347, 363 (1976). The Supreme Court has repeatedly stated that the free speech rights of adults may not be reduced to allow them to read only what is acceptable for children. See, e.g., Sable, 492 U.S. at 127 (citing Butler v. Michigan, 352 U.S. 380, 383 (1957) (reversing a conviction under a statute which made it an offense to make available to the public materials found to have a potentially harmful influence on minors as an effort to "burn the house to roast the pig")).

37

## 2. Burden on Speech Imposed by COPA

The first step in determining whether a statute passes strict scrutiny is to assess the burden the statute places on speech. A statute which has the effect of deterring speech, even if not totally suppressing speech, is a restraint on free expression. See Fabulous Associates, Inc. v. Pennsylvania Public Utility Commission, 896 F.2d 780, 785 (3d Cir. 1990). One such deterrent can be a financial disincentive created by the statute. "A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board, 502 U.S. 105, 115 (1991). The Court in Erznoznik noted that the regulation on speech at issue left the speaker "faced with an unwelcome choice: to avoid prosecution of themselves and their employees they must either restrict their movie offerings or construct adequate protective fencing which may be extremely expensive or even physically impracticable." Erznoznik v. City of Jacksonville, 422 U.S. 205, 217 (1975).

In Simon & Schuster, in which the constitutionality of a New York statute which required that the proceeds of any publication of any person who committed a crime be placed in an escrow account for the benefit of the victims of the crime, the Supreme Court noted that "[a] statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." 502 U.S. at 115. "In the context of financial regulation, it bears repeating, . . . that the government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." Id. at 116. The Court considered this law to be similar to an unconstitutional tax based on the content of speech, as "[b]oth forms of financial burden operate as disincentives to

38

speak." Id. at 117. The Supreme Court found that the challenged law established a financial disincentive to create or publish works with a particular content, and as such, the government must justify such differential treatment by showing that the statute was necessary to serve a compelling interest and it narrowly drawn to achieve that end. Id., at 118.

In Fabulous Associates, the Court of Appeals for the Third Circuit considered the constitutionality of an amendment to the Pennsylvania Public Utility Act which required adults who wished to listen to sexually explicit recorded telephone messages to apply for an access code to receive such messages. The court noted that requiring an adult to obtain an access code exerted an inhibitory effect on speech, which "raises issues comparable to those raised by direct [government] imposed burdens or restrictions." Id. The court affirmed the district court's finding that access codes would chill or inhibit potential adult users of dial-a-porn, based on testimony that "impulse callers" would not access the material if they must apply for an access code, as well as evidence that the plaintiffs' revenues dropped to $0 when they switched to an identification number system and the lack of any evidence from the Commonwealth to rebut the showing by plaintiffs. Id. at 785-86.

The district court in Fabulous Associates had found that the statute would impose additional costs on potential customers who owned rotary phones because they would need to purchase equipment so that the phone could utilize the access code. Id. at 786. The cost of the equipment ranged from $19.95 to $29.95. Id. The Court of Appeals observed that while this may not seem overly burdensome, the "First Amendment is not available 'merely to those who can pay their own way.'" Id. at 787 (quoting Murdock v. Pennsylvania, 319 U.S. 105, 111 (1943)). The court noted that this cost may be a deterrent to some users who may call the services on impulse

39

or too infrequently to justify the extra cost. Id. at 787.

In Reno I, in determining whether the CDA imposed a burden on constitutionally protected adult speech, the Supreme Court adopted the district court's finding that "existing technology did not include any effective method for a sender to prevent minors from obtaining access to its communications on the Internet without also denying access to adults." 117 S.Ct 2329, 2347 (1997). The district court also found that there was "no effective way to determine the age of a user who is accessing material through e-mail, mail exploders, newsgroups, or chat rooms." Id. The Supreme Court noted that this limitation, as well as the prohibitively high economic burden of age verification for some sites, "must inevitably curtail a significant amount of adult communication on the Internet." Id.

Much of the evidence and argument at the preliminary injunction hearing here focused on the economic costs that would be imposed on Web site operators and content providers, and particularly the plaintiffs in this action, in complying with COPA, including out-of-pocket costs of implementing the affirmative defenses, loss of revenue and potential closure of Web sites that could occur, and the ability of specific plaintiffs to shoulder these economic costs as incremental costs of running a commercial Web site. The defendant argues that the economic and technological burden imposed by COPA is not substantial and does not impose an unreasonable economic burden on Web site operators.

