IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION**, *et al.*, | ) ) ) | |
| **Plaintiffs**, | ) ) | |
| v. | ) ) | Civil Action No. 98-CV-5591 |
| **ALBERTO R. GONZALES**, in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| **Defendant.** | ) ) ) | |

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR PARTIAL JUDGMENT ON THE PLEADINGS

PETER D. KEISLER
Assistant Attorney General

PATRICK L. MEEHAN
United States Attorney
RICHARD BERNSTEIN
Assistant U.S. Attorney

THEODORE C. HIRT
Assistant Branch Director
RAPHAEL O. GOMEZ
Senior Trial Counsel

ERIC J. BEANE
ISAAC CAMPBELL
JOEL McELVAIN
KENNETH SEALLS
JAMES TODD
TAMARA ULRICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C.  20530
(202) 305-1432

Date: August 25, 2006

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    A.    Statutory Background ................................................................................ 2

    B.    Amended Complaint and Procedural Background ................................... 4

LEGAL STANDARDS ................................................................................................. 5

ARGUMENT ............................................................................................................... 6

I.    PLAINTIFFS LACK STANDING TO CHALLENGE THE
CONSTITUTIONALITY OF COPA ............................................................... 6

    A.    There Is Established Precedent to Determine the Parameters of
Harmful-To-Minors Material Under COPA ......................................... 9

    B.    Plaintiffs' Claims Are Premised Only On A Subjective Fear of Prosecution ..... 14

    C.    None of the Objective Evidence Submitted by Plaintiffs Supports Their
Alleged Fear of Prosecution ................................................................. 16

        1.    The Material Upon Which ACLU Member Lawrence Ferlinghetti
Fears Prosecution Does Not Fall Within COPA ....................................... 17

        2.    The Material Upon Which ACLU Member Patricia Nell Warren
Fears Prosecution Does Not Fall Within COPA ..................................... 18

        3.    The Material Upon Which Plaintiff Addazi, Inc. d/b/a Condomania
Fears Prosecution Does Not Fall Within COPA ....................................... 20

        4.    The Material Upon Which Heather Corinna Fears Prosecution
Does Not Fall Within COPA ................................................................. 21

            a.    Scarleteen .................................................................. 21

            b.    Scarlet Letters ........................................................... 23

            c.    Femmerotic ................................................................ 24

        5.    The Material Upon Which Electronic Frontier Foundation Member
Bill Boushka Fears Prosecution Does Not Fall Within COPA ............... 26

6. The Material Upon Which Free Speech Media Fears Prosecution Does Not Fall Within COPA ................................... 28

7. The Material Upon Which Nerve.com Fears Prosecution Does Not Fall Within COPA ................................... 29

8. The Material Upon Which Aaron Peckham d/b/a Urban Dictionary Fears Prosecution Does Not Fall Within COPA ..................................... 31

9. The Material Upon Which Philadelphia Gay News Fears Prosecution Does Not Fall Within COPA ................................... 33

10. The Material Upon Which Powell's Bookstores Fears Prosecution Does Not Fall Within COPA ................................... 35

11. The Material Upon Which Salon Media Group Fears Prosecution Does Not Fall Within COPA ................................... 35

12. The Material Upon Which Sexual Health Network Fears Prosecution Does Not Fall Within COPA ................................... 38

B. Associational Plaintiffs Have Not Demonstrated Standing ................................. 39

1. Associations Have Not Demonstrated Standing on Behalf of Individual Members Who Post Material on the Web ............................. 40

2. Associations Have Not Demonstrated Standing on Behalf of Listener Members ................................... 42

3. Participation of Individual Members Is Necessary In This Lawsuit ................................... 43

C. The Electronic Privacy Information Center Has Not Demonstrated Standing ................................... 44

II. BECAUSE COPA'S DEFINITION OF MINOR DOES NOT RESTRICT OLDER MINORS' ACCESS TO OTHERWISE APPROPRIATE SEXUALLY EXPLICIT INFORMATION, PLAINTIFFS CANNOT MAINTAIN THEIR SECOND CAUSE OF ACTION ................................... 46

III. BECAUSE PLAINTIFFS DO NOT HAVE A RIGHT TO COMMUNICATE OR ACCESS HARMFUL TO MINORS CONTENT ANONYMOUSLY, THEY CANNOT SUSTAIN THEIR THIRD CAUSE OF ACTION ................................... 49

CONCLUSION ................................... 53

# TABLE OF AUTHORITIES

**CASES**          **PAGE(s)**

ACLU Student Chapter Univ. of Md. v. Mote,
     321 F. Supp. 2d 670 (D. Md. 2004) ............................................................ 42

ACLU v. Johnson,
     194 F.3d 1149 (10th Cir. 1999) .................................................................. 10

ACLU v. Reno,
     31 F. Supp. 2d 473 (E.D. Pa. 1999) ....................................................... 5, 15

Aiello v. City of Wilmington,
     623 F.2d 845 (3d Cir. 1980) ........................................................................ 7

Allen v. Wright,
     468 U.S. 737 (1984)) .................................................................................... 7

Am. Booksellers Ass'n v. Virginia,
     882 F.2d 125 (4th Cir. 1989) ............................................................... 12, 47

Am. Booksellers Found. v. Dean,
     342 F.3d 96 (2d Cir. 2003) ......................................................................... 10

Am. Booksellers v. Webb,
     919 F.2d 1493 (11th Cir. 1990) ........................................................... 12, 47

Am. Library Ass'n v. Barr,
     956 F.2d 1178 (D.C. Cir. 1992) ....................................................... 8, 15, 16

Ashcroft v. ACLU,
     542 U.S. 656 (2004) .................................................................................... 14

Athenaco, Ltd. v. Cox,
     335 F. Supp.2d 773 (E.D. Mich. 2004) ........................................... 10, 13, 43

Babbitt v. United Farm Workers Nat'l Union,
     442 U.S. 289 (1979) ..................................................................................... 7

Baker v. Glover,
     776 F. Supp. 1511 (M.D. Ala. 1991) .......................................................... 32

Bellotti v. Baird,
     443 U.S. 622 (1979) .................................................................................... 48

Bordell v. Gen. Elec. Co.,
   922 F.2d 1057 (2d Cir. 1991) .......................................................................... 8, 9, 18, 20

Broadrick v. Oklahoma,
   413 U.S. 601 (1973) ............................................................................................. 48

Brockett v. Spokane Arcades, Inc.,
   472 U.S. 491 (1985) ............................................................................................. 11

Buckley v. Am. Constitutional Law Found.,
   525 U.S. 182 (1999) ............................................................................................. 49

Carpet Group Int'l v.  Oriental Rug Importers Ass'n,
   227 F.3d 62 (3d Cir. 2000) ................................................................................... 5

City of Los Angeles v. Lyons,
   461 U.S. 95 (1983) ............................................................................................. 7, 42

Cohen v. Calif.,
   403 U.S. 15 (1971) ............................................................................................. 12, 32

Conley v. Gibson,
   355 U.S. 41 (1957) ................................................................................................. 6

Connection Distributing Co. v. Reno,
   154 F.3d 281 (6th Cir. 1998) ............................................................................. 51, 52

Crawford v. Lungren,
   96 F.3d 380 (9th Cir. 1996) .................................................................................. 52

Cyberspace Communications, Inc. v. Engler,
   142 F. Supp.2d 827 (E.D. Mich. 2001) ................................................................. 10

Davis-Kidd Booksellers, Inc. v. McWherter,
   866 S.W.2d 520 (Tenn. 1993) .............................................................................. 47

Doe v. City of Minneapolis,
   693 F. Supp. 774 (D. Minn. 1988), aff'd, 898 F.2d 612 (8th Cir. 1990) ....................... 52

Erznoznik v. City of Jacksonville,
   422 U.S. 205 (1975) ............................................................................................. 11

Evans v. United States,
   504 U.S. 255 (1992) ............................................................................................. 48

Fabulous Assoc., Inc. v. Pennsylvania Public Utility Comm'n,
    896 F.2d 780 (3d Cir. 1990) ........................................ 52

Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,
    141 F.3d 71 (3d Cir. 1998) ........................................ 6

Fort Wayne Books, Inc. v. Indiana,
    489 U.S. 46 (1989) ................................................ 53

Georgia Cemetery Ass'n v. Cox,
    353 F.3d 1319 (11th Cir. 2003) .................................... 44

Gibson v. Mayor & Council of Wilmington,
    355 F.3d 215 (3d Cir. 2004) ....................................... 9

Ginsberg v. State of New York,
    390 U.S. 629 (1968) ........................................... passim

Harp Adver. Illinois, Inc. v. Village of Chicago Ridge,
    9 F.3d 1290 (7th Cir. 1993) ....................................... 9

Hayes v. Cmty. Gen. Osteopathic Hosp.,
    940 F.2d 54 (3d Cir. 1991) ........................................ 6

Hoffman v. Hunt,
    845 F. Supp. 340 (W.D.N.C. 1994) ................................. 8

Humane Soc'y v. Hodel,
    840 F.2d 45 (D.C. Cir. 1988) ..................................... 45

Hunt v. Washington State Apple Adver. Comm'n,
    432 U.S. 333 (1977) ........................................ 40, 43, 44

Information Providers' Coalition for Defense of First Amendment v. FCC,
    928 F.2d 866 (9th Cir. 1991) ..................................... 52

Kessler Inst. for Rehab. v. Mayor and Council of Borough of Essex Fells,
    876 F. Supp. 641 (D.N.J. 1995) .................................. 45

Knievel v. ESPN,
    393 F.3d 1068 (9th Cir. 2005) .................................... 14

Kois v. Wisconsin,
    408 U.S. 229 (1972) .............................................. 13

Laird v. Tatum,
    408 U.S. 1 (1972) ................................................................. 7, 8, 18, 20

Lamont v. Postmaster General,
    381 U.S. 301 (1965) ................................................................... 50

McIntyre v. Ohio Elections Comm'n,
    514 U.S. 334 (1995) ................................................................... 50

McKay v. Heyison,
    614 F.2d 899 (3d Cir. 1980) ......................................................... 42

Meese v. Keene,
    481 U.S. 465 (1987) ..................................................................... 8

Mendelsohn v. Meese,
    695 F. Supp. 1474 (S.D.N.Y. 1988) ............................................... 45

Miller v. California,
    413 U.S. 15 (1973) .................................................................. 10, 12

Miree v. DeKalb County,
    433 U.S. 25 (1977) ....................................................................... 6

Mortensen v. First Fed. Sav. & Loan Ass'n,
    549 F.2d 884 (3d Cir. 1977) ....................................................... 5, 14

Newark Branch, NAACP v. Town of Harrison,
    907 F.2d 1408 (3d Cir. 1990) ....................................................... 39

O'Shea v. Littleton,
    414 U.S. 488 (1974) .................................................................... 41

Osborne v. Ohio,
    495 U.S. 103 (1990) ................................................................ 11, 12

PSINet v. Chapman,
    362 F.3d 227 (4th Cir. 2004) ........................................................ 10

Penn. Psychiatric Soc'y v. Green Spring Health Servs., Inc.,
    280 F.3d 278 (3d Cir. 2002) ......................................................... 44

Pfizer, Inc. v. Ranbaxy Labs. Ltd.,
    321 F. Supp. 2d 612 (D. Del. 2004) ................................................. 6

Phelps v. Hamilton,
    122 F.3d 1309 (10th Cir. 1997) ........................... 15

Pope v. Illinois,
    481 U.S. 497 (1987) ........................... 12, 47

Powers v. Ohio,
    499 U.S. 400 (1991) ........................... 9

Prevard v. Fauver,
    47 F. Supp. 2d 539 (D.N.J. 1999) ........................... 6

Raines v. Byrd,
    521 U.S. 811 (1997) ........................... 7

Reno v. ACLU,
    521 U.S. 844 (1997) ........................... 10, 13, 43, 49, 53

Rent Stabilization Ass'n v. Dinkins,
    5 F.3d 591 (2d Cir. 1993) ........................... 44

Roth v. United States,
    354 U.S. 476 (1957) ........................... 13

Sable Comm'n of Cal., Inc. v. FCC,
    492 U.S. 115 (1989) ........................... 49

Serv. Employees Int'l Union v. Municipality of Mt. Lebanon,
    446 F.3d 419 (3d Cir. 2006) ........................... 8, 15

Simon v. Eastern Ky. Welfare Rights Org.,
    426 U.S. 26 (1976) ........................... 7, 14

Spencer v. Kemna,
    523 U.S. 1 (1998) ........................... 26

State of Texas v. Stone,
    137 S.W.3d 167 (Tex. Ct. App. 2004) ........................... 10

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ........................... 7

Talley v. Calif.,
    362 U.S. 60 (1960) ........................... 50

United States v. Torquato,
      602 F.2d 564 (3d Cir. 1979) ....................................................................... 16

Upper Midwest Booksellers Ass'n v. Minneapolis,
      780 F.2d 1389 (8th Cir. 1986) ..................................................................... 52

Valley Forge Christian College v. Am. United for Separation of Church and State, Inc.,
      454 U.S. 464 (1982) ...................................................................... 40, 41, 42

Veterans and Reservists for Peace in Vietnam v. Regional Commissioner of Customs,
      459 F.2d 676 (3d Cir. 1972) ....................................................................... 51

Virginia v. Am. Booksellers Ass'n,
      372 S.E.2d 618 (Va. 1988) ............................................................. 12, 13, 43, 47

Warth v. Seldin,
      422 U.S. 490 (1975) ........................................................................... 39, 45

**STATUTES**

18 U.S.C. § 2257 ................................................................................... 51

47 U.S.C. § 231(a) ............................................................................ 2, 23

47 U.S.C. § 231(b) .................................................................. 4, 33, 34, 38

47 U.S.C. § 231(c) .................................................................................. 3

47 U.S.C. § 231(d) .............................................................................. 3, 50

47 U.S.C. § 231(e) ........................................................................... passim

47 U.S.C. § 501 ................................................................................... 51

Ga. Code Ann. § 16-12-102 ....................................................................... 47

N.Y. Penal Law § 235.20(1) ..................................................................... 46

Tenn. Code Ann. § 39-17-901 ................................................................... 47

Tex. Penal Code § 43.24 ......................................................................... 10

Va. Code Ann. § 18.2-390(1) ................................................................... 47

# MISCELLANEOUS

Fed. R. Civ. P. 12(b)(1) ............................................................................................. 5

Fed. R. Civ. P. 12(c) .................................................................................................. 6

H.R. Rep. No. 105-775 (1998) ....................................................................... 10, 12, 48

S. Rep. No. 105-225 (1998) ................................................................................... 23, 24

**INTRODUCTION**

The growth of the Internet has provided easy access to materials for the majority of Americans.  It is a valuable resource, where individuals can shop, research, connect with others, and be entertained.  It is also the only place in the country where commercial pornographers can place their material without any restrictions, offering it to anyone regardless age.  Congress passed the Child Online Protection Act ("COPA") in 1998 to address a pervasive problem in American society – how to protect the nation's children from being exposed to pornography on the Internet.  There are laws to protect children from sexually explicit material in all other contexts, and, with COPA, there is now a law to protect children on the World Wide Web.

