# EXHIBIT 19

**ORIGINAL**

1

2   UNITED STATES DISTRICT COURT

3   EASTERN DISTRICT OF PENNSYLVANIA

4   ------------------------------------------X

5   AMERICAN CIVIL LIBERTIES UNION, et al.,

6                         Plaintiffs,
                                                    Case No.
7             -against-                             98-CV-5591

8   ALBERTO R. GONZALEZ, in his official
    capacity as Attorney General of the
9   United States,

10                        Defendant.

11  ------------------------------------------X

                    -- DAILY COPY --
12

13                       February 17, 2006
                         9:30 A.M.
14
                         885 Third Avenue
15                       New York, New York

16

17

18          DEPOSITION of SALON, one of the

19  Plaintiffs herein, by JOAN WALSH, taken by the

20  Defendants, pursuant to Notice.

21

22

23           ARISTA COURT REPORTING CO.
                192 Lexington Avenue
24                   Suite 802
             New York, New York 10016
25               (212) 684-6100

| | |
|---|---|
| 1 | JOAN WALSH |

2  had an accuracy problem with a piece about four

3  years ago to my knowledge, that's the only

4  thing that we've ever taken down.  It's all

5  there, ten years worth.

6        Q.    I think we've been over this, do

7  you consider any portion of your web site to be

8  pornographic?

9        A.    No, I personally do not.

10       Q.    Could you just review who

11 determines what content is put on the web site?

12       A.    Sure.  We have a fairly

13 decentralized decision-making structure in

14 which senior editors have responsibility for

15 section areas, whether it's life, news,

16 technology, arts and entertainment, and those

17 editors are the ones kind of at the first line

18 deciding, you know, we're covering the Oscars,

19 we're covering Abu Ghraib, whatever.

20             We have a daily meeting where we go

21 over what editors think will be in their

22 section, what they would like to be in their

23 section, and it's at that point that I would

24 exercise some discretion or judgment and say,

25 "You know, I need to read that story.  You

| | |
|---|---|
| 1 | JOAN WALSH |
| 2 | know, this package sounds a little heavy on the |
| 3 | entertainment without enough news."  At some |
| 4 | point in the process I read everything, but |
| 5 | quite honestly that may be after it's gone up. |
| 6 | We have an executive editor, a |
| 7 | managing editor who are really at the front |
| 8 | line with those section editors reviewing the |
| 9 | stories for quality, clarity, accuracy.  Cover |
| 10 | stories I tend to read, you know.  I read every |
| 11 | word and comma of our Abu Grave coverage, saw |
| 12 | every image, saw all the images we didn't use. |
| 13 | Issues like that I'm involved in every other |
| 14 | random. |
| 15 | The columnists, the bloggers, the |
| 16 | bloggers post and we read what they write |
| 17 | later.  They have complete autonomy to put |
| 18 | their words on the site themselves.  So, quite |
| 19 | a lot of that I have very little to do that I |
| 20 | read it and make sure quality's good and then, |
| 21 | you know, we're doing right by our readers, but |
| 22 | I'm not reading to filter or pull back or say |
| 23 | this isn't going up today. |
| 24 | Q.  How about with photos? |
| 25 | A.  With photos it's the art department |

```
 1                       JOAN WALSH
 2    kind of thing that I don't want our bloggers
 3    doing.  It was a combination of simply not
 4    wanting to be derivative and re-purposing other
 5    people's blog, and frankly finding the subject
 6    matter not, you know, not smart.
 7             Q.    Are there photos on the blogs?
 8             A.    Occasionally.
 9             Q.    Are there sexually explicit photos
10    on the blogs?
11             A.    Not so far.
12             Q.    Just to make sure I understand, you
13    say that you or somebody at Salon at some point
14    reviews everything in the blogs after its
15    posted at some point?
16             A.    We have a copy editor whose job it
17    is to mainly look for spelling errors and
18    certain things.  They're really high-level
19    professionals so they don't make a lot of
20    mistakes.  That's mainly what she does.  If she
21    was to see something that she thought was poor
22    reasoning, poor news judgment or offensive, she
23    might flag it for the managing editor or for me
24    and say hey, take a look at this, this point
25    doesn't make sense to me or I have this or that
```

```
1                    .JOAN WALSH
2    issue with it.
3            Q.    Do you have chat rooms?
4            A.    We don't technically have chat
5    rooms.  We have something called Table Talk
6    that was founded with Salon I'm pretty sure,
7    you know, right when Salon went up maybe a week
8    later, I wasn't there.  Why it's not chat, the
9    definitions are a little bit tough for me.
10   Before I joined I would have called it chat,
11   but it's definitely not chat.
12                 Basically members can post in
13   literally hundreds of conversation threads and
14   talk to, you know, they're certainly talking to
15   one another, often some of them aren't, some of
16   them are declaiming and, you know.
17                 We had a whole thread devoted to an
18   amateur person who decided to take apart the
19   inconsistencies in George Bush's National Guard
20   service, and he got the documents and he did
21   what major news organizations including Salon
22   unfortunately really didn't do and, you know,
23   that was a thread that people might chime in
24   and say you go, good job, but wasn't terribly
25   conversational as I recall it.
```

