# Sexual Solicitations and Approaches

The dangers posed from people who use the Internet to make inappropriate and sometimes criminal sexual overtures to youth remain a primary concern of families, law enforcement, and others concerned with the welfare of youth. The second *Youth Internet Safety Survey* shows a smaller proportion of youth who said they were sexually solicited online. Further, the fact a smaller proportion of youth said they went to chatrooms, talked to people they did not know in person online, and formed close online relationships with people they knew only online suggests at least some of this decline may be due to youth being aware of the risky nature of online encounters with such people. Despite the decline in the proportion of youth who received solicitations, however, the number of youth receiving the most dangerous sexual overtures, aggressive solicitations that move, or threaten to move, beyond the Internet into real life has not declined. The percentage of youth who said they felt very or extremely upset or frightened because of a solicitation also did not show a statistically significant decrease.

---

### How We Assessed Sexual Solicitations and Approaches

As in *YISS-1*, *YISS-2* assessed the problem of online sexual exploitation by asking youth four kinds of questions, the results of which were aggregated under the category of sexual solicitations and approaches. The four kinds of questions were about

- Sexual approaches made to them in the past year — situations where someone on the Internet attempted to get them to talk about sex when they did not want to or asked them unwanted sexual questions about themselves
- Sexual solicitations they had received in the past year from persons over the Internet who had asked them to do sexual things they did not want to do
- Close friendships they had formed in the past year with adults they met over the Internet that involved sexual overtures
- Invitations from people they met online to help them run away, a ploy apparently used by some individuals looking for vulnerable youth

---

In *YISS-2* approximately 1 in 7 youth Internet users (13%) received unwanted sexual solicitations or approaches in the past year. Close to half of the solicitations were relatively mild events that did not appear to be dangerous or frightening. Four (4) percent of all youth Internet users, however, received aggressive sexual solicitations, which threatened to spill over into "real life" because the solicitor asked to meet the youth in person; called them on the telephone; or sent them offline mail, money, or gifts. Also 4% of youth Internet users had **distressing sexual solicitations** that left them feeling very or extremely upset or afraid. Two (2) percent of youth had solicitations that were both aggressive and distressing.

Figure 5



## Findings About Solicitations

**Who were the youth targeted for sexual solicitations and approaches in YISS-2?[10]**

- Seventy (70) percent were girls and 30% were boys
- Eighty-one (81) percent were ages 14 or older
- No 10 year olds and only 3% of 11 year olds were solicited
- Aggressive and distressing solicitations were also concentrated among older youth with 79% of aggressive incidents and 74% of distressing incidents happening to youth ages 14 and older

These findings point to another piece of good news from YISS-2, which is few pre-teen youth interviewed (ages 10 to 12) experienced sexual solicitations. The concerning news, however, is 90% of solicitations happened to teenagers (ages 13 to 17). There are several possible reasons for this. Teenagers may be less supervised when they are online than younger youth. They may spend more time online, use the Internet in more places and have different patterns of Internet use. Developmental differences may also be a factor. A study of Internet-related crimes found sex offenders who met their victims online were targeting young teenagers by using their developmentally driven desire for romance and interest in sex to manipulate them into meetings for sexual purposes (Wolak, Finkelhor, &

---

[10] Also see Table 3 on page 13, which shows trends in sexual solicitations based on youth age and gender for YISS-1 and YISS-2.

Mitchell, 2004). This approach may not work with younger youth who have not reached the stage of adolescence where such interests are triggered by sexual development.

**Who were the perpetrators of sexual solicitations and approaches in YISS-2?**

- The perpetrators were largely male (73%). Females made 16% of aggressive solicitations. Of the females who made aggressive sexual solicitations 64% were younger than 18 and 36% were 18 to 24.
- In YISS-2 a larger proportion of youth (39%) said solicitors were adults (age 18 or older), compared to the results reported in YISS-1, in which 24% said solicitors were adults. Thirty (30) percent of the solicitors were described as being between 18 and 25.[11]
- Those younger than 18 were identified as solicitors in a substantial number of incidents — 43% of all solicitations and 44% of aggressive solicitations.
- Youth met 86% of solicitors online, but 14% were people youth knew in person before the solicitation.

As in YISS-1 many of the YISS-2 solicitors did not match the stereotype of the older male "Internet predator." Many were identified as other youth and some were female (19% in YISS-1 and 16% in YISS-2). While a larger percentage of youth identified solicitors as adults in 2005 (39% in YISS-2 versus 24% in YISS-1), this could be due to more youth being aware of adults using the Internet to meet youth. Most youth readily admitted they were not certain of the ages of solicitors they met online.[12] Eighty-five (85) percent of youth whose contact with perpetrators was limited to the Internet said they were not at all or only somewhat certain of the solicitor's age.

An important difference between the first and second *Youth Internet Safety Surveys* is an increase in the proportion of solicitors who were personally known to youth. In YISS-1 virtually all perpetrators (97%) were persons youth met online. In YISS-2, 14% were people youth had known before solicitations occurred and these solicitors were mostly other youth (82%). This is consistent with our finding that a smaller proportion of youth were using the Internet to talk online with people they did not know in person, but it may also signal a lowering of civility among peers online. High rates of rude sexual comments have been documented among peers in middle and high schools (American Association of University Women, 1993) and the Internet may have become another forum for this type of behavior.

**What happened?**

In YISS-1 and YISS-2 youth were asked to describe the unwanted sexual solicitations they received. Examples of their responses include accounts of

---

[11] All statistics referring to ages, genders, or other characteristics of people youth met online and did not know in person are based on youths' perceptions. In 85% of solicitation cases in which the youth only knew the solicitor online, youth said they were not at all or only somewhat certain of solicitors' ages.
[12] We did not ask youth how certain they were about a solicitor's age in YISS-1, but 27% of YISS-1 solicited youth answered "Don't know" when we asked them how old the solicitor was.

solicitations starting with personal questions about physical appearance and sexual experience and of propositions for "cybersex" in live chat or instant-messaging sessions. ("Cybersex" means online encounters during which participants engage in explicit sexual talk and sometimes disrobe and masturbate.) In *YISS-2*

- Most solicitation incidents (79%) happened on home computers.
- A smaller proportion of incidents happened while youth were in chatrooms, 37% compared to 65% in *YISS-1*. Forty (40) percent of *YISS-2* solicitations began with solicitors sending instant messages.
- Many unwanted sexual solicitations, including aggressive and distressing ones, happened when youth were with "friends or other kids [they] knew" — 41% of all solicitations, 45% of aggressive solicitations, and 42% of distressing solicitations.[13]

---

### What Youth Said About Solicitations

**Boy, 11**, who was playing an online game with a 20-year-old man: "He asked me something personal, something about a man's privates."

