IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 98-CV-5591 (LAR) |
| ALBERTO R. GONZALES, in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR
PARTIAL JUDGMENT ON THE PLEADINGS**

Christopher A. Hansen
Aden Fine
Catherine Crump
Ben Wizner
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Of Counsel to American Civil Liberties Union
Foundation:
Christopher Harris
Seth Friedman
Katharine Marshall
Jeroen van Kwawegen
Elan Dobbs
Latham & Watkins
885 Third Avenue
New York NY 10022

Date: September. 15, 2006

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES................................................................................................i

INTRODUCTION ............................................................................................................ 1

ARGUMENT.................................................................................................................... 4

I.    PLAINTIFFS CLEARLY HAVE STANDING UNDER WELL-
ESTABLISHED RULES IN FIRST AMENDMENT CASES ............................... 4

    A.    THIS COURT CORRECTLY APPLIED THE LAW IN 1999 ................. 4

    B.    NONE OF DEFENDANT'S ARGUMENTS HAVE MERIT .................. 7

        COPA is Not Limited to Commercial Pornographers, and
Plaintiffs' Identities as Something Other Than Commercial
Pornographers Does Not Destroy Standing..................................... 7

        Precedent Cited By The Defendant To Narrow The Definition Of
COPA Is Irrelevant As To Plaintiffs' Standing .............................. 9

        The Value Prong Does Not Alleviate Plaintiffs' Fear Of
Prosecution, As It Does Not Allow For Value For Adults........... 16

        The "As A Whole" Language Within COPA Does Not Alleviate
Plaintiffs' Fear Of Prosecution, But Contributes To It................. 17

II.    INDIVIDUAL PLAINTIFFS REASONABLY FEAR PROSECUTION
UNDER COPA................................................................................................... 18

    A.    PLAINTIFF ACLU MEMBER LAWRENCE FERLINGHETTI
REASONABLY FEARS PROSECUTION UNDER COPA.................... 18

    B.    PLAINTIFF ACLU MEMBER PATRICIA NELL WARREN
REASONABLY FEARS PROSECUTION UNDER COPA.................... 22

    C.    PLAINTIFF ADDAZI, INC. D/B/A CONDOMANIA
REASONABLY FEARS PROSECUTION UNDER COPA.................... 25

    D.    PLAINTIFF HEATHER CORINNA REASONABLY FEARS
PROSECUTION UNDER COPA ........................................................... 27

        Scarleteen........................................................................................ 27

        Scarlet Letters ................................................................................ 30

        Femmerotic ..................................................................................... 31

    E.    PLAINTIFF ELECTRONIC FRONTIER FOUNDATION
MEMBER BILL BOUSHKA REASONABLY FEARS
PROSECUTION UNDER COPA ........................................................... 33

    F.    PLAINTIFF FREE SPEECH MEDIA REASONABLY FEARS
PROSECUTION UNDER COPA ........................................................... 35

G.     PLAINTIFF NERVE.COM REASONABLY FEARS
PROSECUTION UNDER COPA ...........................................................37

H.     PLAINTIFF AARON PECKHAM D/B/A URBAN
DICTIONARY REASONABLY FEARS PROSECUTION
UNDER COPA...............................................................................40

I.      PLAINTIFF PHILADELPHIA GAY NEWS REASONABLY
FEARS PROSECUTION UNDER COPA ................................................43

J.      PLAINTIFF POWELL'S BOOKSTORE REASONABLY FEARS
PROSECUTION UNDER COPA ...........................................................45

K.     PLAINTIFF SALON MEDIA GROUP REASONABLY FEARS
PROSECUTION UNDER COPA ...........................................................48

L.      PLAINTIFF SEXUAL HEALTH NETWORK REASONABLY
FEARS PROSECUTION UNDER COPA ................................................52

III.    ASSOCIATIONAL PLAINTIFFS HAVE DEMONSTRATED
STANDING.......................................................................................55

IV.    PLAINTIFFS HAVE STATED A CLAIM THAT COPA VIOLATES
THE FIRST AND FIFTH AMENDMENTS BY PROHIBITING
DISSEMINATION TO ALL MINORS OF MATERIALS NOT
HARMFUL TO OLDER MINORS. ........................................................59

V.     PLAINTIFFS HAVE STATED A CLAIM THAT COPA VIOLATES
THE FIRST AND FIFTH AMENDMENT RIGHT TO COMMUNICATE
AND ACCESS INFORMATION ANONYMOUSLY .................................63

VI.    CONCLUSION ..................................................................................67

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*ACLU v. Miller,*
    977 F. Supp. 1228 (N.D. Ga. 1997)..........................................................61, 62

*ACLU v. Ashcroft,*
    322 F.3d 240 (3d Cir. 2003) ...........................................................1, 6

*ACLU v. Johnson,*
    4 F. Supp. 2d 1029 (D. N.M. 1998)...............................................1, 12, 15, 64

*ACLU v. Reno,*
    31 F. Supp. 2d 473 (E.D. Pa. 1999)................................................*passim*

*ACLU v. Reno,*
    217 F.3d 162 (3d Cir. 2000) ...........................................................6, 56, 63

*ACLU v. Reno,*
    929 F. Supp. 824 (E.D. Pa. 1996)...................................................7, 10, 62

*Adult Video Association v. Barr,*
    960 F.2d 781 (9th Cir. 1992) ...........................................................8

*American Booksellers Foundation v. Dean,*
    202 F. Supp. 2d 300 (D. Vt. 2002) .................................................1, 12, 15

*American Library Association v. Pataki,*
    969 F. Supp. 160 (S.D.N.Y. 1997) .................................................1, 12, 15

*American Booksellers v. Webb,*
    919 F.2d 1493 (11th Cir. 1990) .....................................................13

*Ashby v. State,*
    663 S.W.2d 453 (Tex. Crim. App. 1984) ......................................18

*Ashcroft v. ACLU,*
    535 U.S. 564 (2002) ......................................................................17

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ......................................................................9

*Athenaco, Ltd. v. Cox,*
    335 F. Supp. 2d 773 (E.D. Mich. 2004) .......................................13

NY\1188513.1

*Board of Education v. Pico*,
    457 U.S. 853 (1982) ................................................................. 19, 64

*Bookcase, Inc. v. Broderick*,
    218 N.E.2d 668 (1966) ............................................................ 16, 19

*Bordell v. General Electric Co.*,
    922 F.2d 1057 (2d Cir. 1991) ........................................................ 22

*Brockett v. Spokane Arcades, Inc.*,
    472 U.S. 491 (1985) ................................................................... 10

*City of Cincinnati v. Contemporary Arts Center*,
    566 N.E.2d 214 (Ohio Mun. 1990) ................................................... 17

*Columbia Insurance Co. v. Seescandy.com*,
    185 F.R.D. 573 (N.D. Cal. 1999) ..................................................... 65

*Conchatta Inc. v. Miller*,
    2006 U.S. App. LEXIS 20836 (3d Cir. 2006) ................................... 8, 9, 21

*Connection Distributing Co. v. Reno*,
    154 F.3d 281 (6th Cir. 1998) .......................................................... 65

*Craig v. Boren*,
    429 U.S. 190 (1976) .................................................................... 5

*Crawford v. Lungren*,
    96 F.3d 380 (9th Cir. 1996) ........................................................... 67

*Cybersace Communications, Inc. v. Engler*,
    142 F. Supp. 2d 827 (E.D. Mich. 2001) .............................................. 13

*Cyberspace Communications, Inc. v. Engler*,
    55 F. Supp. 2d 737 (E.D. Mich. 1999) ......................................... 1, 12, 15

*Davis-Kidd Booksellers, Inc. v. McWherter*,
    866 S.W.2d 520 (Tenn. 1993) ........................................................ 13

*Denver Area Educational Telecommunications Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) ............................................................... 64, 66

*Doe v. 2theMart.com, Inc.*,

140 F. Supp. 2d 1088 (W.D. Wash. 2001) ........................................................................65

*Doe v. Bolton,*
410 U.S. 179 (1973) ...........................................................................................................5

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) .........................................................................................................62

*Fabulous Associates v. Penn. Public Utility Commission,*
896 F.2d 780 (3d Cir. 1990) ............................................................................................65

*Georgia Cemetery Association v. Cox,*
353 F.3d 1319 (11th Cir. 2003) .................................................................................58, 59

*Ginsberg v. New York,*
390 U.S. 629 (1968) ..................................................................................................*passimi*

*Hunt v. Washington State Apple Advertising Commission,*
432 U.S. 333 (1977) .............................................................................................56, 58, 59

*Kois v. Wisconsin,*
408 U.S. 229 (1972) .........................................................................................................17

*Lamont v. Postmaster General,*
381 U.S. 301 (1965) .........................................................................................................64

*Lawrence v. Texas,*
539 U.S. 558 (2003) .........................................................................................................48

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) .........................................................................................................56

*McIntyre v. Board of Elections Commission,*
514 U.S. 334 (1995) ...................................................................................................64, 65

*Miller v. California,*
413 U.S. 15 (1973) ...........................................................................................................16

*Odle v. Decatur County, Tennessee,*
421 F.3d 386 (6th Cir. 2005) ........................................................................................9, 22

*Ohio Civil Rights Commission  v. Dayton Christian Schools, Inc.,*
477 U.S. 619 (1986) .........................................................................................................57

*Osborn v. Ohio,*
495 U.S. 103 (1990) .........................................................................................................11

v

*Pennsylvania Psychiatric Society v. Green Spring Health Services,*
  280 F.3d 278 (3d Cir. 2002) ...................................................................... 56, 59

*Pope v. Illinois,*
  481 U.S. 497 (1987) ........................................................................................ 27

*PSINet, Inc. v. Chapman,*
  108 F. Supp. 2d 611 (W.D. Va. 2000) .................................................. 1, 12, 15

*Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman,*
  99 F.3d 101 (3d Cir. 1996) .............................................................................. 7

*Reno v. ACLU,*
  521 U.S. 844 (1997) ........................................................................................ 10

*Rent Stabilization Association v. Dinkins,*
  5 F.3d 591 (2d. Cir. 1993) .............................................................................. 58

*Secretary of Maryland v. Joseph H. Munson Company,*
  467 U.S. 947 (1984) .......................................................................................... 5

*Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Board,*
  502 U.S. 105 (1991) .................................................................................... 6, 21

*State v. Vachon,*
  306 A.2d 781 (D.N.H. 1973), *rev'd on other grounds*, 414 U.S. 478 (1974) ............ *passim*

*United States v. National Treasury Employees Union,*
  513 U.S. 454 (1995) .......................................................................................... 6

*University of Tex. v. Camenisch,*
  451 U.S. 390 (1981) .......................................................................................... 4

*Virginia v. American Booksellers Association,*
  484 U.S. 383 (1988) ............................................................................ 4, 13, 22

*Wisconsin v. Stankus,*
  No. 95-2159-CR, 1997 Wisc. Ct. App. LEXIS 138 (Wis. App. Feb. 13, 1997) ......... 15, 39

## STATUTES

47 U.S.C. § 223(d)(1) ........................................................................................ 62

47 U.S.C. § 231(a)(1) ............................................................................... 6, 8, 60

47 U.S.C. § 231(a)(3) ...........................................................................................7

47 U.S.C. § 231(d)(2)(A) ......................................................................................66

47 U.S.C. § 231(e)(2)(B) ..............................................................................8, 44, 45

47 U.S.C. § 231(e)(6) ...................................................................................*passim*

47 U.S.C. § 231(e)(6)(A) - (C) ......................................................................*passim*

720 Ill. Comp. Stat. 5/11-21 ................................................................................17

47 U.S.C. § 231(e)(7) ...........................................................................................18

Ark. Code. Ann. § 5-68-502 ..........................................................................12, 14

Cal. Penal Code § 313.3 .......................................................................................14

Col. Rev. Stat. § 18-7-502(1) ...............................................................................14

Conn. Gen. Stat. § 53a-196 ..................................................................................12

D.C. Code Ann. §22-2001(b)(1) .....................................................................12, 14

Del. Code Ann. tit. 11, § 1365 .............................................................................13

Ga. Code Ann. § 16-12-100 ..................................................................................14

Haw. Rev. Stat. § 712-1215 ..................................................................................12

Idaho Code § 18-1515 ...........................................................................................12

Ind. Code § 35-49(1) .............................................................................................14

Ind. Code § 35-49-3-3 ...........................................................................................13

Iowa Code Ann. § 728.2 .......................................................................................14

Kan. Stat. Ann. § 21-4301c ..................................................................................14

Mass Ann. Laws ch. 272, § 31 .......................................................................12, 14

Mont. Code Ann § 45-8-206 .................................................................................14

Neb. Rev. Stat. 28-808 ..........................................................................................12

Nev. Rev. Stat. § 201.261-264 ................................................................................ 14

N.H. Rev. Stat. Ann. § 571-B:1 ....................................................................... 12, 14

N. Y. Penal Law § 235.20 ........................................................................................ 14

N.C. Gen. Stat. § 14-190.13 .................................................................................... 14

Ohio Rev. Code Ann. § 2907.01 ............................................................................. 14

Ohio Rev. Code Ann. § 2907.31 ............................................................................. 14

Okla. Stat. Ann. tit. 21, § 1040.76 .......................................................................... 14

Or. Rev. Stat. § 2907.01 .......................................................................................... 14

Pennsylvania 19 Cons. Stat. § 5903 ........................................................................ 14

S.C. Code Ann. § 16-15-375 ................................................................................... 14

S.C. Code Ann. § 16-15-385 ............................................................................. 12, 14

Tenn. Code Ann. § 39-17-1901 ............................................................................... 14

Tex. Penal Code Ann. § 43.24 ................................................................................. 14

Utah Code Ann. § 76-10-1201 ................................................................................ 14

Vt. Stat. Ann. tit. 13, § 2801 ................................................................................... 14

Va. Code Ann. § 18.2-390 ....................................................................................... 14

Wisc. Stat. § 948.11 ................................................................................................. 14



Job : 7
Date: 9/15/2006
Time: 10:44:27 PM

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS AND, IN THE ALTERNATIVE, FOR
PARTIAL JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

Defendant's principal argument is that each of the Plaintiffs lack standing because none

has a reasonable fear of prosecution. This Court has previously addressed a virtually identical

argument. *ACLU v. Reno*, 31 F. Supp. 2d 473, 479 (E.D. Pa. 1999). The Court accurately

described the applicable legal standards and applied them to the group of Plaintiffs that existed at

that time. The Court's holdings on standing were explicitly affirmed on two occasions by the

Court of Appeals. *ACLU v. Reno*, 217 F.3d 162, 171 (3d Cir. 2000); *ACLU v. Ashcroft*, 322 F.3d

240, 250, n. 10, 266, n. 33 (3d Cir. 2003).

Other federal courts have addressed identical arguments in connection with the successful

challenges to state laws similar to COPA. Without exception, those courts have found (explicitly

or implicitly) that plaintiffs similar to (or in some instances the same as) the Plaintiffs in this case

had standing. *See American Booksellers Found. v. Dean*, 202 F. Supp. 2d 300 (D. Vt. 2002)

(American Booksellers and Sexual Health Network); *Cyberspace Communications, Inc. v.

Engler*, 55 F. Supp. 2d 737 (E.D. Mich. 1999) (ACLU); *PSINet, Inc. v. Chapman*, 108 F. Supp.

2d 611 (W.D. Va. 2000) (Sexual Health Network, American Booksellers); *American Library

Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (ACLU and American Booksellers); *ACLU v.

Johnson*, 4 F. Supp. 2d 1029 (D.N.M. 1998) (ACLU, EFF, and American Booksellers).

The statute has not changed since the Court's prior decision. Some of the current

Plaintiffs were Plaintiffs at the time of the Court's prior holding and the nature of their speech

has not changed. Other Plaintiffs are new, but the speech that they assert is at risk of prosecution

is, if anything, more sexually explicit than the speech by prior Plaintiffs.  Defendant presents no

new facts, makes no new arguments, and suggests no reason why this Court should revisit this

issue.

There are some additional facts that the Court can consider.  First, Defendant has

responded to contention interrogatories asserting that a photograph of a woman with her breasts

bared, even if the nipples are covered by superimposed stars, is harmful to minors.  (*See*

Defendant's Supplemental Response to Plaintiffs' First Set of Contention Interrogatories (Harris

Decl. at Ex. 1[1]) at 13.)  This provides significant support for Plaintiffs' view that their speech,

which is often more explicit than that image, is at risk under COPA.  Second, Defendant has also

responded to contention interrogatories asserting that a photograph of a woman with her breasts

bared is *not* harmful to minors.  (*Id.* at 11.)  This provides significant support for Plaintiffs' view

that it is impossible for them to discern the Defendant's standards for enforcing COPA, thus

making them reasonably fear prosecution.[2]  Third, Defendant's purported expert, Mr. Mewett,

tested each of the Plaintiffs' websites against 11 filtering products.  He found that all of the

Plaintiffs' websites include webpages that were blocked by at least two of the filtering products.

(*See* Mewett Rebuttal Report (Harris Decl. at Ex. 6).)  In other words, the very products designed

---

[1] Reference to "Harris Decl. at Ex. [_]" is to the exhibits attached to the September 16, 2006
Declaration of Christopher R. Harris filed in support of this Memorandum in Opposition
to Defendant's Motion to Dismiss and, in the Alternative, for Partial Judgment on the
Pleadings.

