# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
-------------------------------------------------------------------x
                                          :
AMERICAN CIVIL LIBERTIES UNION, et al.,   :
                                          :
                 Plaintiffs,              :
                                          :
          v.                              :   Civ. Act. No. 98-CV-5591
                                          :
ALBERTO R. GONZALES, in his official capacity as  :
ATTORNEY GENERAL OF THE UNITED STATES,    :
                                          :
                 Defendant.               :
                                          :
-------------------------------------------------------------------x
```

## PRE-TRIAL MEMORANDUM

### Brief of Plaintiffs

| | |
|---|---|
| Christopher A. Hansen | Christopher Harris |
| Aden Fine | Seth Friedman |
| Benjamin Wizner | Katharine Marshall |
| Catherine Crump | Jeroen Van Kwawegan |
| American Civil Liberties Union | Latham & Watkins LLP |
| 125 Broad Street – 18th Floor | 885 Third Avenue |
| New York, NY 10004 | New York, NY 10022 |
| (212) 549-2693 | (212) 906-1800 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTORY STATEMENT ................................................................................ 1

STATUTORY LANGUAGE ......................................................................................... 4

PROCEDURAL HISTORY ........................................................................................... 5

PLAINTIFFS AND THEIR SPEECH .......................................................................... 8

SUMMARY OF ARGUMENT ................................................................................... 10

ARGUMENT ............................................................................................................... 13

I.      COPA impermissibly deprives adults of speech to which they are
        constitutionally entitled and is overbroad ..................................................... 13

II.     COPA is a content-based regulation that does not withstand heightened
        scrutiny ............................................................................................................ 15

        A.   COPA is overinclusive because it criminalizes a vast quantity of
             protected speech ...................................................................................... 16

             1.   Defendant's proposed narrowing constructions are
                  unsupported by law ........................................................................ 16

                  (a)  COPA is not limited to commercial pornography ........ 17

                  (b)  COPA is not limited to content that is harmful to
                       "older" minors ................................................................ 18

                  (c)  COPA is not limited to entire Web sites that are
                       harmful to minors ........................................................... 19

                  (d)  Narrowing constructions are inappropriate in these
                       circumstances .................................................................. 20

             2.   The affirmative defenses do not remedy COPA's
                  overinclusiveness ........................................................................... 21

**B. COPA is underinclusive because it is wholly ineffectual in protecting minors from vast quantities of speech that, by the government's standards, is harmful to minors** ..................................................24

    **1. COPA fails to stop much speech that the government would consider "harmful to minors"** ......................................................25

        **(a) COPA does not apply to material that originates overseas** ..............................................................................25

        **(b) COPA does not apply to non-Web speech** ...................27

    **2. The affirmative defenses allow minors to receive even the speech that COPA does cover** ........................................................28

**C. Less restrictive alternatives** ...........................................................29

    **1. Filtering and blocking software** ....................................................29

    **2. Narrower restriction on speech** ...................................................31

    **3. Utilizing existing laws and voluntary practices** ....................31

**III. COPA is unconstitutionally vague** ..................................................34

**IV. COPA violates the First and Fifth Amendments by Prohibiting Dissemination to All Minors of Material Not Harmful to Older Minors** ...........................................................................................................36

**V. COPA violates the First and Fifth Amendment Right to Communicate and Access Information Anonymously** ...........................39

**CONCLUSION** ...........................................................................................43

## TABLE OF AUTHORITIES

*CASES*

*ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003) ............................................. 7, 19, 20, 39

*ACLU v. Johnson*, 4 F. Supp. 2d 1029 (D. N.M. 1998) ................................................. 40

*ACLU v. Miller*, 977 F. Supp. 1228 (N.D. Ga. 1997) ..................................................... 41

*ACLU  v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999) ............................................ *passim*

*ACLU v. Reno*, 217 F.3d 162 (3d. Cir. 2000) ................................................................. 6

*ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996) .......................................................... 37

*ACLU of Georgia v. Miller*, 977 F. Supp 1228 (N.D. Ga. 1997) ................................. 38

*American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990) ................................. 14

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) ........................................................................ 6

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ................................................................ *passim*

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ................................ 13, 14, 15

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) .................................................................... 40

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ........................................... 14

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) .............................................................. 15

*Butler v. Michigan*, 352 U.S. 380 (1957) ...................................................................... 14

*Carey v. Population Servs. Int'l*, 431 U.S. 678 (1977) ................................................. 13

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
447 U.S. 557 (1980) ........................................................................................................ 24

*Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573
(N.D. Cal. 1999) ........................................................................................................ 40, 41

*Crawford v. Lungren*, 96 F.3d 380 (9th Cir. 1996) ...................................................... 42

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
518 U.S. 727 (1996) ................................................................................................ *passim*

*Doe v. 2theMart.com*, 140 F. Supp. 2d 1088 (W.D. Wash. 2001)................................40

*Erznoznik v. City of Jacksonville,* 422 U.S. 205 (1975) ..............................14, 22, 28, 37

*Fabulous Assocs., Inc, v. Penn. Pub. Utility Comm'n,*
896 F.2d 780 (3d Cir. 1990)...................................................................................41

*Foley Bros., Inc. v. Filardo*, 336 U.S. 281 (1949) ........................................................25

*Ginsberg v. New York,* 390 U.S. 629 (1968) ...............................................................14

*Helicopteros Nacionales do Colombia, S.A. v. Hall,*
466 U.S. 408 (1984).............................................................................................27

*Hynes v. Mayor of Oradell*, 425 U.S. 610 (1977).........................................................34

*Lamont v. Postmaster General,* 381 U.S. 301 (1965)....................................................40

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 535 (2001)...................................................15

*McIntyre v. Bd. of Elections Comm'n,* 514 U.S. 334 (1995) .........................................40

*N.Y. Cent. R.R. Co. v. Chisholm*, 268 U.S. 29 (1925)  ...............................................26

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) .........................................................15

*Reno v. ACLU*, 521 U.S. 844 (1997)...............................................................*passim*

*Sable Communications v. FCC*, 492 U.S. 115 (1989) ...................................................14

*Shea v. Reno,* 930 F. Supp. 916 (S.D.N.Y. 1996).........................................................21

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,*
502 U.S. 105 (1991)...............................................................................................22

*Smith v. California*, 361 U.S. 147 (1959) ...................................................................34

*Speiser v. Randall*, 357 U.S. 513 (1958)......................................................................24

*Toys "R" Us, Inc. v. Step Two, S.A.,*318 F.3d 446 (3d Cir. 2003)...............................27

*United States v. Eckhardt*, ___ F.3d ___, 2006 WL 2820908
(11th Cir., Oct. 4, 2006)................................................................................28, 32

*United States v. Edge Broadcasting Company*, 509 U.S. 418 (1993) .........................28

*United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000) .............................15

*United States v. Reese*, 92 U.S. 214 (1875) .................................................................21

## STATUTES AND REGULATIONS

18 USC § 2252B ...........................................................................................................33

47 U.S.C. § 231 .....................................................................................................*passim*

112 Stat. 2681-736 .......................................................................................................30

116 Stat. 2766 ..............................................................................................................33

521 U.S. 1113 (1997)....................................................................................................21

Extradition Treaty, Dec. 3, 1971, U.S. Canada, 27 UST 983 .......................................27

H.R. Rep. No. 105-775, pt. III (1998).........................................................................26

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------------------------------------------x
:

AMERICAN CIVIL LIBERTIES UNION, et al.,     :

Plaintiffs,     :

:

v.     :    Civ. Act. No. 98-CV-5591

:

ALBERTO R. GONZALES, in his official capacity as     :
ATTORNEY GENERAL OF THE UNITED STATES,     :

:

Defendant.     :

:

------------------------------------------------------------------------x

## PRE-TRIAL MEMORANDUM

## INTRODUCTORY STATEMENT

Plaintiffs challenge the constitutionality of the Child Online Protection Act
(COPA), a broad federal censorship law that imposes severe criminal and civil penalties
on the availability, display, and dissemination of constitutionally protected, non-obscene
materials on the Internet by making it a crime to "knowingly . . . by means of the World
Wide Web, make[] any communication for commercial purposes that is available to any
minor and that includes any material that is harmful to minors . . . ." 47 U.S.C. §
231(a)(1) (hereinafter "COPA"). Under COPA, *any* speech that some community might
consider to be "harmful to minors" is potentially criminal if displayed for free on the
World Wide Web (the "Web") and accessible by minors. The effect of COPA is to
restrict adults from communicating and receiving expression that is clearly protected by
the Constitution. COPA is unconstitutional under the First and Fifth Amendments to the
United States Constitution, both on its face and as applied to plaintiffs. In February 1999,

this Court granted a preliminary injunction against COPA.  In June 2004, the United

States Supreme Court affirmed that ruling.  Plaintiffs now seek a permanent injunction

against enforcement of COPA.

