## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION**, *et al.*, | ) ) ) | |
| **Plaintiffs**, | ) ) | Civil Action No. 98-CV-5591 |
| v. | ) ) | |
| **ALBERTO R. GONZALES**, in his official capacity as Attorney General of the United States, | ) ) ) ) | |
| **Defendant**. | ) ) | |

## <u>DEFENDANT'S TRIAL BRIEF</u>

PETER D. KEISLER
Assistant Attorney General

PATRICK L. MEEHAN
United States Attorney
RICHARD BERNSTEIN
Assistant U.S. Attorney

THEODORE C. HIRT
Assistant Branch Director
RAPHAEL O. GOMEZ
Senior Trial Counsel

ERIC J. BEANE
ISAAC CAMPBELL
JOEL McELVAIN
KENNETH SEALLS
JAMES TODD
TAMARA ULRICH
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
(202) 305-1432

Date: October 17, 2006

## **TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ................................................................................................ 1

STATUTORY BACKGROUND .......................................................................... 1

ARGUMENT ...................................................................................................... 3

I.      LESSER SCRUTINY APPLIES BECAUSE COPA PERTAINS TO COMMERCIAL SPEECH .................................................................... 3

II.     JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' FIRST AMENDMENT OVERBREADTH CLAIM ................... 5

III.    COPA SATISFIES EVEN STRICT SCRUTINY ................................... 7

        A.    Sexually Explicit Content is Prevalent on the Web, and the Government Has a Compelling Interest in Protecting Minors from Exposure to This Material ................................................ 7

        B.    COPA Is Narrowly Tailored ...................................................... 8

               1. Congress Followed the Guidance of the Supreme Court In Narrowly Tailoring COPA ................................................. 9

               2. COPA Defines Speech Within Its Reach Through Well-Established, Constitutionally-Upheld Legal Standards ....................... 11

               3. Other Statutory Limits Ensure That COPA is Narrowly Tailored ...... 13

        C.    COPA Is the Most Effective Way to Prevent Minors from Accessing Harmful-To-Minors Material ...................................................... 15

               1.    Viability of Affirmative Defenses ................................. 15

                    a.    Credit Cards ................................................... 15

                    b.    Age Verification Services ................................. 17

                2.    COPA Provides a Worldwide Solution ......................... 18

        D.    COPA Does not Unreasonably Burden Web Operators or Consumers ............................................................................ 20

        E.    There Are No Less Restrictive Alternatives to COPA ............................. 22

1. The Private Use of Filtering Software Cannot Be Deemed a Less Restrictive Alternative for the Government ........................ 22

 a. Filters Alone Are Not Effective ...................................... 23

 b. Filters Overblock ........................................................... 25

 c. Filters Are Not Always Implemented Properly ............... 26

2. Plaintiffs' Other Proposed Alternatives Would Not Be As Effective As COPA To Protect Children from the Exposure to Harmful Material ....................................................... 27

 a. Obscenity Prosecutions Are Not a Less Restrictive Alternative, Because COPA Applies to a Broader Category of Speech than Obscenity .................................. 27

 b. The Misleading Domain Names Statute Is Not a Panacea .......................................................................... 29

 c. Plaintiffs' Suggestions for a More Limited Statute Would Not Be As Effective as COPA ............................ 29

IV. JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' FIRST AMENDMENT VAGUENESS CLAIM ........................ 32

V. JUDGMENT SHOULD BE GRANTED TO DEFENDANT ON COUNTS TWO AND THREE OF THE AMENDED COMPLAINT ............... 33

# TABLE OF AUTHORITIES

**CASES**                                                         **PAGE(s)**

*44 Liquormart v. Rhode Island,*
    517 U.S. 484 (1996) ........................................................... 4

*Am. Booksellers Ass'n v. Virginia,*
    882 F.2d 125 (4th Cir. 1989) ........................................ 12

*Am. Future Sys. v. Penn. State Univ.,*
    752 F.2d 854 (3rd Cir. 1984) .................................. 3, 4, 5

*Am. Booksellers v. Webb,*
    919 F.2d 1493 (11th Cir. 1990) ........................... 9, 12, 29

*Ashcroft v. ACLU,*
    535 U.S. 564 (2002) ........................................................... 3

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) .................................................. 22, 29, 30

*Athenaco, Ltd. v. Cox,*
    335 F. Supp. 2d 773 (E.D. Mich. 2004) ....................... 33

*Baker v. Glover,*
    776 F. Supp. 1511 (N.D. Ala. 1990) ............................. 33

*Board of Education v. Pico,*
    457 U.S. 853 (1982) ........................................................ 11

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983) ............................................................ 4

*Briggs & Stratton Corp. v. Baldridge,*
    728 F.2d 915 (7th Cir. 1984) (1984) ............................... 3

*Brockett v. Spokane Arcades, Inc.,*
    472 U.S. 491 (1985) ........................................................ 11

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980) ................................................... 4, 5

*Crawford v.  Lungren,*
    96 F.3d 380 (9th Cir. 1996) ............................................ 9

*Davis-Kidd Booksellers, Inc. v. McWherter,*
866 S.W.2d 520 (Tenn. 1993) ................................................................... 12

*Dial Information Servs. v. Thornburgh,*
938 F.2d 1535 (2d Cir. 1991) .............................................................. 13, 15

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ........................................................................... 11, 12

*Excalibur Group, Inc. v. City of Minneapolis,*
116 F.2d 1216 (8th Cir. 1997) ..................................................................... 6

*Florida Bar v. Went For It, Inc.,*
515 U.S. 618 (1995) ..................................................................................... 4

*Fort Wayne Books, Inc. v. Indiana,*
489 U.S. 46 (1989) ..................................................................................... 32

*Ginsberg v. New York,*
390 U.S. 629 (1968) ........................................................................... passim

*Ginzburg v. United States,*
383 U.S. 463 (1966) ................................................................................... 13

*Greater New Orleans Broad. Ass'n v. U.S.,*
527 U.S. 173 (1999) ..................................................................................... 5

*Information Providers' Coalition for Defense of the First Amendment v. FCC,*
928 F.2d 866 (9th Cir. 1991) .................................................................... 13

*Jenkins v. Georgia,*
418 U.S. 153 (1974) ................................................................................... 11

*Kois v. Wisconsin,*
408 U.S. 229(1972) .................................................................................... 12

*Lorillard Tobacco Co. v. Reilly,*
533 U.S.  525 (2001) .................................................................................... 5

*M.S. News Co. v. Casado,*
721 F.2d 1281 (10th Cir. 1983) .................................................................. 9

*Manual Enterprises, Inc. v. Day,*
370 U.S. 478 (1962) ................................................................................... 13

*Matney v. County of Kenosha,*
    86 F.3d 692 (7th Cir. 1996) ........................................ 20

*McConnell v. FEC,*
    540 U.S. 93 (2003) ........................................ 10

*Miller v. California,*
    413 U.S. 15 (1973) ........................................ passim

*Mitchell v. Comm'n on Adult Entertainment Establishments,*
    10 F.3d 123 (3d Cir. 1993) ........................................ 20

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ........................................ 10

*New York State Club Ass'n v. City of New York,*
    487 U.S. 1 (1988) ........................................ 6

*New York v. Ferber,*
    458 U.S. 747 (1982) ........................................ 7, 11

*Osborne v. Ohio,*
    495 U.S. 103 (1990) ........................................ 11, 12

*Pitt News v. Pappert,*
    379 F.3d 96 (3d Cir. 2004) ........................................ 5

*Reno v. ACLU,*
    521 U.S. 844 (1997) ........................................ passim

*Roth v. United States,*
    354 U.S. 476 (1957) ........................................ 13

*Sable Comm'n of Cal., Inc. v. FCC,*
    492 U.S. 115 (1989) ........................................ passim

*Sabri v. United States,*
    541 U.S. 600 (2004) ........................................ 7

*San Filippo v. Bongiovanni,*
    961 F.2d 1125 (3d Cir. 1992) ........................................ 32

*United States v. Am. Library Ass'n,*
    539 U.S. 194 (2003) ........................................ 9