The economic costs associated with compliance with COPA are relevant to the Court's determination of the burden imposed by the statute. However, even if this Court should conclude that most of the plaintiffs would be able to afford the cost of implementing and maintaining their sites if they add credit card or adult verification screens, such conclusion is not dispositive. First

Amendment jurisprudence indicates that the relevant inquiry is determining the burden imposed on the <u>protected speech</u> regulated by COPA, not the pressure placed on the <u>pocketbooks or bottom lines</u> of the plaintiffs, or of other Web site operators and content providers  not before the Court. The protection provided by the First Amendment in this context is not diminished because the speakers affected by COPA may be commercial entities who speak for a profit. "The government's power to impose content-based financial disincentives on speech surely does not vary with the identity of the speaker." <u>See</u> <u>Simon & Schuster,</u> at 117.  Strict scrutiny is required, not because of the risk of driving certain commercial Web sites out of business, but the risk of driving this particular type of protected speech from the marketplace of ideas.

In assessing the burden placed on protected speech by COPA, it is necessary to take into consideration the unique factors that affect communication in the new and technology-laden medium of the Web.  Each medium of expression "must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems."  <u>Southeastern Promotions, Ltd. v. Conrad</u>, 420 U.S. 546, 557 (1975).  For example, the plaintiffs have presented evidence that the nature of the Web and the Internet is such that Web site operators and content providers cannot know who is accessing their sites, or from where, or how old the users are, unless they take affirmative steps to gather information from the user and the user is willing to given them truthful responses.  In the same vein, it can be inferred that any barrier that Web site operators and content providers construct to bar access to even some of the content on their sites to minors will be a barrier that adults must cross as well.

Evidence presented to this Court is likely to establish at trial that the implementation of credit card or adult verification screens in front of material that is harmful to minors may deter

41

users from accessing such materials and that the loss of users of such material may affect the speakers' economic ability to provide such communications. (Finding of Fact ¶¶ 61-62). The plaintiffs are likely to establish at trial that under COPA, Web site operators and content providers may feel an economic disincentive to engage in communications that are or may be considered to be harmful to minors and thus, may self-censor the content of their sites. Further, the uncontroverted evidence showed that there is no way to restrict the access of minors to harmful materials in chat rooms and discussion groups, which the plaintiffs assert draw traffic to their sites, without screening all users before accessing any content, even that which is not harmful to minors, or editing all content before it is posted to exclude material that is harmful to minors. (Finding of Fact ¶ 59). This has the effect of burdening speech in these fora that is not covered by the statute. I conclude that based on the evidence presented to date, the plaintiffs have established a substantial likelihood that they will be able to show that COPA imposes a burden on speech that is protected for adults. The Court's analysis then turns to the likelihood of plaintiff's ability to make a successful showing that the statute is narrowly tailored to a compelling government interest.

### 3. Compelling Government Interest

It is clear that Congress has a compelling interest in the protection of minors, including shielding them from materials that are not obscene by adult standards. See Sable, 492 U.S. at 126 (citing Ginsberg v. New York, 390 U.S. 629, 639-40 (1968)). There is nothing in the legislative history of COPA that indicates that the intention of Congress was anything but the protection of minors. Congress recognized that the Web is widely accessible to minors and pornography is widely available on the Web. See H.R. Rep. No.105-775 at 9-10. Congress expressed that its

42

intent in COPA was to require "the commercial pornographer to put sexually explicit messages 'behind the counter'" on the Web, similar to existing requirements in some states that such material to be held behind the counter or sold in a paper wrapper in a physical store. Id. at 15.

### 4. Narrow Tailoring and Least Restrictive Means

While the plaintiffs have the burden in the context of the motion for preliminary injunction of showing success on the merits of their claims, the defendant ultimately will bear the burden of establishing that COPA is the least restrictive means and narrowly tailored its objective, which the defendant argues is the regulation of commercial pornographers. See Elrod v. Burns, 427 U.S. 347, 362 (1976). In Elrod, the Supreme Court described "least restrictive means" by stating that "if the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." Id. at 363. Further, to survive constitutional challenge the statute "must further some vital government end by a means that is least restrictive of [First Amendment freedoms] in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." Id.