Plaintiffs in this action raise First Amendment challenges to COPA.  As an initial matter, the Plaintiffs filing suit are not the proper entities to do so.  COPA targets commercial pornography, and none of the Plaintiffs in this action are commercial pornographers.  Many do not even have sexually explicit material on their website that could possibly fall within COPA's definition of harmful-to-minors material.  Others have clear artistic, literary, or scientific value – the kind of material that cannot be considered to be harmful to minors under COPA.  Plaintiffs' purported fear of prosecution under COPA is not supported by any objective evidence, and Plaintiffs, therefore, do not have standing to bring this lawsuit.  Therefore, the court should dismiss their claims for lack of jurisdiction.

In their Amended Complaint, Plaintiffs raise four causes of action.  While some of these require factual development at trial, two of these causes of action raise pure questions of law and can be summarily disposed on the pleadings.  Plaintiffs' Second Cause of Action – that COPA violates older minors' rights to access material on the Internet – is based on a flawed legal

1

premise, and can be decided without further factual development.  Likewise, Plaintiffs' Third

Cause of Action – that COPA violates the right to communicate and access information

anonymously – is also premised on flawed assumptions and can be disposed of without further

factual development.  Because Plaintiffs cannot maintain their Second and Third Causes of

Action as a matter of law, the court should award Defendant judgment on the pleadings for those

claims.

## BACKGROUND

### A.    Statutory Background

COPA's objective is to prevent commercial pornography websites from offering minors

access to the materials on their sites.  To that end, COPA establishes criminal and civil penalties

when a person "knowingly and with knowledge of the character of the material, in interstate or

foreign commerce by means of the World Wide Web, makes any communication for commercial

purposes that is available to any minor and that includes any material that is harmful to minors."

47 U.S.C. § 231(a)(1)-(3).  COPA defines a minor as "any person under 17 years of age."  *Id.* at

§ 231(e)(7).  A person communicates "for commercial purposes" only if he "is engaged in the

business of making such communications," *id.* at § 231(e)(2)(A), and a person is engaged in the

business of making such communications only if he "devotes time, attention, or labor" to making

harmful-to-minors communications "as a regular course of [his] trade or business, with the

objective of earning a profit as a result of such activities (although it is not necessary that the

person make a profit or that the making or offering to make such communications be the

person's sole or principal business or source of income)."  *Id.* at § 231(e)(2)(B).  Further, only a

person who "knowingly causes material that is harmful to minors to be posted on the World

Wide Web or knowingly solicits such material to be posted on the World Wide Web" will be

considered to be "engaged in the business of making, by means of the World Wide Web,

communications for commercial purposes that include material that is harmful to minors."  *Id.*

COPA defines "material that is harmful to minors" as "any communication, picture,

image, graphic image file, article, recording, writing, or other matter of any kind" that is

"obscene" or that:

> (A) the average person, applying contemporary community
> standards, would find, taking the material as a whole and with
> respect to minors, is designed to appeal to, or is designed to pander
> to, the prurient interest;

> (B) depicts, describes, or represents, in a manner patently offensive
> with respect to minors, an actual or simulated sexual act or sexual
> contact, an actual or simulated normal or perverted sexual act, or a
> lewd exhibition of the genitals or post-pubescent female breast;
> and

> (C) taken as a whole, lacks serious literary, artistic, political, or
> scientific value for minors.

47 U.S.C. § 231(e)(6).

COPA provides "an affirmative defense to prosecution" if a person, "in good faith, has

restricted access by minors to material that is harmful to minors."  47 U.S.C. § 231(c)(1).  A

person qualifies for this affirmative defense by (A) "requiring use of a credit card, debit account,

adult access code, or adult personal identification number," (B) "accepting a digital certificate

that verifies age," or (C) taking "any other reasonable measures that are feasible under available

technology."  *Id.*  Information collected for the purpose of restricting minors' access to materials

covered by the Act is protected from unauthorized disclosure.  47 U.S.C. § 231(d).

COPA does not apply to Internet access service providers (commonly referred to as

"ISPs," such as America Online or Cox Communications) or Internet information location tool

providers.[1]  47 U.S.C. § 231(b)(2)-(3).  In addition, COPA does not apply to those "similarly

engaged in the transmission, storage, retrieval, hosting, formatting, or translation . . . of a

communication made by another person, without selection or alteration of the content of the

communication."  47 U.S.C. § 231(b)(4).

### B.     Amended Complaint and Procedural Background

On January 19, 2005, Plaintiffs filed an Amended Complaint for declaratory and

injunctive relief.  Plaintiffs are either website operators, none of which have anything to do with

the commercial display and distribution of pornography on the Web, or associations suing on

behalf of members who operate websites.[2]

Plaintiffs assert four causes of action, all based on violations of the First and Fifth

Amendments of the Constitution.  First, Plaintiffs allege that COPA violates the First and Fifth

Amendments of the Constitution on its face and applied because it restricts constitutionally

protected speech for adults, is not the least restrictive means, and is overbroad.  Am. Compl. at

54 ¶¶ 18-21.[3]  Second, Plaintiffs allege that COPA violates older minors' rights to access

material.  *Id.* at 54 ¶¶ 22-23.  Third, Plaintiffs allege that COPA violates the right to

---

[1]  An Internet information location tool is "a service that refers or links users to an online location on the World Wide Web.  Such term includes directories, indices, references, pointers, and hypertext links."  47 U.S.C. § 231(e)(5).

[2]  In addition to representing website operators, ACLU, American Booksellers Foundation for Free Expression ("ABFFE") and the Electronic Frontier Foundation ("EFF") assert that they represent their members seeking access to the Internet.  The Electronic Privacy Information Center ("EPIC") asserts an Internet access claim in its own right.

[3]  The Amended Complaint filed electronically with the Court does not contain consecutive numbering throughout the document.  Therefore, all references to the Amended Complaint will refer to both a page and paragraph number.

communicate and access information anonymously.  *Id.* at 54-55 ¶¶ 24-25.  Fourth, Plaintiffs

allege that COPA is unconstitutionally vague.  *Id.* at 55 ¶¶ 26-27.

Plaintiffs base their challenge of COPA on their fear of prosecution under the Act "for

communicating, sending, displaying, or distributing material that might be deemed 'harmful to

minors' by some community in the United States."  Am. Compl. at 24 ¶ 2.  Plaintiffs further

allege that speakers providing information on the Web do not have a reasonable means to limit

access to their speech by minors.  *Id.* at 20-21 ¶ 3.  Plaintiffs allege that, if COPA were to go

into effect, they would need to: (1) risk criminal prosecution and civil penalties; (2) self-censor;

or (3) set up credit card or access code systems which would prevent or deter adults and older

minors from accessing their websites.  *Id.* at 26 ¶ 7.  On March 29, 2006, Plaintiffs Androgyny

Books, Inc., Dan Savage and PlanetOut were voluntarily dismissed from the case.  *See* Dkt. Nos.

268-70.

COPA is not currently in effect, as the Court issued a preliminary injunction on February

1, 1999, based on the original complaint.  *ACLU v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999).

## LEGAL STANDARDS

Defendant challenges Plaintiffs' standing under Fed. R. Civ. P. 12(b)(1).  Because this

motion raises a jurisdictional challenge "in fact," the trial court "is free to weigh the evidence

and satisfy itself as to the existence of its power to hear the case."  *Mortensen v. First Fed. Sav.*

*& Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).  "In short, no presumptive truthfulness attaches

to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial

court from evaluating for itself the merits of jurisdictional claims."  *Id.  See also Carpet Group*

*Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 69 (3d Cir. 2000) (same).

The remainder of Defendant's motion is one for judgment on the pleadings under Fed. R. Civ. P. 12(c).  A motion is granted under Rule 12(c) when the movant "clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law, . . . view[ing] the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the non-moving party."  *Hayes v. Cmty. Gen. Osteopathic Hosp.*, 940 F.2d 54 (3d Cir. 1991).  Judgment on the pleadings can be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief."  *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 321 F. Supp. 2d 612, 615 (D. Del. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 45 (1957)).  While the court accepts all well-pleaded allegations as true, "it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations."  *Prevard v. Fauver*, 47 F. Supp. 2d 539, 542 (D.N.J. 1999) (citing *Miree v. DeKalb County,* 433 U.S. 25, 27 (1977)).

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO CHALLENGE THE CONSTITUTIONALITY OF COPA

Plaintiffs bear the burden at every stage of the litigation of establishing their standing to sue, and, once the case has moved beyond the pleading stage, must do so by proffering specific facts to demonstrate that they have standing.  *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998).  "To meet the standing requirements of Article III, '[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"[4]  *Raines,* 521

---

[4]  Of particular importance to this case, the Supreme Court has stated that the "standing inquiry has been especially rigorous when reaching the merits of the dispute that would force us

U.S. at 818 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  The standing issue must be resolved prior to reaching the merits of Plaintiffs' claims.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) ("The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception.") (internal quotations omitted).

In order to satisfy the injury-in-fact requirement of Article III standing:

> Abstract injury is not enough.  The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural, or hypothetical.

*City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (internal quotations omitted).  Thus, "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976).  A plaintiff's fear of prosecution must be "realistic" and "credible."  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

Plaintiffs do not have standing to challenge COPA because they have alleged only a subjective "chill" on their speech that is not supported by the evidence in the record.  The Supreme Court has noted, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).  *See also Aiello v. City of Wilmington*, 623 F.2d 845, 857 (3d Cir. 1980) ("generalized allegations of chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm").  "Rather, to establish standing in this

---

to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

manner, a plaintiff must proffer some objective evidence to substantiate his claim that the challenged conduct has deterred him from engaging in protected activity." *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991). That is, Plaintiffs must have "suffered some concrete harm (past or immediately threatened) apart from the chill itself." *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1194 (D.C. Cir. 1992) (internal quotations omitted). *See also Laird*, 401 U.S. 1, 11 (1972) (in order to state First Amendment claim based on chilling effect on speech, plaintiff must show that he is "either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging"). Plaintiffs have offered no objective evidence to demonstrate that their fear of prosecution is reasonable or to substantiate their subjective chill, which is necessary to maintain standing. *Laird*, 408 U.S. at 14. *Cf. Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (finding detailed affidavits and an expert's opinion were sufficient to establish standing). "Hypothetical or imaginary threats of prosecution, subjective fear of state backed sanctions and feeling of inhibition are not enough to create constitutional standing." *Hoffman v. Hunt*, 845 F. Supp. 340, 346 (W.D.N.C. 1994).