Case 2:98-cv-05591-LR   Document 292-15   Filed 09/07/06   Page 7 of 19
45

```
1                    JOAN WALSH
2             Other threads are completely
3    conversational.  Other threads are being the
4    parents of toddlers and what it's like, and
5    then there are, you know, there's a real
6    private life thread that discusses
7    relationships a lot.  There's a thread on what
8    it's like to be a transgendered person.  So, in
9    those threads there can be very sexually,
10   frank, and by some standards explicit
11   conversations going on.
12        Q.   Do you review or does anyone
13   monitor the threads on Table Talk?
14        A.   Not really.  We have, basically
15   we've created this infinite almost infinite
16   garden in ten years.  There are literally I
17   would say more than hundreds, thousands of
18   individual conversations going on with quite
19   literally thousands, tens of thousands of
20   people who've posted over the years.
21             We have a half time person
22   moderating Table Talk, and her job mainly
23   consists of, you know, visiting threads and
24   occasionally starting new threads, seeing
25   what's on people's minds, and then breaking up
```

1                        JOAN WALSH

2       fights, and periodically, very rarely, but

3       periodically removing posts either because

4       they're abusive.  By and large it's because

5       they're really over the line, abusive to

6       another Table Talk member.  Never because

7       they're abusive to me which really bothers me

8       because there's a whole thread devoted to my

9       failures, and I'm trying to think if ever in my

10      experience a thread a post was pulled because

11      it was obscene or is sexually inappropriate,

12      and I just don't know that.  I can't say

13      definitively either way.

14              Q.    Do you have a complaint process?

15              A.    We do have a complaint process, and

16      they, for Table Talk the first line of

17      complaint would be Marybeth Williams, our

18      moderator, but they go around her, above her,

19      they find me, they find other management when

20      they think something's going on that they don't

21      like, but for the most part really it's all

22      about civility and how they're treating one

23      another.  It's not, you know, somebody's being

24      very sexually inappropriate in the private

25      lives folder.

1                    JOAN WALSH

2    went along with them.  So, it wasn't an

3    affirmative change or decision on our part.  It

4    was like our vendor was going out of business,

5    they found a buyer, we took the path of least

6    resistance and hooked up with them.

7                    (Brief recess)

8         Q.    I was just about to ask you a few

9    questions about The Well.  Could you just

10   generally tell me about The Well, how is it

11   different than Table Talk?

12        A.    The Well is a 20-year-old online

13   membership community.  It was purchased by

14   Salon in 1999 and was never integrated with

15   Table Talk in any way except that the director

16   of The Well also is the director of Table Talk.

17   She's the director of our community.  It's very

18   separate.  It's a small membership community.

19   You can't -- unlike Table Talk where you can

20   read it, any of us could read it, but then you

21   have to be a member to post.  With The Well you

22   can't read anything.  If you want to go in and

23   look around, you've got to pay your membership,

24   and those are the differences.