**Girl, 12**: "I went into the chatroom, and they asked me if I wanted to have cybersex. I was asking them what kind of music they liked and stuff."

**Girl, 14**: "I was chatting on the Internet and this guy just popped up in an instant message and started talking really dirty to me and saying things that I had never heard of before. He told me he was 30 years old and then he said, 'LOL' (laugh out loud)."

---

## Findings About Aggressive Solicitations

In *YISS-2* close to one-third of the solicitations (31%) were aggressive meaning the solicitors made, or attempted, offline contact with youth. Some of the aggressive episodes (26%) involved solicitors youth knew offline, but most did not. In aggressive solicitation incidents

- Seventy-five (75) percent of solicitors asked to meet youth in person
- Thirty-four (34) percent called youth on the telephone
- Eighteen (18) percent came to youths' homes
- Twelve (12) percent gave youth money, gifts, or other items
- Nine (9) percent sent offline mail to youth
- Three (3) percent bought travel tickets for youth

In *YISS-1* none of the solicited youth were sexually assaulted as a result of an online sexual solicitation. This was not true in *YISS-2*, although the number of youth who were assaulted was small — two girls. In 1 case a 15-year-old victim formed a close online relationship with a man in his 30s. He urged her to run away from home and stay with him. She stayed with him for several days and was sexually assaulted. In the other case a 16-year-old girl was at a party with a man she met online. He tried to rape her. (Both of these cases were reported to law enforcement.)

---

[13] We did not ask about this in *YISS-1*.

## Other Aspects of Solicitations

### Solicitations for Sexual Photographs

In more than half (56%) of solicitation incidents solicitors asked youth for photographs of themselves.[14] In more than one-quarter (27%) of incidents solicitors asked youth for **sexual** photographs of themselves. In addition, in 15% of the incidents where solicitors requested sexual photographs, solicitors sent sexual photographs of themselves to youth. We left the definition of "sexual" open, but youth gave descriptions of what happened in a number of these instances.

---

#### What Youth Said About Being Asked for Sexual Photographs

**Girl, 12:** A man in his 30s "asked me to describe myself and to stick a pen in my private parts and set up a digital camera and show the parts of my body."
**Boy, 15:** A girl in her teens "asked me to get naked on 'cam' but I just ignored her."
**Girl, 16:** "I was ...instant messag[ing] and the boy, who was a friend that I had known for a long time, asked me to finger myself in front of the web cam. I just told him that if he ever asked me that again, I would never talk to him again."
**Girl, 17:** A man in a chatroom "offered me $1,000 to expose myself to him. I recorded [what he wrote] and gave it to the police."

#### What Youth Said About Solicitors Sending Sexual Photographs

**Girl, 11:** A man who said he was 19 "was showing his body parts."
**Girl, 15:** An 18-year-old male had "a web cam. I wanted to see what he looked like. He was naked. Then I clicked off and blocked him. He was being perverted. I was tricked."
**Girl, 16:** A man, age 35, "kept taking nude pictures of himself and sending them to me. He was writing stuff like how big his cock is."

---

These requests for sexual photographs may be a new development since *YISS-1*, although we cannot say this for certain because we did not ask questions about this in *YISS-1* when we asked about unwanted sexual solicitations.[15] Web and digital cameras were not in wide use at the time that study was conducted, and the youth we consulted in focus groups for *YISS-1* did not talk about people online asking them for sexual photographs or sending sexual photographs to them. In contrast the youth who participated in the *YISS-2* focus groups were familiar with web and digital cameras and a number of them spoke about being asked for sexual photographs and seeing live web-cam videos or other types of pictures of solicitors exposing themselves.

---

[14] We did not ask about this in *YISS-1*.
[15] In *YISS-1* we asked youth whether they had sent a picture of themselves to someone they had met online as part of a series of questions about risky online behavior. In that context 12% of youth said they had sent a picture of themselves to someone they met online, but we did not gather additional details or ask whether the pictures sent were sexual.

Under federal child-pornography[16] laws it is a crime to take, distribute, or possess sexually explicit images of children younger than 18.[17] As can be seen from the descriptions youth gave, some of the solicitors were clearly asking youth to take sexually explicit photographs that would constitute child pornography. In addition, if youth complied with a request for sexual pictures, a solicitor could easily circulate the images online and the youth pictured would have no way of retrieving the images. This is a situation some youth might not have the foresight to understand.

One youth in YISS-2 admitted to sending a sexual photograph to a solicitor. (This number is too low for us to be able to draw a reliable conclusion about how many in the population of youth Internet users have done this.) The youth was a 16-year-old boy who sent a sexual picture of himself to someone he described as a 23-year-old woman. He told the interviewer his relationship with the woman had ended and he never met her in person.

### How did youth respond to the episodes?
In YISS-2 most youth (66%) handled unwanted solicitations by removing themselves from the situation, by blocking the solicitor, or leaving the web site or computer. Other youth told the person to stop, confronted or warned the solicitor (16%), while others ignored them (11%). Very few incidents were reported to law enforcement or other authorities (5%) or handled by parents or guardians (12%) or teachers or other school personnel (2%). In more than half of cases (56%), youth did not tell anyone about solicitations.

### How did the incidents affect youth?
In YISS-2 most youth (66%) were not particularly upset or frightened by the solicitations they told us about; however, 28% of solicited youth said an incident left them feeling very or extremely upset and 20% felt very or extremely afraid. Thirty-four (34) percent of **aggressive incidents** left youth feeling very or extremely upset, and 28% left youth feeling very or extremely afraid. Also youth were very or extremely embarrassed in 19% of aggressive solicitations and 49% of distressing incidents. Further in one-quarter of all solicitation incidents, youth had one or more symptoms of stress, including staying away from the Internet or a particular part of it, being unable to stop thinking about the incident, feeling jumpy or irritable, and/or losing interest in things.