For the Court's convenience, Defendant's Supplemental Response to Plaintiffs' First Set
of Contention Interrogatories is attached to the Harris Declaration, as well as the relevant
images from the "Hecker Exhibit" (Defendant's exhibit 54, entered on January 25, 1999
in the preliminary injunction hearing), and Exhibits A and B to Plaintiffs' First Set of
Contention Interrogatories (Exhibits 2, 3 and 4 respectively).

[2] Defendant's continuously shifting views on whether Plaintiffs' webpages are "harmful to
minors" provides further support for Plaintiffs' concerns.  (*See* Pls. Mem. in Opp. to Def.
Mot. to Quash Pls. Notice of Dep., March 3, 2006 (Harris Decl. at Ex. 5) at 1-2.)

to block materials parents may consider inappropriate for minors identify at least some speech on each of Plaintiffs websites as inappropriate.  This demonstrates that there are many people who believe that the plaintiffs' websites are inappropriate for minors, and thus fear of prosecution is reasonable.  Finally, plaintiff has submitted an expert report, by Professor Henry Reichman (Harris Decl. at Ex. 7), supporting Plaintiffs' view that they reasonably fear prosecution, by pointing to innumerable instances of pressure to censor or prosecute speech far less explicit than that of Plaintiffs in the name of protecting children from sexual material.[3]

Rather than rely on new facts, defendant relies almost exclusively on two arguments. First, in the most conclusory fashion, he asserts that certain speech is or is not harmful to minors. He never explains the basis for his conclusion, apparently believing that if he asserts it, it is true. Because he refuses to explain the basis for his conclusions, those conclusions should be summarily ignored. Second, defendant relies on opinions expressed by plaintiffs themselves that their speech is valuable. Plaintiffs expressed similar views at the preliminary injunction, which did not prevent this Court and the Third Circuit from finding they had standing. Moreover, if plaintiffs' own stated opinions were dispositive, there would never be any obscenity and/or harmful to minors prosecutions. In every major prosecution, including the prosecution of ACLU plaintiff Ferlinghetti, the government disagreed with the speaker and prosecuted.

In short, the only new facts and/or law fully support this Court's prior decision on standing.  The Court should reaffirm that decision and deny the motion to dismiss.

---

[3] Professor Reichman's testimony is one of the subjects of Defendant's motion in limine.

## ARGUMENT

**I.     PLAINTIFFS CLEARLY HAVE STANDING UNDER WELL-ESTABLISHED RULES IN FIRST AMENDMENT CASES**

### A.     THIS COURT CORRECTLY APPLIED THE LAW IN 1999

As this Court acknowledged in 1999 (and as Defendant ignores now as he did in 1999), the analysis of standing in a case such as this begins with the Supreme Court's decision in *Virginia v. American Booksellers Association*, 484 U.S. 383, 384 (1988). In *American Booksellers Ass'n*, the Supreme Court unanimously upheld Plaintiffs' standing to challenge a statute criminalizing the "display" of materials that were harmful to minors for commercial purposes in such a manner that "juveniles [may] examine and peruse" them. *Am. Booksellers Ass'n*, 484 U.S. at 383. In that case, government counsel asserted, exactly as Defendant does here, that Plaintiffs' fears of prosecution were subjective and unreasonable. Indeed, defense counsel in *Am. Booksellers* asserted that Plaintiffs' fears were so absurd that if their speech were covered by the statute, then the statute was unconstitutional. 484 U.S. at 393, n.8. The Supreme Court easily dismissed the self-serving assertions of defense counsel and held that Plaintiffs did have standing.

In its prior opinion, this Court explained the rationale behind the Supreme Court's standing rules in contexts such as this one. First, "a credible threat of present or future prosecution is itself an injury that is sufficient to confer standing, even if there is no past history of enforcement. In part, this rationale is based on a recognition that a speaker who fears prosecution may engage in self-censorship, which is itself an injury." 31 F. Supp. at 479 (citations omitted). Just as in *American Booksellers Ass'n*, "the law is aimed directly at Plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *American Booksellers* 484 U.S. at

392. (citing *Craig v. Boren*, 429 U.S. 190 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).  *See also ACLU v. Reno*, 31 F. Supp.2d at 481.  Plaintiffs have provided numerous examples in the Amended Complaint, preliminary injunction hearing, declarations, interrogatory responses, and depositions, of speech they communicate that may violate COPA and of the significant burdens imposed by COPA's affirmative defenses.[4]  Thus, Plaintiffs have alleged an "actual and well-founded fear that the law will be enforced against them."  *Id.* at 393.

Second, courts have repeatedly noted that standing rules are relaxed in First Amendment cases.  *See, e.g., ACLU v. Reno*, 31 F. Supp. 2d at 481; *Sec'y of MD v. Joseph H. Munson Co.*, 467 U.S. 947, 956-957 (1984).

COPA defines material that is "harmful to minors" as:

> [a]ny communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that -- (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest; (B) depicts, describes, or represents, in a manor patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

47 U.S.C. § 231(e)(6).  COPA purports to regulate all forms of material communicated over the Internet, and would criminalize any representation of a "sexual act or sexual contact" whether "actual or simulated" or "normal or perverted," and any "lewd" display of the "female breast," that any community may find "patently offensive with respect to minors."  Each of the Plaintiffs engages in sexually explicit speech, which fits squarely within the proscribed conduct

---

[4]  These examples are detailed below in section II.

of COPA.  COPA cannot be narrowly construed to exclude Plaintiffs' speech without ignoring a great deal of text that Congress included in the statute.

Defendant contends that Plaintiffs' fears under COPA are subjective and speculative – an argument that has already been addressed and dismissed within this litigation.[5]  In *ACLU v. Reno*, a three-judge panel of this court noted that that "[i]n recent First Amendment challenges, the Supreme Court has itself paid close attention to extreme applications of content-based laws." 929 F. Supp. 824, 870 (1996).  The court held that "[i]f a content-based law '*can* produce such an outcome', then [we may] consider those outcomes in our analysis." *Id.* (*quoting Simon & Schuster, Inc. v. Members of N.Y. Crime Victims Bd.*, 502 U.S. 105, 123 (1991) (internal cites omitted)).  In *Simon & Schuster*, the Supreme Court held that a law requiring criminals to provide to their victims income from works describing their crimes violated the First Amendment.  The Court considered the claim that the law could have potentially been applied to works such as *The Autobiography of Malcolm X, Civil Disobedience*, or even the writings of Martin Luther King, Jr., even though the Court considered the claim to be "hyperbole."  *Simon & Schuster*, 502 U.S. at 121-22; *see also United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 464-65 (1995) (noting that a ban on Federal employees receiving honoraria could potentially reach "literary giants like Nathaniel Hawthorne and Herman Melville,... Walt Whitman,... and Bret Harte").

Plaintiffs' speech is covered by the plain language of the statute.  Each plaintiff's fear of prosecution is based not on "hyperbole," but on the necessary interpretation of the scope of COPA created by the plain language of COPA.  However, even if the Court were to consider

---

[5]  *ACLU v. Reno*, 31 F. Supp. 2d 473, 480 (E.D. Pa. 1999); *ACLU v. Reno*, 217 F.3d 162, 171 (3d Cir. 2000); *ACLU v. Ashcroft*, 322 F.3d 240, 250 n.10, 267 n.33 (3d Cir. 2003).

some of Plaintiffs' claims exaggerated, "hyperbolic claims do not themselves weigh in the Government's favor." *Reno*, 929 F. Supp. at 870.  Defendant's claim that federal prosecutors will use their discretion to apply the law heightens, rather than diminishes, the level of COPA's constitutional infirmity.  *Id.* at 857 (stating that the Department of Justice "is not a monolithic structure, and individual U.S. Attorneys in various districts of the country have or appear to exercise some independence... the First Amendment should not be interpreted to require us to entrust the protection it affords to the judgment of prosecutors").

Finally, COPA has civil penalties as well as criminal penalties.  47 U.S.C. § 231(a)(3).  If these penalties are enforceable by private citizens, then all of Defendant's protests that he will not prosecute are irrelevant.  The statute is silent on the means of enforcing these civil penalties, so this is not an abstract concern.  In addition, even if the penalties were solely enforceable by Defendant, the standard for initiating an action is lower than in the criminal context.  Even if Defendant is correct that he would not prosecute because he could not predict that a jury would find Plaintiffs guilty beyond a reasonable doubt, he might still choose to seek civil penalties, reasoning that he could win when the "preponderance of the evidence" standard were applied.

In short, Plaintiffs' fears are reasonable and they have standing.

**B.      NONE OF DEFENDANT'S ARGUMENTS HAS MERIT**

1.      <u>COPA is Not Limited to Commercial Pornographers, and Plaintiffs'
Identities as Something Other Than Commercial Pornographers Does Not
Destroy Standing</u>

Defendant repeatedly argues that Plaintiffs lack standing because "COPA addresses commercial pornography, and none of the Plaintiffs are commercial pornographers."  (Def. Br. at 14; 1, 2.)  Yet, nowhere within the text of the statute is the term "commercial pornography" or a

limitation of COPA's application to commercial pornographers. Indeed, this Court has already explicitly rejected this argument, finding that nothing in the text limits the statute to only commercial pornographers. *ACLU v. Reno*, 31 F. Supp. 2d at 480. Rather, the text of the statute applies COPA broadly to all speech on the Web. Included within COPA's broad reach is speech provided for free, if the speaker is engaging in some business through which she merely hopes to make a profit through advertising or other means. 47 U.S.C. § 231(e)(6). The plain language of COPA encompasses both written communications as well as images; indeed, COPA purports to regulate all forms of material communicated over the Internet. Neither this Court nor the Third Circuit has limited the definition of COPA to "commercial pornographers," and in fact, Congress specified three times that communications covered by COPA "include[] any material" that may be deemed harmful to minors. *See* 47 U.S.C. § 231(a)(1); § 231(e)(2)(B) (twice).

Defendant's hollow assertion that there is no intent to prosecute Plaintiffs' speech because it is not "commercial pornography" does not have the effect of limiting the scope of COPA, and thus does nothing to allay the fear of prosecution. *See Adult Video Ass'n v. Barr*, 960 F.2d 781, 785 (9th Cir. 1992) (although there had been no instance of pre-trial seizure in RICO obscenity cases, the fact that the plain language of the statute authorized such seizures created a reasonable fear sufficient to confer standing to challenged statute). Instructively, the Third Circuit recently held that a Pennsylvania statute prohibiting "lewd entertainment" did not apply solely to nude dancing, which the statute was envisioned to target. *Conchatta Inc. v. Miller*, 2006 U.S. App. LEXIS 20836, *17 (3d Cir. 2006). The government argued that the statute was not intended to affect "legitimate theatrical or concert performances." *Id.* at *14-15. Rejecting the argument, the court found that the language of the statute applied its penalties to a variety of performances, including plays, musicals, comedies, ballets, poetry readings, and others

throughout Pennsylvania, as long as the venue served alcohol. *Id.* at \*14-15, 18. The court held that "the mere fact that an agency does not currently intend to apply a statute in an unconstitutional manner cannot have the effect of an explicit limiting construction." *Id.* at \*15 (citing *Odle v. Decatur County, Tenn.*, 421 F.3d 386, 397 (6th Cir. 2005)). Similarly, Defendant's self-serving "intentions" do not have the effect of explicitly limiting COPA to commercial pornographers, and accordingly, Plaintiffs' standing is not evaluated based on the absence of a commercial pornography business purpose.

Finally, Defendant's reliance on Justice Breyer's dissent in the opinion affirming this Court's February 1999 opinion is misplaced for two reasons. (*See* Def. Br. at 14 (citing *Ashcroft v. ACLU*, 542 U.S. 656, 681-82 (2004) (Breyer, J., dissenting).) First, although Justice Breyer identified some speech of Plaintiffs' that he believes falls outside of COPA's scope, he did so in dissent. The majority of the Court did not question Plaintiffs' standing. Rather, the Supreme Court affirmed the decision of this Court, which held that Plaintiffs were likely to prevail on the merits under the preliminary injunction standard. (*Id* at 674.) In doing so, the Court implicitly affirmed Plaintiffs' standing to challenge COPA, both on its face and as applied.

Second, the identity of the Plaintiffs has changed, in part, since the preliminary injunction and the examples of Plaintiffs' speech that causes them to reasonably fear prosecution are, if anything, more sexually explicit than those cited by the prior Plaintiffs and on which Justice Breyer relied.

      2.    <u>Precedent Cited By The Defendant To Narrow The Definition Of COPA Is Irrelevant As To Plaintiffs' Standing</u>

As he did in his 1998 Motion to Dismiss, Defendant first asserts that the "harmful to minors" definition approved by the Supreme Court in *Ginsberg v. New York*, 390 U.S. 629

(1968), "incorporates standards that courts have affirmed as constitutional" (Def. Br. at 9), and that "a body of decisional law can be used to clarify what material falls within the scope of that definition" (*Id.*) First, Defendant's arguments are an attempt to cure the statute's overbreadth, and have no impact on the Plaintiffs' standing. Second, neither *Ginsberg* nor the other cases cited by the Defendant diminish COPA's overbreadth, which arises from the application of a harmful to minors restriction to *adults*. In *Ginsberg*, the Supreme Court considered the constitutionality of a restriction on the face-to-face sale of material that is "harmful to minors" directly to minors. Unlike COPA, the statute in *Ginsberg* did *not* impact adult speech and did not address the problems posed by applying "harmful to minors" restrictions to online communications. *See ACLU*, 929 F. Supp. at 859 (noting that restrictions relying on *Ginsberg* "that have been found constitutional were sensitive to the unique qualities of the medium at which the restriction was aimed"). Thus, *Ginsberg* and its progeny do nothing to alleviate the burden that COPA imposes on communications to adults.

Next, Defendant's brief conflates adult obscenity cases and even child pornography cases with harmful to minors statutes in an attempt to narrow the plain language of COPA. (*See* Def. Br., § I A.) For instance, the Defendant cites an obscenity case, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498 (1985), for the proposition that material which "does no more than arouse a 'good, old fashioned, healthy' interest in sex" would not violate the "prurient interest" prong of COPA. (*See* Def. Br. at 11.) Because by definition the category of "prurience" that can be regulated through a harmful to minors law is broader than the category that can be proscribed

for adults in obscenity statutes, the case does nothing to diminish Plaintiffs' fears that they could

be prosecuted under COPA.[6]

Defendant likewise cites a child pornography case, *Osborn v. Ohio*, 495 U.S. 103, 112

(1990), for the proposition that "'mere' nudity is not enough to render material 'harmful to

minors'" under the second prong of COPA. (*See* Def. Br. at 11.)  Defendant argues that since the

statute in *Osborn* required "a graphic focus on the genitals" before material could be termed

"lewd," the same standard must be met before material can be deemed "harmful to minors"

under COPA.  Again whether speech can be prohibited even for adults under child pornography

laws is simply not relevant to determining whether the material may be "harmful to minors"

under COPA, and in fact ignores COPA's plain language.  *See* 47 U.S.C. § 231(e)(6)(B))

("depicts, describes or represents, in a manner patently offensive with respect to minors, an

actual *or* simulated sex act *or* sexual contact, an actual *or* simulated normal *or* a lewd exhibition

of the genitals *or post-pubescent female breast*") (emphasis added).  Defendant's claims ignore

his own admission that COPA regulates a much broader category of material than can be

constitutionally proscribed for adults. (*See* Def. Br. at 10.)

COPA is the *only* federal harmful-to-minors statute.  Indeed, COPA is the first federal

harmful-to-minors statute in any medium.  Far from there being "a body of decisional law" (Def.

_____

[6]  Defendant cites to Plaintiffs' expert Professor Reichman, who stated that he personally
     believes none of the material on the Plaintiffs' websites is obscene. (*See* Def. Br. at 15.)
     This statement is irrelevant as to standing because COPA proscribes material that is
     "harmful to minors," not material that is obscene.  Furthermore, Professor Reichman does
     not hold a position within the Department of Justice that would give his opinion any
     authoritative effect regarding the application of COPA.  However, Professor Reichman's
     opinion that others may view this material as harmful to minors is extremely relevant, as
     it demonstrates that Plaintiffs' speech is at risk.  *See infra* at 23 (providing a more
     detailed discussion of Professor Reichman's expert opinions).

Br. at 10) narrowing the scope of COPA, in fact there has never been a federal prosecution of material that is "harmful to minors."

Defendant also wrongly suggests that state harmful-to-minors laws, and cases interpreting them, undermine Plaintiffs' fear of prosecution under COPA.  (*See* Def. Br. at 10.) In fact, there is no comparable state or federal statute, and no case law, to which Plaintiffs and other speakers can look to allay their fears of prosecution.

For a variety of reasons, the state harmful-to-minors statutes provide no guidance whatsoever to speakers as to how COPA's restrictions of online speech would be applied by federal prosecutors.  First, none of the state laws cited by Defendant deals with the unique problems presented by regulation of online speech.  Indeed, virtually every state harmful to minors law dealing with speech on the Internet has been declared unconstitutional, often for reasons identical to those urged by Plaintiffs in this case.  *See Am. Booksellers Found. v. Dean*, 202 F. Supp. 2d 300 (D. Vt. 2002); *Cyberspace Communications, Inc. v. Engler*, 55 F. Supp. 2d 737 (E.D. Mich. 1999); *PSINet, Inc. v. Chapman*, 108 F. Supp. 2d 611 (W.D. Va. 2000); *Am. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997); *ACLU v. Johnson*, 4 F. Supp. 2d 1029 (D.N.M. 1998).