Plaintiffs represent a broad range of individuals and entities who are speakers,

content providers, and users of the Web.  Plaintiffs include online magazines,

booksellers, gay and lesbian content providers, and individual authors and columnists.

COPA directly violates the First Amendment rights of plaintiffs, their members, and tens

of millions of other speakers to communicate protected expression on the Web.  COPA

targets both written and visual expression that is sexually-explicit, including sexually

frank magazine articles, advice about sexual pleasure, Web-based discussion boards and

chat rooms about sexual topics, and visual art and videos.  In addition to violating the

rights of Web content providers, COPA violates the rights of millions of Web users to

view this constitutionally-protected speech, including the right to do so anonymously.

COPA restricts speech on the Web.  The Internet in general, and the Web in

particular, represents the most participatory marketplace of mass speech yet developed --

it is in many ways a far more speech-enhancing medium than radio or television, print,

the mails, or even the village green.  With a few simple tools and at a very low cost, the

Web enables average citizens and small businesses, as well as large corporations, to

publish online newspapers, distribute electronic pamphlets, participate in local or

worldwide conversations, and communicate with a broader audience than ever before

possible.  The vast majority of information on the Web is available for free, even when it

is created and provided by commercial entities or individuals hoping to make a profit.

Thus, the Web also provides millions of users with access to a vast range of free

information and resources.  Web users are far from passive listeners -- rather, they are empowered with the tools to seek out exactly the information they need and to respond with their own information if desired.

COPA does not restrict the *sale* of speech on the Web.  In fact, COPA provides an explicit defense for providers who charge for their speech by credit or debit card, thus exempting the very commercial pornography defendant says COPA targets.  Rather, COPA explicitly and purposefully restricts a wide range of protected expression that is provided for free on the Web by organizations, entities, and individuals who happen to be communicating on the Web "for commercial purposes."

Because of the way the Web works, COPA's prohibition on certain communications with minors prevents many adults from accessing those same communications.  There are no reasonable means for speakers to ascertain the age of persons who access their free Web communications, or to restrict or prevent access only by minors to their content.  COPA's affirmative defenses impose tremendous burdens on both Web speakers and users, and thus do not save the statute.  COPA would reduce much of the adult population on the Web to reading and communicating only material that is suitable for young children.  In addition, because COPA makes no allowance for the varying levels of maturity of minors of different ages, COPA prohibits speech that is valuable and constitutionally protected for older minors, but that may not be appropriate for younger children.  Moreover, COPA prevents adults from speaking and listening anonymously on the Web.

Since enactment of COPA, two reports commissioned by Congress propose a variety of options for protecting minors *without* imposing criminal sanctions on adult

speech.  These options include the use of filtering programs, the promotion of Internet

education and high-quality Internet content for children, and the vigorous enforcement of

existing laws, including several new laws enacted since this Court's injunction against

COPA's.  In contrast to the many other options now available, COPA only marginally

advances the government's interest, while imposing a censorship regime on the Web that

is far more draconian than in any other medium.

## STATUTORY LANGUAGE

COPA imposes severe criminal and civil penalties[1] on persons who:

> knowingly and with knowledge of the character of the material, in
> interstate or foreign commerce by means of the World Wide Web, make[]
> any communication for commercial purposes that is available to any minor
> and that includes any material that is harmful to minors . . . .

47 U.S.C. § 231(a)(1)-(3).  COPA defines material that is "harmful to minors" as "any

communication, picture, image, graphic image file, article, recording, writing, or other

matter of any kind that is obscene or that -- (A) the average person, applying

contemporary community standards, would find, taking the material as a whole and with

respect to minors, is designed to appeal to, or is designed to pander to, the prurient

interest; (B) depicts, describes, or represents, in a manner patently offensive with respect

to minors, an actual or simulated sexual act or sexual contact, an actual or simulated

normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent

female breast; and (C) taken as a whole, lacks serious literary, artistic, political, or

scientific value for minors."  47 U.S.C. § 231(e)(6).  The statute defines "minor" as "any

person under 17 years of age."  47 U.S.C. § 231(e)(7).

---

[1] Violation of COPA subjects speakers to up to six months imprisonment and/or $50,000
in fines, plus additional fines for each intentional violation.  47 U.S.C. § 231(a).

COPA defines "commercial purposes" as being "engaged in the business of making such communications." 47 U.S.C. § 231(e)(2)(A). COPA then defines "engaged in the business" as meaning:

> that the person who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income).

47 U.S.C. § 231(e)(2)(B).

Section 231(c)(1) of COPA provides an affirmative defense to prosecution if the defendant, "in good faith, has restricted access by minors to material that is harmful to minors - (A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." 47 U.S.C. § 231(c)(1); *see also* 47 U.S.C. § 231(b).

## PROCEDURAL HISTORY

COPA was signed into law on October 21, 1998. The following day, plaintiffs filed suit in this Court, alleging that COPA violated the First Amendment to the Constitution. This Court heard five days of live testimony from 10 witnesses and admitted approximately 18 sworn declarations and more than 400 exhibits. *ACLU v. Reno*, 31 F. Supp. 2d 473, 477, 485, ¶24 & n.5 (E.D. Pa. 1999) ("*ACLU II*"). Thereafter, this Court granted a preliminary injunction, holding that plaintiffs were likely to succeed on the merits of their claim that COPA violated the First Amendment. *Id.* at 494-95. This Court held that plaintiffs were likely to show that "COPA imposes a burden on

speech that is protected for adults," *id.* at 495, and that the government could not prove that COPA is the "least restrictive means available to achieve the goal of restricting the access of minors to [harmful to minors] material," *id.* at 497.

On the initial appeal of this Court's decision, the Third Circuit upheld this Court's ruling that COPA violates the First Amendment. *ACLU v. Reno*, 217 F.3d 162 (3d. Cir. 2000). The court held that "because the standard by which COPA gauges whether material is 'harmful to minors' is based on identifying 'contemporary community standards[,]' the inability of Web publishers to restrict access to their Web sites based on the geographic locale of the site visitor, in and of itself, imposed an impermissible burden on constitutionally protected First Amendment speech." *Id.* at 166. The Third Circuit affirmed on this single ground, and did not reach the other grounds relied upon by this Court.

The Supreme Court vacated and remanded the decision by the Court of Appeals. Rejecting the Third Circuit's approach, the Court held "that COPA's reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment." *Ashcroft v. ACLU*, 535 U.S. 564, 585 (2002) (emphasis in original). However, the Court did not lift the injunction preventing the government from enforcing COPA absent further action. *Id.* at 586. The Court remanded the case for further proceedings on issues including "whether COPA suffers from substantial overbreadth for other reasons, whether the statute is unconstitutionally vague, or whether the district court correctly concluded that the statute likely will not survive strict scrutiny analysis . . . ." *Id.* at 585-86.

On remand, the Third Circuit reaffirmed its conclusion that COPA was unconstitutional. *ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003). In its primary holding, the court ruled that COPA failed strict scrutiny because it would deprive adults of material they are constitutionally entitled to receive. *Id.* at 260-61. Reviewing the plain language of the statute, the court concluded that COPA "endangers a wide range of communications, exhibits, and speakers whose messages do not comport with the type of harmful materials legitimately targeted . . . ." *Id.* at 253. The court rejected the government's plea to re-write the statute to narrow its application, and held that COPA's affirmative defenses did nothing to ameliorate the statute's burden on speech protected for adults. The court further held that other alternatives, including Internet filtering software, were "substantially less restrictive than COPA in achieving COPA's objective of preventing a minor's access to harmful materials." *Id.* at 265.

The Supreme Court affirmed, holding that plaintiffs were likely to prevail on their claim that COPA violated the First Amendment by burdening adults' access to protected speech. *Ashcroft v. ACLU*, 542 U.S. 656 (2004). The Court held that the government had not met its burden of establishing that COPA's criminal penalties were the least restrictive means of protecting minors from sexually-explicit material on the Web. The Court observed that Internet content filters, which "impose selective restrictions on speech at the receiving end, not universal restrictions at the source," were "less restrictive than COPA." *Id.* at 667. It further noted that filtering technology "may well be more effective than COPA," because filters, unlike COPA, "can prevent minors from seeing all pornography, not just pornography posted to the Web from America," and because filters "can be applied to all forms of Internet communication, including e-mail, not just

communications available via the World Wide Web." *Id.*  Noting the passage of time since entry of this Court's injunction, the Court observed that "the factual record d[id] not reflect current technological reality," suggesting that "[m]ore and better filtering alternatives may exist than when the District Court entered its findings." *Id.* at 671. Moreover, the Court noted, the "legal landscape" had changed, as "Congress ha[d] passed at least two further statutes that might qualify as less restrictive alternatives to COPA – a prohibition on misleading domain names, and a statute creating a minors-safe 'Dot Kids' domain." *Id.* at 672.  Accordingly, the Court remanded the case for trial on the merits.