*United States v. Harvey,*
    2 F.3d 1318 (3d Cir. 1993) ........................................................ 18

*United States v. Knox,*
    32 F.3d 733 (3d Cir. 1994) ........................................................ 6

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000) ................................................................ 7

*United States v. Salerno,*
    481 U.S.739 (1987) ................................................................ 6

*United States v. Thomas,*
    893 F.2d 1066 (9th Cir. 1990) ................................................... 18

*Upper Midwest Booksellers Ass'n v. City of Minneapolis,*
    780 F.2d 1389 (8th Cir. 1986) ................................................... 9

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ........................................................... 5, 6

*Virginia v. Am. Booksellers Ass'n,*
    372 S.E.2d at 622 ........................................................... 12, 33

*Virginia v. Hicks,*
    123 S. Ct. 2191 (2003) ........................................................... 6

## STATUTES

18 U.S.C. § 2252B ...................................................................... 29

47 U.S.C. § 223(b) ..................................................................... 9

47 U.S.C. § 231 .................................................................. passim

H.R. 4411 §§ (2006) ................................................................... 20

Pub. L. No. 109-248, 120 Stat. 587 (July 27, 2006) ................................... 31

## INTRODUCTION

The Child Online Protection Act ("COPA") aims to protect this country's minors from sexually explicit harmful-to-minors material on the Web.  When it enacted COPA, Congress noted the pervasive amount of pornography on the Web and the fact that there are no laws regulating the exposure to such material by minors.  To this day, minors can access sexually explicit material on the Web in ever-increasing amounts.  Despite parents' best efforts, filters have not been successful at keeping such material away from minors, nor have any other measures taken by private entities or the government.  COPA fills the gap that other measures cannot; it targets those entities engaged in the business of disseminating material that is harmful to minors and prevents them from doing so.  COPA's affirmative defenses ensure that adults can continue to have access to this material, while furthering the government's compelling interest in keeping this material away from minors.

## STATUTORY BACKGROUND

COPA's objective is to prevent commercial pornography websites from offering minors access to the material on their sites.  H.R. Rep. No. 105-775, at 15 (1998).  To that end, COPA establishes criminal and civil penalties when a person "knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, makes any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors."  47 U.S.C. § 231(a)(1)-(3).  COPA defines a minor as "any person under 17 years of age."  *Id.* at § 231(e)(7).  A person communicates "for commercial purposes" only if he "is engaged in the business of making such communications," *id.* at § 231(e)(2)(A), and a person is engaged in the business of making such communications only if he "devotes time, attention, or labor" to making harmful-to-minors communications "as a

regular course of [his] trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income)." *Id.* at § 231(e)(2)(B). Further, only a person who "knowingly causes material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web" will be considered to be "engaged in the business of making, by means of the World Wide Web, communications for commercial purposes that include material that is harmful to minors." *Id.*

COPA defines "material that is harmful to minors" as "any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind" that is "obscene" or that:

> (A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;
>
> (B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and
>
> (C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

47 U.S.C. § 231(e)(6).

COPA provides "an affirmative defense to prosecution" if a person, "in good faith, has restricted access by minors to material that is harmful to minors." 47 U.S.C. § 231(c)(1). A person qualifies for this affirmative defense by (A) "requiring use of a credit card, debit account, adult access code, or adult personal identification number," (B) "accepting a digital certificate

that verifies age," or (C) taking "any other reasonable measures that are feasible under available technology." *Id.* Information collected for the purpose of restricting minors' access to materials covered by the Act is protected from unauthorized disclosure. 47 U.S.C. § 231(d).

COPA does not apply to Internet access service providers (commonly referred to as "ISPs," such as America Online or Cox Communications) or Internet information location tool providers.[1] 47 U.S.C. § 231(b)(2)-(3). In addition, COPA does not apply to those "similarly engaged in the transmission, storage, retrieval, hosting, formatting, or translation . . . of a communication made by another person, without selection or alteration of the content of the communication." 47 U.S.C. § 231(b)(4).

## ARGUMENT

### I.   LESSER SCRUTINY APPLIES BECAUSE COPA PERTAINS TO COMMERCIAL SPEECH

The statutory text and legislative history demonstrate that COPA applies to commercial speech. 47 U.S.C. § 231(a)(1). *See also* Stipulated Facts ¶ 119 ("COPA does not reach non-commercial speech, even on the World Wide Web."). Speech is deemed "commercial" when it is "part and parcel of a proposed commercial transaction." *Am. Future Sys. v. Penn. State Univ.,* 752 F.2d 854, 862 (3rd Cir. 1984). *See also Briggs & Stratton Corp. v. Baldrige,* 728 F.2d 915, 917-18 (7th Cir. 1984) (holding that speech motivated by a desire to "continue to maintain commercial dealings" was commercial). COPA regulates only "communication[s] for commercial purposes," § 231(a)(1), and "person[s] engaged in the business of making such communications." § 231(e)(2)(A); *see Ashcroft v. ACLU*, 535 U.S. 564, 569 (2002) (noting that

---

[1]  An Internet information location tool is "a service that refers or links users to an online location on the World Wide Web. Such term includes directories, indices, references, pointers, and hypertext links." 47 U.S.C. § 231(e)(5).

COPA's commercial limitation distinguished statute from predecessor).  COPA regulates

commercial enterprises trying to profit from material that is harmful to minors – entities less

likely to be deterred by minor age-verification requirements.  *See 44 Liquormart v. Rhode Island*,

517 U.S. 484, 499 (1996) (plurality opinion) (noting "the greater 'hardiness' of commercial

speech, inspired as it is by the profit motive"); *Am. Future Sys.*, 752 F.2d at 862 (noting

commercial speech is less likely to be chilled by regulation).  *See also* H.R. Rep. No. 105-775, at

15 (noting that the "age verification system procedures prescribed under the bill represent

standard procedures for conducting commercial activity on pornographic Web sites, the effect of

the bill is simply to reorder the process in such a way as to require age verification before

pornography is made available").

Because COPA regulates commercial speech, it should be reviewed under intermediate

scrutiny.  Laws regulating commercial speech are permissible if the government has a substantial

interest that is directly advanced by a regulation that is "not more extensive than is necessary to

serve that interest."  *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557,

566 (1980).  In other words, there must be a "reasonable" fit between the statute's ends and the

means chosen to accomplish those ends.  *Florida Bar v. Went For It, Inc*., 515 U.S. 618, 632

(1995).

Commercial speech is analyzed with intermediate scrutiny even if the regulated speech is

selected on the basis of its content.  *See, e.g., Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60,

65 (1983) ("regulation of commercial speech based on content is less problematic [than

restrictions on noncommercial speech, and therefore] content-based restrictions on commercial

speech may be permissible").  In cases involving legislative judgments about the harms of a

given product, intermediate scrutiny has been applied notwithstanding the fact that the statutes

made content-based distinctions.  For example, the Supreme Court recognized that Massachusetts's decision to prohibit the display of tobacco advertisement to protect minors was entitled to no more than intermediate scrutiny.  *Lorillard Tobacco Co. v. Reilly*, 553 U.S. 525, 554-55 (2001).  Similarly, restrictions adopted by Congress to address a variety of social costs associated with gaming advertisements were entitled to less exacting constitutional scrutiny. *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 184-87 (1999).

The Third Circuit, when considering a Pennsylvania law that banned the sale of advertisements of alcoholic beverages in school newspapers, stated that "[t]he very purpose of [the challenged statute] is to discourage a form of speech (alcoholic beverage ads) that the Commonwealth regards as harmful," which constituted a "content-based restriction of expression."  *Pitt News v. Pappert*, 379 F.3d 96, 106-07 (3d Cir. 2004).  Nevertheless, this statute was analyzed under the *Central Hudson* intermediate scrutiny test.  *Id.*; *see also Am. Future Sys.,* 752 F.2d at 859-61 (holding that *Central Hudson* test applied to a "content-based regulation").