In Simon & Schuster, 502 U.S. 105, 121 (1991), the Supreme Court, in holding that the "Son of Sam" law, which restricted the ability of a person who had committed a crime to profit by writing about it, was significantly overinclusive and thus not narrowly tailored, noted "that had the law been in effect at the time and place of publication, it would have escrowed payment for such works as The Autobiography of Malcolm X, . . . Civil Disobedience, . . . even the Confessions of St. Augustine." While the Court recognized that this argument was "hyperbole," the Court noted that the law clearly reached a wide range of literature that was outside the scope of the statute's interest. Id at 122.

43

In Fabulous Associates, the Court of Appeals for the Third Circuit upheld the district court's finding that a less restrictive means was available other than requiring access codes because calls to dial-a-porn could be pre-blocked until a customer requested otherwise. Id. at 787. The court held that even if some chill was associated with pre-blocking, it did not entail additional costs to the user nor did it require that the message provider purchase new equipment and absorb increased operating costs. Id. at 788.

The Fabulous Associates court rejected the Commonwealth's argument that central blocking was not as effective as the access code requirement of the statute because minors with phone lines could request unblocking or gain access to unblocked phones, or that a parent who chooses to unblock his phone for the parent's use would place the dial-a-porn messages within the reach of minors. Id. at 788. The court noted that "[i]n this respect, the decision a parent must make is comparable to whether to keep sexually e⸴ ⸴ ⸴ ⸴ ⸴ ⸴ ⸴ ⸴ ⸴or subscribe to adult magazines. No constitutional principle is implicated. The responsibility for making such choices is where our society has traditionally placed it – on the shoulders of the parent." Id.

In evaluating the proposed less restrictive means, the court acknowledged that some minors will access the dial-a-porn message if they are determined to do so; however, the court noted that preventing "'a few of the most enterprising and disobedient young people'" from obtaining access to these messages did not justify a statute that had the "'invalid effect of limiting the content of adult telephone conversations to that which is suitable for children.'" Id. at 788 (quoting Sable Communications v. FCC, 109 S.Ct. 2829, 2838, 2839 (1989)).

Here, this Court's finding that minors may be able to gain access to harmful to minors materials on foreign Web sites, non-commercial sites, and online via protocols other than http

44

demonstrates the problems this statute has with efficaciously meeting its goal. Moreover, there is some indication in the record that minors may be able to legitimately possess a credit or debit card and access harmful to minors materials despite the screening mechanisms provided in the affirmative defenses. See Reno I, 117 S.Ct. at 2349 (noting that "[e]ven with respect to the commercial pornographers that would be protected by the defense[s] [provided in the CDA], the Government failed to adduce any evidence that these verification techniques actually preclude minors from posing as adults"). These factors reduce the benefit that will be realized by the implementation of COPA in preventing minors from accessing such materials online.

On the record to date, it is not apparent to this Court that the defendant can meet its burden to prove that COPA is the least restrictive means available to achieve the goal of restricting the access of minors to this material. Of course, the final determination must await trial on the merits. The plaintiffs suggest that an example of a more efficacious and less restrictive means to shield minors from harmful materials is to rely upon filtering and blocking technology.[3] Evidence was presented that blocking and filtering software is not perfect, in that it is possible that some appropriate sites for minors will be blocked while inappropriate sites may slip through the cracks. However, there was also evidence that such software blocks certain sources of content that COPA does not cover, such as foreign sites and content on other protocols. (Finding of Fact ¶ 66). The record before the Court reveals that blocking or filtering technology may be at least as successful as COPA would be in restricting minors' access to harmful material online without imposing the burden on constitutionally protected speech that COPA imposes on adult

---

[3]       The plaintiffs do not argue that Congress should statutorily require the use of such technology to shield minors from such materials.

45

users or Web site operators.  Such a factual conclusion is at least some evidence that COPA does not employ the least restrictive means.