Plaintiffs cannot avoid the injury-in-fact requirements merely by asserting an overbreadth claim. A plaintiff raising an overbreadth claim can overcome the prudential standing requirement, which is "that a plaintiff generally must assert its own legal rights and interests, and cannot rest his claim for relief on the legal rights and interests of third parties." *Serv. Employees Int'l Union v. Municipality of Mt. Lebanon*, 446 F.3d 419, 423 (3d Cir. 2006) (internal quotations omitted). For First Amendment overbreadth claims, "courts will allow the party to raise the claims of others when protected speech is at issue." *Id.* Third Circuit precedent makes clear, however, that relaxation of this prudential standing requirement does nothing to relax

Article III standing requirements and all litigants – including those raising overbreadth claims –

must meet the injury-in-fact requirements of Article III standing.  *Id.* at 423-24.  *See also Powers*

*v. Ohio*, 499 U.S. 400, 410-411 (1991) (litigant may bring actions on behalf of third parties

provided that litigant has "suffered an injury in fact, thus giving him or her a sufficiently

concrete interest in the outcome of the issue in dispute") (internal quotations omitted); *Harp*

*Adver. Illinois, Inc. v. Village of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993) (finding that

facial attack for overbreadth "does not imply . . . that the requirement of standing to sue has been

elided"); *Bordell*, 922 F.2d at 1061 ("This slender exception to prudential limits on standing . . .

does not affect the rigid constitutional requirement that plaintiffs must demonstrate an injury in

fact to invoke a federal court's jurisdiction.").  Thus, Plaintiffs cannot avoid the stringent Article

III standing requirements simply because they bring an overbreadth claim, among other claims.[5]

A.      **There Is Established Precedent to Determine the Parameters of Harmful-To-Minors Material Under COPA**

The issue of whether Plaintiffs' fear of prosecution is reasonable necessitates an

evaluation of the type of material that is harmful to minors under COPA's definition.  Congress

defined the term narrowly, and incorporated many concepts under established case law.  This

context of what constitutes harmful-to-minors material illustrates that Plaintiffs' fears of

prosecution under COPA are, in fact, speculative and unreasonable.

COPA incorporates standards that courts have affirmed as constitutional to ensure that it

reaches only that material which can be deemed obscene for minors.  COPA's definition of

---

[5]  In addition, Plaintiffs cannot maintain standing for their vagueness claim (Count Four). In the Third Circuit, "a vagueness attack requires the plaintiff to show that he himself was injured by the vague language of the regulation."  *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 225-26 (3d Cir. 2004).

harmful to minors is directly derived from the test for obscenity developed by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973), and is grounded in the Supreme Court's recognition that legislatures may vary the definition of obscenity to cover a broader category of speech in order to further their goal of protecting minors. *Ginsberg v. State of New York*, 390 U.S. 629 (1968). The definition of "harmful to minors" and the concept of variable obscenity are well established and have been incorporated into state statutes since their use was first approved by *Ginsberg* in 1968. More than 40 states have laws that regulate the sale and/or distribution of material deemed "harmful to minors." *See Reno v. ACLU,* 521 U.S. 844, 887 n.2 (1997) (listing state "harmful to minors" statutes) (O'Connor, J., concurring in part and dissenting in part). COPA's definition is derived from the *Miller/Ginsberg* standard, H.R. Rep. No. 105-775, at 27-28 (1998), as well as definitions found in state harmful-to-minors laws that have been upheld. *Id.* at 13.[6] Consequently, a body of decisional law can be used to clarify what material falls within the scope of that definition.

The first prong of COPA's harmful-to-minors definition requires a fact finder to

---

[6] Subsequent to the passage of COPA, some state harmful-to-minors laws have been deemed unconstitutional by some courts on Commerce Clause and other grounds. *See, e.g., PSINet v. Chapman*, 362 F.3d 227 (4th Cir. 2004); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999); *Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003); *Cyberspace Communications, Inc. v. Engler*, 142 F. Supp. 2d 827, 830 (E.D. Mich. 2001). None of these cases invalidated state harmful-to-minors laws based on the vagueness of the harmful-to-minors definitions. In fact, courts continue to uphold the *Ginsberg/Miller* state harmful-to-minors definitions. *See Athenaco, Ltd. v. Cox*, 335 F. Supp. 2d 773, 781-82 (E.D. Mich. 2004) ("The Court is constrained to agree with Defendants that Plaintiffs have operated under the definitions codified in [Michigan's harmful to minors law] since 1978, and do not credibly establish how the Act's recent amendments . . . throws [sic] any section of the harmful to minors' definition, and by extension, the category of materials to which that definition applies, into doubt."); *State of Texas v. Stone*, 137 S.W.3d 167, 181 (Tex. Ct. App. 2004) ("Section 43.24 of the Texas Penal Code is a constitutionally permissible variable obscenity statute of the type approved in *Ginsberg* and *Reno*.").

determine that "the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest."  47 U.S.C. § 231(e)(6)(A).  The standard of an "appeal to the prurient interest" is well-accepted in the regulation of obscene speech and requires that the material "appeal to a shameful or morbid interest in nudity [or] sex."  *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498 (1985).  The term "prurient interest" is a cornerstone of obscenity law, and refers to "sexual responses over and beyond those that would be characterized as normal."  *Id.*  It does not include material that, "taken as a whole, does no more than arouse good, old fashioned, healthy interest in sex."  *Id.* at 499.  This prong also narrowly tailors the reach of COPA, because it establishes a scienter requirement – material must be "designed to" appeal to the prurient interest.  47 U.S.C. § 231(e)(6)(A).  COPA, like many state harmful-to-minors statutes, adapts this prong of the obscenity test to analyze it in the context of minors.

COPA's second prong requires materials deemed harmful to minors to depict, describe, or represent, "in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast."  47 U.S.C. § 231(e)(6)(B).  Again, the scope of this language has been authoritatively interpreted by decisional law.  Mere nudity is not enough to render material harmful to minors.  *See Osborne v. Ohio*, 495 U.S. 103, 112 (1990) ("depictions of nudity, without more, constitute protected expression"); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 n.10 (1975) ("It is clear . . . that under any test of obscenity as to minors not all nudity would be proscribed.  Rather, to be obscene 'such expression must be, in

some significant way, erotic.'") (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).  In

*Osborne*, the Supreme Court upheld a state obscenity regulation where the term nudity was

construed to require "a graphic focus on the genitals."  495 U.S. at 113.  COPA incorporates this

standard within the second prong and also defines the specific types of actions that must be

present in a patently offensive manner.  *See* H.R. Rep. 105-775 at 13 (noting that COPA

"modifies the 'patently offensive' language by explicitly describing material that is harmful to

minors").

COPA's third prong requires the fact finder to determine that the material, "taken as a

whole, lacks serious literary, artistic, political or scientific value for minors."[7]  47 U.S.C.

§ 231(e)(6)(C).  As the *Miller* court itself recognized, works with value are protected "regardless

of whether the government or a majority of the people approve of the ideas those works

represent."  413 U.S. at 34.  In determining whether a given work has value, the proper inquiry is

"whether a reasonable person would find such value in the material, taken as a whole."  *Pope v.*

*Illinois*, 481 U.S. 497, 501 (1987).  It is important to note that the value of a work does not "vary

from community to community based on the degree of local acceptance it has won."  *Id.* at 500.

Because this prong is not judged by community standards, but, instead, sets a "national floor" of

societal value, *see Reno*, 521 U.S. at 873, Plaintiffs' speculative fears that the harmful-to-minors

_____

[7]  As explained in detail in Section II, under established harmful-to-minors precedent, reference to older minors is the relevant inquiry.  *See Am. Booksellers v. Webb*, 919 F.2d 1493, 1504-05 (11th Cir. 1990) (in construing a statute defining minors as under 18 years old, concluding that "if any reasonable minor, including a seventeen-year-old would find serious value, the material is not harmful to minors"); *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127 (4th Cir. 1989) ("if a work is found to have a serious literary, artistic, political, or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack value for the entire class of juveniles taken as a whole") (quoting *Virginia v. Am. Booksellers Ass'n*, 732 S.E.2d 618, 624 (Va. 1988)).

test will by applied in vastly different ways by different communities is unavailing.  As one court

has noted in addressing a state harmful-to-minors law:

> [W]orks that Plaintiffs fear will be targeted, such as *Lolita*,
> *Sanctuary*, *Of Mice and Men*, *The Catcher in the Rye*, *Portnoy's*
> *Complaint*, and *Joy of Sex*, are not subject to the Act's
> proscriptions because a reasonable person could conclude that
> those works clearly have literary and educational merit for minors.

*Athenaco, Ltd.*, 335 F. Supp. 2d at 781.  *See also Am. Booksellers Ass'n*, 372 S.E.2d at 622 &

625 (finding that sixteen books, including Judy Blume's *Forever*, *Hollywood Wives, Changing*

*Bodies, Changing Lives* and *Our Bodies Ourselves*, had serious literary, artistic, political or

scientific value for minors).

Both the first and third prong of the *Ginsberg/Miller* test adopted by COPA require that

the material be judged "as a whole."  In *Kois v. Wisconsin*, the Court held that the "as a whole"

language requires a "reviewing court [to] look at the context of material, as well as its content."

408 U.S. 229, 231 (1972).  This contextual analysis has been a mainstay of obscenity law since

the 1950s.  *See Roth v. United States*, 354 U.S. 476, 490 (1957) (requiring examination of "entire

context" of books, pictures and circulars alleged to be obscene); *Kois*, 408 U.S. at 231 (holding

that, even if particular photographs in a newspaper would be obscene "by themselves," they

could not be the basis for an obscenity prosecution where, "in the context in which they appeared

in the newspaper they were rationally related to an article that itself was clearly [not obscene]").

COPA relies on this familiar concept to define what is harmful to minors.[8]

---

[8] The fact that COPA applies to the Internet does not obviate the need or ability to view
the material in context, looking to the website as a whole.  A constitutional method for
evaluating content does not become unconstitutional merely because it is applied to a new
medium.  Material on the Internet can be viewed, and has been viewed by the courts, in context.
For example, in a defamation action, the Ninth Circuit applied the non-Internet defamation

**B.     Plaintiffs' Claims Are Premised Only On A Subjective Fear of Prosecution**

Most of the Plaintiffs in this action operate websites and contend that, although they do not believe they display material that is harmful to minors, they fear prosecution because someone, in some community, might consider their content harmful to minors.[9]  *See* Am. Compl. at 24 ¶ 2; Expert Report of Henry Reichman at 15 ("Reichman Report") (Ex. 1).  In order to maintain standing, Plaintiffs must demonstrate that their fear of prosecution is reasonable and supported by objective evidence.  Neither conclusory allegations in the Amended Complaint nor speculative, unsupported fears will suffice.  *Simon*, 426 U.S. at 44; *Mortensen*, 549 F.2d at 891.

All Plaintiffs share common deficiencies regarding standing.  COPA addresses commercial pornography, and none of the Plaintiffs are commercial pornographers.  Even though the issue of standing was not before the Supreme Court earlier in this case, three Justices noted that the material on the original plaintiffs' websites (many of which are plaintiffs in the Amended Complaint) fell outside the scope of COPA.  *Ashcroft v. ACLU*, 542 U.S. 656, 681-82 (2004) (Breyer, J., dissenting).[10]  When a litigant does not allege an intent to engage in conduct

standards to material found on the Internet, which included looking at the allegedly defamatory web page in context with other web pages on the defendant's website.  *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).  Each of the Plaintiffs in this case operate websites with a distinctive mission and tone, and this context, when taken into consideration, precludes a determination that the material they post is harmful to minors.

[9]  The following Plaintiffs assert standing based on an alleged fear of prosecution for the materials on their websites: Addazzi, Inc. d/b/a Condomania, Heather Corinna, Free Speech Media, LLC, Nerve.com, Aaron Peckham d/b/a Urban Dictionary, Philadelphia Gay News, Powells Bookstores, Salon Media Group, and Sexual Health Network.  In addition, ACLU sues on behalf of its members Lawrence Ferlinghetti and Patricia Nell Warren, who operate websites, and the Electronic Frontier Foundation sues on behalf of its member Bill Boushka, who operates a website.

[10]  The Court denied Defendant's previous motion to dismiss the original complaint on standing. 31 F. Supp. 2d at 499.  That motion, however, was based on the allegations of the

14

covered by the challenged law, it lacks standing.  *Serv. Employees Int'l Union*, 446 F.3d at 424.

*See also Phelps v. Hamilton*, 122 F.3d 1309, 1327 (10th Cir. 1997) (finding plaintiffs lacked

standing when they failed to produce objective evidence that they would transmit

communications arguably covered by statute and offered no evidence of either direct threats or

details of past prosecutions, to support their allegation that they were subject to prosecution).  In

addition, Plaintiffs' alleged fears are entirely speculative.  They have produced no evidence to

indicate that this fear is reasonable.  No Plaintiff has ever been contacted by state or local

authorities regarding any investigation into criminal violations.  *See* Pls.' Resp. to Def.'s First

Interrog. No. 9 (Ex. 2).[11]

      Plaintiffs' standing argument is premised on the fact that, even though they do not

believe themselves to be covered by COPA, someone *might* interpret the statute in a manner to

sweep them within its reach.  This does not suffice to maintain standing.  Claims of "'present

deterrence from First Amendment conduct because of the difficulty of determining the

application of a regulatory provision to that conduct' will not 'by itself support standing.'"  *Am.*

*Library Ass'n,* 956 F.2d at 1192-93 (quoting *United Presbyterian Church v. Reagan*, 738 F.2d

1375, 1380 (D.C. Cir. 1985)).  Moreover, the non-objective nature of this alleged fear is

highlighted by Plaintiffs' own purported expert, who states about Plaintiffs that "I have

encountered nothing  that could reasonably be deemed 'obscene' under my understanding of the

current legal standards, or 'harmful to minors' under any reasonable definition of those words."

---

Complaint and occurred prior to discovery in this case.  At this juncture, Defendant's motion is
based on the Amended Complaint and the extensive evidence gathered in discovery.