25        Q.    Are the kinds of materials, the

Case 2:98-cv-05591-LR   Document 292-15   Filed 09/07/06   Page 10 of 19

70

1                    JOAN WALSH
2     -- your increasing traffic is your goal I
3     believe.  Do you have a target demographic that
4     you seek?
5           A.    It's, you know, I try to be broad.
6     I don't want Salon to be a kind of narrow
7     casting niche publication for, you know, men in
8     their late 20s or, you know.  I really think
9     that we're producing content and that success
10    for us lies in a pretty broad general interest
11    audience.  I know there are a lot of niche
12    publishing, but that doesn't excite me.  I like
13    to bring people across age lines, political
14    lines, cultural lines so.
15          Q.    What about your advertisers, what
16    kind of demographics do they ask about, are
17    they interested in?
18          A.    Sure, there's a difference between
19    what I shoot for and what I get.  So, I shoot
20    for the world, what I seem to have gotten is
21    fairly affluent, educated, tends to be male, 30
22    something, professional.  So, having said that,
23    we more -- the web is very male.  We have more
24    female readers than many publications, but it
25    tends to be an affluent, educated, youngish,

```
1                        JOAN WALSH
2           times.  Whereas the original numbers
3           seem to go in sequence from beginning to
4           end.
5                   MR. TODD:  That is correct.
6                   MR. WIDMAN:  For whatever it's
7           worth.
8                   MR. TODD:  Right, and for the
9           future down the road.
10             Q.    Starting with this article, I don't
11      know if you need to take a moment to review it
12      again, but I was just curious, Salon fears
13      prosecution under COPA because of this article;
14      what about this article gives rise to your
15      fears of prosecution?
16             A.    You know, again, while I might have
17      no problem with this level of discourse, no
18      doubt it would be offensive to some people with
19      traditional values.  So, the long description
20      of all sorts of words for pussy, the, you know,
21      the description of pussy.
22             Q.    Do you think this article -- why
23      did you publish this article, why did Salon
24      publish this article?
25             A.    Because we thought it was a
```

1                    JOAN WALSH

2    provocative, this argument, how misogynistic it

3    is that the term pussy when it's associated

4    with women it's used to mean weak, loser,

5    wishy-washy.

6            Q.   You think it's a serious

7    discussion?

8                MR. WIDMAN:   Objection.   Calls for

9        a legal conclusion.

10           Q.   Again, I'm asking you to use the

11   common sense term of that word and not the

12   legal definition.

13               MR. WIDMAN:   Same objection.

14           A.   I think serious like all the other

15   terms is in the eye of the beholder so, and so

16   my interpretation that this young writer really

17   does want to change the way of how we use the

18   word pussy, but that's my interpretation.

19   Someone else could think it's an offensive,

20   juvenile exercise and throwing around dirty

21   words and getting to describe vaginas.

22           Q.   Did you publish this article in

23   order to appeal to sexual, you know, sexual

24   excitement, prurient interests?

25               MR. WIDMAN:   Objection.   Calls for

```
 1                    JOAN WALSH
 2        A.    Very briefly it's about her coming
 3   to believe that where she once thought porn was
 4   very exploitive of women and anti-feminist,
 5   that in fact porn could be not only liberating,
 6   not only titillating and sexually very, very
 7   exciting, but liberating and with a, you know,
 8   segue way into the fascinating under side of
 9   people who frequent porn theaters.
10              MR. WIDMAN:  I would like to object
11         to the question.  I think the article
12         speaks for itself.
13         Q.   Why did you publish, why did Salon
14   publish this article?
15         A.   This was actually before my time,
16   but I would have published it, you know, still
17   am open to publishing Susie, you know.  We
18   think she's a good writer with a unique voice
19   on these topics.  We think her history as a
20   feminist and her evolution in the way she
21   thinks about sexuality and even what's
22   considered pornography is provocative and that
23   she has interesting and unusual insights.
24         Q.   Was the article itself designed to
25   appeal to the prurient interest?
```

                                    JOAN WALSH

1
2                  MR. WIDMAN:  Objection.  Calls for
3          a legal conclusion.  Vagueness.
4          A.    Again, it wouldn't seem that way to
5    me, but with this level of explicit language
6    and actual depiction of masturbation and
7    everything else that's in here, it's very easy
8    for me to imagine somebody else disagreeing
9    with me.
10         Q.    Did Ms. Bright ask you to link to a
11   sample of any of the videos?
12         A.    I don't know.
13         Q.    Would you publish, would you put up
14   links to pornographic movies if someone asked
15   you to if they were reviewing a porn or
16   discussing a porn movie like they did here?
17                MR. WIDMAN:  Objection.
18         Hypothetical.
19         A.    Theoretically, yeah.  I mean we
20   link to a lot of things.
21         Q.    But she didn't ask you to link to
22   it here?
23         A.    To my knowledge, like I said, I
24   didn't work there then.
25         Q.    Am I correct in noting that one of

```
 1                         JOAN WALSH
 2    entitled 'Rectal Romance', and I want to
 3    confirm that this is the article you were
 4    referring to in your complaint?
 5            A.    Yes.
 6            Q.    Would you like a moment to review
 7    this article?
 8            A.    Sure.  Okay.
 9            Q.    Why did you publish this article?
10            A.    It was a widely-reviewed book by a
11    relatively serious writer and was attracting
12    all kinds of interest, and our staff writer
13    wanted to explore the contradictions of this
14    woman who considers herself a feminist writing
15    a book called 'The Surrender', and talking
16    about how important it was to be dominated in
17    this particular way by a man.
18            Q.    Do you consider this article a
19    serious piece of journalism?
20                  MR. WIDMAN:  Objection.  Calls for
21         a legal conclusion.  Vagueness.
22            A.    We had serious intentions in
23    printing it.
24            Q.    When you printed this was your
25    intent to arouse sexual excitement or appeal to
```