## Close Online Relationships With Adults
One source of sexual solicitations people remain concerned about is youth forming close online relationships with adults who might exploit or take advantage of them. In addition to asking youth about unwanted sexual solicitations, we asked

---

[16] The term "child pornography," because it implies simply conventional pornography with child subjects, is an inappropriate term to describe the true nature and extent of sexually exploitive images of child victims. Use of this term should not be taken to imply children "consented" to the sexual acts depicted in these photographs. We have, however, retained the term because there is a history in the United States of court decisions and statutes that have used and developed the term, and it is the term most readily recognized by the public, at this point in time, to describe this form of child sexual exploitation. "Child pornography" is used in this report to refer to visual depictions of the sexual exploitation of a child under the standards developed by statute, case law, and law-enforcement-agency protocols. It is hoped a more accurate term will be recognized, understood, and accepted for use in the near future.

[17] 18 U.S.C. § 2256.

them about close online relationships they had formed with adults they met online. (Close online relationship was defined as a relationship with "someone you met online who you didn't know in person...that you could talk online with about things that were real important to you.") These questions were aimed at finding out about relationships that could violate criminal laws against sexual relationships between adults and underage youth but that youth might consider consensual romantic or sexual relationships. Research has shown that many of the sex crimes committed against minors that develop from online meetings follow this scenario (Wolak, et al., 2004).

In *YISS-2*, 4% of youth had formed close online relationships with adults (age 18 or older[18]) they met online, and of those youth, 29% had face-to-face meetings with the adults they met online. Most of these relationships seemed benign, however, of the 58 youth who had close online relationships with adults, 8 told interviewers about **relationships that had sexual aspects**. These included the adult asking the youth for sexually explicit photographs of themselves, sending the youth sexually explicit photographs, having some degree of sexual physical contact with the youth, or acting in some other way that showed a sexual interest in the youth. All of these close online relationships involved adults who were 5 or more years older than the youth. Four (4) youth (7%) had "physical contact [they] would call sexual" during face-to-face meetings with adults they met online. These youth were all 17 years of age, and the adults were all in their early 20s. All 8 of these cases were counted as solicitations because of the sexual component, whether or not a youth was disturbed by the sexual aspect in the relationship.

---

### *YISS-2* Close Online Relationships With Adults

- A 16-year-old girl met a 23-year-old man in an online game site. He asked her to send him a sexual picture of herself and wanted to meet her in person. (She did neither.) The girl became very afraid when the man told her he had found out a lot of personal information about her. She said, "When he told me all the things that he knew about me, [it] was enough to make me stop going to that site altogether. He tried to contact me after this happened and I wouldn't send a reply back to him. He hasn't bothered me since." She never told her parents.
- A boy, 17, developed a romance with a woman, age 24, who he met in an online dating site. She lived near him. They talked on the telephone, and he went with a friend to meet her where she worked. She had been to his house and he to hers. She had bought him clothes. His parents knew about the relationship. He said yes when asked, "Did you have physical contact with this person that you would call sexual?"
- A 16-year-old girl met a 26-year-old woman in a chatroom. They exchanged mail and photographs. Her parents knew about the relationship. The girl said, "I can talk to this person very easily . . . I never felt obligated to give her more information than I wanted to."

---

[18] All statistics referring to ages, genders, or other characteristics of people youth met online and did not know in person are based on youths' perceptions. In 85% of solicitation cases in which youth only knew the solicitor online, youth said they were not at all or only somewhat certain of solicitors' ages.

- A 15-year-old girl met a man in a teen chatroom who said he was 17. They exchanged pictures and talked on the telephone. She met him in person in a public place and one of her parents went with her. Later he took her out to dinner, however, she became quite uncomfortable when, after the meal, he admitted he was 22. There was no sexual contact between them, and the relationship ended.
- A 12-year-old girl met an 18-year-old man online through instant messaging. They had no offline contact, but he wanted a picture of her and wanted to meet her. She became uncomfortable about the relationship when he asked her to have cybersex. She never told her parents about it. She said, "I never gave him my E-mail. I would never give [out my] address, city, or anything."
- A boy, 16, formed a relationship with a woman, 40, in a chatroom about psychic phenomena. They exchanged pictures and telephone calls. They met face-to-face in a public place. One of his parents and a friend went along. She bought him a CD and acne medication. The relationship did not appear to be sexual. He commented, "She's really nice."

Overall, in *YISS-2* a smaller proportion of youth said they had formed close online relationships with people they did not know in person (adults and other youth) — 11% compared to 16% in *YISS-1*. This is consistent with our finding that a smaller proportion of youth Internet users interacted online with people they did not know in person. Also the youth who had close online relationships in *YISS-2* were older — 82% were ages 14 to 17 compared to 75% in *YISS-1*.

Most close online relationships (62%) in *YISS-2* were with other youth, age 17 or younger, and most (71%) were with people who were close in age (no more than 4 years older). Boys and girls had close online relationships in similar numbers (53% of girls and 47% of boys). About one-third (32%) of close online relationships involved face-to-face meetings. In most of the cases with face-to-face meetings (73%) parents and guardians knew about the meetings before they occurred, and most youth (75%) were accompanied when they went to meetings.[19]

## Runaway Episodes

Because of reports some youth have been sexually victimized after being persuaded to run away from home by adults they met online, we asked youth about such incidents.

In *YISS-1* and *YISS-2* we asked youth, "In the past year, did anyone on the Internet ever ask you or encourage you to run away from home?" In both surveys only a few youth — 0.4% or 7 youth in *YISS-1* and 0.9% or 13 youth in *YISS-2* — answered this question affirmatively. Three cases in *YISS-2* involved adults who solicited youth to run away. In 2 of those the youth did not respond to the suggestions. In a third case, however, a 15-year-old girl did run away to be with a man in his 30s. We counted this case as a sexual solicitation. It was described earlier in the section about sexual assaults.

---

[19] These findings are consistent with findings based on *YISS-1* data (Wolak, Mitchell, & Finkelhor, 2002).

## Summary

In *YISS-2* unwanted sexual solicitations or approaches happened to approximately 1 in 7 youth Internet users during the past year. Close to half of these incidents (49%) were neither aggressive nor distressing. Further, there was a smaller proportion of unwanted sexual solicitations in *YISS-2* since the 1 in 5 when *YISS-1* was conducted. This is good news.

Unfortunately, however, there was no decline in the proportion of youth who experienced the most serious incidents, aggressive solicitations in which solicitors tried to make offline contact (4% of all youth). Also there was no reduction in the proportion of youth who were distressed about a solicitation they received (4% of all youth).