Second, Defendant argues that "[m]ore than forty states have laws that regulate the sale and/or distribution of material deemed 'harmful to minors.'"  (*See* Def. Br. at 10.)  But, many of these statutes regulate only the *direct sale* to minors of material that is "harmful to minors."[7]

---

[7] *See, e.g.*, Arkansas (Ark. Code. Ann. § 5-68-502 (Michie 1993)); Connecticut (Conn. Gen. Stat. § 53a-196 (1994)); District of Columbia (D.C. Code Ann. §22-2001(b)(1) (1996)); Hawaii (Haw. Rev. Stat. § 712-1215 (1994)); Idaho (Idaho Code § 18-1515) (1987)); Illinois (§ 720 Ill. Comp. Stat. 5/11-21) (1993)); Massachusetts (Mass Ann. Laws ch.

These statutes, like the similar statute in *Ginsberg* and in stark contrast to COPA, do not interfere with adult speech at all.  A smaller number of states have statutes that regulate the display, in the physical world, of material that is harmful to minors.  *See, e.g.*, Del. Code tit. 11 § 1365; Ga. Code § 16-12-103 (1996); Ind. Code § 35-49-3-3 (1996).  These statutes have been narrowly construed by lower courts to avoid the constitutional problems they impose on speech for adults and older minors, and their constitutionality has never been considered by the Supreme Court. *See, e.g., Am. Booksellers Ass'n*, 372 S.E.2d 618 (Va. 1988) (answering certified question from 484 U.S. 383 (1988)); *Am. Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990); *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520 (Tenn. 1993).

Third, Defendant's reliance on *Athenaco, Ltd. v. Cox*, 335 F. Supp. 2d 773 (E.D. Mich. 2004), one of only two new cases he cites since his last, nearly identical motion, is equally misplaced.  In the first instance, the Plaintiffs in *Athenaco* did not challenge any portions of the Michigan definition of harmful to minors that it shares with COPA, but rather challenged the definitions of "display," "exhibit," "allow to examine," "restricted area," "visual matter," and "examine."  335 F. Supp 2d. at 780.  Second, like other state laws discussed *supra*, the portions of the Michigan law enacted to govern communications on the Internet were deemed unconstitutional by *Cyberspace Communications , Inc. v. Engler*, 142 F. Supp. 2d 827, 830 (E.D. Mich. 2001).

Fourth, the definition of the prohibited speech in COPA is far less detailed than the descriptions of the prohibited speech in many of the state laws.  Many of these state statutes provide detailed definitions of "sexual conduct" and analogous terms, making the statutes much

---

272, § 28) (1998)); New Hampshire (N.H. Rev. Stat. § 571-B (1997)); South Carolina (S.C. Code Ann. § 16-15-385 Law Co-op (1997)); Nebraska (Neb. Rev. Stat. 28-808).

less vague than COPA.[8]  In contrast, COPA nowhere defines "sexual act or conduct," "normal or

perverted sexual act," or "post-pubescent female breast."  In *ACLU I*, the Supreme Court held

that a similar lack of specificity contributed to the unconstitutional vagueness and chilling effect

of the CDA.  *ACLU I*, 521 U.S. at 897-98.

Fifth, COPA prohibits material consisting entirely of written words.  In contrast, some

state harmful-to-minors statutes do not apply purely to textual materials.  *See, e.g.*, North

Carolina (N.C. Gen. Stat. § 14-190.13 (1997)); South Carolina (S.C. Code Ann. § 16-15-375

(1997)); Arkansas (Ark. Code. § 5-68-502); Colorado (Col. Rev. Stat. § 18-7-502(1)); North

Carolina (N.C. Code § 14-190.13); South Carolina (S.C. Code § 16-15-385).

Sixth, COPA's value-to-minors prong does not exclude material that has "educational" or

"medical" value for minors.  In contrast, many state harmful-to-minors statutes do not restrict

speech that has "educational" or "medical" value as to minors.[9]  Congress' decision not to

_____

[8]  *See, e.g.*, District of Columbia (D.C. Code § 22-2001(b) (1996)); Georgia (Ga. Code Ann. §
16-12-100 (1996)); Indiana (Ind. Code § 35-49(1) (1996); Iowa (Iowa Code Ann. § 728.2
(1997)); Kansas (Kansas Stat. Ann. § 21-4301c (1997)); Massachusetts (Mass Ann. Laws
ch. 272, § 31 (1998)); Nevada (Nev. Rev. Stat. § 201.261-264 (1997)); New Hampshire
(N.H. Rev. Stat. Ann. § 571-B:1 (1997)); New York (N. Y. Penal Law §235.20
(McKinney 1998)); North Carolina (N.C. Gen. Stat. § 14-190.13 (1997)); Ohio (Ohio
Rev. Code Ann. § 2907.01 (Anderson 1998)); Oklahoma (21 Okla. Stat. tit. 21 § 1040.76
(1998)); Pennsylvania (18 Pa. Cons. Stat. §5903))); South Carolina (S.C. Code Ann. §
16-15-385 (1997)); South Dakota (S.D. Codified Laws § 22-24-27(1998)); Tennessee
(Tenn. Code Ann. § 39-17-1901 (1998)); Utah (Utah Code Ann. § 76-10-1201 (1998));
Vermont (Vt. Stat. Ann. Tit. 13. § 2801 (1998)); Virginia (Va. Code Ann. § 18.2-390
(1998)); Wisconsin (Wisc. Code § 948.11 (1997)).

[9]  *See, e.g.*, Cal. Penal Code § 313.3 (West 1997) (educational purposes protected); Kan. Stat.
Ann. § 21-4301c (1997) (same); Or. Rev. Stat. § 2907.01 (same); Tex. Penal Code Ann.
§ 43.24 (same); Wis. Code § 948.11 (1988) (same); Mont. Code Ann § 45-8-206
(medical purposes protected); Okla. Stat. Ann tit. 21 § 1040.75 (1998) (same); Ohio Rev.
Code Ann. § 2907.31 (Anderson 1998) (educational and medical purposes protected).

include the terms "educational" or "medical" in COPA's harmful-to-minors prong increases

Plaintiffs' fear that they could be prosecuted for providing sexual health material over the Web.

To the extent that judicial opinions regarding state harmful to minors laws are relevant to

Plaintiffs' standing determination, they support Plaintiffs' fears that material such as theirs could

be prosecuted.  As noted, numerous federal district courts have held that Plaintiffs whose speech

is as diverse and broad as the Plaintiffs in this case – and in at least one case, identical – had

standing to challenge state online harmful to minors laws.  *See Am. Booksellers Found. v. Dean*,

202 F. Supp. 2d 300 (D. Vt. 2002) (holding that the ACLU and Sexual Health Network websites

have standing because they contain material potentially "harmful to minors"); *PSINet, Inc. v.*

*Chapman*, 108 F. Supp. 2d 611 (W.D. Va. 2000) (holding that Plaintiffs have standing because

their speech is arguably covered by the "harmful to juveniles" statute); *Cyberspace*

*Communications, Inc. v. Engler*, 55 F. Supp. 2d 737 (E.D. Mich. 1999) (holding that the ACLU

has standing because it reasonably fears prosecution for potentially "harmful to minors"

materials on its website); *Am. Library Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997)

(holding that Plaintiffs communicate a broad range of valuable speech and have standing because

of a credible fear of prosecution under harmful to minors law); *ACLU v. Johnson*, 4 F. Supp. 2d

1029 (D.N.M. 1998) (same).

In addition, some prosecutions under state harmful to minors laws demonstrate that

material substantially less sexually explicit than Plaintiffs' has in fact been prosecuted.  *See*

*Wisconsin v. Stankus*, No. 95-2159-CR, 1997 Wisc. App. LEXIS 138 at * 2-3 (Wis. App. Feb.

13, 1997) (upholding conviction for exposing a child to harmful material by displaying a

photograph showing "a woman with a shirt and jacket open to the waist, without exposing her

nipples" because the court read the statute to apply to "any part of the breast which is below a

horizontal line drawn parallel to the top of the nipple'');[10] *see also State v. Vachon*, 306 A.2d

781, 784 (D.N.H. 1973) (holding that the sale of a button with the slogan "Copulation Not

Masturbation" was obscene as to minors under *Ginsberg*), *rev'd on other grounds*, 414 U.S. 478

(1974); *Bookcase Inc. v. Broderick*, 218 N.E.2d 668, 620 (1966) (holding that *Fanny Hill* falls

within the scope New York's "harmful to minors" law).

     3.     <u>The Value Prong Does Not Alleviate Plaintiffs' Fear Of Prosecution, As It Does Not Allow For Value For Adults</u>

Defendant further contends that the Plaintiffs' speech will be protected by the national

standard of the value prong of the "harmful to minors" test.  (Def. Br. at 12.)  The value prong

purports to protect only material that would have "serious literary, artistic, political, or scientific

value *for minors*."  47 U.S.C. § 231(e)(6) (emphasis added).  Because it would protect only

speech that jurors believed had value for *minors*, Plaintiffs are legitimately fearful of prosecution

for material that has value for *adults*, but may not be considered to have value for minors even

applying a national standard.  Defendant cites to an obscenity case to show that Plaintiffs will be

protected.  (*See* Def. Br. at 12, citing *Miller v. California*, 413 U.S. 15 (1973).)  As discussed,

*supra*, obscenity precedent, based on what has value for adults, is inapplicable to the COPA

"harmful to minors" standard, based on what has value for minors.

In addition, COPA does not define, and the Defendant does not proffer, a "national

standard" for what qualifies as having "serious literary, artistic, political, or scientific value."

Indeed, Defendant's conclusory statement that the naked breasts visible on the Playboy website

---

[10]  With respect to female breasts, COPA is even more restrictive than the Wisconsin statute at issue in *Wisconsin v. Stankus*.  COPA purports to criminalize the "lewd exhibition of the ... post-pubescent female breast" whether above or below the nipple.  47 U.S.C. § 231(e)(6).  Thus, a picture of a woman in a bathing suit or even low-cut shirt could violate COPA.

have value for minors but the naked breasts on the Penthouse website do not, and that the naked

breasts in Mr. Hecker's exhibits also do not, including those with the nipples covered, suggest

that Defendant cannot proffer any rational standard, much less a national standard, for the value

prong.  Moreover, Mr. Reichman's expert testimony will show that numerous forms of speech,

many much less explicit than Plaintiffs', are believed by large numbers of Americans to lack

value *for minors*.

    4. The "As A Whole" Language Within COPA Does Not Alleviate
      Plaintiffs' Fear Of Prosecution, But Contributes To It

   Defendant is incorrect that because material prohibited by COPA requires that it be

considered "as a whole," Plaintiffs have no fear of prosecution.  (Def. Br. at 13.)  *See* 47 U.S.C.

§ 231(e)(6)(A) & (C).  First, Defendant relies on an interpretation of the "as a whole" provision

that this Court and the Third Circuit have already rejected.  *ACLU v. Reno,* 31 F. Supp.2d at 480;

*see also Ashcroft v. ACLU*, 535 U.S. 564, 600 (2002) (Kennedy, J., concurring).

   Second, Defendant has been inconsistent in his application of the "as a whole"

requirement.  In response to the Plaintiffs' contention interrogatories, despite ritualistic

invocation of the "as a whole" requirement, Defendant repeatedly opined on whether single web

pages were or were not harmful to minors.  In addition, at trial, it will be obvious that

Defendant's principal expert on filtering based all of his judgments about the effectiveness of

filters on individual web pages without regard for their context.  He is not alone in doing so.  *See,*

*e.g., City of Cincinnati v. Contemporary Arts Ctr.*, 566 N.E.2d 214, 216-17 (Ohio Mun. 1990)

(holding that in obscenity trial involving Robert Mapplethorpe exhibition each individual

photograph has a separate identity); *see also Kois v. Wisconsin*, 408 U.S. 229, 231 (1972)

(reviewing court does not require the jury to consider the whole exhibit, only the five

photographs cited in the indictment); *Ashby v. State*, 663 S.W.2d 453, 454 (Tex. Crim. App.

1984) (holding that in prosecution for exhibiting harmful material to a minor, a jury is only

required to consider the "dominant theme taken as a whole" of what was actually viewed by the

minor).

In any event, in the context of the Web, the relevant "whole" is not, as Defendant

intermittently asserts, the entirety of a website, but rather a specific webpage.  Plaintiffs have

submitted an expert report, by Professor Edward Felten, supporting Plaintiffs' view.  Professor

Felten explains that individuals rely on search engines to locate information on the Internet, that

search engines direct individuals to specific web pages, and that it is more accurate to think of a

web page as a "whole," rather than the entirety of a site.  (Felten Report (Harris Decl. at Ex. 8) at

28.)  Finally, other than in the most conclusory fashion, Defendant does not indicate what about

the "as a whole" requirement would guarantee that any of the Plaintiffs could be assured that

although their speech fits the language of the statute, they need not fear prosecution.

## II.     INDIVIDUAL PLAINTIFFS REASONABLY FEAR PROSECUTION UNDER COPA

The individual plaintiffs reasonably fear prosecution under COPA.

### A.     PLAINTIFF ACLU MEMBER LAWRENCE FERLINGHETTI REASONABLY FEARS PROSECUTION UNDER COPA

Plaintiff ACLU is suing on behalf of its members.  One of those members is Lawrence

Ferlinghetti, the co-founder of City Lights Bookstore.  This bookstore maintains a website

online, available to internet users of all ages, that promotes books available for purchase.

(Plaintiffs' Third Amended Complaint ("Am. Compl.") (Harris Decl. at Ex. 9) at 27.)  Contrary

to Defendant's unsupported assertions, Mr. Ferlinghetti has provided numerous examples of

injury in fact in his Declaration, the Amended Complaint and Interrogatory Responses, all of

which show speech that he communicates which may violate COPA.[11]  For example, in a highly

publicized case, Mr. Ferlinghetti was prosecuted under an obscenity statute for publishing and

selling Allen Ginsberg's "Howl," excerpts of which are still posted on his website  (*See*

Ferlinghetti Decl. [12] (Harris Decl. at Ex. 11 at ¶ 4.)[13]  The fact that COPA prohibits a *broader*

scope of material than the obscenity statute used to prosecute Mr. Ferlinghetti previously only

further supports his fear of prosecution under COPA.[14]  Defendant's claim that this material

"could not conceivably appeal to the prurient interest" (Def. Br. at 18) is plainly untrue in light

of past prosecution of this very material under the obscenity standard.

     The City Lights bookstore website lists numerous erotic books and describes them in

erotic terms.  *The Tears of Eros*, for example, is described as the successor to a prior book that

---

[11]  Defendant suggests that because Mr. Ferlinghetti is the poet laureate for San Francisco, it is "highly unlikely" that his work lacks serious literary or artistic value for minors.  (*See* Def. Br. at 18 n.13).  Despite high regard for a literary work by one segment of people, it is not necessarily acceptable or highly regarded by all segments (or all juries).  *See, e.g., Board of Education v. Pico*, 457 U.S. 853, 857 (1982) (illustrating a school board's classification of books by Langston Hughes, Kurt Vonnegut and other respected authors as "anti-American, anti-Christian, anti-[Semetic], and just plain filthy"); *Bookcase Inc. v. Broderick*, 218 N.E.2d 668, 620 (1966) (John Cleland's *Fanny Hill* falls within the scope New York's "harmful to minors" law),  University of Pennsylvania's Online Book Page, *Books Suppressed or Censored By Legal Authorities*, *at* http://onlinebooks.library.upenn.edu/banned- books.html (listing banned books by authors including James Joyce, Voltaire, Shakespeare, and John Locke).  (Harris Decl. at Ex. 10.); (*see also* report of Dr. Henry Reichman (Harris Decl. at Ex. 7).)

[12]  Originally submitted to the court as Tab M to Declarations in Support of Plaintiffs' Preliminary Injunction Motion, Volume 1.

[13]  Federal Rule of Civil Procedure 65(a)(2) provides that "any evidence received upon an application for a preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial." Because Mr. Ferlinghetti's sworn declaration from 1998 is admissible testimonial evidence, reference to it as part of the record is appropriate.

[14]  In fact, the U.S. Customs officer who first seized "Howl" justified the seizure by stating that "You wouldn't want your children to come across it." (Ferlinghetti Decl. (Harris Decl. at Ex. 11) at ¶ 12.)

"examines death - the 'little death' that follows sexual climax, the proximate death in sadomasochistic practices…."  Similarly, *Terrible Girls* is "a powerful account of erotic love." Although neither of these books are currently excerpted on the website, the trend in publishing is, of course, to provide excerpts.  *See* http://www.amazon.com/gp/help/customer/display.html/104-8628231-3650313?ie=UTF8&nodeId=10197041.  (Harris Decl. at Ex. 12.)   If City Lights cannot follow the lead of Amazon, it risks a competitive disadvantage.  Given the subject matter of the books, Mr. Ferlinghetti could not do so without risking prosecution under 47 U.S.C. § 231(e)(6)(B) ("describes…an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act…").