## PLAINTIFFS AND THEIR SPEECH

Plaintiffs represent a wide range of individuals and entities including speakers, content providers, and ordinary users on the Web, as that term is defined in the Act. Plaintiffs post content including, inter alia, resources on sexual health, safe sex, and sexual education; visual art and poetry; resources for gays and lesbians; online magazines and articles; music; and books and information about books that are being offered for sale.  Stip. Facts ¶ 1.

Many of the plaintiffs are committed to providing uncensored Web sites.  Pls.' Findings ¶ 1.  The vast majority of information on plaintiffs' Web sites, as on the Web in general, is provided to users for free.  Pls.' Findings ¶ 2.  Similarly, the vast majority of information on plaintiffs' Web sites, as on the Web in general, can be accessed immediately without any requirement that users register, provide a password or log-in, or otherwise provide any personal, identifying information in order to access the material. Pls.' Findings ¶ 3.  Nonetheless, plaintiffs are commercial speakers on the Web.  The speech on plaintiffs' Web sites is designed to assist in making a profit.  Although many

8

of the plaintiffs believe that much of the information available on their Web sites has non-commercial value, all of the information meets the definition of "for commercial purposes" under the Act. Pls.' Findings ¶ 4.

Plaintiffs, like the universe of commercial speakers on the Web, have a variety of business models. Some of the plaintiffs receive income by selling advertising on their Web sites. Some of the plaintiffs sell goods over their Web sites, ranging from millions of books, to condoms and other sexual health devices, to books that they authored themselves. Some of the plaintiffs use the Web simply as an advertising and marketing tool -- a means of promoting their commercial activities. Some of the plaintiffs generate revenue by combining these or utilizing other business models. Pls.' Findings ¶ 5. Some of the plaintiffs provide interactive fora on their Web sites, such as online discussion groups, bulletin boards and chat rooms, which enable users to create their own material on plaintiffs' Web sites. Some of the verbal and visual exchanges that could potentially occur in these chatrooms or in the postings on their bulletin boards may include language or images that contain sexual content. Stip. Facts ¶ 3.

Web sites, including plaintiffs' Web sites, depend on attracting a high level of traffic to their sites to attract and retain advertisers and investors. Pls.' Findings ¶ 6. The most effective way to stimulate user traffic on a Web site is to offer some content for free to users. Pls.' Findings ¶ 7. With respect to those plaintiffs and others who sell goods on their Web sites, only a small percentage of Internet users who visit those plaintiffs' sites for information actually make a purchase. Pls.' Findings ¶ 8.

Although all of plaintiffs' speech is commercial within the meaning of the statute, plaintiffs believe that all of their speech has value, especially for adults and older minors.

Pls.' Findings ¶ 9. If the Act is not permanently enjoined, some of the plaintiffs intend to self-censor; others intend to risk liability and prosecution under the Act; and others have not yet decided what they will do. At least one plaintiff has decided that, because it would be contrary to its mission to self-censor, it will have to forego the financial benefits of its commercial activities and become a noncommercial site if the Act is not permanently enjoined. Pls.' Findings ¶ 10.

Plaintiffs respectfully direct the Court's attention to paragraphs 20 to 38 of Plaintiffs' Proposed Findings of Fact, as well as pages 27 to 67 of the Amended Complaint, for factual information specific to each plaintiff's Web sites.

## SUMMARY OF ARGUMENT

COPA was passed in 1998, when the Internet was still relatively new and less understood. Like Congress' first attempt at legislation in this area, struck down by the Supreme Court in *Reno v. ACLU*, COPA relies exclusively on threatening Web speakers with severe criminal and civil penalties for communicating protected speech. COPA's bludgeon suppresses an enormous amount of speech protected for adults and older minors, and is unnecessary and ill-tailored to address the government's interest in protecting children from sexually-explicit content. It is also impermissibly vague, and would punish with imprisonment the incorrect interpretation of terms that the government itself has been unable or unwilling to define with clarity. At the same time, it fails to address many sources of frank speech about sex that are readily accessible to minors.

COPA's content-based prohibitions on protected speech do not remotely satisfy the demands of strict scrutiny. As a means of protecting minors from exposure to inappropriate sexually-explicit speech, COPA is crudely over- and underinclusive. It is

overinclusive because it would criminalize and deter a vast amount of non-obscene speech that has value for adults and older minors.  It is underinclusive because it would be wholly ineffectual in protecting minors from exposure to vast amounts of speech about sex that originates abroad or is delivered by media other than the Internet or Internet methods not implicated by COPA's prohibitions.

Absent enforcement of COPA, a variety of existing laws and tools already offer significant protection for minors using the Internet.  Internet content filters are one such alternative.  The Supreme Court has previously characterized content filters as "less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." *Ashcroft v. ACLU,* 542 U.S. at 666-67.  That description is even more apt today, in light of advances in filtering technology; the increasing movement of sexually-explicit speech overseas and beyond COPA's reach; and the development of new means for communicating speech, including explicit speech about sex over the Internet that are unaddressed by COPA.

Moreover, the government has all but ceased using one of the most potent protections available, the federal obscenity law.  The government's failure to protect minors from materials that are obscene even for adults seriously undermines its claimed need for a much broader law that burdens protected speech.  In addition, several new federal laws protect minors by requiring the use of filtering software in schools and libraries throughout the country; educating parents about the availability of filters for use in the home; prohibiting the use of misleading domain names; and creating a new "dot kids" domain that provides a safe online environment for children.  Since enactment of COPA, two reports commissioned by Congress offer a variety of additional suggestions

for protecting minors without imposing criminal sanctions on adult speech.

COPA's affirmative defenses, identical to those found insufficient by the Supreme Court in *Reno v. ACLU*, burden millions of content providers who have no effective way to prevent minors from obtaining their speech without also deterring and burdening access by adults. The two reports commissioned by Congress now confirm the key findings of this Court following the preliminary injunction trial. COPA's defenses would force Web speakers to choose between risking criminal prosecution or implementing costly defenses that would inevitably deter their adult users. Furthermore, these screens would have to be placed at the entrance to Web-based chat rooms and discussion boards, which are vitally important features on many Web sites, thus restricting conversations not even targeted by the statute.

Under the Supreme Court's clear precedents, specifically affirmed in the Internet context, COPA thus violates strict scrutiny and is overbroad because it "effectively suppress[es] a large amount of speech that adults have a constitutional right to receive and to address to one another." *Reno v. ACLU*, 521 U.S. 844, 874 (1997) ("ACLU I").

In addition, COPA is unconstitutionally vague. Plaintiffs have made repeated efforts to require defendant to define the speech that is covered by COPA, i.e. speech that is "harmful to minors" but that is also not obscene. As the responses to the Contention Interrogatories illustrate, defendant has been unable to do so. Defendant's answers confirm the vagueness of the statute.

In addition to violating the rights of Web content providers, COPA violates the rights of millions of Web users to view this constitutionally protected speech, including the right to do so anonymously. COPA also violates the rights of older minors to receive

speech they are entitled to receive.

Especially with a broad range of more effective tools available, Congress may not enforce its interest in protecting minors by making it a crime to communicate constitutionally protected material to adults.

## ARGUMENT

### I.     COPA impermissibly deprives adults of speech to which they are constitutionally entitled and is overbroad.

COPA criminalizes a category of communication that is indisputably constitutionally protected for adults:  non-obscene but sexually-explicit speech on the Web.  Once a speaker posts content on the Web, it is available to all other Web users worldwide.  *Reno v. ACLU*, 521 U.S. at 853.  Unlike face-to-face communications, it is not technologically feasible for a speaker to determine the age of a user who is accessing her communications on the Web.  Pl. ff ¶¶ 64, 66, 71-73, 110, 111, 114, 114; *ACLU I* at 876.  Thus, COPA requires Web speakers to restrict access by both minors and adults to any speech that may be considered "harmful to minors" in order to avoid the risk of criminal prosecution and civil penalties.

The Supreme Court has repeatedly held that "the governmental interest in protecting children from harmful materials … does not justify an unnecessarily broad suppression of speech addressed to adults." *ACLU I* at 875 (citations omitted); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 252 (2002) ("[S]peech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it"); *see also Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977) ("[W]here obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression."). Applying this time-honored First Amendment

analysis, the Court has invalidated two recent attempts by Congress to criminalize non-obscene sexually-explicit speech. *Reno v. ACLU*, 521 U.S. at 875 (striking down the Communications Decency Act); *Free Speech Coalition*, 535 U.S. at 252 (invalidating ban on "virtual" child pornography). Like those statutes, COPA "proscribes a significant universe of speech that is neither obscene . . . nor child pornography." *Free Speech Coalition*, 535 U.S. at 240; *see also Reno v. ACLU*, 521 U.S. at 874.