Applying the *Central Hudson* intermediate scrutiny test to this case, it is clear that COPA is constitutional under the First Amendment.  As the arguments set forth below clearly demonstrate, COPA is "narrowly drawn" to "directly and materially advance[]" the government's interest in protecting minors from harmful material.  *See Central Hudson*, 447 U.S. at 564-65.

## II.     JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' FIRST AMENDMENT OVERBREADTH CLAIM

As an initial matter, "the overbreadth doctrine does not apply to commercial speech." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).  *See also*

*Excalibur Group, Inc. v. City of Minneapolis*, 116 F.2d 1216, 1225 (8th Cir. 1997).  Therefore,

Plaintiffs cannot raise a facial overbreadth challenge to COPA, as the issue of whether COPA

applies in an overbroad manner to speakers other than Plaintiffs is "irrelevant" for constitutional

purposes.  *Vill. Of Hoffman Estates*, 455 U.S. at 497.

Even if Plaintiffs were able to raise an overbreadth challenge to COPA, their claim that

COPA violates the First Amendment because it is overbroad should be rejected.  The Supreme

Court has noted that facial challenges are "to be discouraged," and it has "recognized the validity

of facial attacks alleging overbreadth . . . in relatively few settings, and, generally on the strength

of specific reasons weighty enough to overcome our well-founded reticence."  *Sabri v. United

States*, 541 U.S. 600, 609-10 (2004).  In order to succeed on their overbreadth challenge,

Plaintiffs must demonstrate that "no set of circumstances exists under which the Act would be

valid," *United States v. Salerno*, 481 U.S.739, 745 (1987), or that COPA is "substantially

overbroad."  *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988).  "The

overbreadth claimant bears the burden of demonstrating, from the text of [the law] and from

actual fact," that substantial overbreadth exists."  *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)

(quoting *New York State Club Ass'n*, 487 U.S. at 14).  For a law to be unconstitutionally

overbroad, its impermissible applications must be "'substantial,' not only in an absolute sense,

but also relative to the scope of the law's plainly legitimate applications."  *Id.* at 119-20.

Moreover, the courts will invalidate a statute as facially overbroad "only as a last resort" and

only if it is substantially overbroad.  *United States v. Knox*, 32 F.3d 733, 751-52 (3d Cir. 1994).

Plaintiffs will not be able to demonstrate at trial that COPA has no constitutional

applications or is "substantially overbroad."  To the contrary, Defendant will demonstrate that

COPA meets the requisite level of constitutional scrutiny for Plaintiffs' First Amendment

overbreadth challenge.[1]

## III.    COPA SATISFIES EVEN STRICT SCRUTINY

Even if the Court considers COPA to be a content-based restriction for which strict scrutiny applies, Defendant is able to meet his burden.  In such a situation, the statute at issue "must be narrowly tailored to promote a compelling Government interest" to be constitutional under the First Amendment.  *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 813 (2000).

### A.    Sexually Explicit Content is Prevalent on the Web, and the Government Has a Compelling Interest in Protecting Minors from Exposure to This Material

Defendant's experts Paul Mewett and Philip Stark performed a study of sexually explicit material on the Web.  To perform this study, a random sample was first drawn from URLs available in the index maintained by the Google and MSN search engines.  This study showed that approximately 1.1 percent of the Web pages in both the Google and MSN indexes are sexually explicit.  Def.'s Proposed Findings of Fact ¶ 57.  Given the estimates of the size of the Surface Web,[2] it is reasonable to estimate that between 275 million and 704 million of the Web pages on the Surface Web alone are sexually explicit.  *Id.* Defendant's experts also analyzed the prevalence of sexually explicit material that is returned from various search engine queries.  These studies demonstrated that sexually explicit web pages are disproportionately likely to be returned in response to search engine queries, and be returned even in response to seemingly innocent query terms.  *Id.* ¶¶ 58-60.

---

[1]  In any event, when addressing an overbreadth challenge, the Court "should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such limiting construction."  *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

[2]  The Surface Web is that portion of the Web that is indexed by search engines.  The portion of the Web that is not indexed is much larger, and is referred to as the "Deep Web."  *See* Def.'s Findings of Fact ¶ 39.

- 7 -

The prevalence of sexually explicit material on the Web is borne out by studies addressing minors' use of the Web.  Minors are commonly exposed to pornography on the Internet.  One report found that 25% of minors surveyed between the ages of 10 and 17 who regularly use the Internet inadvertently viewed pornography in the prior year.  *See Youth, Pornography and the Internet* at 50 (Dick Thornburgh & Herbert S. Lin, eds., National Academy Press 2005) (Pls.' Ex. 54) ("NRC Report").  Another study noted that 70% if minors between the ages of 15 and 17 have accidentally come across pornography on the Web.  *Id.*

The Defendant has a compelling interest in protecting minors from exposure to sexually explicit material on the World Wide Web.  The Supreme Court has firmly established that the government has "a compelling interest in protecting the physical and psychological well-being of children" and that "[t]his interest extends to shielding minors from the influence of literature that is not obscene by adult standards."  *Sable Comm'n of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).  *See also Reno v. ACLU*, 521 U.S. 844, 864-65 (1997); *Ginsberg v. New York*, 390 U.S. 629, 639 (1968).  There are two components to the compelling government interest in the protection of minors.  The government has an interest in aiding parents who wish to protect their children from the harmful effects of pornographic material.  *Reno*, 521 U.S. at 865.  In addition, the government has an independent interest in the well being of the nation's minors.  *Id.*  The government has acted upon this compelling interest by defining certain sexually explicit material as harmful to minors and regulating this material to protect minors from such material.

**B.     COPA Is Narrowly Tailored**

COPA is not a ban on speech.  Instead, it regulates access to harmful-to-minors material by following established precedent to ensure that it is narrowly tailored.  The Supreme Court has repeatedly held that Congress has authority to enact laws that are narrowly tailored to protect

minors from harmful material.  *Reno*, 521 U.S. at 864-865; *Sable*, 492 U.S. at 126; *Ginsberg*, 390 U.S. at 639.  That authority necessarily includes the power to place reasonable burdens on adults when it is necessary to protect minors from harmful material.  *See United States v. Am. Library Ass'n*, 539 U.S. 194, 209 (2003); *American Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990).  The requirement that COPA-regulated speech be placed behind an age-verification "curtain" is no more restrictive than state-law display requirements that require harmful-to-minors speech to be physically segregated, placed behind blinder racks, or accessed only by a token or other device intended to verify adult access.  *See Crawford v. Lungren*, 96 F.3d 380 (9th Cir. 1996); *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1395 (8th Cir. 1986); *M.S. News Co. v. Casado*, 721 F.2d 1281, 1289 (10th Cir. 1983).

> ### 1.  Congress Followed the Guidance of the Supreme Court in Narrowly Tailoring COPA

Congress initially passed the Communications Decency Act of 1996 ("CDA") to protect minors from harmful material on the Internet.  *See* Pub. L. No. 104-104, Tit. V § 502, 110 Stat. 133.  The CDA prohibited the knowing transmission of "indecent" messages over the internet to persons under 18 years of age, 47 U.S.C. § 223(b), as well as the display of "patently offensive" sexually explicit messages in a manner available to those under 18 years of age.  *Id.* § 223(d).  Although the Supreme Court recognized the government's compelling interest in protecting minors, it struck down the CDA as not narrowly tailored.  *Reno*, 521 U.S. at 879.

In drafting COPA, Congress addressed the specific concerns raised by the Supreme Court to ensure the law would be narrowly tailored.  First, as opposed to the CDA's application to Internet-based communications including e-mail news groups, and chat rooms, and to some media where age screening is not technologically feasible, COPA applies only to material posted

on the World Wide Web, in which sexually explicit material is prevalent and easily encountered by minors, and where age screening is both technologically feasible and affordable.[3]  H.R. Rep. No. 775 at 13-14.  Second, COPA follows well-established legal concepts in limiting the covered speech to that which constitutes obscenity for minors.  47 U.S.C. § 231(e)(6).  This is a much narrower range of speech than that covered by the CDA, which did not require material to appeal to the prurient interest or define the "indecent" or "patently offensive" speech covered.   Third, unlike the CDA, which applied to noncommercial entities and individuals posting material from their own computers, COPA applies only to persons who seek to profit from placing harmful-to-minors material on their websites as a regular course of business.  47 U.S.C. § 231(a)(1) and (e)(2).  Finally, COPA sets the age of minority at 17, rather than the CDA's age of 18 and clarifies that parents do not violate the Act when they permit their children to view covered material.  47 U.S.C. § 231(e)(7); H.R. Rep. No. 775, at 15; S. Rep. No. 225 at 6; *Reno*, 521 U.S. at 865-66, 878.  *Cf. Ginsberg*, 390 U.S. at 638 (upholding variable obscenity law for minors under 17 years old).