Beyond the debate over the relative efficacy of COPA compared to blocking and filtering technology, plaintiffs point to other aspects of COPA which Congress could have made less restrictive. Notably, the sweeping category of forms of content that are prohibited – "any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind" (emphasis added)– could have been less restrictive of speech on the Web and more narrowly tailored to Congress' goal of shielding minors from pornographic teasers if the prohibited forms of content had included, for instance, only pictures, images, or graphic image files, which are typically employed by adult entertainment Web sites as "teasers." In addition, perhaps the goals of Congress could be served without the imposition of possibly excessive and serious criminal penalties, including imprisonment and hefty fines, for communicating speech that is protected as to adults or without exposing speakers to prosecution and placing the burden of establishing an affirmative defense on them instead of incorporating the substance of the affirmative defenses in the elements of the crime.

### B. Irreparable Harm

The plaintiffs have uniformly testified or declared that their fears of prosecution under COPA will result in the self-censorship of their online materials in an effort to avoid prosecution, and this Court has concluded in the resolution of the motion to dismiss that such fears are reasonable given the breadth of the statute   Such a chilling effect could result in the censoring of constitutionally protected speech, which constitutes an irreparable harm to the plaintiffs.  "It is

46

well established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Hohe v. Casey, 868 F.2d 69, 72,73 (3d Cir. 1989). For plaintiffs who choose not to self-censor their speech, they face criminal prosecution and penalties for communicating speech that is protected for adults under the First Amendment, which also constitutes irreparable harm.

### C.  Balance of Interests

In deciding whether to issue injunctive relief, this Court must balance the interests and potential harm to the parties.  It is well established that no one, the government included, has an interest in the enforcement of an unconstitutional law.  See ACLU v. Reno, 929 F. Supp. 824, 849 (E.D. Pa. 1996).  It follows in this context that the harm to plaintiffs from the infringement of their rights under the First Amendment clearly outweighs any purported interest of the defendant.

While the public certainly has an interest in protecting its minors, the public interest is not served by the enforcement of an unconstitutional law.  Indeed, to the extent that other members of the public who are not parties to this lawsuit may be effected by this statute, the interest of the public is served by preservation of the status quo until such time that this Court may ultimately rule on the merits of plaintiffs' claims at trial.

### VII.  Conclusion

The protection of children from access to harmful to minors materials on the Web, the compelling interest sought to be furthered by Congress in COPA, particularly resonates with the Court.  This Court and many parents and grandparents would like to see the efforts of Congress

to protect children from harmful materials on the Internet to ultimately succeed and the will of the

majority of citizens in this country to be realized through the enforcement of an act of Congress.

However, the Court is acutely cognizant of its charge under the law of this country not to protect

the majoritarian will at the expense of stifling the rights embodied in the Constitution. Even at

this preliminary stage of the case, I borrow from Justice Kennedy, who faced a similar dilemma

when the Supreme Court struck down a statute that criminalized the burning of the American

flag:

> The case before us illustrates better than most that the judicial power is
> often difficult in its exercise. We cannot here ask another Branch to share
> responsibility, as when the argument is made that a statute is flawed or incomplete.
> For we are presented with a clear and simple statute to be judged against a pure
> command of the Constitution. The outcome can be laid at no door but ours.
> The hard fact is that sometimes we must make decisions that we do not
> like. We make them because they are right, right in the sense that the law and the
> Constitution, as we see them, compel the result. And so great is our commitment
> to the process that, except in the rare case, we do not pause to express distaste for
> the result, perhaps for fear of undermining a valued principle that dictates the
> decision. This is one of those rare cases.

Texas v. Johnson, 491 U.S. 397, 420 (1989) (Kennedy, J., concurring).

Despite the Court's personal regret that this preliminary injunction will delay once again

the careful protection of our children, I without hesitation acknowledge the duty imposed on the

Court and the greater good such duty serves. Indeed, perhaps we do the minors of this country

harm if First Amendment protections, which they will with age inherit fully, are chipped away in

the name of their protection.

Based on the foregoing analysis, the motion to dismiss the plaintiffs for lack of standing

will be denied.

Based on the foregoing findings and analysis, the Court concludes that the plaintiffs have

48

established a likelihood of success on the merits, irreparable harm, and that the balance of interests, including the interest of the public, weighs in favor of enjoining the enforcement of this statute pending a trial on the merits, and the motion of plaintiffs for a preliminary injunction will be granted.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| JANET RENO, in her official capacity as | : | |
| Attorney General of the United States | : | NO.  98-5591 |

FILED   FEB ● 1 1999

## O R D E R

AND NOW, this 1ˢᵗ day of February, 1999, upon consideration of the motion of plaintiffs

for a preliminary injunction and supporting brief (Document No. 73), the response of the

defendant (Document No. 82), and the supplemental reply brief of the plaintiffs (Document No.