    [11]  Defendant has attached Condomania's response.  All other Plaintiffs responded
identically.

Reichman Report at 15 (Ex. 1).  Instead, Plaintiffs' fear of prosecution is based on the possibility

that Plaintiffs "might well be unfairly targeted as 'obscene' or 'harmful to minors' by

overzealous officials or members of the general public.  Such officials and citizens could

reasonably be expected to pressure prosecutors to file charges under the provisions of COPA,

even if such charges might not eventually be affirmed in court."  *Id.*  This basis for standing runs

contrary to the legal presumption that prosecutors will operate with good faith, *United States v.*

*Torquato*, 602 F.2d 564, 569 (3d Cir. 1979), and demonstrates the purely speculative and

hypothetical nature of Plaintiffs' claims.

### C.   None of the Objective Evidence Submitted by Plaintiffs Supports Their Alleged Fear of Prosecution

Plaintiffs have had ample opportunity during discovery to offer objective facts and

concrete examples to substantiate their fear of prosecution.  Instead of providing Defendant with

copies of web pages upon which they feared prosecution, Plaintiffs referred Defendant to their

responses to Defendant's Interrogatory in which he asked for representative samples about which

Plaintiffs fear prosecution.  *See* Pls.' Resp. to Def.'s Request for Docs. No. 16 (Ex. 3).  The

following sections discuss the materials that Plaintiffs have identified as material upon which

they fear prosecution.  Far from showing that the material on Plaintiffs' websites is within the

reach of COPA, the material demonstrates that Plaintiffs' fears are unfounded.[12]  While

Defendant believes that none of the website Plaintiffs has met the standards for standing, he sets

forth the evidence proffered by each Plaintiff separately.  In doing so, the Court will be able to

---

[12]  As discussed in Section A, the material on a website must be considered in the context
of the website.  For purposes of this motion, Defendant has attached only the web pages
proffered by Plaintiffs.

evaluate the material produced by each Plaintiff.  Even if the Court does not concur that all

Plaintiffs lack standing, dismissing those Plaintiffs without standing will streamline the case and

shorten the trial.

### 1.     The Material Upon Which ACLU Member Lawrence Ferlinghetti Fears Prosecution Does Not Fall Within COPA

Plaintiff ACLU is suing on behalf of its member Lawrence Ferlinghetti, who is a writer

and San Francisco's poet laureate.  Am. Compl. at 27 ¶ 10.  Mr. Ferlinghetti is the co-founder of

City Lights Bookstore, which maintains a website "that promotes books available from the

bookstore" and "contains lists of literary events and a brief history of City Lights Bookstore and

Publishing," has a section describing Mr. Ferlinghetti's 1956 obscenity trial for selling the Allen

Ginsberg poem "Howl," and also has Mr. Ferlinghetti's poetry.  *Id.* ¶ 12.  The ACLU merely

asserts that, "[i]n Mr. Ferlinghetti's experience, there are people who would find his work and

the work he publishes 'harmful to minors.'"  *Id. ¶ 13.*

When asked to provide representative samples about his feared prosecution, Mr.

Ferlinghetti stated:

> Examples of material that might be deemed 'harmful to minors' by some community in the United States include:
>
> 1) The City Lights Books website has a section with a history of the 'Howl' obscenity trial and photographs from the trial, located at http://www.citylights.com/His/CLhowl.html;
>
> 2) ACLU Member's work, which is available on a variety of poetry sites on the web, including the City Lights Books web site.

*See* Pl.'s Resp. to Def.'s Interrog. No. 13 (Ex. 4).  This response is deficient for standing

purposes.  First, it states only that this is material that *might* be deemed harmful to minors, not

that he has any intent of posting harmful-to-minors material on the web.  This is precisely the

type of "subjective chill" allegations that are insufficient to maintain standing.  *See Laird*, 408

U.S. at 13-14.  Second, the only web page specifically identified by Mr. Ferlinghetti is clearly

outside of COPA's harmful-to-minors definition.  It is a web page providing information about

this history of Allen Ginsberg's poem "Howl," and which is devoid of any sexual content.

Therefore, it could not conceivably appeal to the prurient interest, there is no depiction in *any*

manner, let alone a patently offensive manner, of a sexual act, and there is no nudity, let alone a

lewd exhibition of the genitals or post-pubescent female breast.  This demonstrates that Mr.

Ferlinghetti's fear of prosecution under COPA is not reasonable.  Third, Mr. Ferlinghetti does

not identify the poetry he believes is harmful to minors and, therefore, does not present the

objective evidence necessary to maintain standing.  *Bordell*, 922 F.2d at 1061.  Rather, it is

simply an example of a generalized, subjective fear that is insufficient to warrant standing.[13]

### 2. The Material Upon Which ACLU Member Patricia Nell Warren Fears Prosecution Does Not Fall Within COPA

According to the Amended Complaint, Patricia Nell Warren is an author of novels,

poetry, numerous articles, and essays.  Am. Compl. at 27 ¶ 14.  Her novels are alleged to be the

most popular novels among classic gay literature.  *Id.*  Ms. Warren is a co-owner of Wildcat

International and its publishing arm, Wildcat Press.  *Id.* at 28 ¶ 15.  According to the Amended

Complaint, the website for Wildcat Press contains excerpts of her work, including "sexually

explicit details such as the description of a 'foursome' erotically dancing and a description of

two men passionately kissing."  *Id.* at 28-29 ¶ 16.

---

[13]  In any event, it is highly unlikely that the work of San Francisco's poet laureate would be said to lack serious literary or artistic value for minors, which is a necessary element of the harmful-to-minors test.

Ms. Warren listed six examples of material that "might be deemed harmful to minors by some community."  Pl.'s Resp. to Def.'s Interrog. No. 13 (Ex. 5).  The first example is a commentary on the death of Matthew Shepard, a college student who was beaten to death in 1998 in what was widely perceived to be a hate crime based on sexual orientation.  In her commentary, Ms. Warren discusses the dangers of trusting strangers.  This piece is inarguably outside the scope of "harmful to minors" as it is devoid of sexual content.  *See id.*

The other five web pages for which Ms. Warren fears prosecution are excerpts from five of her novels.  Like the first example, none of these web pages approaches being "harmful to minors."  *See* Ex. 5.  They do not appeal to the prurient interest, they do not have explicit sexual content, and they cannot be said to lack serious literary value.  *See* 47 U.S.C. § 231(e)(6).  In fact, each of the books excerpted on Ms. Warren's website are sold on mainstream outlets such as Amazon.com.  Ms. Warren acknowledges the serious literary value of her works, as the Wildcat International website states:  "Patricia Nell Warren's novels have become essential gay literature for bookstores, libraries and college courses worldwide and, according to recent surveys of independent book sales, are the most popular novels among classic gay literature."  Ms. Warren believes that adults and minors "should have the right to access speech provided on the Wildcat Web site."  Am. Compl. at 29 ¶ 17.  While she describes scenes of "dancing" and "kissing" to be sexually explicit, *id.* at 28 ¶ 16, as a matter of law, such scenes do not create a reasonable fear of prosecution under COPA.

### 3. The Material Upon Which Plaintiff Addazi, Inc. d/b/a Condomania Fears Prosecution Does Not Fall Within COPA

Plaintiff Addazi, Inc. d/b/a Condomania ("Condomania") alleges that it is "a leading online seller of condoms and distributor of safer-sex related materials."  Am. Compl. at 12 ¶ 4.

Condomania displays photographs of condoms, a product recommendation guide, and a safer sex manual. *Id.* at 32 ¶ 11. Condomania alleges that the Centers for Disease Control refers individuals to its website to answer questions, and Condomania "believes that the information it provides may prevent sexually transmitted disease and unwanted pregnancy among older minors and adults." *Id.* at 32-33 ¶¶ 13, 14. Condomania refers to the information it provides as "important information about sexuality and safer sex." Plaintiffs' purported expert concludes that material on Condomania provides sex education and "post-pubescent teenagers can . . . find useful information there." Reichman Report at 16 (Ex. 1). He also concludes that the material on Condomania "is by no reasonable definition obscene or harmful to minors." *Id.*

The representative sample of material upon which Condomania fears prosecution are: (1) a page discussing safer sex; (2) product reviews of condoms; (3) a "condom wizard" page for a cartoon-led interactive shopping experience; (4) a page selling gifts and novelties: and (5) a blog entitled "Condoms, Sex, and Desire" that discusses topics such as National HIV Testing Day, comments on the products sold on Condomania, and Internet Sexuality Information Services.[14] Pl.'s Resp. to Def.'s Interrog. No. 13 (Ex. 6). A review of these web pages indisputably demonstrates that Condomania does not fall within the scope of COPA because there is nothing on these web pages that could reasonably be found to fall within the harmful-to-minors definition of COPA. *See id.* Unlike the commercial pornography covered by COPA, the pages for which Condomania fears prosecution contain factual information for education and sales of

---

[14] Condomania alleges a fear of prosecution on these five web pages "and the links accessible therein." Condomania cannot maintain standing on a general allegation of "links" without identifying the material contained in the linksl; such an allegation does not constitute the type of specific, objective evidence necessary to maintain standing. *See Laird*, 408 U.S. at 14; *Bordell*, 922 F.2d at 1061.

safer-sex products and contain no nudity whatsoever. *Id.* No reasonable person could find that the pages submitted meet any prong of the COPA harmful-to-minors test: they cannot be said to be designed to appeal or pander to the prurient interest; there is no depiction, "in a manner patently offensive with respect to minors," of any actual or simulated sexual act or contact or any "lewd exhibition of the genitals or post-pubescent female breast;" and the work cannot be said to lack serious value, as it provides valuable educational and scientific information regarding safer sex.

### 4. The Material Upon Which Heather Corinna Fears Prosecution Does Not Fall Within COPA

Heather Corinna[15] alleges that she fears prosecution regarding three of her websites, "each of which deals with issues of sex and sexuality with an explicit focus on challenging and combating the sexual oppression of traditionally marginalized groups." Am. Compl. at 33 ¶ 1. Defendant will address each website in turn.

### a. Scarleteen

"Scarleteen is the Internet's largest independent, unaffiliated, free resource for young adult sex education, information, and discussion, serving nearly two million teens, young adults, parents, and educators each year." Am. Compl. at 34 ¶ 3. The web pages identified by Ms. Corinna as representative of those about which she fears prosecution are attached as Exhibit 7. They are the website's front page, the discussion group front page, and the "front pages, and 'Articles' and 'Advice' subsections" of the website sections entitled: Body, SexYOUality,

---

[15] Heather Corinna is identified as Heather Corinna in the Amended Complaint and Heather Rearick in her discovery responses.

Reproduction, Infection Section, Pink Slip, Boyfriend, Take Two, Gaydar, and Sexual Politics.[16]

A review of the web pages identified reveals that Scarleteen is meant for an audience of minors and provides, as the Amended Complaint describes, "teen-oriented" content.  Am. Compl. at 35 ¶ 3.  In fact, Ms. Corinna stated in her deposition that the content on the Scarleteen website is driven by the teenage viewers of the website.  Deposition of Heather C. Rearick at 84, 86 (Ex. 8).  The pages offer health, scientific, and political information specifically geared toward teenagers.  In addition, it does not contain any photographs of sexual acts, nor could the educational dissemination of sexual information in a manner geared toward teenagers be considered "patently offensive" to minors.  It also has serious scientific value for minors.  In fact, the online encyclopedia Wikipedia references Scarleteen for anatomy articles.  *See id.* at 88-89.

Ms. Corinna identified several pages in her deposition about which she feared prosecution under COPA.  These pages are:  an article about a 15-year old's experience with being a gay teenager, instructions for putting on a condom, and the Scarleteen message boards. *See* Ex. 7; Rearick. Dep. at 71, 81, 244-45 (Ex. 8).  A review of these pages demonstrates that Ms. Corinna's fear of prosecution is illusory, as the material contained therein does not meet any of COPA's "harmful to minors" definition.  Instead, it is information that is age-appropriate for

---

[16]  Exhibit 7 contains Ms. Corinna's interrogatory responses and corresponding web pages.  In responding to interrogatories, Ms. Corinna did not identify any specific articles or advice about which she fears prosecution, and therefore has not met her burden to prove standing for this unidentified speech.  In addition, it is clear from the titles of the articles on the pages identified that they are designed to educate teenagers about sex, have serious value for minors, and are not designed to pander to the prurient interest.  In addition, the Amended Complaint noted several articles.  *See* Am. Comp. at 34 ¶ 3.  Exhibit 7 contains those articles, as well, which also have serious value for minors.

older minors, which is the goal of the Scarleteen website.  *See* Rearick Dep. at 46-48 (Ex. 8).[17]

*See also id.* at 143-44 (asserting that there are no photos on the Scarleteen website, but

illustrations for educational purposes, and that the written descriptions on Scarleteen are for

educational purposes).  COPA was not designed to prohibit the type of information that

Scarleteen offers.  *See* S. Rep. No. 105-225, at 12-13 (1998) (noting that the harmful-to-minors

definition "ensures that the bill may not be construed as to restrict access to public health

information, art, literature, and political information").