1                         JOAN WALSH
2     the prurient interest?
3              MR. WIDMAN: Objection. Calls for
4         a legal conclusion. Vagueness.
5         A.   I really can't speculate about what
6     somebody will find arousing or prurient.
7         Q.   I'm asking what Salon's intent was.
8     Was Salon's intent to appeal to the prurient
9     interest?
10             MR. WIDMAN: Same objection.
11        A.   Prurient is one of those really
12    loaded, negative words. I mean of course not.
13        Q.   With these three exhibits that I've
14    put before you, did you put any kind of, did
15    Salon put any kind of warning screen in front
16    of them?
17        A.   No.
18        Q.   Why not?
19        A.   We didn't think they rose to the
20    level of being so disturbing or, you know,
21    beyond the mainstream that we would have to do
22    that.
23        Q.   Do you know whether Salon picked
24    these examples out from its archives or the
25    ACLU picked these examples out from the archive

1               JOAN WALSH

2       someone as harmful to minors.

3                  MR. WIDMAN:  I would like to object

4           to the last question because it calls

5           for a legal conclusion.

6           Q.    Are you aware that California has a

7       harmful to minors statute?

8           A.    I am.

9           Q.    Are you concerned about prosecution

10      of any material on your web site under that

11      statute?

12          A.    I'm not aware of it being applied

13      to publications like ours.  So, at this point I

14      know it's a possibility, but it's not something

15      I actively worry about.

16          Q.    Because?  I'm sorry, could you just

17      explain that a little bit more?

18          A.    Because I've never been informed

19      that it would apply to the kind of content that

20      we post on Salon and it's never been used that

21      way.

22          Q.    Are you aware that or generally

23      aware that many states have harmful to minors

24      laws that prohibit the sale or display of

25      harmful to minor materials?

```
 1                      JOAN WALSH
 2              MR. WIDMAN:  Objection.  Calls for
 3         information beyond the witness's
 4         personal information.
 5         A.   I'm vaguely aware.
 6         Q.   Do you fear prosecution under any
 7    of those statutes?
 8         A.   No, I don't actively fear it.
 9    Anything's possible.
10         Q.   To back up and ask another
11    question, you say on some of the photographs
12    that you post sometimes you put a warning
13    screen right in front of a series of
14    photographs, you think that that's easier to do
15    than to put some other sort of age-verification
16    barrier?
17              MR. WIDMAN:  Objection.  Misstates
18         prior testimony.  Vagueness.
19         Q.   Or something else that might comply
20    with COPA?
21              MR. WIDMAN:  Same objection.  Calls
22         for a legal conclusion also.
23         A.   I wouldn't necessarily call it a
24    warning screen.  The language varies.  It's
25    part of the layout, it's part of the editorial
```

```
1                    JOAN WALSH
2         A.   That's a very tough question to
3    answer and I get asked it all the time so I
4    should have a better answer.  I personally, you
5    know, think we compete with the New York Times
6    and the blogs.  I think we compete on some
7    level with the New Yorker and Vanity Fare.  I
8    have high aspirations, but, you know, in terms
9    to a direct, we get compared to Slate.  Slate
10   is the last thing I think about.  I mean I'm
11   not putting it down, it's just not what we're
12   doing given that my goal is to break news as
13   well as produce the most compelling sort of
14   social commentary certainly on the web.
15             But even beyond the web I tend to
16   think of us more in the context of the New York
17   Times than a, you know, talking points memo as
18   much as I love Josh Marshall.
19        Q.   Can you give us some examples of
20   some other blogs that you view as competitors?
21        A.   I don't really view the blogs as
22   competitors because they're so small.  I think
23   collectively the blogisphere competes with us.
24        Q.   Can you give us some examples of
25   daily blogs that compete with you?
```