We also found a disturbing trend. A considerable number of solicitors (27%) asked youth to take sexual pictures of themselves to send to solicitors. Four (4) percent of all the youth Internet users surveyed experienced solicitations for sexual pictures in the past year. We did not ask about this in *YISS-1*, so we cannot say whether this is an increase. We expect, however, that solicitations for sexual pictures are related to recent advances in digital picture-taking that have made technology, such as digital still and video cameras, increasingly available in recent years. We cannot say with any certainty who these solicitors of sexual photographs were. Some may have been sexual predators who were soliciting photographs to lower the inhibitions of potential victims, use for their own sexual gratification, trade in the child-pornography market, or ascertain whether targeted victims were undercover law-enforcement agents. Not all of those who solicited photographs, however, may have been seeking face-to-face contact with victims. Researchers who work with sex offenders have noted the Internet has drawn an audience of voyeurs, some of whom get sexual pleasure from observing nudity and sexual acts but may not wish for physical contact with victims (Galbreath, Berlin, & Sawyer, 2002). Some of the solicitors of photographs may have been such voyeurs who were seeking photographs for sexual gratification and possibly to distribute as child pornography. Other solicitors may have been misguided youth or adults whose motives were harassment and insult, rather than sexual gratification. Whatever their motives, those who ask youth for sexual photographs are committing serious crimes when they solicit minors to produce child pornography. Clearly we need to educate youth and their families about how the Internet may allow and encourage these incidents. We also need to educate them about how to handle these incidents including promptly reporting them to law enforcement through use of the CyberTipline®.[20]

---

[20] On March 9, 1998, the National Center for Missing & Exploited Children launched the CyberTipline initiative to serve as the national online clearinghouse for tips and leads about child sexual exploitation. The CyberTipline, www.cybertipline.com, was created by Congressional mandate 42 U.S.C. § 5773(b)(1)(H) to allow persons to report online (and via toll-free telephone) specific sexual crimes committed against children. During the *YISS-2* study reporting period, March 1, 2004, through June 30, 2005, the CyberTipline received 111,686 reports of child pornography; 3,755 reports of online enticement; 2,067 reports of child sexual molestation; 882 reports of misleading domain names; 719 reports of child victims of prostitution; 663 reports of unsolicited obscene material sent to a child; and 302 reports of child sex tourism. Since its creation through December 2005 the CyberTipline has received 365,683 reports. The CyberTipline is a part of NCMEC's Exploited Child Unit, which was established by the U.S. Congress in 1996.

Another important finding is that 90% of the sexual solicitations happened to youth ages 13 and older. This reinforces what previous research has found — online sexual solicitations to youth are concentrated among teenage Internet users. Research based on interviews with law enforcement about Internet-related sex crimes similarly found sex offenders who met their victims online largely sought out young teenagers, and rarely targeted those younger than 13.[21] The research also found offenders rarely used deceit or violence. Rather they appealed to adolescents' interest in romance and sex (Wolak, et al., 2004). Internet safety programs need to take this into account and make sure they are targeting the appropriate audience and giving them accurate information.

YISS-2 also uncovered a considerable degree of peer involvement in unwanted sexual solicitations, in two ways. First, there was an increase in the proportion of solicitors youth knew in person (3% in *YISS-1* and 14% in *YISS-2*). The great majority of solicitors known in person (82%) in *YISS-2* were other youth, age 17 or younger. Second, in *YISS-2* we found 41% of incidents of unwanted solicitations happened when the recipients were with friends or other peers. This is an area of online dynamics we know little about. It may be that some youth tend to ignore Internet safety guidelines when they are in groups. They may be more likely to do things such as going to questionable chatrooms or engaging in risqué conversations with people they know only online, situations in which solicitations may be more likely to occur. We need to learn more about sexual solicitations between known peers and those that happen when youth use the Internet together in groups and fashion prevention messages aimed at these situations.

---

[21] There are cases of individuals who use the Internet indirectly to meet and sexually exploit young children. These individuals seek adults online who could give them access to young victims. The dynamics of these cases, however, may differ from the dynamics of cases in which individuals use the Internet to meet youth directly.

**Table 4.** *YISS-2* Internet Sexual Solicitation of Youth (N=1,500)

| | All Incidents (n=200) 13% of Youth | Aggressive Incidents (n=63) 4% of Youth | Distressing Incidents (n=67) 4% of Youth |
|---|---|---|---|
| **Individual Characteristics** | | | |
| **Age of Youth** | | | |
| 10 | 0 | 0 | 0 |
| 11 | 3% | 1% | 5% |
| 12 | 7% | 5% | 10% |
| 13 | 9% | 14% | 10% |
| 14 | 15% | 14% | 18% |
| 15 | 23% | 27% | 15% |
| 16 | 24% | 16% | 25% |
| 17 | 19% | 22% | 16% |
| **Gender of Youth** | | | |
| Girl | 70% | 79% | 81% |
| Boy | 30% | 21% | 19% |
| **Episode Characteristics** | **All (n=216)** | **Aggressive (n=68)** | **Distressing (n=73)** |
| **Gender of Solicitor** | | | |
| Male | 73% | 84% | 86% |
| Female | 16% | 16% | 7% |
| Don't Know | 11% | 0 | 7% |
| **Age of Solicitor** | | | |
| Younger Than 18 Years | 43% | 44% | 40% |
| 18 to 25 Years | 30% | 34% | 31% |
| Older Than 25 Years | 9% | 15% | 15% |
| Don't Know | 18% | 7% | 14% |
| **Youth Was Very or Extremely Certain of Solicitor's Age+** | 15% (n=186) | 24% (n=50) | 17% (n=63) |
| **Relation to Solicitor** | | | |
| Met Online | 86% | 73% | 86% |
| Knew in Person Before Solicitation | 14% | 26% | 14% |
| **Location of Computer When Incident Occurred** | | | |
| Home | 79% | 79% | 74% |
| A Friend's Home | 13% | 12% | 16% |
| School, Library, or Other Similar Place | 8% | 9% | 9% |
| **Place on Internet Incident First Happened** | | | |
| Chatroom | 37% | 32% | 33% |
| Using Instant Messages | 40% | 54% | 42% |
| Other | 21% | 13% | 23% |
| Don't Know | 1% | 0 | 1% |
| **Youth Was With Friends or Other Kids When This Happened** | 41% | 45% | 42% |
| **Forms of Offline Contact*** | | | |
| Asked to Meet Somewhere | 23% | 75% | 33% |
| Sent Offline Mail | 3% | 9% | 4% |
| Called on Telephone | 11% | 34% | 5% |
| Went to Home | 5% | 18% | 7% |
| Gave Money, Gifts, or Other Similar Things | 4% | 12% | 5% |
| Bought Plane, Train, or Bus Ticket | 1% | 3% | 3% |
| None of the Above | 69% | 0 | 62% |
| **Solicitor Sent Picture of Self** | 21% | 35% | 22% |
| Picture Was Sexual | 6% | 7% | 7% |
| **Solicitor Requested Picture of Youth** | 56% | 76% | 60% |
| Wanted a Sexual Picture | 27% | 44% | 38% |
| Youth Sent a Sexual Picture | <1% | 1% | 0 |