Defendant claims that Mr. Ferlinghetti's experience within the field and his view that people may find his work "harmful to minors" is insufficient to further his standing argument. Mr. Ferlinghetti testified in his sworn Declaration that despite his acquittal, many of the books on his website are still not widely available in mainstream bookstores because of the sexual themes.  (*See* Ferlinghetti Decl. (Harris Decl. at Ex. 11) at ¶ 4.)  In his experience within the publishing industry for more than fifty years, Mr. Ferlinghetti has found that there are people who would find the content of City Lights "harmful to minors."  This is not a "subjective" baseless claim, as Defendant suggests, but a fear supported by his experience with the City Lights website and the publishing industry.  (Am. Compl. (Harris Decl. at Ex. 0) ¶ 108); (Ferlinghetti Interrog. Resp. (Harris Decl. at Ex. 13) at No. 13[15] (providing examples of speech).)

---

[15]  Response number 13 in Lawrence Ferlinghetti's Responses and Objections to Defendant's First Set of Interrogatories, dated Oct. 28, 2005.

Defendant also alleges that Mr. Ferlinghetti does not have "any intent of posting harmful-to-minors material on the web." Mr. Ferlinghetti's opinion as to what is "harmful to minors" is irrelevant for the purposes of standing, since his opinion is not authoritative in Department of Justice prosecutions or statutory interpretation. The relevant inquiry, described above in *Simon & Schuster* and *Conchatta*, is whether or not Mr. Ferlinghetti's speech *could* potentially be subject to COPA.[16] The material on his website has been subject to prosecutions in the past, other sections of this website could be prosecuted in the future, and all the material is similar to content analyzed under state statutes that was found to be sufficient to confer standing.[17] The examples of speech provided, Mr. Ferlinghetti's past prosecution for obscenity, his significant experience within the publishing industry, and the similar standing decisions from state law cases taken together all support the conclusion that standing has clearly been established.[18]

Finally, Defendant claims that because Mr. Ferlinghetti has not specifically identified which poetry he believes is harmful to minors the poetry on his website is insufficient to confer standing. Again, Mr. Ferlinghetti's opinion as to what materials are harmful to minors is irrelevant to the determination of standing. Nevertheless, Mr. Ferlinghetti did direct Defendant to the poetry section on his website, which is easily identifiable under the heading of "Poetry," as containing material that some could conclude is harmful to minors. (Ferlinghetti Interrog. Resp.

---

[16] *See supra* section I.B.

[17] *See supra* section I.B.2.

[18] Defendant's reliance on *Bordell* is misplaced. (Def. Br. at 18.) In that situation, the plaintiff claimed that he had already been deterred in the past, but was not able to provide any evidence of the alleged detrimental affect. *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, *1060 (2d Cir. 1991). Unlike *Bordell*, since COPA has not yet taken effect, no deterrence has actually occurred. Therefore, when "the law is aimed directly at Plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution[,]" standing has been satisfied. *Am. Booksellers Ass'n*, 484 U.S. at 392.

(Harris Decl. at Ex. 13) at No. 13.)  Several of the covers of the works in this section may be considered "harmful to minors," including the picture of a naked female on the cover of "In The Middle Distance."[19]  In addition, many of these works deal with material that could be considered harmful to minors, such as discussions of sex, desire, and passion, which are excerpted on the City Lights website.  Defendant's argument that this material cannot be used to confer standing is wholly without authority.  Defendant improperly relies on *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, (2d Cir. 1991) (Def. Br. at 18), which does not require that a plaintiff provide a specific weblink to show standing; it simply requires that a plaintiff show objective evidence of his or her fear, which Mr. Ferlinghetti has done with his website.

### B.   PLAINTIFF ACLU MEMBER PATRICIA NELL WARREN REASONABLY FEARS PROSECUTION UNDER COPA

Defendant contends that ACLU member Patricia Nell Warren lacks standing to challenge the constitutionality of COPA because "as a matter of law" her writing, as excerpted on the World Wide Web and as presented in her Response to Defendant's Interrogatory No. 13 (Pl. Warren's Interrog. Resp. (Harris Decl. at Ex. 16) at No. 13[20]), "do[es] not create a reasonable fear of prosecution under COPA."  (Def. Br. at 19.)

Defendant argues that the first piece of writing listed in Ms. Warren's Interrogatory Response, a commentary on the 1998 death of gay college student Matthew Shephard, is "inarguably outside the scope of 'harmful to minors' as it is devoid of sexual content."  (*Id.*)

---

[19]   *Available at* http://citylights.com/poetry.html.  (Harris Decl. at Ex. 14.)  A Google search of Mr. Ferlinghetti reveals over 600,000 searches including the entire text of many of his poems, many of which discuss sex in explicit terms. *See, e.g.*, "All We Need is Love" *at* http://www.lorenwebster.net/In_a_Dark_Time/category/poets/lawrence-ferlinghetti/ (Harris Decl. at Ex. 15.)

[20]   Response number 13 in Patricia Nell Warren's Responses and Objections to Defendant's First Set of Interrogatories, dated Oct. 28, 2005.

Defendant disingenuously characterizes Ms. Warren's commentary as being focused on "the dangers of trusting strangers." (*Id.*) In fact, Ms. Warren's commentary is accurately described as the dangers of trusting strangers in the context of casual or anonymous gay sexual encounters. By way of support for her point, she candidly discusses prostitution, gay pornographic videos, and rape. (*Id.*) COPA's statutory definition of "material that is harmful to minors" plainly can include "descriptions," not merely "depictions," and it is not unreasonable to suppose that an "average person applying contemporary community standards" would find Ms. Warren's written discussion of anonymous and casual homosexual activity to be "designed to appeal to the prurient interest," "patently offensive with respect to minors" and lacking in serious "value for minors." 47 U.S.C. § 231(e)(6).

Defendant is similarly disingenuous in his characterization of other writing presented in Ms. Warren's Interrogatory Response, most notably an excerpt from Ms. Warren's book *Billy's Boy*, which is also cited in Plaintiffs' Amended Complaint. Defendant quotes from the Amended Complaint, which notes that the excerpt includes "the description of a 'foursome' erotically dancing and a description of two men passionately kissing." (Am. Compl. (Harris Decl. at Ex. 9) at 30, ¶ 111.) In his final sentence criticizing Ms. Warren's claims, Defendant truncates this description to "scenes of 'dancing' and 'kissing.'" (Def. Br. at 19.) Given the strong adverse reaction in many communities around the country to material even alluding to homosexuality, this elision is telling. As demonstrated extensively in the Expert Report of Henry Reichman, private citizens and public officials alike are often of the view that such material is not only inappropriate for minors but also lacking in any countervailing or justifying value for minors. (*See* Reichman Report (Harris Decl. at Ex. 7) at 9, 24–27.) Defendant's brief description of the *Billy's Boy* excerpt does not cite the narrator's repeated references to his erections ("my hard-on

was going crazy"), or, for that matter, his graphic description of a neighborhood boy caught experimenting sexually with the family dog. (Pl. Warren's Interrog. Resp. (Harris Decl. at Ex. 16) at No. 13.) Indeed, both of these descriptions are descriptions of "an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals…" and it is not difficult to imagine that bestiality would be viewed as harmful to minors. (Indeed, in response to the Contention Interrogatories, Defendant included bestiality as evidence of obscenity.)

Defendant notes that "each of the books excerpted on Ms. Warren's website are sold on mainstream outlets such as Amazon.com." (Def. Br. at 19.) In fact, a number of the books are even excerpted on Amazon.com, much as they are on Ms. Warren's website, but Defendant elects not to make this point. Perhaps this is because the manner of their excerption on Amazon.com in fact weakens Defendant's arguments regarding the chilling effect of COPA on Ms. Warren's speech. The aforementioned novel *Billy's Boy* is represented on Amazon.com by an entirely different excerpt, one which is, unlike that posted on Ms. Warren's website, truly devoid of any sexual content.[21] Similarly, Amazon.com draws from the same chapter of *The Wild Man* that Ms. Warren features on her website, but instead uses a shorter excerpt, thus omitting the chapter's candid description of a bullfighter's mutual sexual arousal with another man.[22] Regardless of Ms. Warren's stature in the field of gay-themed literature, she reasonably fears prosecution under COPA for her sexually candid writing as it has been posted on the World Wide Web.

---

[21] *Available at* http://www.amazon.com/gp/reader/096410993X/ref=sib_dp_pt/103-1290022-5593427#reader-link (Last viewed September 6, 2006).

[22] *Available at* http://www.amazon.com/gp/reader/1889135054/ref=sib_dp_pt/103-1290022-5593427#reader-link  (Last Viewed September 6, 2006).

## C.     PLAINTIFF ADDAZI, INC. D/B/A CONDOMANIA REASONABLY FEARS PROSECUTION UNDER COPA

Plaintiff Condomania is a leading online retailer of condoms and sexual products and distributor of safer-sex related materials.  (Am. Compl. (Harris Decl. at Ex. 9) at 12.) Condomania has provided numerous examples of injury in fact in Declaration, the Amended Complaint and Interrogatory Responses, all of which identify speech communicated by Condomania for which it fears prosecution under COPA.  For example, Condomania's website provides sex information, vibrators for sale, detailed discussions of masturbation and other sexual acts, to name a few.  (*See* Glickman Decl.[23] (Harris Decl. at Ex. 17).)  The page referred to by Defendant (*See* Def. Br. at 20) in Condomania's Safer Sex Manual is a discussion regarding Dental Dams, Finger Cots and Latex Gloves.  (*See* Glickman Decl. (Harris Decl. at Ex. 17) at ¶ 33.)  It describes the use of these items "during fingering or fisting of the vagina or anus."  (*Id.*; *see also* Pl. Condomania's Interrog. Resp. (Harris Decl. at Ex. 18) at No. 13 (describing examples of sexual content and photos on the website).)  Defendant asserts without supporting authority that "no reasonable person could find that the pages submitted meet any prong" of COPA's test, despite this explicit sexual information, pictures, and discussions that exist on the website.  It is more than reasonable for Condomania to feel that some communities may find discussions of "fingering or fisting of the vagina anus" to be harmful to minors.

Previously, Defendant's own witness, FBI agent Damon Hecker, stated at his deposition that he believed certain stories about people's experiences using condoms, taken from the Condomania Web site, were sexually explicit, that some minors would find them prurient or

---

[23]  Declaration of Adam K. Glickman on Behalf of Addazi, Inc.d/b/a Condomania (in Support of Plaintiff's Motion for Temporary Restraining Order and Plaintiff's Motion for Preliminary Injunction).

erotic, and that some communities would find they were patently offensive and lacked value for

minors.[24]  (Hecker Depo. (Harris Decl. at Ex. 19) at 134-36.)  If Mr. Hecker believes that two

stories about condom use on the Condomania Web site could be considered to be "harmful to

minors," it seems clear that numerous other explicit articles about sex published by Plaintiffs and

others could be considered "harmful to minors" under COPA.  It is hard for Defendant to argue

Condomania does not have standing because the website has no harmful to minors materials

when their own witness has conceded as much.

Defendant emphasizes that Condomania's website has educational value, and is outside

the scope of COPA.  (Def. Br. at 20.)  (Of course, COPA does not except material that has

"educational" value.  Thus Defendants have to argue that Condomania has "educational or

scientific" value.  Condomania may have some educational value, but to argue that it has serious

"scientific" value is to stretch the word scientific.  See 47 U.S.C. § 231(e)(6)(C)).  Condomania

testified in a sworn Declaration that it fears these materials may be considered "harmful to

minors" because free access to safer sex information is perceived by some communities as

encouraging premarital sex and alternative forms of sexual contact.  (See Glickman Decl. (Harris

Decl. at Ex. 17).)  Despite the fact that this information is considered educational to some, it may

be perceived by others as "patently offensive." (See id. at ¶ 27.)  Although some communities

might recognize the value of safer sex information for adults, they may believe such information

---

[24]  Defendant repeatedly finds speech by many of the plaintiffs to lack prurience, apparently
     believing that educational speech about sex can not be prurient.  Perhaps defendant has
     forgotten what it is like to be 16 and find any information about sex.  It should not be
     necessary to remind defendant that many 16 year olds (and younger persons) had their
     first prurient experience of viewing the female breast by reading National Geographic.

or products lacks such value for minors, especially pre-pubescent minors.[25]  (*See id.* at ¶ 30.)

Indeed, Professor Reichman notes that the material on Condomania is substantially more explicit

than much of the information on sex education that has been the subject of censorship efforts.

He cites three specific examples of speech less explicit than that of Condomania that parents

sought to censor because it was inappropriate for minors.  (*See* Reichman Report (Harris Decl. at

Ex. 7) at 15-18.)  In one instance, the effort was based in part on information about condoms.

Given the explicit descriptions of "sexual act or sexual contact…" and discussion of the

"genitals" in the context of sex, all found on the Condomania webpages, it is clear that

Condomania has standing.

### D.    PLAINTIFF HEATHER CORINNE REASONABLY FEARS PROSECUTION UNDER COPA

To be blunt, if Heather Corinne does not have standing in this case, then no one does.

Despite Defendant's *ipse dixit* assertions to the contrary, Heather Corinne Rearick[26] reasonably

fears prosecution under COPA for the material on each of her three most visited websites:

www.scarleteen.com, www.scarletletters.com and www.femmerotic.com.  Once again,

Defendant's unwarranted narrowing construction of the plain language of COPA and selective

quotation of deposition transcript fails to alter the salient facts.

#### 1.    Scarleteen

Scarleteen contains numerous pages that meet the plain language of COPA.  For

example, a teenager discusses engaging in frottage and oral sex.  (Pls.' Contention Interrogs.

---

[25]  The value prong is applied by local juries, *see Pope v. Illinois*, 481 U.S. 497, 500-03 (1987), which may have very different notions of national standards for minors than the Plaintiffs or even the Department of Justice hold.

[26]  This is the plaintiff's actual, legal name.  She goes by Heather Corrina in her Internet work.

(Harris Decl. at Ex. 3) at App. A, at http://scarleteen.com/gaydar/making.html.)  Corrina herself
describes "dry sex" and first time intercourse.  (*Id.* at
http://scarleteen.com/sexuality/ftmemoir.html.)  These descriptions are clearly descriptions of
"sexual acts".  47 U.S.C. § 231(e)(6)(B).  Professor Reichman has shown that similar speech is
frequently the subject of efforts of suppression, solely based on its inappropriateness for minors.
(Reichman Report (Harris Decl. at Ex. 7) at 18-23.)  He provides innumerable such examples.[27]

Defendant claims that "Ms. [Rearick's] fear of prosecution is illusory, as the material
contained therein does not meet any of COPA's 'harmful to minors' definition" (Def. Br. at 22),
that the material on her site "has serious scientific value for minors" (*id.*), and that the material
on her site could not "be considered 'patently offensive' to minors."  In support of these
conclusory statements, Defendant cites Ms. Rearick's *personal* belief that the material on
Scarleteen is geared towards the education of teens, the fact that Scarleteen does not contain
photographs of sexual acts and a non-binding statement from COPA's legislative history.  None
of these factors is relevant to the issue of whether or not Ms. Rearick reasonably fears
prosecution under COPA and in fact ignores the plain language of the statute.

Defendant's citations to Ms. Rearick's deposition transcript convey Ms. Rearick's
*personal* opinion that her site is a valuable educational resource for minors.  Defendant neglects
to cite to Ms. Rearick's repeated qualification that despite her personal opinions regarding the

---

[27] This factual predicate for Plaintiffs' assertion is in stark contrast to Defendant's unsupported
assertion that "educational dissemination of sexual information in a manner geared
toward teenagers" "could…[not] be considered 'patently offensive' to minors."  (Def. Br.
at 22.)  Indeed, the federal government itself has taken the position that teaching
abstinence only is the appropriate sexual education for minors.  *See* Title V, Section 510
of the Social Security Act.  *See* http://aspe.hhs.gov/hsp/05/abstinence/.  (Harris Decl. at
Ex. 20.)

value of Scarleteen, she fears prosecution under COPA because of its frankly sexual nature. (Rearick Dep. (Harris Decl. at Ex. 21) at 71-72 (describing concern among volunteers at Scarleteen about the explicitness of an article on queer sex and Ms. Rearick's fear of prosecution for that piece); *id.* at 81-82 (describing Ms. Rearick's fear of prosecution for explicit instructions regarding condom use).) Ms. Rearick's belief that she provides a valuable educational resource for teenagers does not change the fact that Scarleteen contains explicit content that "depicts, describes or represents" sexual acts in a way that some may consider patently offensive to minors and without redeeming value for minors. Ms. Rearick is not the arbiter of artistic, literary, scientific or political value under COPA.

Furthermore, Defendant seems to think it matters that Scarleteen does not contain photographs. (*See* Def. Br. at 22, 23.) However, COPA does not restrict the definition of "Material that is harmful to minors" to graphic representation, and in fact explicitly includes any "*article*, recording, *writing*, or other matter of *any* kind" 47 U.S.C. § 231(e)(6)(emphasis added). The fact that Scarleteen contains explicit descriptions of sexual acts, rather than photographs of such acts, does not make Ms. Rearick's fear of prosecution any less reasonable or the content available on her site any less explicit.

Finally, Defendant's recitation of COPA's legislative history is not pertinent. The cited portions of the legislative history are not encoded in law and do not carry with them the imprimatur of Congress. The text of COPA itself is the only guide that those prospectively subject to the law may use to determine the type of materials at risk for prosecution and according to the text, Scarleteen.com contains language subject to prosecution.