Indeed, because "[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox," the Court has *never* upheld a criminal prohibition on non-obscene communications between adults. *Id.* at 875 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 74-75 (1983) (internal quotation marks omitted)); *see also Sable Communications v. FCC*, 492 U.S. 115, 131 (1989) (invalidating a conviction for distribution of indecent publications); *Bolger*, 463 U.S. at 74 (striking down a ban on mail advertisements for contraceptives); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217-18 (1975) (striking down a statute that criminalized showing of certain movie content at drive-in theaters); *Butler v. Michigan*, 352 U.S. 380, 383 (1957) (invalidating a conviction for distribution of indecent publications). The Court has uniformly rejected such attempts to "burn the house to roast the pig." *Butler*, 352 U.S. at 383.[2]

The Court has also rejected even noncriminal speech regulations that attempt to "'reduc[e] the adult population . . . to . . . only what is fit for children.'" *Denver Area*

---

[2] *Cf. Ginsberg v. New York*, 390 U.S. 629 (1968) (upholding restriction on the direct commercial sale to minors of material deemed "harmful to minors" because it "does not bar the appellant from stocking the magazines and selling them" to adults); *American Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990) (noting that "*Ginsberg* did not address the difficulties which arise when the government's protection of minors burdens (even indirectly) adults' access to material protected as to them").

*Educ. Telecomms. Consortium, Inc. v. FCC,* 518 U.S. 727, 759 (1996) (invalidating law requiring cable television operators to segregate and block "patently offensive" content on certain channels); *see also United States v. Playboy Entm't Group.*, 529 U.S. 803, 813 (2000) (invalidating law requiring cable television operators to scramble channels); *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 535, 563 (2001) (invalidating tobacco advertising restrictions aimed at preventing children from viewing such advertising).

The overbreadth doctrine provides an independently sufficient reason why COPA is unconstitutional. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Free Speech Coalition*, 535 U.S. at 244; *see also Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). COPA cannot stand if it "effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another." *Reno v. ACLU*, 521 U.S. at 874.

COPA is a classic example of an overbroad statute. In their Amended Complaint and Findings of Fact, plaintiffs detail at length the large quantity of constitutionally-protected speech that COPA sweeps in. Pls.' Findings ¶¶ 20-38; Amended Complaint at 27-67. Because COPA criminalizes a substantial amount of speech that is constitutionally protected for adults, it must be invalidated.

## II.     COPA is a content-based regulation that does not withstand heightened scrutiny.

It is beyond dispute that COPA, which selectively proscribes speech that is "harmful to minors," regulates speech on the basis of its content. Content-based regulations of protected speech are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992). Such laws will be upheld only if they are justified by a compelling

governmental interest and are "narrowly tailored" to effectuate that interest. In concluding that strict scrutiny applies to content-based bans on the Internet, the Supreme Court has held that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *ACLU I* at 870; *see also id.* at 874 ("Th[e] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."). Because COPA is substantially over- and underinclusive and the government could avail itself of effective alternatives that suppress less speech, COPA must be permanently enjoined.

### A.    COPA is overinclusive because it criminalizes a vast quantity of protected speech.

COPA's prohibition on the display of "harmful to minors" material online criminalizes vast quantities of protected speech. The speech of plaintiffs themselves provides the most forceful illustration of the speech that would be criminalized or deterred were COPA to take effect. *See* Pls.' Findings ¶¶ 20-38; Amended Complaint at 27-67. Diverse and valuable, but embracing the often stigmatized subject of sex, plaintiffs' speech provides free content ranging from fine art photography to poetry to sexual health information.

### 1.    Defendant's proposed narrowing constructions are unsupported by law.

Implicitly acknowledging COPA's broad sweep, throughout this litigation defendant has sought to narrow COPA by offering a number of unviable interpretations of its operative terms. Specifically, defendant has argued that COPA's phrase "harmful to minors" encompasses only "commercial pornography," or at least only material

16

harmful to *older* minors.  Defendant has further argued that the requirement that material be harmful to minors "as a whole" means that entire Web sites must satisfy COPA's definition of harmful to minors, not just individual web pages.  None of defendant's narrowing interpretations withstands scrutiny.

### (a)  COPA is not limited to commercial pornography

Nothing in COPA limits its application to "commercial pornography."  The term "pornography" is mentioned nowhere in the statute, and has no legal meaning.  This Court rejected defendant's interpretation more than seven years ago, and rejected it again last week.  See *ACLU v. Reno*, 31. F.Supp.2d 473, 480 (E.D. Pa. 1999) ("There is nothing in the text of COPA . . . that limits its applicability to so-called commercial pornographers only."); Memorandum Opinion, Oct. 10, 2006, at 4 ("[T]here is nothing in the statute that limits COPA to commercial pornographers.").  COPA expressly targets "writing[s]," "recording[s]," and "article [s]," not simply  images, which the term "commercial pornography" normally connotes.  47 U.S.C. § 231(e)(6).  The government's use of the term "pornography" in no way cabins the reach of the statute, and is merely a prejudicial label for speech that by definition adults have the right to access.  The relevant question is whether COPA's restriction of "harmful to minors" material burdens a substantial amount of speech on the Web.

Further, COPA's definition of the term "commercial" is so broad that it encompasses many individuals who, like plaintiffs, provide the vast majority of their speech for free.  COPA applies to any speaker who knowingly makes any communication "for commercial purposes . . . that includes any material that is harmful to minors." "Commercial purposes" is further defined to mean that the speaker is "engaged in the

business" of making prohibited communications when she "devotes time, attention, or labor to such activities, as a regular course of such person's trade of business, with the objective of earning a profit." 47 U.S.C. 231(e)(2)(A)-(B). COPA specifically allows prosecutors to seek criminal sanctions against speakers who offer material that is harmful to minors, even if such activities are not the "sole or principal part" of their business. 47 U.S.C. 231(e)(2)(B).

Plaintiffs and other witnesses are not "commercial pornographers," yet COPA, by its plain terms, proscribes their speech. In its recent Memorandum Opinion, this Court stated that "it is possible that some communities would find even minor sexual contact, like kissing, to be prurient in nature and patently offensive if performed by homosexuals." Memorandum Opinion, Oct. 10, 2006, at 5 n.2. Much of plaintiffs' speech is decidedly more explicit than a same-sex kiss. Pls.' Findings ¶¶ 20-38. Further, while plaintiffs offer the vast majority of their speech for free, all of them meet COPA's definition of "commercial," because they operate their sites with the objective of making a profit, often through advertising or the sale of goods.

The government's ungrounded interpretation of the statute as applying only to "commercial pornographers" cannot plausibly be squared with COPA's plain language and does not cure its deficiencies.

### (b) COPA is not limited to content that is harmful to "older" minors

Similarly, nothing in COPA limits it reach to material that is "harmful to older minors." The term "harmful to older minors" is nowhere in the statute. As this Court recently explained, "COPA defines minor as 'any person under 17 years of age,' thus, there is no facial distinction in the statute between older and younger minors."

Memorandum Opinion, Oct. 10, 2006, at 6 (citing 47 U.S.C. § 231(e)(7)).  Indeed, the

Third Circuit explicitly rejected defendant's proposed revision of the statute.  *ACLU v.*

*Ashcroft*, 322 F.3d at 240, 253-55 (3d Cir. 2003); Memorandum Opinion, Oct. 10, 2006,

at 6 (citing Third Circuit opinion); *see also* Section IV, *infra*.

> Moreover, if COPA were so limited, it would literally reach no speech not already
covered by obscenity statutes.  Defendant has admitted that there is no speech that is
"harmful" to a 16-year old but not to a 17 year-old.  Pls.' Findings ¶ 58.  Speech that is
"harmful" to a 17-year old is not the same thing as speech that is obscene.  Thus, if
COPA only covers speech that is "harmful" to a 16 year-old, all of that speech is already
covered by obscenity statutes.

### (c) COPA is not limited to entire Web sites that are harmful to minors.

> Defendant has argued that COPA's "as a whole" language requires an evaluation
of material in the context of the entire Web site.  However, the term "as a whole," lifted
wholesale from *Miller* and rotely applied to the fundamentally different context of the
Web, is but one example of COPA's unconstitutional vagueness, *see* Section III, *infra*,
and is comprehensible only if construed to apply to Web *pages* as a whole.

> Defendant's position is untenable.  If this Court chooses to assign a definite
meaning to the term "as a whole," then it should account for the reality of how individual
users experience the Web.  As plaintiffs detail in their Findings, the building blocks of
the Web are specific web pages, not entire sites.  Pls.' Findings ¶ 49.  For example, many
domains house a vast array of eclectic information that does not cohere into a "whole,"
and search engines, the predominant way of finding information online, direct individuals

to specific pages, not whole sites.

Other provisions of COPA preclude defendant's interpretation of the phrase "as a whole." As this Court and the Court of Appeals have noted, "the text of COPA imposes liability on a speaker who knowingly makes any communication for commercial purposes 'that *includes any material* that is harmful to minors.'" *ACLU v. Reno,* 31 F. Supp. 2d at 480 (emphasis in original); *ACLU v. Ashcroft*, 322 F.3d at 245. In fact, Congress specified *three times* that COPA is targeted at communications that "*include*[] any material" that may be deemed harmful to minors. 47 U.S.C. § 231(a)(1) (emphasis added); § 231(e)(2)(B) (twice). On the basis of COPA's own definitions, this Court correctly concluded that "[b]ecause COPA applies to communications which *include*, but are not necessarily wholly comprised of material that is harmful to minors, it logically follows that it would apply to *any* Web site that contains only some harmful to minors material." *ACLU v. Reno,* 31 F. Supp. 2d at 480 (emphasis added). Thus, any harmful-to-minors material posted on a Web site would subject the speaker to COPA's civil and criminal penalties. COPA effectively criminalizes all Web sites that contain even a single example of content that may be harmful to minors.