---

[3]  Despite successfully arguing that the CDA was unconstitutional because it addressed material *beyond* the Web, Plaintiffs now argue that COPA is unconstitutional because it applies *only* to the Web.  As an initial matter, Plaintiffs are judicially estopped from proffering this inconsistent litigating position.  *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Additionally, this limitation does *not*, in fact, diminish COPA's effectiveness.  COPA's limitation to content placed on the Web for commercial purposes does not impair its effectiveness, as the vast majority of such adult content has a commercial purpose.  The Web poses particular dangers of inadvertent exposure, and ready access, of minors to harmful-to-minors materials.  In addressing social concerns, Congress is allowed to regulate an industry incrementally.  *See McConnell v. FEC*, 540 U.S. 93, 207-08 (2003) (noting that "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind").  Moreover, many of the filters on the market appear to have the ability to completely block non-Web programs (such as e-mail and text messaging), so this is an area where filters can work in conjunction with COPA to protect minors from harmful material over the broader Internet.

### 2. COPA Defines Speech Within Its Reach Through Well-Established, Constitutionally-Upheld Legal Standards

COPA's definition of "harmful to minors," found at 47 U.S.C. § 231(e)(6), is directly derived from the tests for obscenity as to minors developed by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973), and *Ginsberg v. New York*, 390 U.S. 629 (1968) and patterned after the narrowly interpreted state harmful-to-minors statutes with harmful-to-minors definitions that have been upheld by numerous courts. H.R. Rep. No. 105-775, at 27-28 (1998). As the decisional law surrounding the regulation of obscenity-related speech makes evident, the harmful-to-minors standard employed in COPA reaches only materials that are clearly pornographic and inappropriate for minors. COPA does not apply to materials that merely contain nudity or profanity or that merely espouse controversial political or sexual viewpoints, as those materials would not fall within the established definition of "harmful to minors" adopted by COPA. *See* H.R. Rep. No. 105-775, at 28; *see also Osborne v. Ohio*, 495 U.S. 103, 112 (1990); *New York v. Ferber*, 458 U.S. 747, 765 n.18 (1982); *Board of Education v. Pico*, 457 U.S. 853 (1982); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 n.10 (1975); *Jenkins v. Georgia*, 418 U.S. 153, 161 (1974).

COPA's definition of "harmful to minors" contains three prongs, each of which must be met in order for materials to be deemed "harmful to minors." 47 U.S.C. § 231(e)(6). The first prong of COPA's harmful-to-minors definition is that the material must be designed to appeal or pander to the prurient interests. 47 U.S.C. § 231(e)(6)(A). This requires that material be designed to appeal or pander to a morbid or shameful interest in sex or nudity. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 498 (1985).

The second prong of COPA's harmful-to-minors definition limits the scope of "harmful

to minors" materials to those that depict or describe specific conduct (actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast) in a patently offensive manner with respect to minors.  47 U.S.C. § 231(e)(6)(B).   Courts have indicated that these limitations are to be narrowly construed.  *Osborne*, 495 U.S. at 113; *Erznoznik*, 422 U.S. at 214.

The third prong of COPA's harmful-to-minors definition is that the material must lack serious literary, artistic, political or scientific value for minors.  47 U.S.C. § 231(e)(6)(C).   If material has serious value for older minors, it will be considered to have value for all minors. *See, e.g., Webb*, 919 F.2d at 1504-05 (in construing a statute defining minors as under 18 years old, concluding that "if any reasonable minor, including a seventeen-year-old would find serious value, the material is not harmful to minors"); *Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127 (4th Cir. 1989) ("if a work is found to have a serious literary, artistic, political, or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack value for the entire class of juveniles taken as a whole") (quoting *Virginia v. Am. Booksellers Ass'n*, 372 S.E.2d 618, 624 (Va. 1988)); *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 533 (Tenn. 1993) (finding material has serious value for minors within the meaning of that State's display law, if it has serious value for "a reasonable seventeen year old minor").

Both the first and third prong of COPA's harmful-to-minors definition require that the material be judged "as a whole."   In *Kois v. Wisconsin*, the Court held that the "as a whole" language requires a "reviewing court [to] look at the context of material, as well as its content." 408 U.S. 229, 231 (1972).  This contextual analysis has been a mainstay of obscenity law since Roth was decided in the 1950s.  *See Kois*, 408 U.S. at 231 (holding that, even if particular photographs in a newspaper would be obscene "by themselves," they could not be the basis for

an obscenity prosecution where, "in the context in which they appeared in the newspaper they were rationally related to an article that itself was clearly [not obscene]"); *Roth v. United States*, 354 U.S. 476, 490 (1957) (requiring examination of "entire context" of books, pictures and circulars alleged to be obscene).  Websites are analogous to magazines, in which individual pictures or articles are examined in the context of the entire magazine.  *Manual Enterprises, Inc. v. Day*, 370 U.S. 478, 489 (1962); *Ginzburg v. United States*, 383 U.S. 463, 466 n.5 (1966).  In fact, several Plaintiffs, such as Salon, Nerve and Philadelphia Gay News, are online magazines or newspapers.

In addition to following the definitions of numerous state harmful-to-minors laws, Congress borrowed from a solid foundation of cases upholding similar measures in formulating a structure that places the burden on the information content provider to restrict access to harmful-to-minors communications, rather than on the parent or child to avoid those communications. *See Dial Information Servs. v. Thornburgh*, 938 F.2d 1535 (2d Cir. 1991); *Information Providers' Coalition for Defense of the First Amendment v. FCC*, 928 F.2d 866 (9th Cir. 1991). As these cases demonstrate, legislation to protect children in such a manner is clearly constitutional.

### 3.    Other Statutory Limits Ensure That COPA is Narrowly Tailored

COPA contains several other methods through which it remains narrowly tailored.  It applies only to Web transmissions by an entity "knowingly and with knowledge of the character of the material."  47 U.S.C. § 231(a)(1).  Therefore, it does not apply even to entities posting on the Web that do not have knowledge of the content that is posted on their websites.  This alleviates concerns of websites that allow individuals to place material on their websites without controlling such material.  For example, websites that allow others to place blogs or messages on

- 13 -

their site and do not, themselves control this third-party content, cannot be said to violate COPA. *See also id.* at § 231(b)(4) (exempting entities engaged in "the transmission , storage, retrieval, hosting, formatting, or translation . . . of a communication made by another person, without selection or alteration of the content of the communication").

In addition, COPA applies only to persons "engaged in the business" of distributing harmful-to-minors material.  47 U.S.C. § 231(e)(2)(A).  Persons are "engaged in the business" only if they seek to profit from such material, and even businesses that seek to profit from harmful-to-minors material are not covered unless they do so as a "regular course" of their business.  *Id.* at § 231(e)(2)(B).  COPA thus narrowly limits its obligations to businesses that regularly seek to profit from harmful material as a regular course of their business.  Therefore, an entity could not be prosecuted under COPA for the inadvertent, intermittent communication of material that is harmful to minors.  These important qualifications reflect Congress's intent to target commercial pornography.  Congress stated:

> Given that the scope of the bill is limited to commercial activity, and that the age verification system procedures prescribed under the bill represent standard procedures for conducting *commercial activity on pornographic web sites*, the effect of the bill is simply to reorder the process in such a way as to require age verification before pornography is made available, essentially requiring the *commercial pornographer* to put sexually explicit images "behind the counter."  The *commercial pornographer* is not otherwise restricted in his trade.