74), as well as the exhibits, declarations, and other evidence submitted by the parties, having held

a hearing on this motion in which counsel for both sides presented evidence and argument, and for

the reasons set forth in the accompanying Memorandum, it is hereby **ORDERED** that the motion

is **GRANTED** and defendant Janet Reno, in her official capacity as Attorney General of the

United States, and, pursuant to Federal Rule of Civil Procedure 65(d), defendant's officers,

agents, servants, employees, and attorneys, and those persons in active concert or participation

with defendant who receive actual notice of this Order, are **PRELIMINARILY ENJOINED**

from enforcing or prosecuting matters premised upon 47 U.S.C. § 231 of the Child Online

Protection Act at any time[1] for any conduct[2] that occurs while this Order is in effect.  This Order

---

[1]     As noted by this Court in the Order granting the plaintiffs' motion for a temporary restraining
order on November 19, 1998, it appears from the arguments of the parties and research conducted by this Court
that it is unclear whether a federal court has the power to enjoin prosecution under a statute for acts that occur
during the pendency of the injunctive relief if the decision to enjoin enforcement of the statute is later reversed on
appeal.  See Edgar v. MITE Corporation, 457 U.S. 624, 647, 655 (1982) (Stevens, J., concurring) (asserting that a
federal judge lacked the authority to enjoin later state prosecution under a state statute) (Marshall, J., dissenting)
(asserting that federal judges have the power to grant such injunctive relief and if the order is ambiguous, it should

does not extend to or restrict any action by defendant in connection with any investigations or prosecutions concerning child pornography or material that is obscene under 47 U.S.C. § 231 or any other provisions of the United States Code.

**IT IS FURTHER ORDERED** that the filing of a bond is waived.[3]

**IT IS FURTHER ORDERED** that this preliminary injunction shall remain in effect until a final adjudication of the merits of plaintiffs' claims has been made.

**IT IS FURTHER ORDERED** that, upon consideration of the motion of defendant to dismiss the complaint of plaintiffs for lack of standing (Document No. 50), the response of plaintiffs (Document No. 69), and the reply thereto (Document No. 81), for the reasons set forth in the accompanying Memorandum, the motion is **DENIED**.

ENTERED: ___2 - 1 -99___

LOWELL A. REED, JR., J.

## CLERK OF COURT

be presumed to grant such relief). While there is no binding precedent that affirmatively establishes the power of a court to enter such an injunction, there is an indication in the case law that plaintiffs who rely in their actions on judgments of the court and are later prosecuted for their actions after the judgment is reversed can be successful in raising the judgment of the court as a defense to prosecution. See Clarke v U.S., 915 F.2d 699 (D.C. Cir. 1990) (citing cases and noting that a federal judge enjoining a federal prosecution does not present the federalism concerns that were present in Edgar). Granting injunctive relief to the plaintiffs, who are raising a constitutional challenge to a criminal statute that imposes imprisonment and fines on its violators, that only immunizes them for prosecution during the pendency of the injunction, but leaves them open to potential prosecution later if the Order of this Court is reversed, would be hollow relief indeed for plaintiffs and members of the public similarly situated. Thus, the Court enjoins the defendant from enforcing COPA against acts which occur during the pendency of this Order, in an effort to tailor the relief to the realities of the situation facing the plaintiffs.

     [2]    The defendant urges this Court to bar enforcement of COPA, if at all, only as to the plaintiffs. However, the defendant has presented no binding authority or persuasive reason that indicates that this Court should not enjoin total enforcement of COPA. See ACLU v. Reno, 929 F. Supp. 824, 883 (1996); Virginia v. American Booksellers Association, 484 U.S. 383, 392 (1988) (noting that in the First Amendment context, "litigants . . . are permitted to challenge a statute not because of their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression")(internal quotations omitted).

     [3]    See ACLU v. Reno, 929 F. Supp. at 884 (citing Temple University v. White, 941 F.2d 201, 220 (3d Cir. 1991)).

2