### b.    Scarlet Letters

Scarlet Letters is "the Web's first artistic and educational site with a focus on women's

sexuality. . . . Scarlet Letters publishes fiction, nonfiction, poetry, essays, commentary, visual

art, and other material aimed at educating and entertaining its users."  Am. Compl. at 34 ¶ 2.  As

with Scarleteen, Ms. Corinna only specifically identified the front pages of each section of her

website, including visual art and photography, prose and poetry, nonfiction, and forums, as a

representative sample of pages on which she feared prosecution.  *See* Ex. 9.[18]  While the exhibits

provided in discovery show that the website contains nudity and sexual descriptions, it is equally

---

[17]  Ms. Corinna would not face liability under COPA for material others placed on her
message boards, as such material would not meet the statutory requirements of allegedly harmful
to minors material being posted "knowingly and with knowledge of the character of the
material" and "for commercial purposes."  47 U.S.C. § 231(a)(1).  In addition, Scarleteen
maintains a policy for message board postings, and if something inappropriate is posted, Ms.
Corinna edits it.  *See* Rearick Dep. at 28; 110-17 (Ex. 8).  In any event, sample message board
pages are attached at Exhibit 7, and the educational and scientific nature of the material covered
is apparent.

[18]  While Ms. Corinna stated, as a general matter, that she feared prosecution based on the
forum for Scarlet Letters, she admitted at her deposition that "I haven't looked at the message
boards in so long that I couldn't begin to tell you what they are."  Rearick Dep. at 171 (Ex. 8).
Ms. Corinna cannot fear prosecution based on speech she cannot even identify.

clear that this is a website with serious literary and artistic value for older minors.[19]   Nudity alone

does not suffice to render material harmful to minors. *See* 47 U.S.C. § 231(e)(6) (requiring, *inter*

*alia*, a depiction in a manner patently offensive to minors of "an actual or simulated normal or

perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast" that

lacks serious literary, artistic, political, or scientific value for minors).   Scarlet Letters is a

website containing works of an artistic nature.   The website states, "Since February of 1998,

Scarlet Letters has been one of the web's premier publisher of humanist, feminist, sex positive

original and visionary creative and artistic work of all kinds."   *See* Rearick Dep. Ex. 6, attached

at Exhibit 9.   Furthermore, the website states, "Our goal is to give our readers an international

and unique perspective on artistic expression without pretension or arbitrary limits."   *Id.*   As with

Scarleteen, the material is not the type of material that COPA is designed to cover, as COPA

does not restrict access to art.   *See* S. Rep. No. 105-225, at 12-13.

### c.       Femmerotic

"Femmerotic is Heather Corinna's personal Web site for showcasing her photographic

and textual work and providing an 'open and intimate look at her life as an artist and activist.'"

Am. Compl. at 35 ¶ 4.   In her interrogatory responses, Ms. Corinna did not identify any specific

web pages as a representative sample about which she fears prosecution.   She merely stated that

the Gallery section of the website contains "numerous nude photographs of Plaintiff and others,"

that the Journal section of the website contains "explicit discussions of sexuality," and that the

---

[19]   As discussed in Section II, if something has value for older minors, then it is not
considered to be harmful to minors under COPA.

FAQ section of the website "contains frank discussions of sexuality."[20]  *See* Ex. 7 (Interrog.

Resp.).  Attached at Exhibit 10 are the first five pages of the Journal Section, as well as the front

page of the Photography section and FAQ pages.

Ms. Corinna discusses her thoughts and feelings in the Journal section.  A review of these

pages demonstrates that this section does not contain sexually explicit material, and cannot be

said to pander to the prurient interest.  Moreover, the journal has political value.  *See* Rearick

Dep. at 230 ("Q:  Is it fair to say that you express a strong political viewpoint in your journal?

A:  Yes, it is.") (Ex. 8).  The photography on the website – while it contains nudity – cannot be

stated to lack artistic value for older minors.  *See* Rearick Dep. at 213 ("Q:  Do you think the

photography section of Femmerotic has value for people under 17? . . . A:  Again for some

absolutely it could.") (Ex. 8).  Ms. Corinna describes her work on the photography home page in

this manner:

> Blending more traditional styles, archetypes and themes with new
> approaches, keeping the physical and emotional tone real,
> grounded, varied and intense, I try to step outside genre by
> creating work that explores sexuality, gender and personal identity
> within fine art without a typical fine art nude genericism or loss of
> personal identity of the subject.

Ex. 10.  When asked about whether there was a distinction between her work and commercial

pornography, such as Hustler, Ms. Corinna stated:  "Yes, it is very, very different than Hustler."

---

[20] Defendant was unable to find a section entitled "Gallery," and assumes that the
Photography section is what Ms. Corinna referred to in her interrogatory responses.  The only
FAQ page found by Defendant is one relating to her journal, which contains no sexually explicit
material.  There is another page, attached in Exhibit 10, that is "about the site," which is included
in Exhibit 10.  *See* Declaration of Elizabeth Kade, dated Aug. 25, 2006, ¶ 4 (Ex. 11).

Rearick Dep. at 219 (Ex. 8).[21]

Because the Femmerotic material about which Ms. Corinna fears prosecution is artistic, as well as political, it cannot be said to fall within the definition of harmful to minors.

**5.      The Material Upon Which Electronic Frontier Foundation Member Bill Boushka Fears Prosecution Does Not Fall Within COPA**

Bill Boushka[22] has work on the website www.doaskdotell.com.  In the Amended Complaint, Mr. Boushka states that he fears prosecution for his book "Do Ask, Do Tell: A Gay Conservative Lashes Back," which he describes as "an exposé about gays in the military" that is a "politically-charged text" containing subject-matter and language that might be deemed harmful to minors.  Am. Compl. at 36 ¶ 8.  In discovery, Mr. Boushka has not proffered any evidence to support his allegations of fear of prosecution for his book and, in fact, did not offer it as representative of the type of material for which he fears prosecution when asked in discovery. The cover of this book indicates that it is not a work involving sexually explicit or prurient material, but one with political value, as the subtitle is "Individualism, Identity, Personal Rights, Responsibility and Community in a Libertarian Third Millennium."  Because Mr. Boushka has

---

[21]  Femmerotic has a subscription-only area, which users can access with a credit card payment.  Rearick Dep. at 246 (Ex. 8).  In her deposition, Ms. Corinna alleged a fear of prosecution for the subscription material, which she described as "much more explicit" than the publicly available portions of the website.  *Id.*  Because individuals access the subscription area through a credit card payment, this portion of Femmerotic is, by definition, COPA-compliant. Therefore, Ms. Corinna cannot reasonably fear prosecution for her subscription-only material.

[22]  Mr. Boushka is identified as Bill Boushka in the Amended Complaint, but responded to Defendant's Interrogatories under the name John W. Boushka.  The website Mr. Boushka alleges to operate in the Amended Complaint, High Productivity Publishing, is no longer in existence.  Therefore, there is no case or controversy about High Productivity Publishing and claims regarding this website are moot.  *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (explaining case or controversy requirement at all stages of litigation to avoid mootness).  Defendant's standing argument is premised on Mr. Boushka's discovery responses.

not produced any evidence that his book is subject to COPA and, in fact, the book appears not to fall within COPA's harmful-to-minors definition, Mr. Boushka cannot maintain standing based upon his book or any publication of it on the Web.

Nor can Mr. Boushka maintain standing for the other content on his current website for which he alleges to fear prosecution, which are four of his screenplays. *See* Ex. 12. He alleges that these screenplays contain "frank portrayals of sexual desire between younger and older men," with one of those screenplays containing descriptions of nudity. While the screenplays are too voluminous to attach as exhibits, excerpts of pages with potential sexual material are attached hereto as Exhibit 12.[23]

There is nothing in the documents for which Mr. Boushka fears prosecution that could arguably be considered to be harmful to minors. The screenplays are of a literary nature, and they do not pander to the prurient interest. There is no depiction "in a manner patently offensive with respect to minors" of any actual or simulated sexual act or contact or any "lewd exhibition of the genitals or post-pubescent female breast" in any of the evidence proffered by Mr. Boushka. In fact, none of the screenplays contain explicit sexual content.[24]

It appears that Mr. Boushka fears prosecution solely on the subject matter of his

---

[23] Defendant has attached the synopses available for each screenplay, as well as the most explicit portion of each screenplay Mr. Boushka identifies in his interrogatory responses. The screenplay "The Sub" is no longer on the website, and the treatment for "Baptism" is not on the website. *See* Kade Decl. ¶ 6 (Ex. 11).

[24] For example, the Master Reference for the 69 Minutes script states that, in the screenplay, "[t]here is physical horseplay without sexual contact. I'm interested in a provocative story, not in 'pornography.'" 69 Minutes: Master Reference Document for Script at 4 of 12 (Ex. 12). The screenplay excerpts, also attached at Exhibit 12, show nothing of an explicit sexual nature. Most describe kissing and innuendos of sexual activity, cutting into other scenes prior to any explicit sexual conduct occurring.

literature.

This is merely a subjective fear that is unrelated to the objective showing regarding what may be considered to be harmful to minors.

###### 6.    The Material Upon Which Free Speech Media Fears Prosecution Does Not Fall Within COPA

Free Speech Media, LLC operates a website "designed to encourage the democratic expression of progressive ideals through promoting, curating and hosting independent creators of audio and video content on the Web." Am. Compl. at 38-39 ¶ 16. Its video and audio files "cover a wide range of topics, including human rights, homelessness, labor issues, racism, prison conditions, sexuality, AIDS, feminism and environmentalism." *Id.* at 39 ¶ 18. None of the examples of material on its website for which Free Speech Media alleged a fear of prosecution are currently accessible on its website. *See id.* at 40 ¶ 20. Therefore, Free Speech Media cannot maintain standing based upon that material.

Free Speech Media identified five videos as a representative sample upon which it fears prosecution.[25] *See* Ex. 13. Free Speech also stated that it maintains a community page, which contains material and links that "contain or may contain in the future, among other things, candid and explicit comments or questions on a diverse category of topics posted directly by internet web users." *Id.*

The videos about which Free Speech claims to fear prosecution cannot be said to contain harmful to minors material. The two videos currently on the Web – Radical Sex Workshops and

---

[25]  Some of the videos identified by Free Speech Media in its Amended Complaint and in discovery are no longer available on the website. *See* Kade Decl. ¶¶ 7-8 (Ex. 11). Therefore, they cannot be used to confer standing. *See supra*, note 22.

TLC2 – are short documentaries involving the Tarheel Leather Club.  They address the social

support system of "leather clubs" and interview several members of the club.  They also discuss

the impact of AIDS on the leather community, safe sex, and one video has footage of workshops

in which instructors discuss sexual techniques and safety.  There is no nudity in either video, let

alone anything designed to appeal to the prurient interest.  In addition, these informational

videos cannot be said to lack serious value for minors.  Nor can Free Speech maintain standing

based upon its community page.  The community page appears to be a forum for political

discussion and does not have any material with sexual content.  *See* Ex. 13.  Free Speech did not

identify anything of a sexual nature on this page for which it fears prosecution, other than

generalized speculation.  Because Free Speech Media has not adduced evidence that could

reasonably fall within COPA's definition of harmful to minors, it lacks standing to sue.

### 7.    The Material Upon Which Nerve.com Fears Prosecution Does Not Fall Within COPA

Nerve.com "is an online magazine dedicated to a frank exploration of sex and sexuality.

Nerve publishes content in a variety of formats, including but not limited to prose and poetry,

photography, interviews, and reviews."  Am. Compl. at 41 ¶ 23.  Nerve does not allege that it

exhibits material that is harmful to minors.  It states that it "believes that sex as a topic has a

distinctly political dimension, and much of the material on its site contains explicit and indirect

political analysis.  Nerve has won multiple awards for both its prose and photography."  *Id.*  The

founder of Nerve testified that, while some may find Nerve's content titillating, "titillation tends

not to be the primary objective of any of our content whether it's photography or writing. . . .

There's little doubt in my mind that . . . our readers definitely see our content as being, you

know, very smart, . . . serious, award-winning content."  Deposition of Rufus Griscom at 20 (Ex.

14).  In fact, Nerve was one of five finalists for the National Magazine Award for General

Excellence Online in 2005, along with Atlantic Monthly, Consumer Reports, Business Weekly

and Style.com.  *Id.* at 79.

The specifics for which Nerve alleges a fear of prosecution do not demonstrate that

Nerve falls within the scope of COPA.  Much of the content on the website requires a premium

subscription.  Because users purchase premium subscriptions with credit card payments, all

material that is within the "premium" area is, by definition, COPA-compliant.  *See* 47 U.S.C.

§ 231(c)(1).  The two examples that Nerve lists in the Amended Complaint about which it fears

prosecution (the Courting of Anatomy and Mystery Tour), are available only to premium

members.  Because they are not available without the input of credit card information, Nerve

cannot reasonably fear prosecution for this content.[26]  *See* Am. Compl. at 41 ¶ 25.  Nerve also

states in a general manner that its website "includes many photographs of nude and semi-nude

persons taken by professional photographers such as Nan Goldin, Bettina Rheims, and Sylvia

Placy, and by the site's own users."  Am. Compl. at 42 ¶ 26.  Nudity alone does not render

material harmful to minors under COPA, *see* 47 U.S.C. § 231(e)(6), so mere allegations of

nudity are insufficient to warrant standing.