| Episode Characteristics | All Episodes (n=216) | Aggressive Episodes (n=68) | Distressing Episodes (n=73) |
|---|---|---|---|
| **Youth Met Solicitor in Person** | 3% | 7% | 1% |
| Sexual Contact at Meeting | 2% | 7% | 1% |
| **How Situation Ended*** | | | |
| Removed Self From Situation (Blocking or Leaving Site or Computer) | 66% | 44% | 71% |
| Told Solicitor to Stop/Confronted or Warned Solicitor | 16% | 23% | 16% |
| Changed Screen Name, Profile, or E-Mail Address | 6% | 7% | 8% |
| Apologized, Made-Up, Smoothed Over | 2% | 4% | 3% |
| Ignored Solicitor or Incident | 11% | 15% | 8% |
| Parent/Guardian or Teacher Handled Situation | <1% | 1% | 1% |
| Stopped Without Youth Doing Anything | 3% | 3% | 3% |
| Called Law Enforcement or Other Authorities | 1% | 1% | 3% |
| Other | 4% | 9% | 1% |
| **Installed Filtering or Blocking Software After This Happened** | 29% | 19% | 31% |
| **Incident Known or Disclosed to** | | | |
| Friend or Sibling | 26% | 29% | 26% |
| Parent/Guardian | 12% | 18% | 23% |
| Other Adult | 2% | 3% | 3% |
| Teacher, Counselor, or Other School Personnel | 2% | 6% | 3% |
| Law Enforcement, ISP, or Other Authority | 5% | 7% | 8% |
| Someone Else | 4% | 6% | 4% |
| No One | 56% | 35% | 44% |
| **Of Youth Who Did Not Tell Anyone, Why Didn't Youth Tell** | 56% (n=120) | 35% (n=24) | 44% (n=32) |
| Not Serious Enough | 69% | 71% | 41% |
| Afraid | 13% | 8% | 28% |
| Thought Might Get in Trouble | 9% | 8% | 13% |
| Other | 6% | 13% | 13% |
| **Distress: Very/Extremely*** | | | |
| Upset | 28% | 34% | 83% |
| Afraid | 20% | 28% | 60% |
| Embarrassed | 21% | 19% | 49% |
| **Youth With No/Low Levels of Being Upset or Afraid** | 66% | 59% | 0 |
| **Stress Symptoms (More Than a Little/All the Time)~** | | | |
| At Least One of the Following* | 25% | 37% | 51% |
| Staying Away From Internet or Particular Part of It | 17% | 23% | 37% |
| Being Unable to Stop Thinking About It | 13% | 21% | 29% |
| Feeling Jumpy or Irritable | 8% | 16% | 22% |
| Losing Interest in Things | 8% | 9% | 19% |

\* Multiple responses possible.
+ Only youth who did not know the solicitor prior to the incident were asked this question.
~ These items are based on standard research measures of stress responses used to assess post-traumatic stress disorder. The items measure avoidance behaviors, intrusive thoughts, and physical symptoms.
Note: Some categories do not add to 100% because of rounding and/or missing data.

Table 5. YISS-2 Close Online Relationships (N=1,500)

| Individual Characteristics | All Close Online Relationships (n=164) 11% of Youth | Close Online Relationships With Adults (n=58) 4% of Youth | Close Online Relationships With Meetings (n=53) 3% of Youth |
|---|---|---|---|
| **Age of Youth** | | | |
| 10 | 2% | 2% | 0 |
| 11 | 3% | 3% | 4% |
| 12 | 4% | 2% | 2% |
| 13 | 10% | 5% | 11% |
| 14 | 17% | 5% | 21% |
| 15 | 21% | 19% | 21% |
| 16 | 22% | 29% | 17% |
| 17 | 22% | 35% | 25% |
| **Gender of Youth** | | | |
| Girl | 53% | 57% | 57% |
| Boy | 47% | 43% | 43% |
| **Relationship Characteristics** | | | |
| **Gender of Online Person** | | | |
| Male | 54% | 72% | 51% |
| Female | 45% | 28% | 49% |
| Don't Know | 1% | 0 | 0 |
| **Age of Online Person** | | | |
| Younger Than 18 Years | 62% | – | 68% |
| 18 to 25 Years | 28% | 79% | 26% |
| Older Than 25 Years | 7% | 21% | 6% |
| Don't Know | 2% | 0 | 0 |
| **Youth Knew Where Person Lived** | 76% | 71% | 91% |
| Person Lived Near Youth (1 Hour Drive or Less) | 28% | 19% | 68% |
| **Location of Computer Used to Communicate With This Person** | | | |
| Home | 87% | 90% | 91% |
| A Friend's Home | 6% | 3% | 7% |
| School | 2% | 2% | 0 |
| Library or Some Other Similar Place | 5% | 5% | 2% |
| **Where Met Online** | | | |
| Chatroom | 35% | 38% | 26% |
| Using Instant Messages | 36% | 29% | 49% |
| Specific Web Page | 4% | 7% | 4% |
| Online Dating or Romance Site | 2% | 3% | 2% |
| E-Mail | 2% | 3% | 4% |
| Game Room or Other Game Site | 6% | 10% | 2% |
| Online Journal or Blog | 2% | 2% | 4% |
| Other | 11% | 7% | 9% |
| Don't Know | 1% | 0 | 0 |
| **Forms of Offline Contact*** | | | |
| Met or Asked to Meet In Person | 49% | 50% | 100% |
| Sent Offline Mail | 8% | 7% | 17% |
| Called on Telephone | 36% | 40% | 68% |
| Went to Home | 12% | 12% | 38% |
| Gave Money, Gifts, or Other Similar Things | 12% | 14% | 30% |
| Bought Plane, Train, or Bus Ticket | 1% | 0 | 2% |
| None of the Above | 40% | 36% | 0 |
| **Parent/Guardian Was Aware of Relationship** | 65% | 60% | 87% |
| **Individual Sent Picture of Self** | 52% | 59% | 51% |
| Picture Was Sexual | 2% | 5% | 0 |