2.    Scarlet Letters

Scarlet Letters contains stories of a woman's masturbation, both with her hand and with a vibrator.  The same story describes the pleasures of bondage as a means of sexual pleasure, and also describes oral sex.  (Pls. Contention Interrogs. (Harris Decl. at Ex. 3) at App. A, at http://www.scarletletters.com/current/082703_pp_cr.shtml.)  Another page on Scarlet Letters contains drawings of women with their legs wide open and of people having sex.  (*Id.* at http://www.scarletletters.com/current/032303_va_cw.shtml.)  Another page shows photographs of people having sex, including one of a woman using her own fingers on her genitalia.  (*Id.* at http://scarletletters.com/current/091602_va_mm.shtml.)  It is difficult to imagine text of images more obviously covered by COPA.

Defendant claims that Ms. Rearick's fear of prosecution for the content contained on her website www.scarletletters.com is unreasonable because "it is clear that [Scarlet Letters] is a website with serious literary and artistic value for older minors." (Def. Br. at 24.)  He makes this conclusory statement after admitting that "the website contains nudity and sexual descriptions" (*Id.*)  Indeed, both the materials provided in discovery and other materials currently available at Scarlet Letters contain "numerous depictions of nude men and women in sexual poses with one another, and erotic stories that include graphic sexual scenes."  (Am. Compl. (Harris Decl. at Ex. 9) at 34.)  Scarlet Letters also contains textual depictions of bondage, dominance, submission and masochism (Rearick Dep. (Harris Decl. at Ex. 21) at 154), nonfiction writing regarding the transsexual experience (*Id.* at 156-57) and erotic fiction (*Id.*), some of which Ms. Rearick described as "absolutely pornography" (*Id.* at 155:4-5) and "pretty hard core" (*Id.* at 155:12.)

Defendant's assertion that "[n]udity alone does not suffice to render material harmful to minors" (Def. Br. at 24), is contradicted by the precise language of the statute which prohibits

"lewd exhibition of the genitals or post-pubescent female breast."  Moreover, the record in this

case is rife with confusion regarding exactly *when* nudity crosses the line into speech coverage

by COPA.  Defendant contends, for example, that all of the pages on the CD-ROM introduced at

trial by his witness Damon Hecker contain material that is harmful to minors under COPA  (Def.

Supp. Resp. to Pls. First Set of Contention Interrogs. (Harris Decl. at Ex. 1) at 13.)  Some of

these images do not contain a fully exposed post-pubescent female breast, but rather a breast

with stars obstructing the view of the nipples.  Recently, in his supplemental responses to

Plaintiffs' First Set of Contention Interrogatories, Defendant contends, without explanation, that

pages from the website www.playboy.com do not contain material that is harmful to minors

while virtually identical pages from the website www.penthouse.com do contain such material.

(*Id.* at 11-12.)  Given Defendant's blatant inability to articulate a meaningful distinction between

the types of nudity that are and are not covered by COPA, his conclusory assertion that it is

"clear" that the nudity on Scarlet Letters has artistic and literary value for minors rings hollow.

Once again, unlike Defendant's conclusory recitation of the language of the statute,

Plaintiffs provide factual support for the conclusion that speech of this type has often been

sought to be suppressed to protect children.  (*See* Reichman Report (Harris Decl. at Ex. 7) at

pp.18-23.)

          3.     Femmerotic

Femmerotica has photographs of women who are naked, one of which shows a woman

with a flower in her anal area and many of which show naked breasts.  (Pls.' Contention

Interrogs. (Harris Decl. at Ex. 3) at App. A.)  In attempting to escape the obvious conclusion that

these pages are potentially subject to COPA, Defendant again makes conclusory assertions about

Ms. Rearick's website, and selectively quotes from her deposition .  As noted in the Amended

Complaint, "Samples of erotic and non-erotic writing, as well as samples from Heather Corinne's bodies of photographic work, much of which depicts nude women, are available for free to non-subscribing users of Femmerotica." (Am. Compl. (Harris Decl. at Ex. 9) at 35.) A cursory review of the site, of the materials provided to Defendant during discovery, and of the web pages submitted as part of Exhibit A to Plaintiffs' First Set of Contention Interrogatories clearly illustrate the presence of nude images, erotic text and sexual content on the Femmerotic website. Defendant concludes, without analysis, that the photography on the website "cannot be stated to lack artistic value for older minors," (Def. Br. at 25), and cites for this proposition Ms. Rearick's personal opinion regarding the artistic and political value of her site. (*Id.*) As already noted, Ms. Rearick's own opinion regarding her work has nothing to do with her opinion as to whether a prosecutor, judge or jury will agree with her assessments. Moreover, Defendant has egregiously misstated Ms. Rearick's opinions. For example, while Defendant notes that Ms. Rearick states that she considers her work to be very different than Hustler (Def. Br. at 25), he ignores the reasons why Ms. Rearick believes this to be the case

> *Q   This discussion about the distinction between your work and pornography, do you see your work as pornography?*
>
> *A   It depends on the work.  It depends on how you define pornography.  Even the simplest division of some people say that pornography is defined by the intent of the person who makes the work, whereas other people will say that pornography is defined by what the person viewing the work defines pornography.  Personally, I figure it's not up to me because it has to do with what someone is looking at it as, how they are using it as.  I mean when I was 13 years old I masturbated to Jane Eyre.  Now, I don't think that Charlotte Bronte would say that Jane Eyre was pornography, and I don't think that most people would say that Jane Eyre was pornography.  But I was sure using it as pornography.  I don't know why, but I was.  In terms of how I classify pornography, is some of the work that I do pornography?  Absolutely.  Is some of the work that I do in no way pornography? Absolutely.  But my call on those things could be radically -- you know, the stuff that I say this is absolutely not porn could be stuff that  a viewer would say this is my best porn ever.  Other stuff that I say this is porn, other people might say this is not porn at all.  So it depends on how you define it.  If it is about how I define it, some of it, yes. Others of it, no.*

> *Q   Do I understand correctly that you define pornography from a viewer's perspective rather than the artist's perspective?*
>
> *A   Mostly I try not to define pornography at all, if I can avoid it, because it is a vague and meaningless term. It doesn't mean anything to anybody any more. So usually I try to go about it from both ways. But it depends on who is asking me to define. I don't use that term unless I am pressed to use that term or unless it's in the context of talking about what it is and what it is because somebody else is going to wonder).*
>
> *Q   Do you think there is a distinction between your work and the mainstream commercial pornography that is out there on the web?*
>
> *A   Can I have an example of the mainstream commercial pornography?*
>
> *Q   Go with Hustler dot-com.*
>
> *A   Is it different than Hustler? Yes, it is very, very different than Hustler.*

(Rearick Dep. (Harris Decl. at Ex. 21) at 217:1-219:14.) Contrary to Defendant's bald assertion to the contrary, Ms. Rearick does consider some of the work on Femmerotic to be pornography.

Despite the fact that there is explicit sexual content on Femmerotic, including nudity, post pubescent female breasts and graphic descriptions of sexual activity, Defendant asserts, *ipse dixit*, that Ms. Rearick's website is not covered by COPA. Once again, Defendant provides conclusions and plaintiff provides the facts of the speech and evidence of efforts to suppress similar speech to protect minors. (Reichman Report (Harris Decl. at Ex. 7) at 18-23.) This does nothing to allay Ms. Rearick's reasonable fear of prosecution under the plain terms of the statute.

### E.   PLAINTIFF ELECTRONIC FRONTIER FOUNDATION MEMBER BILL BOUSHKA REASONABLY FEARS PROSECUTION UNDER COPA

Mr. Boushka's website, www.doaskdotell.com, deals with a wide variety of issues pertaining to personal liberty, many of which arise from the publication of his book *Do Ask, Do Tell: A Gay Conservative Lashes Back*, an expose about gays in the military. The full text of

this book is available (despite Defendant's assertion to the contrary) on his website[28] and contains subject matter and language depicting homosexual desire and his personal experiences as a gay man. Many communities may find frank treatment of these issues to be patently offensive to minors or to pander the prurient interest of minors. Many communities may find that depictions of homosexuality have no value of any kind for minors. In parts, Mr. Boushka's work depicts actual and simulated sexual acts. Given the history of official and unofficial discrimination and prejudice against homosexuality in this country, Mr. Boushka's fear of prosecution for giving voice to the desires of gay men can hardly be termed unreasonable as a matter of law. In light of these realities, Defendant's assertions that there is nothing on Mr. Boushka's website "that could arguably be considered to be harmful to minors," (Def. Br. at 27) and that his book "appears not to fall within COPA's harmful-to-minors definition" (*id.*) are empty of support and conclusory.

The reasonableness of Mr. Boushka's fear of prosecution is apparent given Professor Reichman's expert testimony noting the regular suppression even non-sexual gay-themed speech. (*See* Reichman Report (Harris Decl. at Ex. 7) at 26 (noting the removal of books "from a public display of gay and lesbian literature... because they allegedly promoted pedophilia.")); (*Id.* at 24-25 (stating that legislators in both Louisiana and Oklahoma have recently declared that books relating to homosexuality are inherently "age inappropriate" and should therefore not be accessible to children in public libraries).)

Defendant's observations regarding what is currently available on www.doaskdotell.com are irrelevant because the items referenced were available at the time Mr. Boushka proffered his

---

[28]  http://www.doaskdotell.com/content/bktxt97i.htm (last viewed on September 7, 2006).
    (Harris Decl. at Ex. 23.)

discovery responses and Defendant has them in his possession.  Plaintiffs' responses to

Defendant's Interrogatories were samples of material about which they fear prosecution, not an

exhaustive, static list of such material.  It is hardly surprising that in the dynamic, ever-changing

environment of the World Wide Web web site operators rotate content and move content offline.

Furthermore, Mr. Boushka plans to publish material similar to the removed content in the future.

(*See* Boushka Decl. (Harris Decl. at Ex. 24).)

### F.    PLAINTIFF FREE SPEECH MEDIA REASONABLY FEARS PROSECUTION UNDER COPA

Free Speech Media fears prosecution under COPA because many of the videos available

on its website contain frank discussions of sexual issues, descriptions of sexual acts, strong

language and presentations of marginalized and unpopular views regarding sex.  In response to

Defendant's Interrogatories, Free Speech Media offered a sample of five videos about which it

fears prosecution.  In routine shifting of content that occurred in the Spring of 2006 some of

these videos are no longer available online.  (*See* Schwartz Decl. (Harris Decl. at Ex. 25).)

However, the videos provided to Defendant were not intended to comprise an exhaustive list of

material for which Free Speech Media fears prosecution.  The two videos from that limited

sample that are online currently, "Radical Sex Workshops" and "TLC 2" are part of a nine part

series called "TLC,"[29] which explores the leather, fetish and sadomasochistic sexual lifestyle of a

group called the Tarheel Leather Club.  These videos candidly discuss sexual practices and

sexual attitudes far outside the mainstream and certainly describe sexual acts in great detail.  It is

reasonable to assume that many communities may consider these videos to be patently offensive

---

[29] All nine videos are available online at
   http://www.freespeech.org/videodb/index.php?search=tlc&action=search (last viewed on
   September 7, 2006).  (Harris Decl. at Ex. 26.).

to minors or to pander to the prurient interest of minors.  It is reasonable to assume that many communities do not find the leather lifestyle to have serious value of any kind for minors.  The videos certainly depict, describe and represent both actual and simulated sexual acts.

Also available online are four videos from the series "Love Will Tear"[30] which deals with **[confirm with Schwartz]**.  The description accompanying "Love Will Tear" episode "Tatoo" reads "He slept between them that night, holding their dicks in his gentle cold hands."[31] The episode "Joey Gets It" discusses "Negotiating sex with a guy who has AIDS."[32]  It is reasonable to assume that many communities may consider these videos to be patently offensive to minors or to appeal to the prurient interest of minors.  It is reasonable to assume that many communities do not find the sexually explicit text accompanying these videos, and the topic of sex with someone infected with AIDS, to have any value for minors.  The videos and accompanying text certainly depict, describe and represent both actual and simulated sexual acts.

Ignoring these facts, Defendant once again makes a string of conclusory statements regarding Free Speech Media's standing, and once again assumes that nudity is the *sin qua non* of liability under COPA.  (Def. Br. at 28-29.)  Once again, Defendant without explanation narrows the scope of COPA in contradiction of its plain language and asserts *ipse dixit* that Free

---

[30] All four videos are available online at http://www.freespeech.org/videodb/index.php?search=love+will+tear&action=search (last viewed on September 7, 2006).  (Harris Decl. at Ex. 27.).

[31] "Tatoo" is available online at http://www.freespeech.org/videodb/index.php?action=detail&video_id=9569&browse=0 (last viewed on September 7, 2006).  (Harris Decl. at Ex. 28.)

[32] "Joey Gets It" is available online at http://www.freespeech.org/videodb/index.php?action=detail&video_id=9376&browse=0 (last viewed on September 7, 2006).  (Harris Decl. at Ex. 29.).

Speech Media lacks standing based on its unwarranted construction. This does not allay Free Speech Media's reasonable fear of prosecution under COPA under its plain terms.

### G.  PLAINTIFF NERVE.COM REASONABLY FEARS PROSECUTION UNDER COPA

Nerve.com is an online magazine devoted to sexual literature, art, and politics. (Am. Compl. (Harris Decl. at Ex. 9) at 13, ¶ 44.) Nerve has provided several examples of speech that demonstrate its reasonable fear of prosecution under COPA. (*Id.* at 43-44, ¶¶ 150-53); (Pl. Nerve's Interrog. Resp. (Harris Decl. at Ex. 30) No. 13); (Pls. First Set of Contention Interrogs. (Harris Decl. at Ex. 3) at App. A.) For example, Nerve submitted a photograph of a naked woman. (Pls. First Set of Contention Interrogs. (Harris Decl. at Ex. 3) at App. A (Nerve Photography Section, lower left-hand corner).) Her legs are splayed and she is masturbating. While her nipples and vagina may be obscured by white stars, these markings do nothing to conceal the fact that this is a photograph of a naked, sexually aroused woman pleasuring herself. Nerve also submitted an excerpt from Clint Burnham's "Smoke Show." (*Id.*) The text is as follows:

> She turned around so her ass was in his face and started stroking his cock. He pulled her lips down, and licked her clit and lips. He moved around so he could lick all the way past her cunt, to her asshole. He stuck his tongue into her, pushing a bit. She was sucking hard on his dick, dragging her teeth into it. He licked from her asshole to her clit and back, and kept doing it, holding onto her hips and her ass, her knees spread outside his elbows.

(*Id.*)

Nerve has a well-founded belief that both the image and the story, as well as the many similar images and stories on its websites, may subject it to prosecution under COPA. It is not unreasonable for Nerve to conclude that "the average person, applying contemporary community

standards" would find that a photograph of a naked, masturbating woman and a story containing phrases such as "he licked her from her asshole to her clit and back" "appeal to" minors' prurient interests. 47 U.S.C. § 231(e)(6)(A). There is no question that a photograph of a naked, masturbating woman can be said to "depict[]" an "actual or simulated sexual act or sexual contact." 47 U.S.C. § 231(e)(6)(B). Similarly, the phrase "[s]he was sucking hard on his dick" is a textbook example of a description of an "actual . . . sexual act." 47 U.S.C. § 231(e)(6)(B).

It is reasonable for Nerve to conclude that the government would consider the photograph and textual excerpt "patently offensive with respect to minors." 47 U.S.C. § 231(e)(6)(B), and that it would find them to lack "serious literary, artistic, political, or scientific value for minors." 47 U.S.C. § 231(e)(6)(C). The reasonableness of Nerve's fear is bolstered by the fact that far less graphic material has been prosecuted in the past. *See Wisconsin v. Stankus*, No. 95-2159-CR, 1997 Wisc. App. LEXIS 138 at * 2-3 (Wis. App. Feb. 13, 1997) (upholding conviction for exposing a child to harmful material by displaying a photograph showing "a woman with a shirt and jacket open to the waist, without exposing her nipples" because the court read the statute to apply to "any part of the breast which is below a horizontal line drawn parallel to the top of the nipple.");[33] *see also State v. Vachon*, 306 A.2d. 781, 784 (D.N.H. 1973) (holding that the sale of a button with the slogan "Copulation Not Masturbation" was obscene as to minors under *Ginsberg*), *rev'd on other grounds*, 414 U.S. 478 (1974). Furthermore, if, as the government contends, the naked breasts with concealed nipples in Mr. Hecker's exhibits lack social value for minors, then surely the photograph and story discussed above also lack such value.

---

[33] With respect to female breasts, COPA is even more restrictive than the Wisconsin statute at issue in *Wisconsin v. Stankus*. COPA purports to criminalize the "lewd exhibition of the... post-pubescent female breast" whether above or below the nipple. 47 U.S.C. § 231(e)(6). Thus, a picture of a woman in a bathing suit or even low-cut shirt could violate COPA.

Defendant's attempt to rebut Nerve's fear of prosecution is unpersuasive.  Defendant's

first argument, that "Nerve does not allege that it exhibits material that is harmful to minors,"

(Def. Br. at 29) is a red herring.  Nerve's opinion as to whether or not its material is harmful to

minors is irrelevant.  The relevant inquiry is whether Nerve has a well-founded fear of

prosecution under COPA.[34]

Defendant then argues that Nerve's specific examples for which it fears prosecution

could not subject it to prosecution because only premium members can access them, and

premium membership requires use of a credit card.  (Def. Br. at 30.)  Defendant misapprehends

Nerve's business model.  All Nerve material goes behind a credit card screen after two weeks.