### (d) Narrowing constructions are inappropriate in these circumstances.

The Supreme Court has specifically rejected narrowing constructions in similar circumstances. As the Court explained in refusing to re-write the Communications Decency Act, courts should decline to "'draw one or more lines between categories of speech covered by an overly broad statute, when Congress has sent inconsistent signals as to where the new line or lines should be drawn.'" *Reno v. ACLU*, 521 U.S. at 884 (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26

(1995)). Just as the CDA could not be cured, COPA cannot be rewritten to "'conform it to constitutional requirements.'" *Reno v. ACLU*, 521 U.S. at 884-85 (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988)). To attempt such a major rewriting of the statute would constitute a " 'serious invasion of the legislative domain.'" *Reno v. ACLU*, 521 U.S. at 884 (quoting *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 479 n.26 (1995)).[3]

(2)   **The affirmative defenses do not remedy COPA's overinclusiveness.**

Defendant has repeatedly contended that COPA's affirmative defenses cure its overinclusiveness. There are at least three reasons to reject defendant's argument: COPA's affirmative defenses (1) are effectively unavailable; (2) impose an impermissible financial penalty on the exercise of a constitutional right; and (3) deter an unacceptable amount of protected speech.

A speaker who displays "harmful to minors" materials that otherwise fall within COPA's reach may avoid conviction only by invoking one of the Act's affirmative defenses.[4] Section 231(c)(1) of COPA provides an affirmative defense to prosecution if the defendant, "in good faith, has restricted access by minors to material that is harmful to minors - (A) by requiring use of a credit card, debit account, adult access code, or adult

---

[3] "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the Judicial for the Legislative Department of the Government." *United States v. Reese*, 92 U.S. 214, 221 (1875).

[4] COPA's criminal penalties would have a strong chilling effect even on those speakers who may have the ability to implement a defense. The defenses are affirmative defenses only, and "in no way shield[] a content provider from prosecution." *Shea v. Reno*, 930 F. Supp. 916, 944 (S.D.N.Y. 1996), *aff'd*, 521 U.S. 1113 (1997).

personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." 47 U.S.C. § 231(c)(1); *see also* 47 U.S.C. § 231(b).

As plaintiffs detail in their findings, COPA's affirmative defenses are literally or functionally unavailable. It is beyond dispute that credit cards, debit accounts, adult access codes, and adult personal identification numbers do not verify age. Pls.' Findings ¶¶ 71, 75-78. Thus, their use does not, "in good faith," "restrict[] access" by minors. 47 U.S.C. § 231(c)(1)(A). There is no evidence that there are digital certificates that verify age. Pls.' Findings ¶ 72. There are no other reasonable measures to verify age that are feasible under available technology. Pls.' Findings ¶ 73.

Even if the Court were to conclude that one or more of COPA's affirmative defenses were available, those defenses still would not render COPA constitutional. There are fees associated with all verification services identified in COPA, as well as others that purport to provide age verification. Such fees apply any time a user attempts to access material on a Web site, even if there is no purchase, and must either be paid by the Web site or passed on to the users. As a result, plaintiffs, who desire to provide free distribution of their information, will be prevented from doing so or will face prosecution. Pls.' Findings ¶ 65. The Supreme Court has routinely struck down such economic burdens on the exercise of protected speech. *See, e.g., Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."); *Erznoznik,* 422 U.S. at 217 (invalidating statute that in effect required drive-in theater owners wishing to avoid

prosecution either to restrict their movie offerings or construct expensive protective fencing). Because speakers must incur a financial penalty to avail themselves of the affirmative defenses, the affirmative defenses do not save COPA from unconstitutionality.

Most importantly, as this Court has said, "First Amendment jurisprudence indicates that the relevant inquiry is determining the burden imposed on the *protected speech* regulated by COPA…" *ACLU v. Reno*, 31 F. Supp. 2d at 473. Thus, even if the Court were to conclude that COPA's affirmative defenses somehow prevented minors from accessing speech, COPA would remain vastly overinclusive because the affirmative defenses themselves deter an unacceptable amount of speech. This Court correctly stated that "the implementation of credit card or adult verification screens in front of material that is harmful to minors may deter [adult] users from accessing such materials." *ACLU v. Reno*, 31 F. Supp. 2d at 495; *see also ACLU I*, 521 U.S. at 857 n.23. The evidence will clearly show that this deterrence still exists. Plaintiffs and others who engage in speech that might violate COPA reasonably believe, as do most Web speakers, that any impediment placed in front of a Web site will deter readers. Pls.' Findings ¶ 81. The risk of deterrence is especially severe where, as here, the speech at issue involves a stigmatizing subject such as sex. In *Denver Area*, the Supreme Court struck down a similar identification requirement because it would "further restrict viewing by subscribers who fear for their reputations should the operator, advertently or inadvertently, disclose the list of those who wish to watch the 'patently offensive' channel." 518 U.S. at 754. As plaintiffs detail in their findings, Web users are reluctant to disclose identifying information even where they do not court the risk of stigma. Pls.'

Findings ¶ 81.  Plaintiffs' speech on themes of sex and sexuality is precisely the sort of speech most likely to be deterred by identification requirements.

In addition, many adults do not have credit cards or debit accounts.  COPA will thus prevent them from accessing constitutionally protected speech and will prevent Web speakers from reaching them.

COPA is a classic illustration of a Hobson's choice.[5]  It threatens any speaker on the Web who displays any material that is "harmful to minors" with severe criminal and civil sanctions.  Faced with the risk of imprisonment, speakers are likely to "steer far wide[] of the unlawful zone."  *Speiser v. Randall*, 357 U.S. 513, 526 (1958).  The sole alternative to risking jail time or engaging in self-censorship is to embrace a set of affirmative defenses that themselves impose an unconstitutional burden.

A choice between two unconstitutional options is no choice at all.  For the foregoing reasons, COPA's affirmative defenses exacerbate, rather than remedy, its constitutional defects.

>    **B.    COPA is underinclusive because it is wholly ineffectual in protecting minors from vast quantities of speech that, by the government's standards, is harmful to minors.**

In addition to sweeping in large amounts of protected speech, COPA is poorly tailored because it is drastically underinclusive.  Under strict (and even intermediate) scrutiny, a law "may not be sustained if it provides only ineffective or remote support for the government's purpose."  *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 564 (1980).  COPA fails this test.  COPA would be wholly ineffectual in protecting minors from exposure to vast amounts of speech defined as "harmful to

---

[5] Thomas Ward, *England's Reformation* (1688) ("Where to elect there is but one, 'tis Hobson's choice — take that or none.").

minors" that is disseminated by persons who live abroad, is disseminated by methods other than the Internet, or are delivered by technological means not implicated by COPA's prohibitions. Additionally, COPA is underinclusive because its affirmative defenses allow minors to receive even the speech that COPA does cover.

### 1. COPA fails to stop much speech that the government would consider "harmful to minors"

#### (a) COPA does not apply to material that originates overseas.

As plaintiffs describe at length in their proposed findings, a large and growing percentage of adult content is provided by foreign Web sites. Pls.' Findings ¶ 121. COPA is substantially underinclusive because it leaves this speech wholly unregulated.

This Court and the Supreme Court have both stated unequivocally that COPA's prohibitions do not extend to overseas speech.[6] *ACLU v. Reno*, 31 F. Supp. 2d at 497; *Ashcroft v. ACLU*, 542 U.S. at 667 ("COPA does not prevent minors from having access to those foreign harmful materials."). There is no reason whatsoever to revisit that conclusion, which is squarely in line with Supreme Court and circuit precedent. A statute is presumed to have only domestic effect unless an analysis of the statutory language and the legislative history illustrate a clear, unambiguous congressional intent to legislate beyond U.S. borders. *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949).

To have extraterritorial effect, statutory language cannot be ambiguous or boilerplate, but rather must directly show intent that the statute at issue is to have extraterritorial application. The Supreme Court has expressly rejected the argument that

---

[6] This conclusion is in line with the Department of Justice's own statement that even if COPA were to go into effect, "children would still be able to obtain ready access to pornography from a myriad of overseas web sites." Letter from L. Anthony Sutin, Acting Assistant Attorney General, Department of Justice, to Honorable Thomas Bliley, Chairman, Committee on Commerce 1 (Oct. 5, 1998). P. Exh. 55.

the use of the phrase "interstate or foreign commerce" is sufficient to overcome the presumption against extraterritoriality. *N.Y. Cent. R.R. Co. v. Chisholm*, 268 U.S. 29, 31-32 (1925). COPA's language is identical to this language deemed insufficient to confer extraterritorial jurisdiction. As in *New York Central Railroad*, COPA applies to persons who "make[] any communication" in "interstate or foreign commerce."[7]  47 U.S.C. § 231(a)(1)-(3).