H.R. Rep. No. 105-775, at 15 (emphasis added).  Not surprisingly, the House Report repeatedly refers to those covered by COPA as "publishers of pornography," "commercial purveyors of pornography," and "commercial sellers of material harmful to minors."[4]  *Id.* at 7, 14, 18.

---

[4] While the Court noted in its October 10, 2006 Memorandum and Order that the statutory language of COPA does not explicitly mention pornography, the legislative history clarifies that the impetus for legislation is to target commercial pornography on the Web.

C.     **COPA Is the Most Effective Way to Prevent Minors from Accessing Harmful-To-Minors Material**

In addition to being narrowly tailored, COPA is the most effective way to prevent minors from accessing harmful-to-minors material.  COPA's narrowly-tailored defenses allow adults access to non-obscene, harmful-to-minors material.  In addition, COPA provides a worldwide solution to address the government's compelling interest in protecting minors from harmful-to-minors material.  Finally, because COPA addresses the problem at its source, COPA is more effective than other solutions proffered by Plaintiffs.

1.     **Viability of Affirmative Defenses**

At trial, Defendant will demonstrate that COPA's affirmative defenses effectively allow adults to access harmful-to-minors material, while preventing such access to minors.  COPA provides affirmative defenses to prosecution that are feasible and not burdensome.  47 U.S.C. § 231(c)(1)(A)–(C).  Credit cards and age verification services are available under COPA's affirmative defenses to effectively restrict minors' access to harmful material in a constitutional manner.

a.     **Credit Cards**

The placement of harmful-to-minors material behind a credit card screen is a valid affirmative defense under the statute, both as a matter of law and fact.  47 U.S.C. § 231(c)(1)(A). As a matter of law, Congress noted that credit cards are an affirmative defense in the FCC's dial-a-porn regulations, which has been upheld by the courts.  *See* H.R. Rep. 105-775 at 14 (citing *Dial Info. Serv's Corp. v. Thornburgh*, 938 F.2d 1535 (2d Cir. 1991), and *Sable*, 492 U.S. 115 (1989)).  Congress also took note of the Supreme Court's approval of affirmative defenses (such as credit cards) within laws protecting minors from sexually explicit material when it stated, "the

FCC's technological approach to restricting dial-a-porn messages to adults who seek them would be extremely effective, and only a few of the most enterprising and disobedient young people would manage to secure access to such messages." H.R. Rep. 105-775, at 14 (quoting *Sable*, 429 U.S. at 130).

As a matter of fact, COPA's credit card defense is viable. At trial, Defendant will show that most adults own either a credit card or a debit card tied to their checking account. Those that do not have such cards can acquire and use reloadable prepaid cards, and banks require these cards to be purchased by adults only. Card issuers have been reluctant to issue accounts to individuals under 18 years old due to state laws, which sets the age of majority for entering into contracts. Defendant will further show that only about 11% of children aged 12-17 have a credit or debit card, and these cards are either an "extra" card on their parent's account or a "parent co-signed" card in the child's name. Therefore, even for this small amount of minors with access to credit or debit cards, parents are able to monitor the card use of their children. While commercial website operators can process a zero-dollar transaction or charge an access fee for its material, either transaction would appear on the billing statement available to parents of minors with cards.

In addition, Defendant will show that credit cards are widely used on the World Wide Web. About 80% of adult U.S. consumers have made purchases online, and over 95% of commercial website operators in the United States accept credit, debit, and/or reloadable prepaid cards. Since 2001, consumer comfort with Internet purchasing has increased significantly for both credit cards and debit cards. Defendant will provide testimony that credit card barriers will not inhibit qualified consumers from viewing online content, and that COPA's affirmative defenses are used successfully in many businesses where controlled products are purchased and

consumed.

        **b.**      **Age Verification Services**

In addition to credit cards, there are effective age verification services that are available

for a website operator to use to ensure that only adults have access to his or her website, or to

portions of his or her website. These services constitute "reasonable measures that are feasible

under available technology" to "restrict[] access by minors to material that is harmful to minors."

47 U.S.C. § 231(c)(1)(C).

Defendant will proffer the testimony of two companies that provide age verification

services ("AVS products" or "AVS technologies"). These products offer two options that

websites can utilize COPA's affirmative defenses. AVS products, which currently are used for

online wine and tobacco sales, require a consumer to enter personal information—usually their

name, address, and the last four digits of their Social Security number. The information is then

verified using commercially available databases that aggregate public records. The process is

completed in less than a second. The testimony will show that AVS products are sophisticated

enough to ensure that a customer is not using someone else's personal information.

Additionally, the testimony will show that age verification can be completed at little cost, which

can be absorbed by the website operator. The cost, which currently ranges from as little as 25

cents to as much as $1.00, depending on the volume of transactions and the websites' tolerance

level for errors, will drop dramatically when there is a high volume of transactions. An age

verification password can be issued to certify that a consumer is not a minor and can be reused

over a specified period of time on the same or different websites. Although age verification

products are the most reliable existing method, the options for online identity and age

verification are becoming more numerous, more effective, and increasingly inexpensive to implement.

### 2.     COPA Provides a Worldwide Solution

COPA applies to operators of *both* foreign and domestic web sites.  COPA applies to anyone who "knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, makes any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors . . ."  47 U.S.C. § 231(a)(1).  Congress did not limit COPA's application on the basis of the residency of the website operator or the geographic location of the server hosting the website.  The statute is replete with references to the World Wide Web and Internet—terms which by definition have no geographic limitation.  For example, the Internet is defined as the "combination of computer facilities and electromagnetic transmission media . . . comprising the interconnected worldwide network of computer networks . . ."  *Id.* at § 231(e)(3).

Under established law, courts have jurisdiction to enforce COPA against foreign website operators.  The Third Circuit has applied other pornography-related statutes abroad when the goal is to "contain the evils caused on American soil by foreign as well as domestic suppliers" of pornography.  *United States v. Harvey*, 2 F.3d 1318, 1327 (3d Cir. 1993) (internal citation omitted); *see also United States v. Thomas*, 893 F.2d 1066 (9th Cir. 1990) (same).

COPA would be effective in protecting minors from exposure to sexually explicit material on the World Wide Web, whether that material is produced in the United States or in other countries.  A significant portion of that material is found on websites hosted in the United States, and the most popular pornography is disproportionately found within the United States.  Nonetheless, United States laws governing the Internet can be directly enforced even against

operators of websites that are hosted abroad.  The United States has entered into more than fifty

bilateral Mutual Legal Assistance Treaties ("MLATs") with other countries.  These agreements

provide the United States with the power, in investigating a violation of its laws that may have

been committed by a resident of another country, to request the assistance of a signatory country

to summon witnesses, to compel the production of evidence, to issue search warrants, and to

serve process.  *See, e.g*., Treaty Doc. 105-12, 105th Cong., 1st Sess., Exec. Rpt. 105-22, 105th

Cong., 2d Sess.  (U.S.-Poland MLAT).  United States' laws have been enforced against overseas

Internet companies in similar contexts.  For example, the foreign-based BetonSports was recently

indicted for violating United States law and, as a result, the company announced that it would

suspend its United States Internet wagering operations, which were physically based in Costa

Rica and Antigua.  Def.'s Trial Ex. 80.

Additionally, Defendant will provide testimony that COPA also can be enforced abroad

indirectly through the payment card industry's enforcement of terms in payment agreements.

The payment card industry can require foreign producers of sexually explicit material who make

that material available to minors in the United States over the World Wide Web to comply with

United States laws.  Each of the card companies (e.g., Amex, Discover, MasterCard, Visa) has

worldwide policies, operating rules and agreements, which govern any retailer or website

operator worldwide that accepts payment cards.  These agreements require compliance with all

applicable laws and regulations.  Further, if a website operator fails to comply with any

applicable law, then the card companies can take one of several actions to correct this:  impose

increasingly severe fines and/or entirely rescind the right of the website operator to accept that

company's payment card.  Moreover, merchant agreements require foreign merchants selling

goods and services to U.S. customers to comply with laws that are unique to the United States.