In response to interrogatories, Nerve listed material in four sections about which it fears

prosecution:  the website's nominations for its  "Henry Miller Award" in the fiction section; the

free tour available within the photography section, the "Blog-A-Log" section, in which readers

can read about the dating experience of Nerve contributors in personal blogs, and the blog

---

[26]  As Exhibit 15 demonstrates, a small part of this premium content is publicly available.
This portion, however, contains nothing of a sexually explicit nature.

section of the website.  *See* Ex. 15.  A review of this material indicates that, while Nerve does, in

fact, contain material of a sexual nature, the context in which it is presented cannot be said to

lack serious artistic, literary, or political value for older minors.[27]  Nerve has won numerous

awards for its artistic and literary content.  Griscom Dep. at 79.  Nerve's founder testified that he

believes Nerve has serious value for older minors.  *Id.* at 133.  Nerve differentiates itself from

commercial pornography, as it has never taken any steps to associate itself with pornographic

websites, *id.* at 57-58, and it has a policy not to accept explicit adult advertising.  *Id.* at 16-17.

Because the sexual material on Nerve is not presented for prurient interest, but is part of a larger

artistic and political agenda, Nerve cannot meet the third prong of the harmful to minors

definition and, therefore, has no reasonable fear of prosecution under COPA.  As a result, Nerve

does not have standing in this case.

### 8. The Material Upon Which Aaron Peckham d/b/a Urban Dictionary Fears Prosecution Does Not Fall Within COPA

Aaron Peckham d/b/a Urban Dictionary operates "an online slang dictionary whose terms

and definitions are solely user-generated and user-rated."  Am. Compl. at 42 ¶ 1.  Mr. Peckham's

fear of prosecution is based on the fact that "Urban Dictionary contains material that may be

considered 'harmful to minors' in some communities," because "[d]ozens of the words, phrases,

and definitions found on urbandictionary.com humorously, graphically, or symbolically describe

human anatomy and sexual acts."  Am. Compl. at 42-43 ¶ 3.  In the Amended Complaint and in

response to Interrogatories, Mr. Peckham listed slang terms for which he feared prosecution.  *See*

Am. Compl. at 42 ¶ 3; Ex. 16 (attaching first two pages of each definition).

---

[27]  As discussed in section II below, the relevant inquiry in the harmful-to-minors
standard is whether the work has value for older minors.

It is clear that Urban Dictionary cannot fall within COPA's harmful-to-minors definition. As a resource of information, it does not appeal to the prurient interest.  Rather, it is designed for users to share definitions of a variety of slang words, including words of a sexual nature.  While some of the definitions may be considered to "describe" sexual acts, they do not do so "in a manner patently offensive with respect to minors," as the descriptions are informative dictionary entries.  Slang terms or vulgar language does not make material harmful to minors when they are used outside of an erotic context, as on the Urban Dictionary website.  *See Cohen v. Calif.*, 403 U.S. 15, 20 (1971) (slogan "Fuck the Draft" was not obscene because it did not convey erotic message); *Baker v. Glover*, 776 F. Supp. 1511, 1516 (M.D. Ala. 1991) (finding bumper sticker stating "Eat Shit" could not be prosecuted as obscene or harmful to minors because it did not appeal to prurient interest and had serious value for adults and older minors).  Finally, the website, taken as a whole, cannot be said to lack serious value for minors.  Mr. Peckham asserts that "Letters to the site from students, parents, lawyers, educators, reporters, media translators and lexicographers attest to the site's cultural significance.  The Urban Dictionary Web site encourages users, including minors, to understand, participate, and take ownership of the English language and its constantly evolving definitions."  Am. Compl. at 43 ¶ 4.   Because Urban Dictionary's material, including the representative samples upon which it fears prosecution, cannot arguably fall within COPA's definition of harmful to minors, Mr. Peckham lacks standing in this case.[28]

---

[28]  In addition, Mr. Peckham asserts that the content of the website is "user-generated" and that he "has little ability to ensure that users comply with a 'harmful to minors' standard." Am. Compl. at 43-44 ¶ 4.  He further alleges that the website does not have a "pre-approval process" for submissions.  *Id.*  Therefore, it is questionable whether Mr. Peckham would be liable under COPA even if the material could be deemed to be harmful to minors, as liability

### 9.     The Material Upon Which Philadelphia Gay News Fears Prosecution Does Not Fall Within COPA

Philadelphia Gay News ("PGN") is the "oldest gay newspaper in Philadelphia" and publishes both in print and online.  Am. Compl. at 44 ¶ 5.  The online and print editions "share much of the same content, including national and local news stories written by PGN correspondents, arts and events sections, regular columns, a calendar of events, and editorials on a variety of social and political topics."  *Id.* at 44 ¶ 6.  The online edition also contains personal and classified advertisements.  *Id.*  The allegations in the Amended Complaint regarding PGN's fear of prosecution are not related to COPA's "harmful to minors" definition.  PGN fears prosecution because it deals with "issues relevant to the gay and lesbian community," that "some communities would consider access to personal advertisements inappropriate for minors when involving persons of the same gender," and that "some communities" may believe PGN's descriptions of social and sports clubs catering to the gay and lesbian community to be harmful to minors "because they 'entice' young people into exploring gay life."  Am. Compl. at 44-45 ¶ 7.  Obviously, these fears of prosecution are completely unfounded and not objectively reasonable, because they have nothing to do with the material that COPA defines as harmful to minors – that which appeals to the prurient interest of minors, depicts sexual acts in a patently offensive manner for minors, and is devoid of any serious value for minors.

Printouts of the web pages that PGN identified in its Interrogatory responses attached

---

does not attach to one who hosts a "communication by another person, without selection or alteration of the content of the communication."  47 U.S.C. § 231(b)(4).

hereto as Exhibit 17.[29]  It is notable that PGN does not fear prosecution for any of its own

content, but for content placed in classified ads by others.  Liability does not attach to one who

hosts a "communication by another person, without selection or alteration of the content of the

communication," 47 U.S.C. § 231(b)(4), which is exactly the type of content for which PGN

alleges a fear of prosecution.  Even if PGN were considered to be the speaker for purposes of its

classified advertising content, there is nothing in the nature of classified advertisements

(including the adult classified ads) that would meet the definition of harmful to minors under

COPA.  As a rule, they are not designed to appeal to the prurient interest, as they are

advertisements of an informational nature.  To the extent that they contain any depictions or

descriptions of sexual acts (and PGN has not produced any documentation to support the fact

that there are such descriptions), they would not be done "in a manner patently offensive with

respect to minors," but rather, as part of informational background of the person placing the

advertisement.  Finally, the advertisements must be viewed in the overall context of PGN.  PGN

cannot be said to lack serious literary, artistic, political, or scientific value – it is a general

interest newspaper catering to the gay and lesbian community.  PGN is a newspaper like many

others throughout the country that cover serious issues and contain, as a small part of its

publication, classified advertising.  Plaintiffs' own purported expert asserts that PGN "is not an

explicitly sexual site by any reasonable definition."  Reichman Report at 25.

---

[29]  Many of the pages about which PGN alleges a fear of prosecution, such as the "Philly
Encounters" section and advertisements therein, as well as chat rooms, are no longer on the
website. *See* Kade Decl. ¶ 9.  Because the links provided by PGN do not lead to any content,
and it is PGN's burden to prove that it has standing, descriptions of material on non-working
links cannot be a basis for standing.

### 10.  The Material Upon Which Powell's Bookstores Fears Prosecution Does Not Fall Within COPA

Powell's Bookstores states that it is the "world's largest independent new and used

bookstore" and operates a website that "allows users to browse and purchase new, used, rare, and

out-of-print books."  Am. Compl. at 48 ¶¶ 1, 2.  It does not believe that it contains any material

that is harmful to minors.  It alleges a fear of prosecution, however, because its website contains

material that "*may* be considered 'harmful to minors.'" *Id.* at 48  ¶ 3 (emphasis added).

Specifically, the Amended Complaint notes Powell's reviews of the books "Joy of Gay Sex Fully

Revised 3rd Edition" and "The Many Joys of Sex Toys: The Ultimate How-To Handbook for

Couples and Singles" as material upon which it fears prosecution.  *See id.*; Ex. 18.  In discovery,

Powell's listed web pages describing eight books as a representative sample about which it

feared prosecution.  *See* Ex. 18.  These book descriptions and excerpts cannot arguably be said to

fall within the harmful to minors definition of COPA.  None appeal to the prurient interest, or

describe any sexual acts in a patently offensive manner with respect to minors.  All have literary,

artistic, or scientific value.  All of the books advertised are literature that would be sold in

general interest bookstores.  The reviews and excerpts contained on Powell's website have

literary, artistic, political, or scientific value for minors, as they all describe the books in a

straightforward and informative manner.

### 11.  The Material Upon Which Salon Media Group Fears Prosecution Does Not Fall Within COPA

Salon Media Group, Inc. ("Salon") states that it "is a well-known, popular on-line

magazine" that contains "news articles; commentaries on and reviews of music, art, television,

and film; and regular columns on politics, relationships, the media, business, and other areas of

interest."  Am. Comp. at 49 ¶ 5.  Salon's "goal is to break news as well as produce the most compelling sort of social commentary . . . on the web," and it seeks to attract a "broad general interest audience" with its readership.  Deposition of Joan Walsh at 70, 145 (Ex. 19).  While Salon is aware of state harmful-to-minors laws, it does not fear prosecution under them because it does not believe that state harmful-to-minors laws "would apply to the kind of content that we post on Salon."  Walsh Dep. at 112-13.  Nevertheless, Salon alleges a fear of prosecution under COPA.

In the Amended Complaint, Salon proffered three articles it believes could be considered to be "harmful to minors" in some communities, which are attached hereto as Exhibit 20.  *See* Am. Compl. at 49-50 ¶ 6.  A review of the articles listed on the pages for which Salon fears prosecution indicates that the articles are serious looks at sexual topics, and do not appeal to the prurient interest.  One article involves "the rhetorical implications of the word 'pussy'" and the author's "belief that it is a word in need of reclamation."  *Id.*  Salon printed the article because it thought the article contained a provocative argument about the misogynistic use of the term, and Salon views the article as a serious article.  Walsh Dep. at 99-100 (Ex. 19).  The second article is a serious article about pornography, which Salon published because it thought the author was "a good writer with a unique voice on these topics.  We think her history as a feminist and her evolution in the way she thinks about sexuality and even what's considered pornography is provocative and that she has interesting and unusual insights."  *Id.* at 102.  Salon did not publish this article to appeal to the prurient interest.  *Id.* at 102-03.  The third article mentioned in the Amended Complaint is an interview with an author who had written a book about anal sex. Salon published the article because the book "was a widely-reviewed book by a relatively

serious writer and was attracting all kinds of interest, and our staff writer wanted to explore the contradictions of this woman who considers herself a feminist writing a book called 'The Surrender,' and talking about how important it was to be dominated in this particular way by a man." *Id.* at 105.  Salon had a serious intent in printing the article, and did not do so to appeal to the prurient interest.  *Id.* at 105-06.  According to Salon's editor-in-chief, none of the articles listed in the Amended Complaint were "beyond the mainstream."  *Id.* at 106.

In discovery, Salon did not provide any additional examples about which it fears prosecution.  Rather, it generally stated that it fears prosecution for "articles discussing, among other things, various forms of sexual contact and activity, human genitalia, and human sexuality generally" in six topic areas of the website (sex, sexuality, homosexuality, gay, lesbians, and oral sex).  *See* Ex. 20 (Resp. to Interrog. 13).  In addition, Salon states that it has a dialogue section where web users can directly post comments "on a diverse category of topics."  *Id.*  Salon's discovery responses indicate that it fears prosecution because it contains articles dealing with sex and sexuality.  This is not an objective fear of prosecution, as COPA does not apply to all material of a sexual nature, but just to that material that falls within the specific definition of harmful to minors.  The editor-in-chief of Salon testified that she did not consider any portion of the Salon website to be pornographic.  Walsh Dep. at 39 (Ex. 19).

Salon also identified sections of its website where users directly post comments as containing material about which it fears prosecution.[30]  Salon does not maintain editorial control

---

[30]  The areas of Salon where users directly post material are:  The Well, Table Talk, and Salon Blogs.  *See* Ex. 20.  The Well is a separate website, and requires a paid subscription.  *See* Walsh Dep. at 52; *see also* http://www.well.com/.  According to Salon's own testimony, therefore, The Well is COPA compliant.

of these sections.  *See* Walsh Dep. at 40 ("the bloggers post and we read what they write later.

They have complete autonomy to put their words on the site themselves."), 45-46 (noting that

Salon does "not really" monitor the threads on the Table Talk section, and that they have a half-

time person to moderate the tens of thousands of posts).   Therefore, these sections do not fall

within the parameters of COPA.  *See* 47 U.S.C. § 231(b)(4) (noting liability does not attach to

one who hosts a "communication by another person, without selection or alteration of the

content of the communication").  Even if Salon could be deemed to be the speaker of these

sections, Salon has not produced any evidence that these sections contain any sexually explicit

material.  To the contrary, the editor-in-chief of Salon testified that the blog section of Salon

does not contain sexually explicit photos.  Walsh Dep. at 43 (Ex. 19).   Because Salon has not

provided any objective evidence that would support a fear of prosecution, Salon does not have

standing to bring this suit.