| Relationship Characteristics | All Close Online Relationships (n=164) 11% of Youth | Close Online Relationships With Adults (n=58) 4% of Youth | Close Online Relationships With Meetings (n=53) 3% of Youth |
|---|---|---|---|
| **Individual Requested Picture of Youth** | 49% | 60% | 49% |
| Wanted a Sexual Picture | 5% | 10% | 4% |
| Youth Sent a Sexual Picture | 1% | 2% | 0 |
| **Individual Made Youth Feel Afraid or Uncomfortable in Any Way** | 7% | 14% | 7% |
| **Met Online Contact In Person** | 32% (n=53) | 29% (n=17) | 100% (n=53) |
| A Parent/Guardian Knew About Meeting Beforehand | 73% | 71% | 73% |
| Someone Went With Youth to Meeting | 75% | 76% | 75% |
| Physical Sexual Contact at Meeting | 4% | 7% | 11% |

\* Multiple responses possible.
Note: Some categories do not add to 100% because of rounding and/or missing data.

# Unwanted Exposure to Sexual Material

The Internet has become a very public and aggressive marketplace for sexual material. The first *Youth Internet Safety Survey* found 25% of youth came across sexual material they did not want to see when they went online to do searches, surf the world wide web, or use E-mail or instant messages.

We asked youth about unwanted exposures to sexual material occurring when they were not looking for such material. (Sexual material was defined as pictures of naked people or people having sex.) In *YISS-2* slightly more than one-third of youth Internet users (34%) received **unwanted exposures to sexual material** in the year prior to their interview. Most of these exposure incidents (83%) happened when youth were surfing the web. Another 17% were related to E-mail or instant-message use.

**Figure 6**



Exposure to unwanted sexual material is not necessarily upsetting. To quantify upsetting incidents, we designated a category of **distressing exposures to sexual material**, which left youth feeling very or extremely upset. Nine (9) percent of youth Internet users in *YISS-2* said they had a distressing exposure to unwanted sexual pictures on the Internet in the past year.

## Findings About Unwanted Exposure to Sexual Material

**Which youth had the unwanted exposures in YISS-2?[22]**
- Boys had 54% of unwanted exposures and girls 46%
- Most of the unwanted exposures (76%) happened to teenagers ages 14 to 17
- About one-quarter of the **distressing** exposures (24%) happened to youth who were 10 to 13 years old

**What were the sources and content of unwanted exposure in YISS-2?**
Most incidents happened while youth were surfing the web (83%). More than one-third of surfing exposure incidents happened when youth were doing online searches (40%). Clicking on links in other web sites led to 17% of exposures. Misspelled web addresses led to 12%, and 14% were from pop-up ads. In 13% of surfing incidents the exposure happened in various other ways, and in 4% of incidents youth did not know how the exposure happened.

Most youth (86%) saw images of naked people and more than half saw more explicit pictures.
- In 37% of incidents youth saw pictures of "people having sex."
- In 13% of incidents youth saw pictures of "sexual things that were violent."
- In 10% they saw pictures of "sexual things that involved animals or other strange things"[23] (deviant images).
- Overall in 57% of incidents youth saw pictures of "people having sex" or violent or deviant images. (Some youth saw more than one type of more explicit image.)

Rates of unwanted exposure increased with age. We found that in the past year of
- 10- to 12-year-old youth Internet users, 7% saw pictures of naked people and an additional 11% saw more graphic images
- 13- to 14-year-old youth, 15% saw pictures of naked people and an additional 18% saw more graphic images
- 15- to 17-year-old youth, 20% saw pictures of naked people and an additional 26% saw more graphic images

We did not specifically ask if youth saw child pornography because we did not believe youth could reliably assess the ages of the people shown in photographs. Two boys, however, spontaneously mentioned seeing child pornography. An 11-year-old boy said he saw pictures of "naked men with young boys" while he was doing an online search from a computer in the living room of his home. A 17-year-old boy was looking for video games online from a computer in his bedroom. He said, "I clicked on a link, and I did not know what it was. It took me to an underage porn site, which is illegal.... I know you're not allowed to go to those. It was disguised as a different link." Neither boy had told anyone what happened prior to the survey interview.

---

[22] Also see Table 3 on page 13, which shows trends in unwanted exposure to sexual material based on youth age and gender for YISS-1 and YISS-2.
[23] We did not ask about this in YISS-1.

**What do we know about how these exposures occurred in *YISS-2*?**

■ More than three-quarters of the unwanted exposures (79%) happened at home. Nine (9) percent happened at school, 5% happened at friends' homes, and 5% happened in other places including libraries.

■ About 1 out of 3 unwanted exposures (29%) happened when youth were "with friends or other kids [they] knew."[24]

We asked youth open-ended questions about why they thought specific instances of unwanted exposure happened. Many of the youth seemed to view the Internet as strewn with sexual material that could only be avoided with constant vigilance. These youth seemed to attribute their exposures to letting their guard down. They said

■ Boy, 12: "I spelled a word wrong."

■ Boy, 13: "I was not clear enough doing the search."

■ Boy, 15: "I didn't read the information underneath the link."

■ Girl, 17: "I was typing too fast, not paying attention."

■ Girl, 17: "There's a lot of that out there. Unless you're careful, it's bound to happen."

Some youth had more sophisticated views of how sexual material was being marketed on the Internet. A girl, 14, said of a misspelling, "[I made] a simple mistake. I'm sure there are people out there who want those types of things to come up if you do make a mistake like a spelling error." Several 17-year-old boys commented

■ "I think people falsely label web sites on the Internet."

■ "People who run porn sites purposely buy old domain web sites, and they change the web sites to what [they're] not supposed to be."

■ "I go to web sites about racing dirt bikes, and when I'm on there pop-up ads come up with naked pictures of girls and guys…. Some of the sites have swimsuit calendars on them and it kind of opens the door for other pornographic images to appear."