The essential point is that the material cited by plaintiff was originally available without

restriction, and is the kind of material routinely available without restriction.

Defendant implies that Nerve's materials cited in its response to Defendant's

Interrogatory 13 are sufficiently explicit to fall under COPA's ambit.  (Def. Br. at 31.)

Defendant asserts, however, that "the context in which it is presented cannot be said to lack

serious... value for older minors."  (*Id.*)  While Defendant states that this assertion is based upon

its "review of this material," Defendant has elected not to divulge the nature of its "review" or to

share its rationale for making the assertion.  Given the graphic nature of some of the material

---

[34] (*See* Griscom Dep. (Harris Decl. at Ex. 31) at 139:25–140:6) (Nerve fears prosecution
because its content might "be considered prurient or offensive or inappropriate or harmful
to minors"); (*Id.* at 162:13 – 162:21) (Nerve publishes content that "someone might
consider... obscene, prurient, harmful to minors, et cetera, et cetera, and we, therefore,
may be held liable"); (*Id.* at 163:16 – 163:25) ("I think if you were to have a
representative collection of Americans vote on whether or not Nerve content was harmful
to minors, I think the majority would say that, yes, it was.  So, that causes me to be
fearful.").

about which Defendant makes this statement,[35] his assertion without further explanation that it "cannot be said" to be harmful to minors is simply perplexing.

Furthermore, Defendant's assertion that "the sexual material on Nerve is not presented for prurient interest" is directly contradicted by Mr. Griscom's deposition testimony:

> Q. Is it fair to say, then, that Nerve.com is not designed to appeal to the prurient interest of the readers?
>
> MR. WIZNER: Objection. Calls for a legal conclusion. Objection, vague. You can answer.
>
> A. I think it does appeal to prurient interests. I think that, you know, perhaps a better way of saying it is we're interested in both titillating, which I sometimes refer to as re-directing blood flow, both the body and the mind at the same time or perhaps alternately.

(Griscom Dep. (Harris Decl. at Ex. 31) at 20:16–21:3.)

Plaintiff Nerve has easily demonstrated a reasonable fear of prosecution if COPA were to take effect, and thus has satisfied the injury in fact required for standing to challenge the statute.

## H.   PLAINTIFF AARON PECKHAM D/B/A URBAN DICTIONARY REASONABLY FEARS PROSECUTION UNDER COPA

Urban Dictionary is an online slang dictionary whose terms and definitions are user-generated and user-rated.  (Am. Compl. (Harris Decl. at Ex. 9) at 44-46, ¶ 154-157.)  Urban Dictionary has provided numerous examples of speech, each of which supports a reasonable fear of prosecution under COPA.  (*Id.*; Pl. Urban Dictionary's Interrog. Resp. (Harris Decl. at Ex. 32)

---

[35] *See, e.g.,* "Sally uncoils the hose, carrying the attachment over to the side return where the outside tap is, not being able to resist brushing it between her legs again before having to shove it on to the tap.  Though this time she doesn't just brush it between her legs but pushes the tip into her vagina, not caring how dirty the end might be, not caring that the end might have spent the winter gathering dirt and dust in the shed all on its own."  (Def. Br. at Ex. 15.)

at No. 13.)  For example, one of the website's 31 separate definitions of the term "pearl

necklace" is as follows:  "the glorious culmination of tit-fucking, in which you blow your nuts all

over a girl's tits, shoulders, and neck, and, with any luck, chin. one of the highest expressions of

love and affection bestowable upon a woman by a man." (Am. Compl. (Harris Decl. at Ex. 9) at

45, ¶ 156.)[36]  The first of seven definitions of "teabagging" reads:  "To have a man insert his

scrotum into another person's mouth in the fashion of a teabag into a mug in an up/down (in/out)

fashion." (*Id.*[37])

These examples and other speech available on Urban Dictionary provide the basis for a

well-founded fear of prosecution under COPA.  The fact that Urban Dictionary provides text

instead of images does not exclude it from COPA's scope, because the statute applies to any

"communication," including "writing." 47 U.S.C. § 231(e)(6).  One could reasonably conclude

that the vivid and slangy definition of "pearl necklace" as "blow[ing] your nuts all over a girl's

tits" appeals or panders to the prurient interest. 47 U.S.C. § 231(e)(6)(A).  The same information

could have been conveyed in relatively clinical terms ("ejaculating on a partner's chest") but was

not.  There is no question that the definitions of teabagging and pearl necklace "depict . . . sexual

contact," 47 U.S.C. § 231(e)(6) (B).  Urban Dictionary's reasonably believes that the

government may conclude the descriptions of teabagging and pearl necklace are "patently

offensive" and lack "serious literary, artistic, political, or scientific value for minors." 47 U.S.C.

§ 231(e)(6)(B),(C).  The soundness of this conclusion is apparent from the fact that less vivid

text has been found to be obscene as to minors. *State v. Vachon*, 306 A.2d. 781, 784 (D.N.H.

---

[36] *See also* http://www.urbandictionary.com/define.php?term=pearl+necklace.  (Harris Decl. at
     Ex. 33.)

[37] *See also* http://www.urbandictionary.com/define.php?term=teabagging.  (Harris Decl. at Ex.
     34.)  Additional materials available that provide a basis for a well-founded fear of
     prosecution under COPA may be found at Am. Compl. (Harris Decl. at Ex. 9) at Ex. 16.

   
1973) (holding that the sale of a button with the slogan "Copulation Not Masturbation" was

obscene as to minors under *Ginsberg*), *rev'd on other grounds*, 414 U.S. 478 (1974).

Defendant's arguments to the contrary are unavailing.   Examples used by Defendant to

argue that slang or vulgar language does not appeal to the prurient interest are slogans that do not

involve sexual acts, descriptions of sexual acts, or other sexual terms.   (*See* Def. Br. at 32, citing

"Fuck the Draft" and "Eat Shit.")   These slogans are inapposite to the speech cited by Urban

Dictionary for which it reasonable fears prosecution under COPA.   A sexually charged slogan or

phrase, such as those found on Urban Dictionary's website, would likely have a different

outcome.   *See Vachon*, 306 A.2d. at 784.   Defendant makes the statement that Urban Dictionary

does not fall under COPA because it is a "resource of information" consisting of "informative

dictionary entries."   (Def. Br. at 32.)   Defendant gives no authority to support their assertion that

the definitions such as pearl necklace and teabagging are universally accepted as a non-prurient

resource.   (Pl. Urban Dictionary's Interrog. Resp. (Harris Decl. at Ex. 32) at No. 13.)

Finally, Defendant is incorrect that § 231(b)(4) would bar prosecution of Urban

Dictionary.   (*See* Def. Br. at 32, n.28.)   The exception only applies to those who do not

"select[]" or "alter[]" content.   47 U.S.C. § 231(b)(4).   Urban Dictionary's content is overseen by

a number of volunteer editors, who are given guidelines to apply when selecting proposed

entries.   Further, the full language of this statutory provision states:

> (b) Inapplicability of carriers and other service providers. For
> purposes of subsection (a), a person shall not be considered to
> make any communication for commercial purposes to the extent
> that such person is- [. . .] (4) similarly engaged in the transmission,
> storage, retrieval, hosting, formatting, or translation (or any
> combination thereof) of a communication made by another person,
> without selection or alteration of the content of the communication,
> except that such person's deletion of a particular communication or

> material made by another person in a manner consistent with
> subsection (c) or section 230 [47 USCS § 230] shall not constitute
> such selection or alteration of the content of the communication.

47 U.S.C. § 231(b). This exception, by its very language, is aimed at telecommunications carriers engaged in the provision of telecommunications services, businesses which provide Internet access service, and "similarly engaged" businesses. This is a catch-all provision following that same subsection's provisions regarding telecommunications carriers, Internet service providers, and search engines. Urban Dictionary does not fall into that category of content provider, nor could the website be interpreted as providing a telecommunication or internet access service. Even if the Plaintiff could arguably fall into this definition, COPA has never been enforced and it is entirely unclear how this provision will be interpreted. Indeed, it seems at least as likely that Urban Dictionary could be exposed to liability on the grounds that it "knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web." 47 U.S.C. § 231(e)(2)(B).

## I.      PLAINTIFF PHILADELPHIA GAY NEWS REASONABLY FEARS PROSECUTION UNDER COPA

Philadelphia Gay News ("PGN"), which runs a website, is the "largest and oldest gay newspaper in Philadelphia." (Pls.' Am. Compl. (Harris Decl. at Ex. 9) at 46, ¶ 158.) PGN has a well-founded fear of prosecution under COPA due to the gay-themed sexual content on its site. For example, in the article "Thanks for the men-orgies," Gary M. Kramer reviews a movie about the "precious window in time" during which "there existed gay sex with narry a consequence." (Pls.' Contention Interrogs (Harris Decl. at Ex. 3) at Ex. A.) The article features a close-up photograph of the crotch of a man wearing skimpy shorts and, apparently, nothing else other than socks and tennis shoes. The man appears to be dancing or gyrating as two other bare-chested,

muscular men look on, one grinning appreciatively. (*Id.*)  In its interrogatory responses, PGN also referenced classified ads on its site that portrayed homosexual romantic contact. (*Id.*) Indeed, the classified advertisement visible in Defendant's Exhibit 17 to the Motion to Dismiss, in which the advertiser declares his interest in "assplay, toys & water sports" directly contradicts Defendant's assertion that "PGN has not produced any documentation to support the fact that there are such descriptions [of sexual acts]." (Def. Br. at. 34.)

The sample content discussed above illustrates PGN's well-founded fear of prosecution. Defendant's dismissal of PGN's fear as "completely unfounded" is especially perplexing given the fact that it was so recently permissible to criminalize the sort of consensual homosexual acts PGN's personal ads solicit.  Professor Reichman's expert testimony documents the degree to which gay-themed speech is suppressed, even where its content is not sexual in nature. (*See* Reichman Report (Harris Decl. at Ex. 7) at 26 (noting the removal of books "from a public display of gay and lesbian literature . . . because they allegedly promoted pedophilia."); (*Id.* at 24-25 (stating that legislators in both Louisiana and Oklahoma have recently declared that books relating to homosexuality are inherently "age inappropriate" and should therefore not be accessible to children in public libraries).)

Defendant argues that PGN's classified advertisements cannot create liability under COPA for two reasons.  First, Defendant argues that PGN would be exempt under COPA's exemption for carriers and other service providers.  47 U.S.C. § 231(b)(4).  As explained in Section V (H) above, a newspaper or website providing classified advertisements represents a qualitatively different situation from the entities described in § 231(b), especially given that publications providing classified advertising generally *do* exert oversight over such advertising. Indeed, it seems at least as likely that PGN's classified advertising could expose it to liability on

grounds that PGN "knowingly causes the material that is harmful to minors to be posted on the

World Wide Web or knowingly solicits such material to be posted on the World Wide Web."  47

U.S.C. § 231(e)(2)(B).

Defendant also argues that PGN's classified advertisements cannot create liability under

COPA because they "must be viewed in the overall context of PGN."  (Def. Br. at 34.)  As

Plaintiffs demonstrate, the relevant context is not, as Defendant maintains, the entirety of PGN's

site, but rather the individual web page on which the classified ads or other sexually explicit

content appear.

Finally, Defendant's assertion that "[p]laintiffs' own purported expert asserts that PGN

'is not an explicitly sexual site by any reasonable definition'" is not, as Defendant implies, a

concession.  Rather it is an irrelevancy, given that the salient question is whether specific web

pages meet COPA's definition of harmful to minors, not whether whole websites are sexually

explicit, and in any event Professor Reichman is not a federal prosecutor.[38]

## J.    PLAINTIFF POWELL'S BOOKSTORE REASONABLY FEARS PROSECUTION UNDER COPA

Powell's Bookstores is a "reader-centered company that operates seven bookstores in

Portland, Oregon, and maintains a bookstore through which users can purchase new, used, rare,

and out-of-print books."  (Am. Compl. (Harris Decl. at Ex. 9) at 14, ¶ 48.)  Powell's Bookstores

has a well-founded fear of prosecution under COPA.  It has already submitted several examples

------------------------------------------------

[38]  Finally, in a footnote, Defendant states that some of the pages referenced by PGN are no longer on the website, and reasons that "[b]ecause the links do not lead to any content, and it is PGN's burden to prove it has standing, descriptions of material on non-working links cannot be a basis for standing."  (Def. Br. at 34 n.29.)  This argument misapprehends both the fluid nature of the Web and the fact that plaintiff offered representative samples, not an exhaustive list.  The essential point is that the proffered examples fairly describe the sort of content that regularly appears on PGN's website.

of material that serve as the basis for that fear.  (*Id.* at 51, ¶ 172); (Pl. Powell's Interrog. Resp.

(Harris Decl. at Ex. 35) at 11.)  These examples include a review of Jen Sincero's *The Straight*

*Girl's Guide to Sleeping with Chicks*, in which the author describes her earliest sexual

experiences:

> I think my first sexual encounter with a member of the same sex happened when I
> was seven.  My friend Wendy and I would spend hours playing with these little
> plastic Fisher-Price people who came with cars and houses and villages and stuff.
> We'd make up stories about them, have them go to work and cook dinner, and
> when they were bad we'd send them off to The Big Ween.  "Uh-oh, Sally didn't
> do her homework again," Wendy would say, kicking off her panties and lying on
> the floor.  She'd hold terrified little plastic Sally up in the air and announce to the
> entire Fisher-Price community that "Sally was bad and must go to the The Big
> Ween," then slowly lower the toy between her legs.  I'd watch mesmerized as
> Wendy rubbed Sally around and around, stopping only when Wendy's My First
> Pussy had gotten its fill.

(Def. Mot. at Ex. 18, p. 10.)  This personal narrative combines several controversial themes:

masturbation, homosexuality, and the sexual lives of children.  Another review on the Powell's

Bookstore's site offers a glimpse of the content of Charles Silverstein's *Joy of Gay Sex*:

> The anus is not only an avenue for elimination but also a sexual organ.  It is
> highly sensitive, as it is lined with particularly responsive nerve endings.
> Moreover, the anus is close to the prostate gland, and its stimulation is highly
> pleasurable.  . . . People who are just beginning to experiment with anal sex
> sometimes fear that sticking a large cock up the anus will tear the skin; proper
> lubrication and relaxation, however, will prevent pain and damage (see "First
> Time.")  More experienced men often worry that by repeatedly getting fucked
> they will lose muscle tone in their asshole . . . .

(*Id.* at 4.)  Powell's Bookstores reasonably believes that "the average person, applying

contemporary community standards" would consider a work describing anal sex, and another

describing children masturbating in front of each other and with their toys, to be "writing[s]" that

"appeal to" or "pander to" "the prurient interest."  47 U.S.C. § 231(e)(6)(A).  Both the

description of anal sex (including "more experienced men" worried about the consequences of

"repeatedly getting fucked," and those "just beginning" concerned about "sticking a large cock

up the anus"), and the voyeuristic description of her young friend's masturbation with a Fisher-

Price toy, are clear descriptions of sexual contact. 47 U.S.C. § 231(e)(6)(B).

There is little question that Powell's Bookstores reasonably fears that its content will be

considered "patently offensive with respect to minors" and without "serious literary, artistic,

political, or scientific value for minors." 47 U.S.C. § 231(e)(6)(B),(C). Indeed, criminal

penalties for engaging in the very activity encouraged in *Joy of Gay Sex* survived until 2003,

when a divided Supreme Court found such prohibitions unconstitutional. *Lawrence v. Texas*,

539 U.S. 558, 563 (2003) (striking down a Texas statute prohibiting "deviate sexual intercourse,

namely anal sex, with a member of the same sex (man)."). Plaintiffs' expert Professor Reichman

details the frequency with which speech pertaining to gay and lesbian issues is suppressed even

where that speech lacks sexual themes. For instance, Professor Reichman notes a 2003 incident

in Sacramento, California, in which "several books were removed from a public display of gay

and lesbian literature . . . because they allegedly promoted pedophilia. (Reichman Report (Harris

Decl. at Ex. 7) at 26.) Professor Reichman also notes that legislators in both Louisiana and

Oklahoma have recently declared that books relating to homosexuality are inherently "age

inappropriate" and should therefore not be accessible to children in public libraries. (*Id*. at 24-

25.)

Defendant asserts that materials referenced by Powell's Bookstores "cannot arguably be

said to fall within the harmful to minors definition of COPA." (Def. Br. at 35.) As support, the

Defendant reasons that all of the materials identified by plaintiff has social value because they

"are literature that would be sold in general interest bookstores." (*Id.*) It is unclear what to make

of this argument. The statute contains no such carve-out and, given that most general interest

bookstores vend commercial pornography, it is hard to square this sentence with Defendant's other contentions. Defendant offers no support for its claim that the *Joy of Gay Sex* would be sold in general interest bookstores. To the extent there is anything in the record on the subject of what books are available in what bookstores, it is Mr. Ferlinghetti's testimony that many of the books on his website are still *not* widely available in mainstream bookstores because of their sexual themes. (*See* Pl. Ferlinghetti's Decl (Harris Decl. at Ex. 13) at 4.) Neither does Defendant explain what he means by "literature;" nor by what criteria he has determined that the *Joy of Gay Sex* should be considered "literature;" nor from the point of view of which communities he has determined that the *Joy of Gay Sex* would be viewed as "literature."