Indeed, review of COPA's legislative history reveals that Congress considered the scope of the problem of harmful internet content originating from abroad. However, Congress explicitly described COPA as a *domestic* legislative solution. Congress created a committee to study the international aspect of the matter and to report back at a future date, thus making plain that it did not consider COPA to be a solution to that problem. As explained in the House Report:

> Clearly domestic restrictions in the United States will help reduce a child's access to pornography, and it may even help protect children in foreign nations who are the recipients of this "burgeoning export trade." To the extent that an international problem exists, the Committee has requested that the Commission on Online Child Protection study the matter and report back to Congress.

H.R. Rep. No. 105-775, pt. III (1998).

Moreover, even if this Court were to change course and conclude that COPA does apply overseas, defendant would face insurmountable obstacles to effective enforcement of COPA against overseas Web sites. One likely difficulty would be establishing jurisdiction. Only rarely will overseas defendants have the "continuous and systematic"

---

[7] Further, COPA never refers to other nations, foreign citizens, or compliance with foreign sovereignties. There is no enforcement scheme within the statute to show how it may be applied overseas, and no other indication from the language that actions beyond U.S. borders were to be included in the statute's scope.

contacts necessary for general jurisdiction, and the Third Circuit's test for specific jurisdiction on the basis of operating a Web site disfavors jurisdiction where a Web site operator is not clearly doing business in the forum state through the site. *Helicopteros Nacionales do Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (referencing as authoritative the framework for jurisdiction over Web sites set out in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997)).  Even if a court were able to establish jurisdiction over a Web site, there would be no guarantee that any court order or judgment against a person in a foreign country would be enforceable.  In addition, because many extradition treaties generally require double criminality -- the extraditable offense must be considered a crime not only in the United States, but also in the country from which the individual is being extradited -- extradition is unlikely to be an option for prosecutors seeking to punish overseas violators of COPA.  John T. Soma, Thomas F. Muther, Heidi M. L. Brissette, *Transnational Extradition for Computer Crimes: Are New Treaties and Laws Needed?*, 34 Harv. J. on Legis., 317, 340 (1997); *see, e.g.,* Extradition Treaty, Dec. 3, 1971, U.S. Canada, 27 UST 983 (stating that both parties shall grant extradition only if the offenses are punishable by the laws of both countries for more than one year of imprisonment).

### (b) COPA does not apply to non-Web speech.

COPA is drastically underinclusive for a second reason:  it does not address many high-traffic means of communication through which sexually-explicit material is readily available.  COPA targets only those sexually-explicit materials that are communicated

"by means of the World Wide Web." 47 U.S.C. § 231(a)(1).  COPA defines "by means

of the World Wide Web" as follows:

> The term "by means of the World Wide Web" means by placement of
> material in a computer server-based file archive so that it is publicly
> accessible, over the Internet, using hypertext transfer protocol or any
> successor protocol.

47 U.S.C. § 231(e)(1).

As plaintiffs set out at length in their findings of fact, this definition does not

encompass such popular means of Internet communication as email, chat, instant

messaging, peer-to-peer, streaming audio and video, Voice over IP, and television over

the Internet.  Pls.' Findings ¶¶ 126-133.  Plaintiffs further establish that these means of

communication enable Internet users to communicate image and video files, including

files that contain images of sexual acts or contacts.  Pls.' Findings ¶ 134.

COPA also fails to address many non-Internet methods by which minors can

access "harmful to minors" material.  For example, it does not address the dissemination

of such material through books, magazines, video, movies, cable TV or broadcast TV.

Indeed, some plaintiffs have published books containing content that is substantially

similar to the content on their websites.  Stip. Facts ¶ 13.  Defendant's failure to regulate

these other means of communication renders COPA ineffective, and therefore fatally

underinclusive.[8]

### 2. The affirmative defenses allow minors to receive even the speech that COPA does cover.

---

[8] In an attempt to avoid the conclusion that COPA is underinclusive because it fails to reach so much speech, defendant cites *United States v. Edge Broadcasting Company*, 509 U.S. 418 (1993), for the proposition that "[e]ven if some pornography were unregulated, nothing prevents Congress from choosing to regulate an industry incrementally." Def. Conc. Law ¶ 65.  COPA does not regulate an industry.  It places a content-based restriction on speech.  The Supreme Court has expressly rejected incremental regulation as a permissible reason for underinclusive content-based speech regulations. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975).

COPA's affirmative defenses provide another reason that it is underinclusive. It is an affirmative defense to "in good faith," "restrict[] access . . . by requiring use of a credit card, debit account . . . ." 47 U.S.C. § 231(c)(1)(A). Minors have access to credit cards and debit accounts. Pls.' Findings ¶¶ 75-78. Thus, many minors will still be able to access "harmful to minors" materials under COPA's statutory scheme.

COPA is vastly underinclusive. It does nothing to address minors' access to "harmful to minors" materials originating overseas. It does nothing to address minors' access to "harmful to minors" materials through email, instant messaging, peer-to-peer file sharing, and a litany of other means of online communication. It does nothing to address minors' access to "harmful to minors" materials through books, magazines, video, movies, cable TV or broadcast TV. Further, even within the circumscribed universe it does regulate, many minors will gain access to "harmful to minors" materials through use of a credit card or debit account. For all of these reasons, COPA is fatally underinclusive.

## C.    Less restrictive alternatives

"A statute that 'effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another . . . is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve.'" *Ashcroft v. ACLU,* 542 U.S. at 665 *(quoting Reno v. ACLU,* 521 U.S. at 874). There are numerous alternatives to COPA that are both less restrictive and more effective in achieving the aim of preventing minors from obtaining access to inappropriate sexually explicit materials.

### 1.    Filtering and blocking software

As the Supreme Court has observed, "[b]locking and filtering software is an alternative that is less restrictive than COPA, and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." *Ashcroft v. ACLU*, 542 U.S. 656, 666-67. This Court has previously reached the identical conclusion, explaining that "blocking or filtering technology may be at least as successful as COPA would be in restricting minors' access to harmful material online without imposing the burden on constitutionally protected speech that COPA imposes on adult users or Web site operators." *ACLU v. Reno*, 31 F. Supp. 2d 473, 497 (E.D. Pa. 1999). Although user-based blocking programs are not perfect, both because they fail to screen some inappropriate material and because they block some valuable Web sites, a voluntary decision by concerned parents to use these products for their children constitutes a far less restrictive alternative than COPA's imposition of criminal penalties for protected speech among adults.

Congress itself has recognized the usefulness of user-based blocking software through another provision enacted along with COPA that requires Internet service providers to "notify [all new customers] that parental control protections (such as computer hardware, software or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors." 47 U.S.C. § 230(d). Congress also established a Commission on Online Child Protection, when it enacted COPA, to study methods of reducing minors' access to harmful materials. 112 Stat. 2681-736. That Commission ultimately concluded that user-based alternatives were more effective and less restrictive than COPA. Comm. on Child Protection Report to Congress (Oct.20, 2000), *available at*

http://www.copacommission.org/report/COPAreport.pdf.

The facts as established at trial will demonstrate that this court's and the Supreme Court's previous conclusions are, if anything, even stronger today in light of advances in filtering technology. Pls.' Findings ¶¶ 136-224. Accordingly, this Court should once again hold that blocking and filtering technology offers a more effective and less restrictive alternative to COPA's ban on constitutionally-protected speech.

### 2. Narrower restriction on speech

As this court previously suggested, Congress could have adopted a narrower restriction on speech that would have advanced the same purported interests without the severe and broad criminal penalties of COPA. Given that Defendant has repeatedly claimed that Congress' goal was to prevent the free dissemination of so-called "teaser" pictures, Congress could have restricted "only pictures, images, or graphic image files, which are typically employed by adult entertainment Web sites as 'teasers.'" *ACLU v. Reno*, 31 F. Supp. 2d at 497. This court also noted that Congress could have resorted to civil penalties, rather than the draconian use of criminal penalties for the distribution of protected speech. *Id.*

### 3. Utilizing existing laws and voluntary practices

Today, absent enforcement of COPA, a variety of laws and voluntary practices are available to protect minors from sexually explicit content. Though the government contends that COPA is necessary to protect minors, it has hardly employed all of the tools currently available. Given the significant protections already in place, surveyed briefly below, COPA's criminal penalties clearly fail strict scrutiny.

First, and most fundamentally, federal law already makes it a crime to distribute

material -- in any form -- that is obscene.  Indeed, a federal appellate court recently

affirmed a federal conviction predicated on a jury's finding that various offensive

*voicemail* messages consisted of words that constituted spoken obscenities,

demonstrating that obscenity laws may be applied even to words that are unaccompanied

by obscene images.  *United States v. Eckhardt*, ___ F.3d ___, 2006 WL 2820908 (11th

Cir., Oct. 4, 2006).[9]  Yet the government has prosecuted only a handful of obscenity

cases in the last twenty-five years.  Stip. Facts ¶ 47.  Because obscene material is not

constitutionally protected for adults *or* minors, prosecuting obscenity raises none of the

constitutional concerns that COPA does.  Though the government contends that its

interest in protecting minors from sexually explicit material is "compelling," it has failed

to protect minors from materials that are obscene even for adults -- a category

significantly more explicit (and thus hypothetically more harmful) than the

constitutionally protected materials that COPA seeks to criminalize.  By contrast, the

government has successfully prosecuted child pornography and solicitation of minors on

the Interact and elsewhere.  These laws also already offer significant protection for

minors.