Thus, once COPA is in effect, foreign providers of commercial pornography will be required to satisfy COPA's regulatory requirements or risk fines or rescission of their right to accept payment cards.[5]

### D.    COPA Does not Unreasonably Burden Web Operators or Consumers

Legislation restricting access to harmful-to-minors material through affirmative defenses permissibly can impose financial burdens on speakers, and maintain its constitutionality.  The Supreme Court has noted that "there is no constitutional impediment to enacting a law which may impose costs on a medium electing to provide [indecent] messages."  *Sable,* 492 U.S. at 125.  *See also Mitchell v. Comm'n on Adult Entertainment Establishments*, 10 F.3d 123, 144 (3d Cir. 1993) (when availability of adult content is not significantly impaired, law's effect on plaintiff's revenue is not material to First Amendment analysis); *Matney v. County of Kenosha*, 86 F.3d 692, 700 (7th Cir. 1996) ("The fact that [the ordinance] may have an incidental financial effect on adult entertainment speakers and not on others is of no consequence.").  In fact, the modest burdens associated with COPA's affirmative defenses are analogous to the burdens associates with obtaining access to adult material in other settings, such as entries to nightclubs, adult bookstores, or NC-17 movies.

Defendant will provide testimony at trial through his expert Dr. Scott Smith that COPA will not have a significant impact on the commercial websites that it regulates.  Internet commerce is thriving, which suggests that consumers are becoming increasingly comfortable with providing personal information on the Internet, and consumers are increasingly willing to

---

[5] In the unlikely event that the payment card industry does not voluntarily comply with United States law, nothing prevents Congress from enacting legislation to ensure that COPA is enforced by the industry worldwide.  For example, the House recently passed the Unlawful Internet Gambling Enforcement Act, which requires financial institutions to refuse overseas financial transactions for unlawful Internet gambling.  H.R. 4411 109th Cong. (2006).

register or provide a credit card in order to gain access to websites.  In fact, the qualification standards of COPA's affirmative defenses are used successfully in many businesses where controlled products and services are purchased and consumed.

COPA's affirmative defenses reflect Congress's understanding of the business model of commercial pornography to present "teasers" to garner business, and Congress's desire to ensure that the adult content is not contained in such publicly-accessible "teasers," but is restricted to the audience for which it is intended – adults.  S. Rep. No. 105-225, at 1 (1998).  Congress noted that the affirmative defenses already "represent standard procedures for conducting commercial activity on pornographic Web sites," and that the affirmative defenses simply ensure that "the commercial pornographer . . . put sexually explicit images 'behind the counter.'"  H.R. Rep. No. 105-775, at 15.  Even the Plaintiffs' websites, which are not the target of COPA, would have no difficulty restricting access to content by minors.  Indeed, most of the Plaintiffs currently accept payment cards or link to second-party sellers who do.  *See* Stipulations at ¶¶ 100-09.

In fact, new technologies further alleviate burdens associated with COPA's affirmative defenses.  Currently available technology permits website operators to process "micro-payments," and that technology can be used, in conjunction with a payment card transaction, to restrict minors' access to harmful-to-minors material.  47 U.S.C. § 231(c)(1)(A).  At trial, Defendant will offer testimony from Bitpass, a company that offers digital media and entertainment companies a means to accept micro-payments for their content.  The technology works by allowing consumers to set up an account with Bitpass that is tied to either a payment card or Paypal account, and allows consumers to access material from the web without interrupting the flow of their web-surfing experience.  The consumer's personal information stays safe with Bitpass and does not require consumers to divulge personal information every

- 21 -

time they want to make a purchase on the web.  Purchases can be as little as $0.99, $0.10, or even for free to the consumer.

###### E.      There Are No Less Restrictive Alternatives to COPA

###### 1.      The Private Use of Filtering Software Cannot Be Deemed a Less Restrictive Alternative for the Government

The Supreme Court remanded this case for a determination of whether filters could present a lesser restrictive alternative than COPA to protect minors to harmful-to-minors material.  Defendant will provide evidence at trial that, in fact, filters are not a lesser restrictive alternative to COPA.  As an initial matter, the private use of filtering software cannot be deemed a "less restrictive alternative" for the purpose of constitutional analysis.  The proper inquiry is whether alternatives available to the government "would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve."  *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (quoting *Reno v. ACLU*, 521 U.S. 844, 874 (1997)).  The government currently encourages the use of filters, and COPA is designed to work *in addition to* filters to protect minors from harmful material.

Filters, however, cannot fully protect minors without the assistance of COPA.  In fact, the use of filters is not currently stopping the proliferation of harmful-to-minors material on the Web.  Despite a reported increase in filter use in the last five years, the rate of unwanted sexual material reaching 10 to 17 year-olds has risen.  *See* Def.'s Trial Ex. D-2 at 46.  Defendant will provide evidence that there is a market failure regarding home filters, which prevents households from using them.   Defendant will provide additional evidence that, even when filters are used in homes, they do not and cannot provide the same level of protection to minors as COPA.  Filters fail to block some websites that contain harmful-to-minors material ("underblocking"), and also

block websites that do *not* contain harmful-to-minors material ("overblocking").  COPA does not suffer from these problems, as it restricts access to the very material that is considered to be harmful to minors, and nothing more.

### a.        Filters Alone Are Not Effective

Defendant will provide expert testimony regarding web-surfing behavior and how various types of filters work in relation to this behavior (e.g., white lists, black lists, and dynamic filtering).  The expert testimony of Dr. Stephen Neale will explain how text-based filters (which are used by all filtering companies) cannot minimize both the underblocking of sexually explicit material and the overblocking of non-sexually explicit material.  These problems will continue in the foreseeable future, because the problems with text-based filtering are conceptual and linguistic.  While computers are able to perform tasks that essentially consist of calculating probabilities and generally crunching numbers, they cannot -- and will never be able to -- abstract features of sorts they have not been programmed to recognize, nor draw on a rich background of perceptual, emotional, and social experience that can be obtained only by living in the world and seeing how others with the same general physical and cognitive architecture live in it.  As such, filters will always have an inherent weakness due to their technological nature.

In addition, Defendant will provide testimony from Paul Mewett and Dr. Philip Stark describing the results of their comprehensive study of home-use filters that were rated among the best content filters on the market, as well as filters offered by major internet service providers.  Their study tested the filters against three data sets.  First, they were tested against URLs drawn randomly from the indices of the major search engines.  Second, they were tested against URLs that were returned from a random set of queries entered into several master search engines.  Third, they were tested against URLs returned from a set of the most popular queries as reported

by the Wordtracker service.  Each filter was set to block material that would be sexually explicit,
but to allow other material through the filter.  A statistical analysis of these tests reveals that
none of the filters succeeded at blocking sexually explicit material while avoiding the blocking
of other material.  In particular, the tests show that:

- with regard to web pages drawn from the Google and MSN search engine indices, the various filter products failed to block the sexually explicit web pages from 8.6 percent to 60.2 percent of the time (underblocked), and the filters blocked the non-sexually explicit web pages from 0.4 percent to 23.6 percent of the time (overblocked).  None of the products had a combined underblocking and overblocking score that was less than 16.3 percent.

- with regard to the web pages that were returned from a random sample of queries on the MSN, Yahoo!, and AOL search engines, the study found that the various filter products failed to block the sexually explicit web pages from 6.2 percent to 43.4 percent of the time (underblocked), and blocked the non-sexually explicit web pages from 0 percent to 20.7 percent of the time (overblocked).  None of the products had a combined underblocking and overblocking score that was less than 15.3 percent. (The two products with a 0 percent overblocking score also underblocked sexually explicit web pages at rates of 20.4 percent and 43.4 percent, respectively.)  Among the queries that retrieved at least one sexually explicit web page, between 15.6 percent and 56.1 percent of those queries retrieved at least one sexually explicit web page that was not blocked by the various filters.