### 12.    The Material Upon Which Sexual Health Network Fears Prosecution Does Not Fall Within COPA

The Sexual Health Network has a website "dedicated to providing easy access to

sexuality information, education, support and other sexuality resources for everyone, including

those with disability, chronic illness or other health-related problems."  Am. Compl. at 52 ¶ 14.

It is run by Dr. Mitchell Tepper, who has a doctorate in Human Sexuality Education and a

master's degree in Public Health.  *Id.*  The Sexual Health website provides information to

minors, as well as adults.  *Id.* at 52 ¶ 15.  It is clear that this website contains material proffered

in a scientific manner that has educational value for minors and, therefore, cannot reasonably be

said to "lack serious literary, artistic, political or scientific value for minors."  Dr. Tepper

testified that his website, in fact, provides social value to minors.  Deposition of Mitchell Tepper

at 103 (Ex. 21).  It is also clear from a review of the material upon which Sexual Health Network alleges a fear of prosecution, attached as Exhibit 22, that it is not designed to appeal to the prurient interest, as it renders advice in a scientific manner.  The scientific nature of the sexual health content prevents any categorization of the material as "patently offensive with respect to minors."  In fact, Dr. Tepper has never received a complaint from anyone that the material on Sexual Health Network is harmful to minors.[31]  Tepper Dep. at 96.  Plaintiffs' own expert has concluded that the material posted on Sexual Health Network is educational and "is by no reasonable definition obscene or harmful to minors."  Reichman Report at 16 (Ex. 1).

### B.   Associational Plaintiffs Have Not Demonstrated Standing

In addition to Plaintiffs operating websites, three associations sue on behalf of their members:  ACLU, American Booksellers Foundation for Free Expression, and the Electronic Frontier Foundation.  Each organization sues on behalf of its members for fear of prosecution for displaying material that is harmful to minors.  *See* Am. Compl. at 26 ¶ 8; at 29 ¶ 1; at 36 ¶ 7. "Even in the absence of an injury to itself, an association may have standing solely as the representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  However, "the possibility of associational standing does not eliminate the constitutional requirement of a case or controversy."  *Newark Branch, NAACP v. Town of Harrison*, 907 F.2d 1408, 1413 (3d Cir. 1990).  An association or organization has standing to sue on behalf of its members when:

---

[31]  The fact that Dr. Tepper's fear of prosecution does not reasonably flow from the statutory restrictions of COPA is apparent from his deposition testimony.  His fear of prosecution rests on several factors:  restrictions on what can be taught to minors for entities receiving federal funds; professional harm college professors have suffered for giving sexuality education; and the federal government's belief about appropriate sexual education and its policies about what should be taught.  *See* Tepper Dep. at 134-40 (Ex. 21).  None of these fears are related to (let alone premised on) COPA's definition of harmful to minors.

> (a) its members would otherwise have standing to sue in their own right;
>
> (b) the interests it seeks to protect are germane to the organization's purpose; and
>
> (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Assuming *arguendo* that the second prong of the test has been met by the organizational plaintiffs in this case, they lack standing because they fail to meet both the first and third prongs of associational standing requirements.

### 1.     Associations Have Not Demonstrated Standing on Behalf of Individual Members Who Post Material on the Web

ACLU, ABFFE, and the Electronic Frontier Foundation ("EFF") each bring claims on behalf of their members who allege they fear prosecution for posting material on the Web.  To demonstrate standing, each is "obligated to allege facts sufficient to establish that one or more of [their] members has suffered, or is threatened with, an injury."  *Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.*, 454 U.S. 464, 487 n.23 (1982).  None of these associations have sufficiently alleged that their members would have standing to sue in their own right.

Plaintiff ACLU is suing on behalf of its members "who fear prosecution or other enforcement under the statute for displaying material that is 'harmful to minors,'" including Lawrence Ferlinghetti and Patricia Nell Warren.  Am. Compl. at 26-29.  As detailed above, neither Mr. Ferlinghetti nor Ms. Warren have demonstrated an injury sufficient to warrant standing in this lawsuit.  ACLU does not mention any other members by name.  Nor does it

allege that its members intend to post material that is harmful to minors.  Because the ACLU's
allegations lack the requisite specificity about any harm its members would imminently suffer
under COPA, ACLU does not have standing to bring suit on their behalf.  *See Valley Forge
Christian College*, 454 U.S. at 487 (when organization did not specify harm for unidentified
members, there was no "cognizable injury" sufficient to confer standing).  Rather, the allegations
are merely the type of "conjectural or hypothetical" allegations that lack the specificity to
demonstrate standing.  *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).

ABFFE is suing on behalf of its "bookseller members from coast to coast, many of whom
sell materials that contain nudity or descriptions of the nude human body, and which deal frankly
with the subject of human sexuality," and that "some bookstores have their own Web pages that
discuss the content of books sold in stores."  Am. Compl. at 29 ¶ 1.  There is no allegation,
however, that any ABFFE member posts any material on their websites that could even arguably
fall within COPA's harmful-to-minors definition.  ABFFE identifies only one bookstore on
whose behalf it sues, the Sisterhood Bookstore, and this bookstore no longer has a website.
ABFFE's standing cannot rest on its one identified (and now defunct) member.  Even if ABFFE
did identify any of its other members, it asserts that its members "are not 'adult bookstores.'"  *Id.*
Because ABFFE's members are not the type of "adult" websites targeted by COPA, ABFFE has
not demonstrated standing.

The Electronic Frontier Foundation's ("EFF") membership consists of individuals
"committed to defending civil liberties in the world of computer communications, to developing
a sound legal framework for that world, and to educating the government, journalists, and the
general public about the legal and social issues raised by this new medium."  Am. Compl. at 35-

36 ¶ 6.  The one named member of EFF is Bill Boushka who, as described above, lacks

standing.[32]  Other than Mr. Boushka, EFF asserts only conclusory allegations that EFF members

fear prosecution due to their display of material on the Web.  There is no mention of the subject

matter communicated by unnamed EFF members and whether they could even arguably be

covered by COPA's restrictions.  Therefore, EFF has not met its obligation "to allege facts

sufficient to establish that one or more of [its] members has suffered, or is threatened with, an

injury."  *Valley Forge Christian College,* 454 U.S. at 487 n.23.  Indeed, EFF has alleged no such

facts, whatsoever.  Therefore, EFF lacks standing to sue on behalf of its members.

### 2.       Associations Have Not Demonstrated Standing on Behalf of Listener Members

ACLU and ABFFE also assert claims of their members that wish to access material on

the internet.  The only allegations raised about ACLU member access claims is that "[t]he ACLU

also has a broad spectrum of members who use the Web to access material.  Many ACLU

members are minors, including both high school and college students, who will be directly

affected by this Act."  Am. Compl. at 26-27 ¶ 9.   Again, ACLU has not attempted to identify

which websites ACLU members seek to access or how COPA would interfere with their specific

intent to access such websites.  The injury alleged is entirely speculative and ACLU has not

demonstrated that its members have standing to sue.  *See Lyons*, 461 U.S. at 101-02; *McKay v.*

*Heyison,* 614 F.2d 899, 903 (3d Cir. 1980) (plaintiff must demonstrate a "realistic danger of

sustaining a direct injury as a result of the statute's operation or enforcement"); *ACLU Student*

*Chapter Univ. of Md. v. Mote*, 321 F. Supp. 2d 670, 676 (D. Md. 2004) (rejecting standing on

---

[32]  Plaintiffs informed Defendant that EFF member Open Enterprises is no longer
participating in this lawsuit, and Open Enterprises has not responded to any discovery.

free speech claim when individual had not established when he intended to engage in speech).

Unlike ACLU, ABFFE explained the type of material that its members seek to access. ABFFE describes it as material that contains "nudity and sexual conduct," such as the books *Primary Colors* by Anonymous and *Sabbath's Theater* by Philip Roth. Both of these books are popular literature and not the type of material that arguably could fall within the scope of COPA. *Cf. Athenaco, Ltd.*, 335 F. Supp. 2d at 781 (noting books that are not harmful to minors under state law); *Am. Booksellers Ass'n*, 372 S.E.2d at 624 (same). Mere nudity or sexual conduct within literature are insufficient to render material subject to COPA. *See* 47 U.S.C. § 231(e)(6). Because the allegations by ABFFE regarding the standing of its members are mere speculation and not objectively reasonable, ABFFE lacks standing to sue on its members' behalf regarding their right to access material.

### 3.     Participation of Individual Members Is Necessary in This Lawsuit

In addition to the fact that Plaintiff associations cannot meet the first prong of the associational standing test (demonstrating that their members have standing to sue in their own right), the associational plaintiffs cannot meet the third prong of the associational standing test because individual participation of their members in the lawsuit is necessary. *See Hunt*, 432 U.S. at 343. Plaintiffs assert that COPA's affirmative defenses "impose tremendous burdens on both Web content providers and Web users." Am. Compl. at 21 ¶ 4. In a similar manner, the overarching inquiry in this case is whether "Congress has designed its statute to accomplish its purpose without imposing an unnecessarily great restriction on speech." *Reno v. ACLU*, 521 U.S. at 875-76 (internal quotations omitted).

In order to evaluate Plaintiffs' allegations of burden and resolve the question of the extent

of COPA's restriction on speech, the Court must determine what burdens COPA imposes on

individual websites and web users, which necessarily varies depending on the individual website

or website user involved.  The Third Circuit has noted that "conferring associational standing

would be improper for claims requiring a fact-intensive-individual inquiry."  *Penn. Psychiatric*

*Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 286 (3d Cir. 2002).  *See Georgia*

*Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003) (finding that association lacked

standing "because the economic impact of [the law] will vary depending on the economic

circumstances of each of its members").[33]  Additionally, the issues of Plaintiffs' claims mandate

an individualized review of the allegedly harmful-to-minors material on each of the Plaintiffs'

websites.  Finally, resolution of the issue of whether COPA's affirmative defenses are

technically feasible or economically burdensome for certain web operators will necessarily

involve individual participation.

> **C.     The Electronic Privacy Information Center Has Not Demonstrated Standing**

The Electronic Privacy Information Center ("EPIC") "is a nonprofit educational

organization established in 1994 to examine civil liberties and privacy issues arising on the

Internet."  Am. Compl. at 37 ¶ 11.  EPIC alleges that it accesses information on the Internet,

---

[33]  As a general matter, it is less likely that individual participation of an association's members would be required in case in which only declaratory or injunctive relief is sought, as such relief usually can be awarded without variation for individual plaintiffs.  *See Pennsylvania Psychiatric Soc.*, 280 F.3d at 284.  "However, the relief sought is only half the story.  The *Hunt* test is not satisfied unless '*neither the cla*im *asserted* nor the relief requested requires the participation of individual members in the lawsuit."  *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (emphasis in original) (quoting *Hunt*, 432 U.S. at 343).  Here, an analysis of Plaintiffs' claims that COPA imposes burdens on web site operators and web users requires an inquiry into the extent and the nature of the burdens that are allegedly imposed on those particular individuals or entities.

including sexually explicit pages, as part of its mission, which includes reporting on how well content filters work.  *Id.* at 37-38 ¶ 13.  EPIC fears that if COPA were to go into effect the websites it reviews "may remove from their Web sites material similar to that which EPIC staff heretofore have been able to access" without providing proof of age.  *Id.* at 38 ¶ 14.  EPIC alleges that COPA compromises the right to access speech anonymously and that it "does not intend to instruct its staff to use a credit card or adult access code" to access websites.[34]  *Id.* ¶ 15.

EPIC does not have standing because COPA will not have a unique impact on EPIC, because a distinct injury has not been alleged, and because a general ideological interest in a topic is not sufficient to confer standing on a party to sue.  As courts have recognized, "[o]ften, the right to receive information will be common to all citizens and will not give a litigant sufficient personal stake in the outcome of a case to sustain a finding of standing."  *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1479 (S.D.N.Y. 1988).  EPIC has not alleged an injury that is "distinct and palpable," as required to assert a justiciable injury.  *Warth,* 422 U.S. at 501.  It raises mere speculation about what (unidentified) websites it needs to access as part of its mission and what (unidentified) Internet content providers *might* do if COPA were to go into effect.  Standing cannot be premised on speculation.  Nor can standing be premised on a general interest in Internet privacy or in studies regarding the effectiveness of filtering software.  *Humane Soc'y v. Hodel*, 840 F.2d 45, 54 n.15 (D.C. Cir. 1988) ("a mere 'special interest' in a subject" does not substitute for allegations of injury); *see also Kessler Inst. for Rehab. v. Mayor and Council of Borough of Essex Fells*, 876 F. Supp. 641, 656 (D.N.J. 1995) ("An organization

---

[34]  As discussed in Section III, the claim regarding a right to anonymously access the Web is based on a faulty legal premise and judgment should be granted in favor of Defendant on this claim.

does not possess standing simply because it has an ideological or abstract social interest that is adversely affected by the challenged action.").

Because none of the Plaintiffs have alleged or proffered evidence sufficient to confer standing, the Court should dismiss their claims.