■ "Whoever put it on there wanted someone to get interested. Someone who wanted to see those kinds of pictures would click on it, and it would spark an interest."

■ "The porn market is really big…. I think they just want young people to go there."

A small number of topics popular with youth were mentioned over and over as sources of unwanted exposures to sexual material. One topic was "gaming" including video games; online gaming sites; and "cheat codes," which are available at certain web sites and allow knowledgeable players to skip levels or gain advantages in other ways when playing particular online games. A boy, 15, said, "I was searching a web site [for cheat codes] and I misspelled [a word] and a nude site came up. There were pictures of people having sex, and I clicked out."

---

[24] We did not ask about this in *YISS-1*.

Another topic was searches for cartoons resulting in sites displaying cartoon pornography, such as anime or caricatures of well-known mainstream cartoon figures.

Overall youth named a wide range of topics as subjects of web searches that brought up unwanted sexual material. Virtually all of these topics seemed quite appropriate — cars, cheerleading stunts, drum beats, hairstyles, skate-board tricks, song lyrics, and software patches were some. Youth mentioned seeing sexual material while doing searches for school projects including research for papers about famous poets; fire prevention; Benjamin Franklin; the Odyssey; Romeo and Juliet; and science projects about deoxyribonucleic acid (DNA), diseases, forensic serology, liquids, and squid. Based on the wide variety of search terms that led youth to unwanted sexual material, it appears even innocent search terms may lead to material that is inappropriate for minors. It is easy to conclude sexual material is so pervasive almost any kind of search will bring it up. The fact that web sites are paid for by advertisers based on the number of "hits" to the site may encourage those who operate pornography sites to use a wide range of search terms and links to help ensure their sites come up often during web searches.

In addition pornography sites are sometimes "mousetrapped" or programmed to make them difficult to exit. Clicking an exit button takes viewers into another sexually explicit site instead of allowing them to leave. In YISS-2, 18% of youth with unwanted exposures while surfing online said they were brought to another sex site when they tried exiting the first site they were in. This happened in 15% of distressing incidents.

In 21% of YISS-2 exposure incidents, youth said they knew a site was X-rated before entering. This was more than the 17% of youth in YISS-1 who said they knew a site was X-rated before they entered. These were all encounters youth described as unwanted, while not necessarily unintentional, and they were not distinguishable from the other incidents of unwanted exposure. Nineteen (19) percent of those who knew a site was X-rated were very or extremely upset about the images they saw, 23% were very or extremely embarrassed, and almost one-third (32%) told their parents or guardians. We did not ask why youth entered these sites, but for many it could have been simple curiosity. These youth may have heard terms such as "X-rated," "adults only," or "pornography" without fully understanding what they meant until after they saw the sexual material.

### What Youth Said About Unwanted Exposure to Sexual Material

**Girl, 10**: "I was looking for a song on the internet and a web site just came up. I clicked on it and it was a site with naked pictures of girls on it. . . . I just closed it really quick."

**Boy, 12**: "I was going to a . . . site [about cereal] . . . . It took me to this weird web site. I saw people with half sex changes who looked part male and part female and who were naked. I spelled [the name of the cereal] wrong."

**Boy, 13**: "It was a picture of [cartoon characters]. [They were] naked and you can probably guess the rest."

**Boy, 14**: "For [a] school project . . . I typed in 'Say no to drugs', and [it] showed naked people using drugs."

**Girl, 14**: "I was just very bored. . . . I typed in [my dog's name] and pictures of naked girls just kept popping up. I tried closing the screen and the pop ups kept coming."

> **Boy, 14:** "I opened a link. It took me to a site, and there was a pop up [of] a huge orgy, and there were other things. Someone sent me [the] link, and I guess there was a virus on his computer because he didn't mean to send it."
>
> **Boy, 15:** "I was [online], and my friend sent me a link through [an instant message] and told me to click on it. It was pornography with naked pictures of girls on it. I told him that it wasn't funny and to never do that to me again. I think he thought it would be funny if I got in trouble with my parents for looking at it."

## How did youth respond to exposures in YISS-2?

- The great majority of youth (92%) simply removed themselves from the situation by blocking or leaving the site or computer when they encountered unwanted sexual material.
- Few youth (2%) who encountered sexual material while surfing said they went back to that site later.
- About one-third (32%) said they or a family member installed some type of blocking, filtering, or monitoring software on their computer after an exposure incident.[25]
- In more than half of incidents (52%), youth did not tell anyone about the sexual material they saw. Youth kept 39% of distressing exposures to themselves.
- When youth did tell someone it was usually a parent or guardian. More than one-quarter of episodes (27%) were revealed to parents or guardians, and youth told parents or guardians about 42% of distressing exposures.
- Very few exposure incidents were reported to authorities. School authorities were notified about 3% of incidents. Internet service providers, law enforcement, or other authorities were notified about 2% of incidents.

We asked youth who did not disclose exposures why they did not tell.[26] Seventy-five (75) percent of youth who did not disclose incidents of exposure said the incidents were not serious enough. They said, "I didn't think it was a big deal. I handled it responsibly." "[I was] barely on the site for 30 seconds." "It was just a random thing;" however, 12% of youth who did not disclose exposures said they were afraid to, and 9% said they thought they might get in trouble.

## How did exposures affect youth in YISS-2?

- Almost three-quarters of all exposure incidents (74%) were not at all or only a little upsetting to youth
- Youth rated 26% of all exposure incidents as very or extremely upsetting and 26% as very or extremely embarrassing
- In 19% of incidents youth had one or more symptoms of stress, including staying away from the Internet or a particular part of it, being unable to stop thinking about the incident, feeling jumpy or irritable, and/or losing interest in things

---

[25] We did not ask about this in YISS-1.
[26] We did not ask about this in YISS-1.

## Summary

A large proportion of youth Internet users continue to be exposed to sexual material they do not seek and do not want to see. This problem has not abated since YISS-1, in which one-quarter of youth revealed unwelcome exposures to sexual material in the past year. In fact the problem has increased. In YISS-2 more than one-third of youth (34%) had unwelcome encounters with sexual material. Further not all youth have become accustomed to these incidents. Twenty-six (26) percent of exposures left youth feeling very or extremely upset. This translates to 9% of youth Internet users surveyed in YISS-2 having distressing exposures to unwanted sexual material. While 76% of youth with distressing exposures were teenagers, 24% were ages 10, 11, and 12. We are not certain why most of the unwanted exposures happen to teenagers, but exposure could be closely related to the kinds of interests youth pursue online and searches they conduct. Teen interests in celebrities, music, romance, and sports may put them in greater proximity to web sites that purveyors of sexual material target for marketing their wares.