In referencing the "literature" label as a prophylactic against censorious prosecution, Defendant ignores the history of obscenity prosecutions in the United States, which has featured many materials now considered literature.[39] The fact that COPA criminalizes a *broader* range of material than the obscenity standard under which prior prosecutions of selling or displaying "obscene literature" have been brought, contributes to Powell's Books concern that it could be subject to prosecution under COPA. Accordingly, an injury in fact is present because of the reasonable fear of prosecution if COPA were to take effect.

### K.    PLAINTIFF SALON MEDIA GROUP REASONABLY FEARS PROSECUTION UNDER COPA

Salon "is a well-known, popular online magazine. Salon includes cutting-edge news articles; commentaries on and reviews of music, art, television, and film; and regular columns on politics, relationships, the media, business, and other areas of interest." (Am. Compl. (Harris Decl. at Ex. 9) at 51-52 ¶ 174.)

---

[39] *See supra* section II.A, n.12.

Salon has a well-founded fear of prosecution based in part on numerous examples it has already identified.  (*Id.* at 52 ¶ 175); (Pl. Salon's Interrog. Response (Harris Decl. at Ex. 36) at No. 13.)  Among them is Rebecca Traister's article *Rectal Romance*.  (Pls. Contention Interrogs. (Harris Decl. at Ex. 3) at Ex. A., pp 13-15.)  In the article, Traister discusses her anal sex memoir.  She reveals that "the g-spot can absolutely be stimulated from your ass," and describes what anal sex is like:

> It's pretty easy for a guy to get in [a vagina] whether a woman wants it or not.
> But it is a much more extreme physical feeling to release your muscles.  We have
> very strong muscles there; we all know that from what we usually do there.  To
> release it, you open your ass and you open your mind and you open your heart.
> For me it opened everything.

(*Id.*)  The article extols the virtues of what the author concedes may be the most taboo sex act.

(*Id.*)  It is reasonable for Salon Media group to conclude that its articles would satisfy COPA's "prurient interest" requirement, given that they include a woman's personal account of what it is like to be anally penetrated.  There is no question the article "depicts," "an actual . . . sexual act or sexual contact," and may even fall into COPA's special prohibition on portraying a "perverted sexual act."  47 U.S.C. § 231(e)(6)(B).  Further, Salon has a well-founded fear that its content will be considered "patently offensive with respect to minors" and without "serious literary, artistic, political, or scientific value for minors," given the less explicit material that has been subject to prosecution in the past.  *State v. Vachon*, 306 A.2d. 781, 784 (D.N.H. 1973) (holding that the sale of a button with the slogan "Copulation Not Masturbation" was obscene as to minors under *Ginsberg*), *rev'd on other grounds*, 414 U.S. 478 (1974); *Bookcase Inc. v. Broderick*, 218 N.E.2d 668, 620 (1966) (holding that *Fanny Hill* falls within the scope New York's "harmful to minors" law).

Defendant 's argument that Salon Media Group cannot reasonably fear prosecution under COPA manages to place both too much and too little weight on the deposition testimony of Salon Editor-in-Chief Joan Walsh.  Defendant places excessive weight on Ms. Walsh's testimony by relying on Ms. Walsh's repeated assertions that various sexually candid Salon materials discussed at her deposition had been included on the Website with "a serious intent" and without an intent to "appeal to the prurient interest."  (Def. Br. at 36–37, *citing* Walsh Dep., pp. 99–106.)  Under COPA, though, the intent of Ms. Walsh and the rest of the Salon.com editorial staff is irrelevant if a prosecutor decides that content on the Website meets the statutory definition of "harmful to minors."

Defendant simultaneously places *too little* weight on Ms. Walsh's testimony by citing to it in an incomplete and misleading manner.  While acknowledging her serious intent in publishing sexually candid speech on Salon.com, Ms. Walsh repeatedly noted that other persons might find that same speech profoundly objectionable.  (*See* Walsh Dep. (Harris Decl. at Ex. 37) at 99–106.)  Defendant's selective citation elides this important point.  Defendant's emphasis on Ms. Walsh's testimony that she herself did not consider any portion of the Salon website to be pornographic is nothing less than an ill-advised attempt to resuscitate Defendant's discredited argument that because the Plaintiffs in this case are not "commercial pornographers," they need not fear prosecution for material plausibly encompassed by the statute.  (*See* Mem. Filed Feb. 1, 1999, Doc. No. 92 (Harris Decl. at Ex. 38) at 9–10.)

Defendant also misconstrues Ms. Walsh's testimony as to Salon's potential liability under state harmful to minors statutes.  Defendant suggests that Ms. Walsh testified she "does not believe that state harmful-to-minors laws 'would apply to the kind of content that we post on Salon.'"  (Def. Br. at 36, *citing* Walsh Dep., pp. 112–13.)  This is false.  As the complete

transcription clearly indicates, Ms. Walsh testified that prosecution of Salon under state harmful-to-minors laws was and is possible, but that she has not actively feared it because she has not been informed of an instance where a publication similar to Salon has been prosecuted. (*See* Walsh Dep. (Harris Decl. at Ex. 37) at 112–13.)

Defendant's discussion of Salon focuses on content proffered in the Amended Complaint and asserts that "Salon did not provide any additional examples about which it fears prosecution." (Def. Br. at 37.)  To the contrary, Ms. Walsh testified at length about other content which Defendant has chosen to ignore in its moving papers, including galleries of erotic photography and a series of photographs chronicling the abuses of prisoners at Abu Ghraib. (*See* Walsh Dep. (Harris Decl. at Ex. 37) at 15–25.)  Salon's Abu Ghraib content is particularly relevant, both to the standing of Salon and to the general constitutional infirmity of COPA. Salon's Abu Ghraib images include extensive full frontal male nudity, and at least one explicit depiction of forcible sodomy. (*Id.* at 21–22, 126–27.)  As such, they clearly fit COPA's "harmful to minors" prong proscribing depictions of "perverted sexual act[s]" and "lewd exhibition[s] of the genitals." 47 U.S.C. § 231(e)(6)(B).  Indeed, given the elements of violence and degradation involved, the images could plausibly be considered not just "harmful to minors" but obscene.

Finally, Defendant asserts that Salon cannot reasonably fear prosecution based on the interactive areas of its site. (Def. Br. at 37–38.)  Defendant cites to COPA's exemption for carriers and other service providers. 47 U.S.C. § 231(b)(4).  As explained in Section V(H) above, a website fostering reader discussion of the content it posts represents a qualitatively different situation from the entities described in the three provisions of § 231(b).  Indeed, Defendant correctly notes that Salon *does* in fact oversee its blogs and its "Table Talk"

discussion section. (*See* Walsh Dep. (Harris Decl. at Ex. 37) at 40, 43-46.) On that basis, it seems at least as likely that if Salon failed to censor sexually explicit speech posted by its bloggers or readers, it could be exposed to liability under COPA on grounds that it "knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web." 47 U.S.C. § 231(e)(2)(B).

### L.    PLAINTIFF SEXUAL HEALTH NETWORK REASONABLY FEARS PROSECUTION UNDER COPA

In 1999, this Court found that plaintiff Sexual Health Network, Inc. ("SHN") had standing to challenge COPA. 31 F. Supp. 2d at 480. As noted, other courts have also specifically found that SHN had standing to challenge an Internet "harmful to minors" law. *See e.g. Am. Booksellers Found. v. Dean*, 202 F. Supp. 2d 300 (D. Vt. 2002). COPA has not changed and the nature of the speech on SHN has not changed. Defendant offers no reason why the Court should alter its holding.

SHN has repeatedly provided examples of injury in fact: in the Amended Complaint; in the deposition testimony of Mitchell Tepper, PhD., M.P.H. in 1999 and again in his deposition testimony in 2006; in Dr. Tepper's testimony before the court in the preliminary injunction phase in 1999; and in SHN's Interrogatory Responses, all of which identify speech published on SHN's website which may violate COPA. One of the pages discusses bestiality. (Pls. Contention Interrogs. (Harris Decl. at Ex. 3) at App. A, at http://sexualhealth.com/question.php?Action=read&question_id=124.) Another discusses the desirability of teaching masturbation to a mentally retarded man. (*Id.* at http://sexualhealth.com/question.php?Action=read&question_id=1287&channel=3&topic=74.) There are frank discussions of methods of achieving sexual pleasure, including advice for

persons with disabilities.  (Pl. Sexual Health Network's Interrog. Resp. (Harris Decl. at Ex. 39) at No. 13.)  There is a sexual health video library.  (*Id.*)  There is an article providing advice to a parent who found their 15 year old child having sex with a dog.  (*Id.*)  There are instructions on how women may masturbate to climax.  (*Id.*)  Numerous other examples have been provided. Each would appear to be covered by the precise language of COPA.

Defendant does not challenge the potential applicability of the first two prongs of the harmful to minors definition to the webpages SHN identifies.  Defendant instead summarily dismisses the possibility that content on SHN's website might be deemed harmful to minors, evidently by construing the value prong.   In keeping with Defendant's insistence that it has no "rationales, practices, policies or internal rules" upon which it might plausibly base such a conclusion, Defendant offers no legal basis for reaching this conclusion, no analytical reasoning, not even a simple common-sense explanation.  Defendant simply asserts that because SHN's website "contains material proffered in a scientific manner that has educational value for minors... [the website] cannot reasonably be said to 'lack serious literary, artistic, political or scientific value for minors.'"  (Def. Br. at 38.)  Once again, Defendant has argued that COPA contains an "educational" exception when it does not.

Defendant chooses to ignore the factual bases that SHN has offered for its belief that material on its website may be viewed as harmful to minors.  Dr. Tepper testified in his deposition that he could not rely on what *he might believe* to be the scientific nature of some of his content.  In partial explanation, he cited the federal government's policies regarding information regarding sexual health.  For example, it is Dr. Tepper's understanding that the government caused peer-reviewed sexual health content to be removed from the website of the Centers For Disease Control, because the content related to abortion and the use of condoms.

(Tepper Dep. (Harris Decl. at Ex. 40) at 139:4–24.)  Similarly, it is his understanding that the federal government will not fund sexual education programs for children if the programs address condoms, abortion or masturbation.  (*Id.* at 135:10-17.)  Dr. Tepper also reasonably fears the definition of "harmful to minors" that might be held by the citizens who could comprise a jury, based upon his understanding that professors who teach sexuality to adults have had funding cut and have been threatened termination.  (*Id.* at 136:8–17.)  Together, these beliefs provide the foundation to Dr. Tepper's reasonable fear that even what he understands to be socially valuable health information could be deemed by others to be harmful to minors.[40]  Once again, Dr. Reichman provides numerous examples of similar speech that has been censored, or about which there have been serious efforts to censor, based on the view that such speech is inappropriate for minors.  (Reichman report (Harris Decl. at Ex. 7) at 15-18.)  Dr. Reichman includes one example in which the Governor of South Dakota removed all references similar to Dr. Tepper's from the state's website and another example in which multiple school boards removed or restricted books providing similar information.  (*Id.*)

Despite Defendant's assumption to the contrary, Dr. Tepper's belief that SHN's content has social value is irrelevant to the standing inquiry.  (*See* Def. Br. at 38.)  As noted above, the relevant testimony is Dr. Tepper's belief that "[p]eople think that what I do is not socially valuable."  (*Id.* at 103:9-10.)

------

[40] "So, we have we have a government policy that limits what we can say to children if we accept government money, and we have adults who are voluntarily coming to a program suing their professors and those things going very far.  So, if those things can happen to sexuality educators and those things are restricted by the government in the school, then I am certainly at risk here when we put on a prong with respect to minors because people's ideas of what's appropriate, what's not appropriate when it comes to sexuality with respect to minors I am very afraid of.  I'm very concerned about that."  (Tepper Dep. (Harris Decl. at Ex. 40) at 136:25–137:14.)

In addition, there are materials on SHN's site about which Dr. Tepper testified that, while

he believes they have social value for adults, he does not believe they have social value for

minors. (*Id.* at 150:17-152:3.) Accordingly, Dr. Tepper reasonably believes that SHN's content

may be deemed valueless for minors and thus to fall within COPA's definition of "harmful to

minors."

This Court's conclusion that SHN has standing should be reaffirmed.

## III.   ASSOCIATIONAL PLAINTIFFS HAVE DEMONSTRATED STANDING

Defendant challenges, in conclusory fashion, the standing of association Plaintiffs

American Civil Liberties Union (ACLU), American Booksellers Foundation for Free Expression

(ABFFE) and Electronic Freedom Foundation (EFF), who challenge COPA on behalf of their

members.  This Court has already rejected Defendant's challenge, finding that these four

associational Plaintiffs have standing to bring this suit on behalf of their members.  *See ACLU v.*

*Reno*, at 480-81.  In doing so, this Court found that the associational Plaintiffs satisfied the

applicable three-part test: each demonstrated that (1) its members would otherwise have standing

to sue in their own right; (2) the interests it seeks to protect are germane to the organization's

purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of

individual members in the lawsuit.  *See ACLU v. Reno*, at 480-81; *see also Pa. Psychiatric Soc'y*

*v. Green Spring Health Servs.*, 280 F.3d 278, 284 (3d Cir. 2002) (citing *Hunt v. Wash. State*

*Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (delineating the three-part test).  Most

importantly, this Court previously found that the test was satisfied for the associational Plaintiffs

because individual members of the organizations had content on their websites that gave them

reason to fear prosecution under [COPA].  *Id.* at 480-81; *see also Lujan v. Defenders of Wildlife*,

504 U.S. 555, 563 (1992) (the first prong requires an association demonstrate that one or more of its members would be directly affected by the challenged statute).

Although this argument has already been resolved in Plaintiffs' favor, Plaintiffs have once again demonstrated above that each associational plaintiff has members whose First Amendment rights are violated by COPA, and thus, the associations have standing to challenge COPA.

Each associational plaintiff has members who have a reasonable fear that they could be prosecuted under COPA for engaging in sexually explicit speech that is constitutionally protected but proscribed by COPA, which is all that is required. *See Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625 n.1 (1986). As discussed above, ACLU members Patricia Nell Warren and Lawrence Ferlinghetti clearly have standing. Other individually named Plaintiffs are also ACLU members, including Mitchell Tepper of the Sexual Health Network. Powell's bookstore, whose standing is discussed at Section II.J, *supra*, is a member of the ABFFE. (*See* Miriam Sontz Decl. (Harris Decl, at Ex. 41).) John William Boushka, whose standing is discussed at Section II.E, *supra*, is a member of the EFF, as are Plaintiffs Nerve.com and Heather Corinne Rearick.

As he did in 1998, to no avail,[41] Defendant claims that participation by all of the members of the associational Plaintiffs is required for standing purposes because Defendant must

---

[41] In deciding the same dispute in 1999, this Court held:

"Furthermore, the four organizations who are bringing suit on behalf of their members... have averred facts sufficient to support their standing to facially challenge the statute. *See, e.g., Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). In each case, members of their respective organizations would have standing in their own right, the interest each organization

examine "each Plaintiffs' Web business" to resolve the issue of "whether COPA's affirmative

defenses are technologically and economically feasible." (Def's. Br. at 56.)  This is yet another

attempt by Defendant to ignore Plaintiffs' facial challenge to COPA, and to focus instead on

their as-applied challenge.

In *Hunt*, the Court stated that associational standing was satisfied when "neither the claim

asserted, nor the relief requested, requires the participation of individual members in the

lawsuit." 432 U.S. at 343.  In this case, the participation of all of the members is not required

because Plaintiffs' claim is that COPA violates the First and Fifth amendments on its face

because it is substantially overbroad and as applied to the individual Plaintiffs who fear

prosecution under the statute.  An analysis of the variable impact of COPA on individual

members of the associational Plaintiffs is not necessary to resolve the question of whether the

statute's plain language applies to and chills a wide array of protected speech.

Attempting to avoid this well settled law, Defendant attempts to rely on *Rent*

*Stabilization Ass'n v. Dinkins*, 5 F.3d 591 (2d. Cir. 1993), for the proposition that an

individualized factual analysis is necessary for each member of the associational Plaintiffs.  This

reliance is misplaced.  *Rent Stabilization*, along with *Georgia Cemetery Ass'n v. Cox*, 353 F.3d

1319 (11th Cir. 2003), also cited by Defendant for this proposition, concerned allegations that

state regulatory schemes constituted unconstitutional takings.  In both cases, the court needed ad

hoc factual inquiry to determine if each member landlord and cemetery owner in the respective

association actually suffered a taking, as alleged.  *Rent Stabilization,* 5 F.3d at 596, *Georgia*

---

seeks to protect is germane to its purpose and neither the claim asserted nor the relief requested
requires the participation of individual members in the lawsuit."
(February 1, 1999 Memo (Harris Decl. at Ex. 38) at 10, n.2.)