  Furthermore, four new federal laws now specifically protect minors from

accessing inappropriate materials on the Internet.  The first, the Children's Internet

Protection Act, mandates the use of filtering software in all public schools and libraries

that receive federal funds (the vast majority of all schools and libraries).  The second, the

Dot Kids Implementation and Efficiency Act of 2002, creates a special ".kids.us" domain

on the Internet that "provides a safe online environment for children, and helps to prevent

---

[9] Given the recent date of the opinion, it may be helpful to note that an electronic copy is available at
http://www.ca11.uscourts.gov/opinions/ops/200512211.pdf.

children from being exposed to harmful material on the Internet." 116 Stat. 2766. The third, passed along with COPA and not challenged here, requires all Internet Service Providers to inform parents of the availability of filtering software for use in the home. The fourth, a prohibition on misleading Internet domain names, 18 U.S.C.A. § 2252B (Supp. 2004), "prevents Web site owners from disguising pornographic Web sites in a way likely to cause uninterested persons to visit them." *Ashcroft v. ACLU,* 542 U.S. at 663. Finally, all of the harmful-to-minors materials that are *for sale* on the Internet are already behind credit card screens. In this sense the online medium, by virtue of its structure, offers more protection than is available in the majority of book stores and convenience stores around the country.

Moreover, since COPA was passed, two congressionally sponsored commissions have recommended numerous additional steps that the government, teachers, and parents can take to minimize exposure and reduce any harmful effects. These steps include educating minors about Internet use, monitoring minors' time on the Internet, and other parental supervision.

In summary, in today's world, a minor is already protected from accessing sexually explicit material online whenever: 1) the minor is accessing the Internet at school or in a public library; 2) the material is for sale; 3) the material is obscene or contains child pornography; or 4) the minor is accessing the Internet at home and the parents are using filtering software. The government's argument that a permanent injunction against COPA will leave minors unprotected from sexually explicit material on the Internet ignores all of these existing protections.

### III.   COPA is unconstitutionally vague.

In addition to its other deficiencies, COPA is unconstitutionally vague.[10]  COPA's vagueness "is a matter of special concern for two reasons." *Reno v. ACLU*, 521 U.S. at 871.  First, COPA is a content-based regulation of speech, which "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Id.* at 871-72.  Second, COPA is a criminal statute.  In addition "to the opprobrium and stigma of a criminal conviction," *id.* at 872, COPA threatens violators with criminal penalties including imprisonment up to six months, criminal and civil penalties up to $150,000 a day, or both.  47 U.S.C. § 231(a)(1)-(3).  Thus, "[t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.* at 872; *see also Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1977) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.") (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939); *Smith v. California*, 361 U.S. 147, 151 (1959)).

Specifically, the phrase "considered as a whole" is hopelessly vague when applied to online communications.  For example, how should a speaker on the Web define the relevant "whole" when trying to determine the legality of a Web site comprised of thousands of linked documents, images, and texts, simultaneously presented through the ad hoc linking feature of the Web?  Plaintiffs and defendant have offered competing

---

[10] As defendant previously recognized, COPA "contains numerous ambiguities concerning the scope of its coverage." Letter Dated October 5, 1998, from the Department of Justice to the Honorable Thomas Bliley, Chairman of the House Committee on Commerce (the "DOJ Letter") at 4 (discussing ten separate ambiguities that are "among the more confusing or troubling").  P. Exh. 55.

explanations of the term's meaning.  COPA itself provides no clear answer to this question, which, if answered incorrectly, could send the speaker to jail.[11]

In addition, while COPA imposes severe additional penalties for "intentional" as opposed to "knowing" violations, it fails to define the distinction between the two requisite levels of knowledge for prosecution.  *See* 47 U.S.C. § 231(a)(1)-(2).  As defendant has noted, "[i]t is unclear what difference is intended in separately prohibiting 'knowing' violations . . . and 'intentional' violations . . . ; and there is no indication why the two distinct penalty provisions are necessary or desirable."  DOJ Letter at 405; P. Exh. 55.  In the absence of any clear definition, plaintiffs and other speakers cannot know how to conform their speech to avoid prosecution.

COPA's vagueness is underscored by defendant's own inconsistencies in defining which content is "harmful to minors."  Defendant's difficulties are significant and disturbing because he is charged with bringing prosecutions under the statute.  Other than the ambiguous and imprecise words of the statute, defendant has promulgated no policies, guidelines, criteria, or rationales for defining which, if any, speech is harmful to minors but not obscene.  Pls.' Findings ¶ 51.

Further, as detailed at length in plaintiffs' proposed findings of fact, defendant has been wholly unable to identify in any rational or coherent manner what speech is criminalized by COPA.  *See, e.g,* Pls.' Findings. ¶¶ 61, 62 (finding a photograph of topless women exposing postpubescent breasts on Playboy.com's Web site is not harmful to minors, but a photograph of topless women exposing postpubescent breasts on Penthouse.com's Web site *is* harmful to minors).  If defendant cannot or will not offer a

---

[11] The fact that plaintiffs have proffered a reasonable explanation of the term – i.e., that the relevant "whole" must refer to a Web page, not a Web site -- does not cure its vagueness.

consistent explanation of COPA's terms, then it is unreasonable to assume that ordinary Web site operators will do better.

It is axiomatic that criminal statutes threatening jail time must be clear. The need for precision is all the more important when what is criminalized bears a close resemblance to the exercise of the constitutional right to free speech. COPA's terms lack the requisite clarity, and therefore must be invalidated as impermissibly vague.

## IV.    COPA violates the First and Fifth Amendments by Prohibiting Dissemination to All Minors of Material Not Harmful to Older Minors[12]

Just as COPA would impermissibly reduce the adult population on the Web to reading and communicating only such free material that is suitable for young children, it would likewise restrict the ability of older minors to participate in speech that is no way harmful to them. Because COPA makes no allowance for the varying levels of maturity of minors of different ages, COPA prohibits speech that is valuable and constitutionally protected for older minors, but that may not be appropriate for younger children.

COPA's language is unambiguous: it is a crime to "make[] any communication for commercial purposes that is available to *any minor* and that includes any material that is harmful to minors.... " 47 U.S.C. § 231(a)(1) (emphasis added). "Material that is harmful to minors" is defined, in pertinent part, as words or images that, "with respect to minors," are "designed to appeal to . . . the prurient interest"; that depict sexual acts or nudity "in a manner patently offensive with respect to minors"; and that "lack[] serious literary, artistic, political, or scientific value for minors." 47 U.S.C. § 231(e)(6)(A-C).

---

[12] Sections IV and V of this brief, addressing the rights of older minors and the right to engage in anonymous online communication, are largely identical to the arguments submitted in response to the government's Motion to Dismiss, and addressed by this Court in its October 10, 2006 Memorandum Opinion.

The definition of "minor" follows immediately: "*any* person under 17 years of age." 47

U.S.C. § 231(e)(7) (emphasis added).

As the Supreme Court has explained, "minors are entitled to a significant measure

of First Amendment protection, and only in relatively narrow and well-defined

circumstances may government bar public dissemination of protected materials to them."

*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-213, (1975) (citations omitted).  In

*ACLU I,* this Court elaborated on that right in the context of sexually-explicit content,

expressing the view that "at least some of the material subject to coverage under the

'indecent' and 'patently offensive' provisions of the CDA may contain valuable literary,

artistic or educational information of value to older minors as well as adults."  *ACLU v.*

*Reno,* 929 F. Supp. 824, 852 (E.D. Pa. 1996).  For example:

> Photographs appearing in National Geographic or a travel magazine of the
> sculptures in India of couples copulating in numerous positions, a written
> description of a brutal prison rape, or Francesco Clemente's painting "Labirinth" .
> . . all might be considered to "depict or describe, in terms patently offensive as
> measured by contemporary community standards, sexual or excretory activities or
> organs."  47 U.S.C. § 223(d)(1).  But the government has made no showing that it
> has a compelling interest in preventing a seventeen-year-old minor from accessing
> such images.

*Id.* at 853.  In upholding this Court's ruling, the Supreme Court, invoking the specter of

"a parent who sent his 17-year-old college freshman information on birth control via e-

mail" facing prosecution under the CDA, affirmed that "[i]t is... clear that the strength of

the Government's interest in protecting minors is not equally strong throughout the

coverage of this broad statute."  *Reno v. ACLU*, 521 U.S. 844, 878 (1997).