- with regard to the web pages that were returned from the most popular queries as reported by Wordtracker, the study found that the various filter products failed to block the sexually explicit web pages from 1.3 percent to 12.6 percent of the time (underblocked).  The various filter products blocked the non-sexually explicit web pages from 2.9 percent to 32.8 percent of the time (overblocked).  None of the products had a combined underblocking and overblocking score that was less than 13.1 percent.

The study confirmed that there is a direct relationship between underblocking and
overblocking.  Filtering products achieve lower rates of underblocking only by blocking
significantly more "clean" content.  For each of these results, the more that a particular filtering
product overblocked, the less it underblocked, and vice versa.  Moreover, this study

demonstrated that some of the most popular filters performed the worst.

This study provides the best estimate of the rates at which filtering software underblock sexually explicit material and overblock "clean" material, for at least three reasons.  First, the study used scientifically valid principles to draw representative data sets of web pages against which to test the filtering products.  Other studies, in contrast, use "samples of convenience" that likely skew their results.  Second, the government's study used the most recent data available.  Because the Web is continuously changing, older studies do not provide the best evidence of the current status of filtering technology.  Third, the government's study was designed to be restrictive.  Because only those web pages that were clearly designed for an adult entertainment purpose were used for the underblocking test, and only those web pages that clearly lacked any sexual content were used for the overblocking test, the results reported in the government's study likely understate the true rates of underblocking and overblocking.

### b. Filters Overblock

Overblocking is a significant concern for filters.  Because non-sexually explicit web pages were significantly greater in number in the study than were sexually explicit web pages, even a relatively small increase in the percentage of "clean" web pages that are blocked can result in many blocked pages for a typical user.  Examples of non-sexually explicit web pages that were blocked by the filters tested by the study include the following:  www.nakedjuice.com (a fruit juice company); www.topless-sandal.com (a footwear company); www.boobiethon.com (a breast cancer awareness web site); www.i-love-cats.com; www.weightlossguide.com; www.aclufl.org/news_events/calendar/index.cfm?viewDate=6%2F1%2F2005 (the calendar of a state ACLU chapter); and www.cia.gov/cia/publications/factbook/geos/mx.html (the CIA World Fact Book).  Even websites maintained by the Plaintiffs are subject to overblocking.  For

example, www.powells.com, an online bookstore, was blocked at the domain level in its entirety by four of the filters, and certain pages were blocked by an additional four filters.

### c.        Filters Are Not Always Implemented Properly

In addition to testimony regarding whether filters are effective when used properly, Defendant will provide testimony that there are significant barriers to the proper use of home filters.  Parents may choose not to use a filter because they find the software to be too restrictive, limiting the child's ability to research online effectively.  A customer must have a significant degree of computer knowledge, and be willing to undertake a certain degree of effort, in order to install, configure, and update filters.  An inexperienced parent is likely to face difficulties in installing the software or in attempting to remove it at a later date.  In addition, many computers are unable to effectively utilize filters due to technical constraints and compatibility problems, such as firewalls, anti-virus software, or conflicts between codes of other programs.  Internet filters can also be circumvented, and there are many websites that describe how disable or circumvent filters.  *See, e.g.*, www.cexx.org.  Additionally, web proxy sites can be used to gain access to blocked websites, and translation tools can be used by bypass filters.

Defendant will also provide testimony regarding the market failure for home filtering products as another barrier to the effective use of filters to protect minors from harmful-to-minors material.  A market failure exists when the value to consumers of higher quality products, if produced, would exceed the cost of producing them.  Only a portion of households with minors use filtering software.  The low level of penetration of filtering software into its potential market indicates a failure of the market to provide products which are effective and can be effectively used by consumers.  The nature of the filtering software market is conducive to market failure because of the asymmetry of information between consumers and producers of the

filtering software.  Market analysis demonstrates that there will be an insignificant increase in

home use of personal computer ICF software.  In addition, it is unlikely that better filtering

software for home computers will be developed because the market is not large enough for the

product.  Defendant's expert Jeffrey Eisenach will testify that the home filter market suffers from

what is known as the "lemon problem," in which filtering software producers lack an incentive to

create a quality product because consumers make purchases without being able to assess the

quality of the product.  In such markets, producers of high quality products are unable to obtain

full value for the products they produce, since consumers are unable to distinguish high quality

products from low quality products, and therefore are unwilling to pay the full cost of producing

a higher quality product.

> ### 2.      Plaintiffs' Other Proposed Alternatives Would Not Be as Effective as COPA To Protect Children from the Exposure to Harmful Material

Plaintiffs proffer a variety of other measures that they allege would be lesser restrictive

alternatives to COPA, such as using other laws such as the obscenity laws or the so-called

Misleading Domain Name statute in an effort to protect minors.  Using other laws would not

target either the material covered by COPA or the protect minors in the same way that COPA

does.  Plaintiffs also point out ways a more limited statute would be less restrictive.  A more

limited statute, however, would not be as effective in protecting minors from harmful-to-minors

material as COPA is.

> ### a.      Obscenity Prosecutions Are Not a Less Restrictive Alternative, Because COPA Applies to a Broader Category of Speech than Obscenity

An increase in obscenity prosecutions will not prevent minors from being exposed to

sexually explicit material on the World Wide Web, because the scope of "harmful to minors"

material is broader than "obscene" material.  Obscenity law regulates a very narrow category of speech that is entitled to no First Amendment protection, while COPA has broader application, creating a category of regulated material that is obscene for minors, not adults.  *Ashcroft v. ACLU*, 542 U.S. 656, 675 (Stevens, J., concurring).  Therefore, additional prosecutions of obscenity laws will do nothing to protect minors from material that is non-obscene, yet harmful to minors.

Material is obscene, under the standard set forth in *Miller v. California*, 413 U.S. 15 (1973), if (a) an average person applying contemporary community standards finds that the material taken as a whole appeals to the prurient interest; (b) an average person applying contemporary community standards finds that the material depicts sexual conduct in a patently offensive manner; and (c) a reasonable person, viewing the material as a whole, finds that the material lacks serious literary, artistic, political or scientific value.  *See id*. at 24.  Examples of websites that have been prosecuted as obscene include, *inter alia*, child pornography, depictions of bondage and sadistic or masochistic behavior involving children, sexual contact between an adult woman and a dog, violent gang rapes of women, sexual intercourse between humans and animals, and sexual activity involving urination, defecation, or genital mutilation.  *See* Def.'s Trial Ex. D-283 (Interrogatory Response No. 18).

The "harmful to minors" standard used in COPA differs from the *Miller* test in two respects.  First, it requires that each prong of the *Miller* test be analyzed with respect to older minors.  In addition, the second prong of the harmful-to-minors standard provides a more detailed description of material that a judge or jury may find to be "patently offensive" than the Miller obscenity test.  47 U.S.C. § 231(e)(6)(B).

The *Miller* test provides a standard that is judged by reference to the reasonable adult,

whereas COPA provides a standard with respect to older minors.  *See Am. Booksellers v. Webb*, 919 F.2d 1493, 1506 (11th Cir. 1990).  Because COPA regulates harmful material beyond that which adults find obscene, its effects cannot be replicated by other criminal statutes.  *See ACLU*, 521 U.S. at 875 (noting a "governmental interest in protecting children from harmful materials" that do not meet the court's definition of obscenity for adults).

> **b.      The Misleading Domain Names Statute Is Not a Panacea**

The Misleading Domain Names statute cannot be considered a less restrictive alternative because it is already in existence; it has been in effect for three years.  18 U.S.C. § 2252B.  In fact, the rate at which minors are exposed to sexually explicit material on the Web has continued to increase since this Act was passed.  Additionally, the Misleading Domain Names statute is not as effective as COPA because it addresses websites that entice visitors to a website by deceptive means.  18 U.S.C. § 2252B.  The statute does not address websites that are, by name or reputation, indisputably pornographic.  It applies only to instances in which a domain name is typed directly into a browser, and thus does not protect minors from exposure to harmful-to-minors websites that are accessed by other means.  Further, the statute does not require that websites verify age before displaying harmful-to-minors material.