## II.     BECAUSE COPA'S DEFINITION OF MINOR DOES NOT RESTRICT OLDER MINORS' ACCESS TO OTHERWISE APPROPRIATE SEXUALLY EXPLICIT INFORMATION, PLAINTIFFS CANNOT MAINTAIN THEIR SECOND CAUSE OF ACTION

Plaintiffs, in their Second Cause of Action allege:

> COPA violates the First and Fifth Amendments of the United
> States Constitution because it interferes with the rights of minors
> to access and view material that is not harmful to them by
> prohibiting the dissemination of any material with sexual content
> that is 'harmful to minors' of any age, despite the fact that the
> material will not be 'harmful' to all minors.

Am. Compl. at 54 ¶ 23.  This claim is based on several false assumptions.  This argument is based on an assumption that the harmful-to-minors standard under COPA evaluates web content based on the youngest of minors.  In fact, a proper interpretation of COPA, supported by the statutory language and case law, is that COPA applies an older minor standard in determining what is considered harmful to minors.  Plaintiffs' argument is also based on an assumption that minors have a constitutional right to access sexually explicit material.  They do not.

The very statute that the Supreme Court upheld in *Ginsberg v. N.Y.*, 390 U.S. 629 (1968), which banned the sale or display of harmful to minors material to minors, defined "minor" as "any person less than seventeen years old."  N.Y. Penal Law § 235.20(1) (formerly N.Y. Penal aw § 484-h).  This definition is indistinguishable from COPA's definition of "minor" as "any person under 17 years of age."  47 U.S.C. § 231(e)(7).  Indeed, of the more than 41 states and the

46

District of Columbia that ban sale and/or display of obscene and/or harmful to minor material to minors, none contain a definition of minor of any significant difference from COPA, and none have been held unconstitutional on that ground.  *See supra* footnote 6.

Courts universally have interpreted state display laws to incorporate an older-minor standard, even though the text of the laws define minors as anyone under either 17 or 18 years old.  The Virginia harmful-to-minors statute defines minor as anyone under the age of eighteen. Va. Code Ann. § 18.2-390(1).  In *American Booksellers Ass'n*, 372 S.E.2d at 624, at the urging of Virginia's Attorney General, the Virginia Supreme Court held that material has serious value for minors and therefore is not subject to the State's display law if it has serious value for a "legitimate minority of normal, older adolescents."  The court explained that "if a work is found to have a serious literary, artistic, political or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole."  *Id.*  The Fourth Circuit sustained this finding.  *American Booksellers Ass'n,* 882 F.2d at 127.  Similarly, the Tennessee Supreme Court has held that material has serious value for minors within the meaning of that State's display law, if it has serious value for "a reasonable seventeen year old minor."  *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 533 (Tenn. 1993).  The statutory provision at issue defined minors as "any person who has not reached eighteen (18) years of age and is not emancipated."  Tenn. Code Ann. § 39-17-901.  And in *Webb*, the Eleventh Circuit interpreted Georgia's display law, which defined minor as "a person less than 18 years of age," Ga. Code Ann. § 16-12-102, in the same way.  919 F.2d at 1504-05 ("As applied to a *Ginsberg*-type adaptation of the adult obscenity test, *Pope* teaches that if any reasonable minor . . . would find serious value, the material is not harmful to minors").

47

To ensure that its harmful-to-minors standard was sufficiently precise and administrable, Congress deliberately borrowed the "familiar" definition of "harmful to minors" as that standard had been applied in the context of state display laws "over the years."  H.R. Rep. No. 105-775 at 13 (citing cases).  Because Congress modeled COPA on the state harmful-to-minor laws and deliberately incorporated their harmful-to-minors definitions, COPA should be construed to incorporate the older minor standard reflected in those state display laws.[35]  *See Evans v. United States*, 504 U.S. 255, 259-260 & n.3 (1992).  To the extent that this interpretation is not apparent from the language of the statute and the legislative history, the Court should apply this narrowing construction.  *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (requiring courts to use a narrowing construction before holding a statute unconstitutional).

In any event, Plaintiffs' claim can survive only if older minors have a constitutional right to access harmful-to-minors material.  In general, "the constitutional rights of children cannot be equated with those of adults."  *Bellotti v. Baird*, 443 U.S. 622, 634 (1979).  "[E]ven when there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults.'"  *Ginsberg,* 390 U.S. at 638 (quoting *Prince v. Mass.*, 321 U.S. 158, 170 (1944)).  The Supreme Court has firmly established that the government has "a compelling interest in protecting the physical and psychological well-being of children" and that "[t]his interest extends to shielding minors from the influence of literature that

---

[35]  Moreover, an older minor standard is consistent with Congress's intent to protect younger minors from harmful material.  Just as the obscenity component of COPA protects older minors from the harmful effects of pornography that lacks serious value even for adults, the harmful-to-minors component of COPA protects younger minors from the harmful effects of pornography that lacks serious value for the oldest minors.  In that way, COPA shields all minors from the most harmful material on the Web, without interfering with the interest of older minors in obtaining access to material that has serious value for them.

is not obscene by adult standards." *Sable Comm'n of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). *See also Reno v. ACLU*, 521 U.S. 844, 864-65 (1997); *Ginsberg*, 390 U.S. at 639. This compelling interest necessarily reflects the fact that minors do not have a constitutionally-protected right to access material that is harmful to minors. Therefore, while non-obscene sexually explicit materials may be constitutionally protected for adults, they are not for minors.

Because COPA incorporates an older-minor standard and because sexually explicit material is not constitutionally protected for minors, judgment should be entered in favor of Defendants on Plaintiffs' Second Cause of Action.

## III.   BECAUSE PLAINTIFFS DO NOT HAVE A RIGHT TO COMMUNICATE OR ACCESS HARMFUL TO MINORS CONTENT ANONYMOUSLY, THEY CANNOT SUSTAIN THEIR THIRD CAUSE OF ACTION

In Count Three of their Amended Complaint, Plaintiffs allege that COPA violates the rights of all Americans to communicate and access harmful-to-minors information anonymously. Am. Compl. at 55 ¶ 25. Because none of the websites in this case are anonymous, Defendant understands Plaintiffs' claim to be one of website users (i.e., listeners) attempting to anonymously access websites. *See* Am. Compl. at 2 ¶ 2 (alleging that COPA violates rights of "Web users to view this constitutionally protected speech, including the right to do so anonymously"). This situation presents quite different concerns than those in which courts have protected the rights of speakers to speak anonymously.

While the Supreme Court has recognized a right to anonymous speech in certain circumstances, this line of cases is inapposite to the instant case. *See Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182 (1999) (striking down statute requiring volunteers to wear identification badges); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)

(allowing anonymous pamphleteering on political issues); *Talley v. Calif.*, 362 U.S. 60 (1960) (finding First Amendment to protect distribution of unsigned handbills urging the boycott of merchants); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305 (1965) (striking down law requiring recipients of "communist political propaganda" through mail to perform an "official act," that is, to affirmatively request that post office deliver material). The rationale for these cases is that a speaker's rights should be protected because public disclosure of unpopular viewpoints could stifle speech. *See, e.g., McIntyre*, 514 U.S. at 357 ("Anonymity is a shield from the tyranny of the majority."); *Lamont*, 381 U.S. at 307 (requirement of affirmative request to government, for material condemned by federal government, has deterrent effect and could raise concerns about retaining employment). These cases – and the rationale of protecting anonymous speech due to the potential chill in disclosing one's identity – do not apply to the situation presented by COPA. COPA does not entail public disclosure of anyone's identity, nor does it require identification to any government officials. To the contrary, absent consent of that adult or a court order, COPA prohibits the disclosure of "any information collected for the purposes of restricting access to such communications to individuals 17 years of age of older." 47 U.S.C. § 231(d)(1)(A).[36] Further, the statute requires that a company that verifies the age of an adult who accesses harmful to minors material to "take such actions as are necessary to prevent unauthorized access to such information by a person other than the [company] and the [adult]." *Id.* at § 231(d)(1)(B). Anyone who willfully or knowingly violates these provisions is subject to criminal penalties. *See* 47 U.S.C. § 501. Under COPA, an individual's identity is disclosed only by providing a

---

[36]  To the extent a minor provides his or her identity to a company that verifies age in order to allow access to harmful to minors material, the statute does allow disclosure of that minor's identity to his or her "parent or guardian." *Id.* at § 231(d)(1)(A)(ii).

credit card or other adult verification in order to access harmful-to-minors material, and this information is disclosed only to the website offering such material.   This non-public disclosure does not implicate the type of policy concerns underlying the Supreme Court's protection of anonymous speech.  *Cf. Veterans & Reservists for Peace in Vietnam v. Reg. Comm'r of Customs,* 459 F.2d 676, 683 (3d Cir. 1972) (upholding statute that required a license to receive certain material from North Vietnam when there were no allegations "that the purpose of the recordation is to embarrass the recipient of materials or to chill the exercise of this right to receive them").

The case of *Connection Distributing Co. v. Reno,* 154 F.3d 281 (6th Cir. 1998), is instructive.  In that case, a "swingers" magazine that allowed members to place sexually explicit photographs of themselves in the magazine challenged a statute that required the magazine to get photographic identification from those appearing in the photos and to maintain records of this identification.  *Id.* at 285 (citing 18 U.S.C. § 2257).  The plaintiff argued that, "because anonymity is important to 'swingers,' these provisions stand as a barrier to those who wish to exercise their free speech rights."  *Id.*  The court assumed the materials were not obscene, *id.* at 289 n.7, and upheld the statutory requirements in the face of the plaintiff's allegations of chill due to lack of anonymity, stating:

> The Act does not constitute an impermissible 'chill' on the exercise of free speech rights because it clearly does not contemplate public release of the information or 'raise the specter of public exposure and harassment' of 'swingers' who choose to express themselves through Connection's publications.

*Id.* at 293.  The court further found that, even assuming the readers of the magazine "will be less likely to engage in this form of expression because of the fear of disclosure, this unsubstantiated fear, and not the Act, is what is diminishing the forum."  *Id.* at 294.  Like the statute at issue in

51

*Connection Distributing*, COPA does not permit the public disclosure of any information of those seeking access to material and, therefore, the statute passes constitutional muster. *See also Fabulous Assoc., Inc. v. Pennsylvania Public Utility Comm'n*, 896 F.2d 780, 788 (3d Cir. 1990) (suggested dial-a-porn regulation that required customers to identify themselves to telephone companies in order to unblock access to services is constitutionally permissible where "there is evidence that the telephone company will not disclose such information").

When the compelling government interest of protecting minors is involved, courts have upheld laws intended to restrict access by minors to sexually explicit material, even if such laws may require adults who desire such material to affirmatively request it or to identify themselves in some manner. *See Crawford v. Lungren*, 96 F.3d 380, 387-89 (9th Cir. 1996) (upholding constitutionality of law regulating sale of "harmful to minors" material in vending machines which allowed access by adults who could verify their adulthood); *Information Providers' Coalition for Defense of First Amendment v. FCC*, 928 F.2d 866, 872-74 (9th Cir. 1991) (upholding credit card or adult access code requirement in the "dial-a-porn" context); *Doe v. City of Minneapolis*, 693 F. Supp. 774, 783 (D. Minn. 1988) (finding no First Amendment right to anonymously view sexually explicit material in bookstore booths), *aff'd*, 898 F.2d 612 (8th Cir. 1990); *Upper Midwest Booksellers Ass'n v. Minneapolis*, 780 F.2d 1389, 1395 (8th Cir. 1986) (upholding constitutionality of display restriction in part because "[a]dults are still free to request a copy of restricted material to view from a merchant"). The suggestion that individuals will be less likely to access harmful to minors material on commercial Web sites if they are required to

provide identifying information is without constitutional significance.[37]  *See Fort Wayne Books,*

*Inc. v. Indiana*, 489 U.S. 46, 60 (1989) ("mere assertion of some possible self-censorship

resulting from the statute is not enough to render . . . [a] law unconstitutional").  Indeed,

providing proof of age is common in other contexts when there is an interest in protecting

minors, such as entries to nightclubs, adult bookstores, or NC-17 movies.  *See Reno v. ACLU*,

521 U.S. at 890 (O'Connor, J., concurring in part and dissenting in part).

Because the government, as a matter of law, is allowed to request adults to identify

themselves to access harmful-to-minors material, Plaintiffs' claim regarding anonymous access

must fail.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed for lack of standing.  In

the alternative, judgment should be entered in favor of Defendants and against Plaintiffs on

Counts II and III.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PATRICK L. MEEHAN
United States Attorney
RICHARD BERNSTEIN
Assistant U.S. Attorney

---

[37]  To the extent that resolution of Plaintiffs' overbreadth and vagueness claims under the First Amendment involve evidence of alleged chill by listeners, Plaintiffs will presumably introduce that evidence at trial.  Plaintiffs' separate claim that they have a *per se* constitutional right to anonymous access to harmful-to-minors material, however, can be decided as a matter of law.

THEODORE C. HIRT
Assistant Branch Director


  /s/
ERIC J. BEANE
ISAAC CAMPBELL
JOEL McELVAIN
KENNETH SEALLS
JAMES TODD
TAMARA ULRICH
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C.  20530
(202) 305-1432

Attorneys for Defendant