Also no progress has been made in convincing more youth to tell adults about incidents of unwanted exposure to sexual material and the problem of lack of disclosure may have gotten worse. It could be there is a disconnect between the online experience of youth and that of parents and guardians, with youth accepting sexual material as an inevitable part of the cyber-landscape and parents and guardians not realizing the extent to which their children see these images. On the other hand, some youth who did not disclose exposure incidents to parents or guardians said these incidents happened all the time. They may have had conversations with their parents or guardians about past incidents and devised strategies for handling exposures, but did not feel it was necessary to talk about every instance. At the same time, the descriptions youth gave of how these incidents occurred suggest youth may blame themselves for exposures that happen when they do things like misspell words or enter overly broad search terms. Education could help both youth and parents and guardians understand that stumbling onto sexual material is hard to avoid on the Internet and youth should be able to tell parents or guardians about such incidents without fear they will be blamed.

Even when youth told parents or guardians, exposure incidents were rarely reported to Internet service providers or law enforcement. This could be because few of these episodes appeared to involve crimes. While it is a crime (often called corruption of a minor) for an adult to knowingly expose a child to pornography, 83% of unwanted exposures occurred when youth were surfing the web, and in the 17% of incidents that originated with E-mail, senders were unknown in most instances (89%). We did not find any cases where adults who were known to youth had sent them sexual material. There were two instances in which youth appeared to stumble across child pornography online. Neither of these was disclosed. In fact the 17-year-old who came across child pornography said he did not tell anyone "because of the illegality of it."

It is discouraging only 1 incident out of more than 500 was reported to an Internet service provider. Many youth indicated they quickly closed the pornography sites they unwittingly entered. This means the details an Internet

service provider would need to follow up on a case may be lacking in many instances. There also may be a sense such reporting would be futile given the ubiquity of sexual material and considerable publicity about its presence online. Another possibility is youth do not know how to make reports to Internet service providers in many cases.

In 2000, when the findings of the first *Youth Internet Safety Survey* were released, we noted there had been virtually no research about the impact on youth of viewing pornography, either voluntarily or — more relevant — involuntarily. There is still no research that sheds light on whether, how, or under what circumstances involuntary exposure to pornography may trigger adverse responses in youth. Clearly the extent of exposure is great enough that even if adverse effects occur to only a small fraction of youth, the numbers in absolute terms could be fairly large. Researchers in the field of sexual development do not know whether there are important "primacy effects" relating to early exposure of youth to sexual material or what the effects of such exposures might be on anxieties, normative standards, or patterns of arousal in some youth (Escobar-Chaves, et al., 2005; Rich, 2005). The widespread exposure to unwanted sexual material should make these issues more of a priority.

But there is a greater and more basic concern. How many people would argue with the premise that youth should be able to use a public forum like the Internet without running across sexual material they are not looking for and do not want to see? The solution that seems to have emerged is that parents/guardians, schools, and libraries are responsible for taking measures to prevent exposure, but there is no one easy solution for protecting youth from unwanted exposure to sexual material. For instance one tool in this effort is filtering programs. And, while a number of different filtering programs exist, it is important for parents/guardians, schools, and libraries to select products wisely to adequately address their needs such as filtering out sexually explicit spam, sexually explicit web sites, and inappropriate key words. At the same time more of the families with home Internet access (55%) in *YISS-2* had installed filtering, blocking, or monitoring software on the computer their child used, yet unwanted exposures to sexual material increased. Some may argue more effective software and more education in how to choose and use it is in order, but others may view this increase as a sign the current approach is not working and we need to look for other solutions. Obviously we need to look more closely at this problem to identify additional tools to decrease unwanted exposures.

Table 6. *YISS-2* Unwanted Exposure to Sexual Material (N=1,500)

| Individual Characteristics | All Incidents (n=512) 34% of Youth | Distressing Incidents (n=136) 9% of Youth |
|---|---|---|
| **Age of Youth** | | |
| 10 | 3% | 7% |
| 11 | 4% | 7% |
| 12 | 6% | 10% |
| 13 | 11% | 13% |
| 14 | 14% | 10% |
| 15 | 19% | 20% |
| 16 | 20% | 18% |
| 17 | 23% | 15% |
| **Gender of Youth** | | |
| Girl | 46% | 57% |
| Boy | 54% | 43% |
| **Episode Characteristics** | **All (n=538)** | **Distressing (n=139)** |
| **Location of Computer When Incident Occurred** | | |
| Home | 79% | 78% |
| A Friend's Home | 5% | 6% |
| School | 9% | 10% |
| Library or Some Other Place | 5% | 3% |
| **Youth Was With Friends or Other Kids When This Happened** | 29% | 31% |
| **Type of Material Youth Saw\*** | | |
| Pictures of Naked People | 86% | 85% |
| Pictures of People Having Sex | 37% | 31% |
| Pictures That Were Violent | 13% | 17% |
| Pictures That Involved Animals or Other Strange Things | 10% | 7% |
| **How Youth Was Exposed** | | |
| Surfing the Web | 83% | 85% |
| Opening E-mail or IM or Clicking on Link in E-Mail or IM | 17% | 15% |
| **Youth Could Tell Material Was X-Rated Before Entering** | 21% | 15% |
| **Surfing Exposure** | **All (n=444)** | **Distressing (n=123)** |
| **How Web Site Came Up** | | |
| Link Came Up as a Result of Search | 40% | 39% |
| Misspelled Web Address | 12% | 13% |
| Clicked on Link When In Other Site | 17% | 16% |
| Pop-Up | 14% | 14% |
| Other | 13% | 12% |
| Don't Know | 4% | 6% |
| **Youth Has Gone Back to Web Site** | 2% | 1% |
| **Youth Was Taken Into Another X-Rated Site When Exiting the First One** | 18% | 15% |
| **E-Mail and Instant Message Exposure** | **All (n=94)** | **Distressing (n=21)** |
| **Youth Received E-Mail or Instant Message at a Personal Address** | 69% | 67% |
| **Sender Unknown** | 89% | 100% |