*Cemetery*, 353 F.3d at 1322.  If the schemes in question did not constitute a taking in *every* case,

they would not violate the constitution on their face.  *Georgia Cemetery* 353 F.3d at 1322.  This

consideration is not present in the First Amendment overbreadth context because COPA will

always, on its face, apply to and chill a wide array of constitutionally protected speech.  The

resolution of whether COPA violates the First and Fifth Amendment rights of all adults who

wish to speak on the World Wide Web, therefore, does not require an inquiry into the specific

burden COPA places on each member of EFF, ACLU and ABFFE.  Defendant does not, and

cannot point to a case where individual member participation is necessary to grant associational

standing in a First Amendment facial overbreadth challenge.

     Moreover, the relief requested, a permanent injunction against the enforcement of

COPA, manifestly does not require a factual inquiry into the circumstances of all the individual

members of associational Plaintiffs.  Citing the Supreme Court's decision in *Hunt*, the Third

Circuit explained that:

> If in a proper case the association seeks a declaration, injunction,
> or some other form of prospective relief, it can reasonably be
> supposed that the remedy, if granted, will inure to the benefit of
> those members of the association actually injured.  Indeed, in all
> cases in which we have expressly recognized standing in
> associations to represent their members, the relief sought has
> been of this kind.

*Penn. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d. 278 (3d Cir. 2002)

(quoting *Hunt*, 432 U.S. at 343).

     The Court ruled on this issue in 1999 and neither the claim asserted by Plaintiffs nor the

relief requested has changed.  Because Plaintiffs have demonstrated that members of the

associational Plaintiffs would have standing in their own right to challenge COPA, the interest

each organization seeks to protect is germane to its purpose and because neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit,

the associational Plaintiffs have standing to bring suit on behalf of their members.[42]

## IV.   PLAINTIFFS HAVE STATED A CLAIM THAT COPA VIOLATES THE FIRST AND FIFTH AMENDMENTS BY PROHIBITING DISSEMINATION TO ALL MINORS OF MATERIALS NOT HARMFUL TO OLDER MINORS.

In seeking the pretrial dismissal of Plaintiffs' second cause of action, Defendant advances

two arguments in support of the contention that Plaintiffs have failed to state a claim that COPA

unconstitutionally infringes the rights of older minors.  First, Defendant proposes that this Court

construe the Act to say something that it does not say.  Second, Defendant insists that older

minors possess no constitutional right to view sexually explicit material.  Both contentions are

erroneous, and neither provides a ground for dismissal of Plaintiffs' claim.

COPA's language is unambiguous:  it is a crime to "make[] any communication for

commercial purposes that is available to *any minor* and that includes any material that is harmful

to minors...." 47 U.S.C. § 231(a)(1) (emphasis added).  "Material that is harmful to minors" is

defined, in pertinent part, as words or images that, "with respect to minors," are "designed to

appeal to . . . the prurient interest"; that depict sexual acts or nudity "in a manner patently

offensive with respect to minors"; and that "lack[] serious literary, artistic, political, or scientific

value for minors." 47 U.S.C. § 231(e)(6)(A-C).  The definition of "minor" follows immediately:

"*any* person under 17 years of age." 47 U.S.C. § 231(e)(7) (emphasis added).

In the face of this plain language, Defendant contends that the "proper interpretation" of

the "statutory language" is that COPA "applies an older minor standard in determining what is

---

[42]  Plaintiff EPIC has standing for the same reason that the Court found it had standing in 1999.  31 F. Supp. 2d at 481, n.2.

considered harmful to minors." (Def. Br. at 46.)  In other words, although Congress expressly

defined "minor" to include "any person under 17 years of age," what Congress meant to say was

that "minor" refers solely to "older minors."  Defendant thus appears to suggest that older minors

have no unique status under COPA, because material deemed to possess "serious literary,

artistic, political, or scientific value" for a sixteen-year-old would be exempt from prosecution

regardless of whether it possessed such value for a six-year-old.  That argument is flawed for

several reasons.

First, the "words and phrases Defendant[] seek[s] to add to the act appear nowhere in it."

*ACLU of Georgia v. Miller*, 977 F. Supp 1228, 1233 (N.D. Ga. 1997).  Indeed, Defendant's

proposed construction of the Act is counterintuitive, and would "narrow" the statute's reach

nearly to the point of nonexistence.  By Defendant's reasoning, COPA proscribes only such

sexually explicit speech that *possesses* "serious literary, artistic, political, or scientific value" for

a seventeen-year-old, but *lacks* such value for a sixteen-year-old.  It is thus hardly surprising that

Defendant has been reluctant to identify non-obscene speech that is proscribed by COPA – by

Defendant's "definition," the universe of such speech is modest indeed.

Second, if Defendant's proposed construction were adopted, the core purpose of COPA –

protecting children from exposure to inappropriate sexually explicit material – would be

undermined by a regime that subjected toddlers to sexually explicit content deemed valuable to

older teens.  There is ample reason to believe that many "average person[s], applying

contemporary community standards," might consider some sexually explicit material – including

some of the speech offered by Plaintiffs – to have value for a sixteen-year-old, but to be

"patently offensive with respect to" a seven-year-old.  Under Defendant's "narrowing," COPA

would be wholly ineffectual as a means of protecting the vast majority of minors from sexually

explicit material considered to have value for older teens.[43]  It is for this reason that, although Defendant cites to decisions in which courts have applied narrowing constructions to similar language, to do so here would be to violate, rather than vindicate, congressional intent.

Defendant's alternative argument – that older minors have no constitutional right whatsoever to view non-obscene sexually explicit material – is simply incorrect.  As the Supreme Court has explained, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them."  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-213, (1975) (citations omitted).  In *ACLU I*, this court elaborated on that right in the context of sexually explicit content, expressing the view that "at least some of the material subject to coverage under the 'indecent' and 'patently offensive' provisions of the CDA may contain valuable literary, artistic or educational information of value to older minors as well as adults."  *ACLU v. Reno*, 929 F. Supp. at 824.  For example:

> Photographs appearing in National Geographic or a travel magazine of the sculptures in India of couples copulating in numerous positions, a written description of a brutal prison rape, or Francesco Clemente's painting "Labirinth" . . . all might be considered to "depict or describe, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs."  47 U.S.C. § 223(d)(1).  But the government has made no showing that it has a compelling interest in preventing a seventeen-year-old minor from accessing such images.

In upholding this court's ruling, the Supreme Court, invoking the specter of "a parent who sent his 17-year-old college freshman information on birth control via e-mail" facing

---

[43] Defendant's contention that "the harmful-to-minors component of COPA protects younger minors from the harmful effects of pornography that lacks value for the oldest minors," (Def. Br. at 48 n.35), misses the point.  The illogic of Defendant's proposed construction of the Act is not that young children would be unprotected from speech deemed *harmful* to older minors, but that they would be unprotected from sexually explicit speech deemed *valuable* to older minors.

prosecution under the CDA, affirmed that "[i]t is... clear that the strength of the Government's interest in protecting minors is not equally strong throughout the coverage of this broad statute." *Reno v. ACLU*, 521 U.S. 844, 878 (1997).

Thus, even if "minors may constitutionally be denied access to material that is obscene as to minors," *id.* at 895 (O'Connor, J., concurring and dissenting), there is a substantial amount of sexually explicit speech that is *not* obscene as to older minors. The government has no compelling interest in preventing older minors from viewing such speech, and the First Amendment accordingly protects their right to do so.

Finally, that courts have not invalidated state harmful-to-minors statutes on this ground hardly supports Defendant's contention that Plaintiffs have failed to state a claim. Courts – including this one – have invalidated those statutes on the established ground that they impermissibly infringe upon the rights of adults to view non-obscene speech, and thus have had no need to consider whether the rights of older minors were additionally implicated. *See, e.g., ACLU I*, 521 U.S. at 878 (because Court held Communications Decency Act unconstitutional for interfering with adult communication, "we need neither accept nor reject the Government's submission" that First Amendment permits government to prohibit communication of sexually explicit content to minors). This court may once again resolve the parties' constitutional dispute without the need to consider Plaintiffs' second cause of action, but there is no basis for dismissing it at this stage.

V.   **PLAINTIFFS HAVE STATED A CLAIM THAT COPA VIOLATES THE FIRST
AND FIFTH AMENDMENT RIGHT TO COMMUNICATE AND ACCESS
INFORMATION ANONYMOUSLY**

Defendant is equally off base in contending that Plaintiffs have not stated a claim that

COPA interferes with the constitutional right to communicate anonymously.  Defendant

mischaracterizes both the scope of Plaintiffs' argument and the significance of applicable case

law in maintaining that COPA's identification requirements are proper "as a matter of law."

(Def. Br. at 53.)

It is axiomatic that the First Amendment guarantees the right to receive, as well as to

communicate, information and ideas.  *Bd of Educ. v. Pico,* 457 U.S. 853, 866-67 (1982); *ACLU*

*I*, 31 F. Supp. 2d 473, 481 n.2 ("The First Amendment protects the right to receive information

and ideas.") (internal quotation marks omitted).  Plaintiffs contend that COPA impermissibly

conditions the exercise of that right on the loss of anonymity and surrender of personally

identifying information.  The result is to deter adults who fear stigma and exposure from

communicating and receiving non-obscene information.  Plaintiff's theory is not a novel one:  in

fact, in striking down New Mexico's online harmful-to-minors law, the district court expressly

held that the act "violate[d] the First and Fourteenth Amendments of the United States

Constitution because it prevent[ed] people from communicating *and* accessing information

anonymously." *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D. N.M. 1998) (emphasis added).

The right of anonymous communication has enjoyed judicial protection in a variety of

settings.  *See McIntyre v. Bd. of Elections Comm'n,* 514 U.S. 334 (1995) (striking down Ohio

statute prohibiting anonymous distribution of campaign literature); *Lamont v. Postmaster*

*General,* 381 U.S. 301, 307 (1965) (invalidating statute requiring that individuals request certain

mail in writing on ground of "deterrent effect"); *see also Denver Area Educational*

*Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 754 (1996) (holding unconstitutionally burdensome requirement that cable users request in writing unblocking of certain cable channels).

The right to anonymous speech has been applied to the Internet. *See, e.g., Doe v. 2theMart.com*, 140 F. Supp. 2d at 1093 ("[T]he constitutional rights of Internet users, including the right to speak anonymously, must be carefully safeguarded"); *Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999) (noting the "legitimate and valuable right to participate in online forums anonymously or pseudonymously"); *ACLU v. Miller*, 977 F. Supp. 1228, 1232 (N.D. Ga. 1997) (striking down law prohibiting anonymous Internet speech "because 'the identity of the speaker is no different from other components of [a] document's contents that the author is free to include or exclude'") (quoting *McIntyre*, 514 U.S. at 348).

Defendant insists that COPA "presents quite different concerns" than those raised in prior cases, presumably because Plaintiffs seek to vindicate the rights of "website users (i.e., listeners)," and because COPA "does not entail public disclosure of anyone's identity.... " (Def. Br. at 49, 50.) But those arguments are misleading.

First, in the context of the internet, there is often no clear distinction between "speaker" and "listener." Several Plaintiffs, for example, operate chatrooms, message boards, and interactive forums on their sites; a visitor to plaintiff Heather Corinne's Scarleteen website might well be posting questions about sensitive subjects like birth control, venereal disease, or even incest. The Third Circuit's admonition that "the First Amendment protects against governmental inhibition as well as prohibition" carries particular weight in these circumstances. *Fabulous Assoc., Inc, v. Penn. Pub. Utility Comm'n*, 896 F.2d 780, 785 (3d Cir. 1990) (citations omitted)

(invalidating statute requiring adults to obtain access code to hear sexually explicit recorded messages).

Second, COPA's statutory protections against wider disclosure of personal information — which are hardly ironclad — are insufficient in themselves to cure the constitutional defect. COPA generally prohibits website operators from disclosing information collected for purposes of verifying age, but includes a broad and poorly defined exception for disclosures "necessary to make the communication or conduct a legitimate business activity related to making the communication.... " 47 U.S.C. § 231(d)(2)(A). Further, those protections guard only against *additional* disclosures of identifying information: in order to gain access to websites, users will *already* have been required to disclose their identities to website operators, thereby breaching their anonymity. *See, e.g., ACLU II,* 31 F. Supp. 2d at 485 (noting testimony that "the internet is a valuable resource for 'closeted' people who do not voluntarily disclose their sexual orientation due to fear of the reactions of others because it allows closeted people to access this information while preserving their anonymity.").

Finally, as the Supreme Court observed in striking down a requirement that cable subscribers submit written requests to obtain certain adult-themed channels, COPA's identification requirements "will further restrict" communication by people "who fear for their reputations should the operator, *advertently or inadvertently,* disclose the list of those who wish to watch the 'patently offensive' channel." *Denver Area,* 518 U.S. at 754 (emphasis added).[44]

---

[44] The principal case upon which Defendant relies, *Connection Distrib. Co. v. Reno,* 154 F.3d 281 (6th Cir. 1998), is inapposite. Unlike COPA, the statute at issue, a record-keeping provision aimed at preventing the use of children in pornography, was deemed "content-neutral" for First Amendment purposes and analyzed under intermediate scrutiny. *Id.* at 290-91. Moreover, the plaintiff's members, subscribers to a "swingers" magazine who

By creating a permanent record of a user's visit to websites deemed harmful to minors by the government, COPA's identification requirement would effect an identical restriction and would impermissibly burden the exercise of important First-Amendment rights.

Plaintiffs do not dispute that courts, including this Court, have recognized the government's compelling interest in protecting minors from harmful materials, *see ACLU II,* 31 F. Supp. 2d at 495, and that that interest has, in certain circumstances, permitted age-verification requirements that have implicated the right of anonymous communication. *See, e.g., Crawford v. Lungren,* 96 F.3f 380 (9th Cir. 1996) (holding constitutional state ordinance banning sale of "harmful matter" in unsupervised sidewalk vending machines). However, that the right to communicate anonymously might yield in some instances to a compelling interest in protecting minors in no way suggests that the right does not exist or that it must yield here. Rather, just as it must with respect to Plaintiffs' other claims, the government must demonstrate that COPA's identification provisions, which burden the First-Amendment right of anonymous communication, are the least restrictive means of accomplishing the compelling end of protecting minors. That is a question for trial, not for a motion to dismiss or for judgment on the pleadings.

In short, Defendant has fallen far short of his burden of demonstrating that *no* set of facts could establish Plaintiffs' claim that COPA violates the right to communicate anonymously. Accordingly, Defendant's motion to dismiss Plaintiffs' third cause of action must be denied.

---

opposed the record-keeping provision, had "already... placed themselves at risk of losing the anonymity of their speech by submitting sexually explicit photographs of themselves to be published and distributed in... magazines." *Id.* at 294.

## VI.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request the Court deny Defendant's motion in its entirety.

Respectfully submitted,

Christopher R. Harris
Seth Friedman
Katharine Marshall
Jeroen van Kwawegen
Elan Dobbs
Latham & Watkins
885 Third Avenue, Suite 1000
New York, NY 10022
(212) 906-1200

Of Counsel to American Civil Liberties Union
Foundation

Christopher A. Hansen
Aden Fine
Catherine Crump
Ben Wizner
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

ATTORNEYS FOR ALL PLAINTIFFS

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMERICAN CIVIL LIBERTIES UNION,  )
et al.,                          )
                                 )
                Plaintiffs,      )
                                 )
        v.                       )        Civil Action No.
                                 )        98-CV-5591
ALBERTO R. GONZALES, in his official  )
capacity as Attorney General of the United  )   **CERTIFICATE OF SERVICE**
States,                          )
                                 )
                Defendant.       )
_____ )

I, KATHARINE E. MARSHALL, hereby certify that on Friday, September 15, 2006, a

true and correct copy of the attached *Plaintiffs' Memorandum in Opposition to Defendant's*

*Motion to Dismiss and, in the alternative, for Partial Judgment on the Pleadings* and Declaration

of Christopher R. Harris, dated September 15, 2006, in the above captioned case, was caused to

be served by Federal Express upon:

Raphael Gomez, Esq.
U.S. Department of Justice
20 Massachusetts Avenue, N.W.
Suite 6144
Washington, D.C. 20530

Dated: September 15, 2006
       New York, New York

LATHAM & WATKINS LLP

By: *Katharine E. Marshall*
    Katharine E. Marshall
    885 Third Avenue, Suite 1000
    New York, New York 10022
    (212) 906-1200

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

----------------------------------------------------------------------x

AMERICAN CIVIL LIBERTIES UNION, et al.,                    :

                Plaintiffs,                    :

              v.                    :     Civ. Act. No. 98-CV-5591

ALBERTO R. GONZALES, in his official capacity as      :
ATTORNEY GENERAL OF THE UNITED STATES,                 :

              Defendant.                    :

----------------------------------------------------------------------x

## [PROPOSED] ORDER

      Before the Court is Defendant's Motion To Dismiss And, In The Alternative, For Partial Judgment On The Pleadings.  After consideration of all papers and pleadings submitted to the Court, and after argument, and for good cause shown, IT IS HEREBY ORDERED that:

      1.     The motion to dismiss the entire action is DENIED in its entirety because each of the Plaintiffs has demonstrated that they possess standing to bring this lawsuit.

      2.     The motion to dismiss Plaintiffs' Second Cause of Action is DENIED in its entirety.

      3.     The motion to dismiss Plaintiffs' Third Cause of Action is DENIED in its entirety.

      IT IS SO ORDERED.

Dated: _____, 2006

                               _____
                               HON. LOWELL A. REED, JR.
                               UNITED STATES DISTRICT JUDGE