This Court has already rejected defendant's argument that minors – even older

minors – have no constitutional right to receive or communicate sexually-explicit speech,

explaining that to "uphold such a broad and amorphous prohibition on access to materials could have significant and troubling effects on materials to which minors could be exposed, including art, health information, current events, and political information." Memorandum Opinion, Oct. 11, 2006, at 7. That determination was plainly correct. Even if "minors may constitutionally be denied access to material that is obscene as to minors," *Reno v. ACLU*, 521 U.S. at 895 (O'Connor, J., concurring and dissenting), there is a substantial amount of sexually-explicit speech that is *not* obscene as to older minors. The government has no compelling interest in preventing older minors from viewing such speech, and the First Amendment accordingly protects their right to do so.

In the alternative, defendant has contended repeatedly that COPA should be construed to incorporate an "older minor," and in particular a 16-year old minor standard, in determining what is considered harmful to minors. Defendant has thus suggested that older minors have no unique status under COPA, because material deemed to possess "serious literary, artistic, political, or scientific value" for a sixteen-year-old would be exempt from prosecution regardless of whether it possessed such value for a six-year-old. That argument is flawed for several reasons.

First, the "words and phrases Defendant[] seek[s] to add to the act appear nowhere in it." *ACLU of Georgia v. Miller*, 977 F. Supp 1228, 1233 (N.D. Ga. 1997). Indeed, defendant's proposed construction of the Act is counterintuitive, and would "narrow" the statute's reach nearly to the point of nonexistence. By defendant's reasoning, the only speech covered by COPA but not by obscenity standards is sexually-explicit speech that *possesses* "serious literary, artistic, political, or scientific value" for a seventeen-year-old, but *lacks* such value for a sixteen-year-old. It is thus hardly

surprising that defendant has been reluctant to identify non-obscene speech that is proscribed by COPA – by defendant's "definition," the universe of such speech is practically null.

Second, if defendant's proposed construction were adopted, the core purpose of COPA – protecting children from exposure to inappropriate sexually-explicit material – would be undermined by a regime that subjected elementary school children to sexually-explicit content deemed valuable to older teens. There is ample reason to believe that many "average person[s], applying contemporary community standards," might consider some sexually-explicit material – including some of the speech offered by plaintiffs – to have value for a sixteen-year-old, but to be "patently offensive with respect to" a seven-year-old. Under defendant's "narrowing," COPA would be wholly ineffectual as a means of protecting the vast majority of minors from sexually-explicit material considered to have value for older teens. It is for this reason that, although defendant cites to decisions in which courts have applied narrowing constructions to similar language, to do so here would be to violate, rather than vindicate, congressional intent.

Finally, as this Court has observed, the Third Circuit has already considered and rejected defendant's attempt to import an older minor standard into the statute. *ACLU v. Ashcroft*, 322 F.3d 240, 253-55 (3d Cir. 2003). There is no reason why the Court of Appeals' purely legal determination should be reexamined here. Accordingly, for the reasons stated above, COPA impermissibly interferes with the rights of older minors to communicate non-obscene speech on the Internet.

**V.    COPA violates the First and Fifth Amendment Right to Communicate and Access Information Anonymously**

It is axiomatic that the First Amendment guarantees the right to receive, as well as to communicate, information and ideas. *Bd. of Educ. v. Pico,* 457 U.S. 853, 866-67 (1982); *ACLU I,* 31 F. Supp. 2d 473, 481 n.2 ("The First Amendment protects the right to receive information and ideas.") (internal quotation marks omitted). COPA impermissibly conditions the exercise of that right on the loss of anonymity and surrender of personally identifying information. The result is to deter adults who fear stigma and exposure from communicating and receiving non-obscene information. Plaintiffs' theory is not a novel one: in fact, in striking down New Mexico's online harmful-to-minors law, the district court expressly held that the act "violate[d] the First and Fourteenth Amendments of the United States Constitution because it prevent[ed] people from communicating *and* accessing information anonymously." *ACLU v. Johnson,* 4 F. Supp. 2d 1029, 1033 (D. N.M. 1998) (emphasis added).

The right of anonymous communication has enjoyed judicial protection in a variety of settings. *See, e.g., McIntyre v. Bd. of Elections Comm'n,* 514 U.S. 334 (1995) (striking down Ohio statute prohibiting anonymous distribution of campaign literature); *Lamont v. Postmaster General,* 381 U.S. 301, 307 (1965) (invalidating statute requiring that individuals request certain mail in writing on ground of "deterrent effect"); *Denver Area Educational Telecommunications Consortium, Inc. v. FCC,* 518 U.S. 727, 754 (1996) (holding unconstitutionally burdensome requirement that cable users request in writing unblocking of certain cable channels). These precedents have been expressly applied in the context of the Internet. *See, e.g., Doe v. 2theMart.com,* 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001) ("[T]he constitutional rights of Internet users, including the right to speak anonymously, must be carefully safeguarded"); *Columbia Ins. Co. v.*

*Seescandy.com,* 185 F.R.D. 573, 578 (N.D. Cal. 1999) (noting the "legitimate and valuable right to participate in online forums anonymously or pseudonymously"); *ACLU v. Miller,* 977 F. Supp. 1228, 1232 (N.D. Ga. 1997) (striking down law prohibiting anonymous Internet speech "because 'the identity of the speaker is no different from other components of [a] document's contents that the author is free to include or exclude'") (quoting *McIntyre,* 514 U.S. at 348).

In the context of the Internet, there is often no clear distinction between "speaker" and "listener." Several plaintiffs, for example, operate chatrooms, message boards, and interactive forums on their sites; a visitor to plaintiff Heather Corinna's Scarleteen Web site might well be posting questions about sensitive subjects like birth control, venereal disease, or even incest. The Third Circuit's admonition that "the First Amendment protects against governmental inhibition as well as prohibition" carries particular weight in these circumstances. *Fabulous Assocs., Inc, v. Penn. Pub. Utility Comm'n,* 896 F.2d 780, 785 (3d Cir. 1990) (citations omitted) (invalidating statute requiring adults to obtain access code to hear sexually-explicit recorded messages).

Moreover, COPA's statutory protections against wider disclosure of personal information — which are hardly ironclad — are insufficient in themselves to cure the constitutional defect. COPA generally prohibits Web site operators from disclosing information collected for purposes of verifying age, but includes a broad and poorly-defined exception for disclosures "necessary to make the communication or conduct a legitimate business activity related to making the communication . . . ." 47 U.S.C. § 231(d)(2)(A). Further, those protections guard only against *additional* disclosures of identifying information; in order to gain access to Web sites, however, users will *already* have been

41

required to disclose their identities to Web site operators, thereby breaching their anonymity. *See, e.g., ACLU II,* 31 F. Supp. 2d at 485 (noting testimony that "the internet is a valuable resource for 'closeted' people who do not voluntarily disclose their sexual orientation due to fear of the reactions of others because it allows closeted people to access this information while preserving their anonymity.").

Finally, as the Supreme Court observed in striking down a requirement that cable subscribers submit written requests to obtain certain adult-themed channels, COPA's identification requirements "will further restrict" communication by people "who fear for their reputations should the operator, *advertently or inadvertently*, disclose the list of those who wish to watch the 'patently offensive' channel." *Denver Area,* 518 U.S. at 754 (emphasis added). By creating a permanent record of a user's visit to Web sites deemed harmful to minors by the government, COPA's identification requirement would effect an identical restriction and would impermissibly burden the exercise of important First-Amendment rights.

Plaintiffs do not dispute that courts, including this Court, have recognized the government's compelling interest in protecting minors from harmful materials, *see ACLU II,* 31 F. Supp. 2d at 495, and that that interest has, in certain circumstances, permitted age-verification requirements that have implicated the right of anonymous communication. *See, e.g., Crawford v. Lungren,* 96 F.3d 380 (9th Cir. 1996) (holding constitutional state ordinance banning sale of "harmful matter" in unsupervised sidewalk vending machines). However, that the right to communicate anonymously might yield in some instances to a compelling interest in protecting minors in no way suggests that the right does not exist or that it must yield here. Rather, just as it must with respect to

plaintiffs' other claims, the government must demonstrate that COPA's identification provisions, which burden the First Amendment right of anonymous communication, are the least restrictive means of accomplishing the compelling end of protecting minors. The government has not remotely satisfied its burden here.

## CONCLUSION

For the reasons stated above, plaintiffs respectfully request that this Court permanently enjoin enforcement of COPA.

Respectfully submitted,

_____/s/_____

Christopher A. Hansen
Aden Fine
Benjamin Wizner
Catherine Crump
American Civil Liberties Union
125 Broad Street – 18th floor
New York, NY 10004
(212) 549-2693

_____/s/_____

Christopher Harris
Seth Friedman
Katharine Marshall
Jeroen Van Kwawegan
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
(212) 906.1800

For Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17, 2006, I electronically filed plaintiffs' Pre-Trial Memorandum with the Clerk of the Court using the ECF system, which will send notification of filing to Raphael O. Gomez, Department of Justice.


_____/ s /_____
Catherine Crump
American Civil Liberties Union
125 Broad Street –18th Floor
New York, NY 10004


Counsel for Plaintiffs