> **c.      Plaintiffs' Suggestions for a More Limited Statute Would Not Be as Effective as COPA**

Plaintiffs suggest a variety of ways in which COPA could be "more limited," such as regulating only images, providing only civil penalties, having websites label harmful-to-minors material, requiring filter companies to create a harmful-to-minors category, creating a government list of harmful-to-minors websites, educational activities, parental involvement, and creating an independent ratings system for websites.  Many of these alternatives are simply not

workable; others contain constitutional concerns of their own.  None of Plaintiffs' proposed alternatives would be as effective as COPA in furthering the government's compelling interest in protecting minors.

The government has a compelling interest in protecting minors from harmful-to-minors material in any form, not just images alone.  Ignoring entire categories of material that are harmful to minors would not be nearly as effective as COPA, which targets all harmful-to-minors material through well-developed legal standards.  Nor would a law providing for only civil penalties be as effective as COPA.  Given the large profits that commercial pornographers make through the distribution of harmful-to-minors material on the Web (estimated to be $12.6 billion in 2005 (Def.'s Trial Ex. 274)), civil penalties alone would be insufficient to address the problem.  *See ACLU*, 542 U.S. at 689 U.S. (Breyer, J., dissenting) (noting that removing a major sanction would make COPA less effective).  The obscenity law upon which COPA is derived has criminal penalties, and the problem of obscenity for minors is no less deserving of the government's full enforcement.

Plaintiffs' suggested measures that work with filtering ignore the fundamental problems with filtering products.  They assume that all parents will be using filtering products, and that such products work perfectly.  The filtering solutions also would place responsibility for the protection of children in the hands of private parties who are not the purveyors of harmful-to-minors material.  Instead of relying on the technology of private parties, COPA constitutes enforceable government action that targets the problem at its source - those that produce harmful-to-minors material.

The use of a government "black list" of websites with harmful-to-minors material, in addition to raising many of the same (or more) constitutional objections present here, would be

ineffective for the same reasons that blacklists are ineffective when used with filtering software. Websites are too numerous and change too frequently for the government, or any private business, to effectively separate harmful from non-harmful material.  Only a solution directed at the source of the problem and with proper incentives for compliance can adequately protect children.

Other voluntary measures, such as having websites label harmful-to-minors material or institute an independent website rating system, will not be as effective as COPA.  Voluntary measures alone will not prevent children from accessing restricted material.  The establishment of a voluntary website rating system would be ineffective because website operators would lack an incentive to label their material in a manner that makes it more likely that filters will block access to the website.  The operators would have to agree to a uniform system of ratings, or agree to subject themselves to an independent rating body for "binding" ratings.  Moreover, there would be no penalties for non-compliance with any such voluntary system.  The government has previously addressed one voluntary system, the creation of a child-friendly top-level domain name of .kids, and this initiative has not been successful in garnering support from website operators.  The top-level domain of .kids contains a trivial number of websites to voluntarily sign up.[6]  *See* www.kids.us.

Promoting further education of parents cannot be deemed a less restrictive alternative for at least two reasons.  First, the government is already pursuing these goals.  *See* Pub. L. No. 109-248, 120 Stat. 587 (July 27, 2006).  Second, this theory assumes that parents, when properly

---

[6]  Some have suggested the creation of a .xxx top level domain name for pornography. Even the ACLU has stated that the creation of a .xxx domain is "not going to make a whole lot of difference" in stopping minors from finding pornography.  *See* Stipulated Fact ¶ 98 (quoting Marv Johnson, legislative council for the ACLU).

educated by the government, invariably can protect their children from the harmful material
lurking on the World Wide Web.  This argument fails because parents are unable to prevent
accidental viewings of such materials, and the widespread availability of the Web subverts
parental control.  According to the NRC Report, while parental supervision and education may
be useful in part to counter the problems of minors' exposure to sexual materials on the Web,
"the expectations for such education and socialization should not be unrealistic."  (Pls.' Trial Ex.
54 at 371).

## IV.   JUDGMENT SHOULD BE ENTERED FOR DEFENDANT ON PLAINTIFFS' FIRST AMENDMENT VAGUENESS CLAIM

To survive a vagueness challenge, criminal statutes "need only give 'fair warning' that
certain conduct is prohibited."  *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992).
A vagueness challenge is particularly difficult to sustain because COPA does not apply to
entities that unknowingly make harmful to minors material available to minors by means of the
World Wide Web.  *See* 47 U.S.C. § 231(a)(1), (e)(2)(B).

For the same reasons discussed in Section III.B, *supra,* regarding why the statutory
language of COPA is narrowly tailored, the language of COPA is not vague.  The Supreme Court
has stated that variable-obscenity tests to protect minors are valid.  *Ginsberg*, 390 U.S. at 639.
As a variable-obscenity test, COPA follows the well-established standards of the *Miller*
obscenity test to define the material within its reach.  To the extent it deviates from the *Miller*
obscenity test, COPA provides specific actions that must be present to be triggered.  47 U.S.C.
sec. 231(e)(6)(B).  The *Miller* and *Ginsberg* standards repeatedly have been upheld over
vagueness challenges.  See*, e.g., Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 57 (1989).

The fact that harmful-to-minors statutes have been universally interpreted as applying an

older-minors standard also undercuts Plaintiffs' vagueness challenge.  *See supra* at 12 (gathering

cases).  Courts interpreting state harmful-to-minors laws provide ample guidance regarding what

types of materials are covered.  *See, e.g., Am. Booksellers Ass'n*, 372 S.E.2d at 622 & 625

(finding that sixteen books, including Judy Blume's *Forever*, *Hollywood Wives, Changing

Bodies, Changing Lives* and *Our Bodies Ourselves*, had serious literary, artistic, political or

scientific value for minors); *Athenaco, Ltd. v. Cox*, 335 F. Supp. 2d 773, 781 (E.D. Mich. 2004)

(finding works including *Lolita*, *Sanctuary*, *Of Mice and Men*, *The Catcher in the Rye*, *Portnoy's

Complaint*, and *Joy of Sex* not to be harmful to minors); *Baker v. Glover*, 776 F. Supp. 1511,

1516 (N.D. Ala. 1990) (finding bumper sticker with phrase "Eat Shit" not to be harmful to

minors).

## V.   JUDGMENT SHOULD BE GRANTED TO DEFENDANT ON COUNTS TWO AND THREE OF THE AMENDED COMPLAINT

Plaintiffs raise two additional causes of actions in their complaint:  on regarding the

rights of older minors and one regarding the right of anonymous access to the internet.

Defendant has previously set forth his arguments regarding these two claims in his Motion for

Partial Judgment on the Pleadings.  The Court denied Defendant's motion, without prejudice, as

it believed the case may be disposed of without deciding these constitutional issues.  To the

extent that the Court will rule on these claims at trial, Defendant incorporates by reference the

arguments contained in his memorandum in support of his motion to dismiss and reply

memorandum addressing these claims.[7]

---

[7] Defendant also filed a motion to dismiss for lack of standing.  While the Court denied
Defendant's motion to dismiss, Plaintiffs still must demonstrate that each Plaintiff has standing at
trial.  *See* Order dated October 13 (Docket No. 335).  Defendant believes that Plaintiffs will not
meet their burden to demonstrate standing at trial, and incorporates herein the arguments
contained in his previous motion to dismiss on standing.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

PATRICK L. MEEHAN
United States Attorney
RICHARD BERNSTEIN
Assistant U.S. Attorney

THEODORE C. HIRT
Assistant Branch Director
RAPHAEL GOMEZ
Senior Trial Attorney


_____/s/_____
ERIC J. BEANE
ISAAC CAMPBELL
JOEL McELVAIN
KENNETH SEALLS
JAMES TODD
TAMARA ULRICH
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
(202) 616-2035

Attorneys for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 17 2006, I caused the foregoing Trial Brief to be filed electronically and therefore to be available for viewing and downloading from the Electronic Case Filing system.  The electronic filing of these documents constituted service of these documents on the following liaison counsel:

Aden Fine
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004


    /s/ Tamara Ulrich
TAMARA ULRICH